**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| FINESSE WIRELESS, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:21-cv-00316-JRG-RSP |
| | § | (Lead Case) |
| AT&T MOBILITY, LLC, | § | |
| | § | |
| *Defendant*. | § | |

## <u>MEMORANDUM ORDER</u>

Before the Court are five motions to strike and one motion to supplement. Plaintiff Finesse Wireless, LLC filed three of the motions to strike: (1) Motion to Exclude Late-Produced Evidence and to Strike Certain Opinions of Defendants' Damages Expert Dr. Becker (Dkt. No. 129); (2) Motion to Strike and Exclude References, Opinion, and Argument Relating to Ericsson's Dismissal (Dkt. No. 130); and (3) Motion to Strike Expert Disclosure and Exclude Testimony of Arnaud Pierrard (Dkt. No. 131). Intervenor Defendant Nokia of America Corporation filed the remaining two motions to strike: (1) Motion to Strike the Expert Testimony of Dr. Coleman Bazelon (Dkt. No. 132); and (2) Motion to Strike the Expert Testimony of Jonathan Wells (Dkt. No 133). Nokia also filed the Motion for Leave to Supplement Expert Reports (Dkt. No 215).

The Court heard oral arguments with respect to the motion to strike (Dkt. No. 130) and the motion to supplement (Dkt. No. 215) at the Pretrial Conference hearing on November 28, 2022. This Order merely supplements the Court's rulings as announced into the record from the bench. For the following reasons, the motion to supplement (Dkt. No. 215) and the motion to

strike (Dkt. No. 131) are **DENIED**, and the remaining motions to strike (Dkt. Nos. 129, 130, 132, 133) are **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I.    Background

On February 24, 2021, Plaintiff Finesse Wireless, LLC initially filed suit against AT&T Mobility, LLC ("AT&T") and Cellco Partnership d/b/a Verizon Wireless ("Verizon") (consolidated Case No. 2:21-cv-00063) alleging that the AT&T and Verizon wireless networks employ base stations that infringe U.S. Patent Nos. 7,346,134 ("'134 Patent") and 9,548,775 ("'775 Patent") (collectively, the "Asserted Patents"). The initial case progressed through part of fact discovery, and then the parties agreed to dismiss the case because of a potential standing issue.

On August 23, 2021, Finesse refiled suit against AT&T and Verizon,[1] again alleging that their networks employ certain base stations capable of mitigating passive intermodulation (PIM) interference in a manner that infringes the Asserted Patents. Dkt. No. 1. The parties agreed that fact discovery from the initial case would apply to the instant case. Dkt. No. 42 at ¶12(f). In addition, Nokia and Ericsson intervened as defendants because they manufacture components used in the accused base stations of the AT&T and Verizon networks. Dkt. No. 33. Over the course of this suit, Finesse has reached agreements with Ericsson[2] and Verizon,[3] leaving AT&T, and Nokia (collectively, "Defendants") as the remaining defendants in suit. Accordingly, Finesse now accuses certain Nokia devices and systems incorporated in AT&T's network of infringing the Asserted Patents.

---

[1] Verizon was added to this suit through a consolidation order.
[2] Dkt. No. 101.
[3] Dkt. No. 232.

## II.        Motion to Strike and Exclude References, Opinion, and Argument Relating to Ericsson's Dismissal (Dkt. No. 129)

On August 4, 2022, Finesse and Ericsson filed a covenant not to sue and joint motion to dismiss, which the Court granted. Dkt. Nos. 100, 101. Finesse seeks to exclude references, opinion, and argument relating to Ericsson's dismissal from the case. Dkt. No. 129 at 1.[4]

Finesse argues that the agreement is not a license, Ericsson's dismissal does not reflect the value of the technology, Defendants' experts draw improper inferences and conclusions from Ericsson's dismissal, and any reference to Ericsson's dismissal is irrelevant and prohibited under FRE 403, 408, 702, and 703. *Id.* at 2–4.

Defendants respond that Finesse seeks to strike highly relevant information for valuing the invention, Finesse puts Ericsson at issue by discussing the now-dismissed Ericsson P614 product in Finesse's expert reports, and the covenant not to sue is relevant to the licensing terms of a PIMC product. Dkt. No. 152 at 5–14.

Here, the Court holds that Ericsson's status as a former party to the suit is simply not relevant. While Ericsson's P614 product and some terms of the covenant not to sue may have probative value to the reasonable royalty analysis, Ericsson's former presence in and dismissal from the suit does not. Fed. R. Evid. 402, 403.

Consistent with the Court's ruling on Plaintiff's MIL No. 3 (Dkt. No. 230 at 2), the Court **GRANTS** the motion to the extent that Defendants' invalidity expert, James Proctor, and Defendants' damages expert, Dr. Stephen Becker, specifically reference the covenant not to sue Ericsson or Ericsson's presence in and dismissal from this suit. Thus, the Court **STRIKES** portions of their reports to the same effect. The court **DENIES** the motion as to opinions or argument based on the Ericsson P614 product.

---

[4] Citations correspond to document numbers and page numbers assigned through ECF.

III.    **Motion to Exclude Late-Produced Evidence and to Strike Certain Opinions of Defendants' Damages Expert Dr. Becker (Dkt. No. 130)**

Fact discovery closed on August 15, 2022, with opening expert reports due on August 23, 2022. Dkt. No. 106 at 4. After receiving Finesse's opening damages report, Defendants performed additional testing for new data and information contained in AT&T_FW_00200948-AT&T_FW_00200951 (the "Disputed Documents"). Dkt. No. 130 at 6–7. The Disputed Documents include four documents: (1) September 2022 Ohio Test Data (AT&T_FW_00200951); (2) National Market Data (AT&T_FW_20200950); (3) Site Mitigation Costs (AT&T_FW_00200948); and (4) Excess Capacity Data (AT&T_FW_00200949). Dkt. No. 155 at 8–10. On September 23, 2022, Defendants produced the Disputed Documents along with the rebuttal report of Defendants' damages expert, Dr. Stephen Becker, who relies on the Disputed Documents. Dkt. No. 130 at 6–7 (citing multiple paragraphs and exhibits of Dkt. No. 130-6, "Becker Report").

During fact discovery, Defendants also found consolidated deal notes from Intellectual Ventures memorializing Finesse's offer to sell the patents in suit to Intellectual Ventures in 2011. Dkt. No. 155-12. Dr. Becker refers to the consolidated deal notes in his report. Dkt. No. 155 at 17.

Finesse seeks to exclude the Disputed Documents and strike Dr. Becker's opinions relying on the Disputed Documents. Dkt. No. 130 at 8–15. Finesse also seeks to exclude Intellectual Ventures' consolidated deal notes and strike Dr. Becker's opinions as to them. *Id.* Thus, the issues before the Court are (1) whether the late production of the Disputed Documents was substantially justified or harmless, and (2) whether the Intellectual Ventures consolidated deal notes are too unreliable to be admissible or form the basis of expert testimony.

### A. The Disputed Documents and Opinions Relying on the Disputed Documents

Were Defendants substantially justified in producing the Disputed Documents after the close of fact discovery? The Court holds that they were substantially justified in their late production of the National Market Data, Site Mitigation Costs, and Excess Capacity Data (collectively, "Custom Reports"), but not as to the late production of the September 2022 Ohio Test Data.

"If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Whether to admit or exclude expert testimony pursuant to Rule 37 is a matter left to the discretion of the trial court. *E.g., Primrose Operating Co. v. National American Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004). The Fifth Circuit applies a four-factor test to determine whether to find a violation substantially justified or harmless: (1) the justification for why the disclosure should be considered timely; (2) the importance of the evidence, (3) the prejudice to the party opposing the introduction of the evidence; and (4) the possibility of curing such prejudice by granting a continuance. *Id.* at 564.

### 1. Justification for Why the Disputed Documents Should be Considered Timely

First, Finesse argues that Defendants were not justified in their untimely disclosure of the Disputed Documents regardless of Finesse's damages model. Dkt. No. 130 at 12–13. According to Finesse, Defendants were obligated to produce the information without a request pursuant to ¶ 3 of the Discovery Order, Finesse specifically requested data showing an "incremental benefit"

of PIMC technology, and the information contained in the Disputed Documents is at least relevant to *Georgia-Pacific* factor 11. *Id.* at 12 (citing Dkt. No. 130-2 at ¶¶ 54, 65, 66; Dkt. No. 130-4). Second, Finesse argues that it put Defendants on notice as to the "salvaged spectrum" damages theory because Defendants knew Finesse had no relevant licenses, and Finesse sought information about the capacity of Defendants' wireless networks and incremental costs for additional capacity. *Id.* at 13 (citing *Tantivy Comms., Inc. v. Lucent Techs. Inc.*, 2005 WL 2860976, *3 (E.D. Tex. Nov. 1, 2005)).

In response, Defendants parse their arguments as to the Disputed Documents. Dkt. No. 199 at 2–4. Defendants assert that the September 2022 Ohio Test Data was timely produced from tests conducted during expert discovery and included data that did not previously exist. *Id.* As far as the remaining documents of the Disputed Documents (*i.e.*, the Custom Reports), Defendants argue that they could not have known the information in the Custom Reports would be responsive to any of Finesse's requests during fact discovery. Dkt. No. 155 at 5; Dkt. No. 199 at 2. Defendants assert that they were unaware of Finesse's damages theory because Finesse did not respond to Nokia's Interrogatory No. 7 (requesting Finesse's method of calculating damages) until the end of fact discovery. *Id.* (citing Dkt. No. 155-11 at 9)*.* In essence, Defendants argue that they could not have anticipated the need to produce data during fact discovery that rebuts an incorrect yet foundational assumption of Finesse's "salvaged spectrum" damages theory. *Id.* at 6 (citing *Wapp Tech Ltd. P'ship v. Seattle SpinCo, Inc.*, No. 4:18-CV-469, 2021 WL 391302, at *3 (E.D. Tex. Feb. 4, 2021)).

Here, the Court agrees with Defendants, except as to the September 2022 Ohio Test Data. The September 2022 Ohio Test Data contains information that could and should have been produced during fact discovery.

Turning to the Custom Reports, the Griffith Letter of July, 2021 (Dkt. No. 130-2) lists 74 categories and 30 subcategories of documents for more than 50 different devices in AT&T's network, and three broad requests for "incremental benefit." This letter and other communications from Finesse hardly amount to a specific request for information in the Disputed Documents. Similarly, Finesse delaying its response to Interrogatory No. 7 indicates that Defendants were not notified of Finesse's damages model until the end of fact discovery. Finesse's reliance on *Tantivity* is unpersuasive because Finesse did not clearly notify Defendants as to the relevance of the information in the Disputed Documents. 2005 WL 2860976, *3 (E.D. Tex. Nov. 1, 2005). Accordingly, this factor weighs in favor of the late production of the Custom Reports being justified.

2.      *The Importance of the Disputed Documents*

Finesse argues that the Disputed Documents are unimportant because there are similar timely-produced documents to support Defendants' damages theory. Dkt. No. 130 at 15–16. For example, Finesse asserts that the September 2022 Test Data is consistent with the December 2021 Ohio Test Data, and therefore Defendants fail to justify the new production. *Id.* at 9, 16. Finesse further argues that Defendants timely produced similar information to the Custom Reports. *Id.* at 8–9.

Defendants respond that the September 2022 Ohio Test Data included different testing parameters, such as a larger set of Nokia radios and random sampling to avoid claims of "cherry-picking" sites where PIM was occurring. Dkt. No. 155 at 8. Defendants argue that the Custom Reports are critical because they directly rebut the unsupported and incorrect assumption underlying Finesse's damages theory that was only disclosed at the end of fact discovery. Dkt. No. 155 at 14–15; Dkt. No. 199 at 2.

Here, the Court agrees with the Defendants, except as to the September 2022 Ohio Test Data. Slightly adjusting test parameters to preempt an argument is an insufficient basis to demonstrate the importance of the September 2022 Ohio Test Data—especially when similar test data was timely produced.

With respect to the Custom Reports, the Court agrees that the information is undoubtedly important to rebut Dr. Bazelon's theory and underlying assumptions. This factor also weighs in favor of the late production of the Custom Reports being justified.

### 3.    The Prejudice to Finesse

Finesse argues that it has suffered prejudice because Finesse no longer has an opportunity to explore the late-produced information and this case is near trial. Dkt. No. 130 at 13–15. Finesse also argues that the prejudice is significant because of Dr. Becker's extensive reliance on the Disputed Documents. *Id.* at 14 (citing *United States Auto. Assoc. v. PNC Bank N.A.*, No. 2:20-cv-00319-JRG-RSP, Dkt. No. 592 at 12 (E.D. Tex. Apr. 17, 2022). Finesse asserts that it was further prejudiced by Defendants' alleged destruction of National data. *Id.* at 14–15.

Defendants respond that there is no prejudice to Finesse because Defendants produced similar types of information to the Disputed Documents during fact discovery, which Finesse had the opportunity to explore. Dkt. No. 155 at 15–16. Defendants further argue that Finesse has not explained the relevance of AT&T's voluminous daily performance data. *Id.* at 16.

Here, the Court holds that Finesse would be prejudiced by the introduction of the Disputed Documents. While Finesse's spoliation argument is meritless and does not impact the prejudice, Dr. Becker relies extensively on the late-produced information, and Finesse has essentially no opportunity to explore the evidence. Accordingly, this factor weighs against the late production of the Custom Reports being justified.

4.      *The Possibility of Curing Finesse's Prejudice by Granting a Continuance*

The parties agree that a continuance is unnecessary as Finesse asserts it will suffer prejudice regardless of whether the information is added, or trial is delayed. Dkt. No. 130 at 15; Dkt. No. 155 at 17. Accordingly, this factor is neutral.

In sum, the Court holds that the justification for why the production should be considered timely, and the importance of the information warrants inclusion of the Custom Reports. The Court therefore **DENIES** the motion with respect to the Custom Reports and opinions relying on the Custom Reports. The Court **GRANTS** the motion and with respect to the September 2022 Ohio Data and **STRIKES** opinions in the report relying on the same.

### B.      *Intellectual Ventures Consolidated Deal Notes*

Are the Intellectual Ventures consolidated deal notes too unreliable to be admissible or form the basis of expert testimony? The Court holds that they are not on both counts.

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed, even if the underlying evidence is inadmissible. Fed. R. Evid. 703. An opposing party's statement is non-hearsay exemption. Fed. R. Evid. 801(d)(2). A record of a regularly conducted activity also qualifies as an exception to hearsay if certain criteria are met. Fed. R. Evid. 803(6).

In the briefing and at the Pretrial Conference of November 28, 2022, the parties argued as to the admissibility of Intellectual Ventures' consolidated deal notes capturing negotiations with Finesse's owner, Francis Smith, and Finesse's CEO, Mark Chapman. The parties also argued as to the admissibility of Dr. Becker's opinions relying on the notes. In essence, Finesse argued that the notes are hearsay, the probative value of the notes does not substantially outweigh the

prejudicial effect, and therefore the notes should be excluded along with Dr. Becker's opinions as to them. Dkt. No. 130 at 16–18. Defendants responded that the notes qualify under the 806(6) exception to hearsay because these notes fall squarely within Intellectual Ventures' business of transacting IP, the information contained within the notes qualifies as an opposing party's statement, and the notes are highly relevant to the hypothetical negotiation analysis. Dkt. No. 155 at 17–19.

At the Pretrial Conference of November 28, 2022, Finesse conceded that the statements contained within the notes qualify as an opposing party's statement and therefore do not qualify as hearsay. Dkt. No. 231 at 88–89; *see* Fed. R. Evid. 801(d)(2). In addition, the Court held that the notes qualify as business records under Rule 803(6) because they were kept within the database of an entity that is in the business of making negotiations and keeping track of them in the database from which the records were excerpted. Accordingly, the motion is **DENIED** with respect to the consolidated deal notes and Dr. Becker's opinions relying on them.

### IV.    Motion for Leave to Supplement Expert Reports (Dkt. No 215)

After receiving the report of Finesses' damages expert, Dr. Coleman Bazelon, Defendants performed additional testing to gather the data in the Disputed Documents. On September 23, 2022, Defendants produced the Disputed Documents along with Dr. Stephen Becker's rebuttal damages report relying on the Disputed Documents. Dkt. No. 215 at 6–7. Finesse expressed concern that Defendants' data was based on "cherry-picking" specific sites where PIM was occurring, so Finesse requested *access* to run AT&T tests in NYC. *Id.* at 7–8 (emphasis added). Defendants instead gathered the data they way they thought best and now seek to supplement their expert reports with the new information. *Id.* at 4.

At the November 28, 2022 Pretrial Conference hearing, after considering Defendants' and oral arguments of counsel, the Court held that the motion is based on an improperly characterized record and fails to show good cause for the new data. Dkt. No. 231 at 143. Accordingly, the motion is **DENIED**.

## V.       Motion to Strike Expert Disclosure and Exclude Testimony of Arnaud Pierrard (Dkt. No. 131)

In light of the Court's Order (Dkt. No. 222) denying Finesse's request to amend its infringement contentions, Defendants have agreed not to bring Mr. Pierrard to trial. Dkt. No. 153 at 9; Dkt. No. 197 at 2. Accordingly, the Court **DENIES** the motion as moot.

## VI.      Motion to Strike the Expert Testimony of Dr. Coleman Bazelon (Dkt. No. 132)

Finesse's damages expert, Dr. Coleman Bazelon, calculates a reasonable royalty under a "salvaged spectrum" theory. Dkt. No. 156-2 at 7. Under this theory, the technology embodied in the Asserted Patents enables AT&T and Verizon to salvage spectrum that would otherwise be unusable due to passive intermodulation (PIM). *Id.* Accordingly, Dr. Bazelon estimates the amount of spectrum salvaged and a reasonable share of the value that would have accrued to Finesse if the Defendants licensed the technology. *Id.*

Defendants move to strike certain opinions of Dr. Bazelon because Defendants assert Dr. Bazelon (1) offers unreliable opinions, (2) improperly references Defendants' total revenues, and (3) calculates damages using the UHFA (AB) product that is not accused of infringement. Dkt. No. 132 at 8–20. Since the Court denied Finesse's request to amend its infringement contentions (Dkt. No. 222), Finesse has agreed that Dr. Bazelon will no longer testify as to the UHFA (AB) product. Dkt. No. 156 at 16. Therefore, the Court **DENIES** as moot the motion with respect to Dr. Bazelon's opinions regarding the UHFA (AB) product.

The issues remaining before the Court are (1) whether Dr. Bazelon's opinions are sufficiently reliable under Rule 702 of the Federal Rules of Evidence, and (2) whether Dr. Bazelon impermissibly references Defendants' total revenues in a manner that skews the damages horizon for the jury.

### A.    The Reliability of Dr. Bazelon's Opinions

Are Dr. Bazelon's opinions sufficiently reliable to be heard by the jury? The Court holds that they are.

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Federal Rule of Evidence 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although there are various factors that the district court may consider in determining admissibility the ultimate inquiry is whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Defendants argue that Dr. Bazelon (1) offers technical opinions outside his area of expertise and (2) includes flawed analysis relying on unsupported assumptions. Dkt. No. 132 at 8–20.

### 1.    Dr. Bazelon's "Technical" Opinions

First, Defendants argue that Dr. Bazelon offers technical opinions about how cellular networks operate without having the requisite technical qualifications and without citing to a technical source. Dkt. No. 132 at 8–10 (citing *Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1351-52, 21 U.S.P.Q.2d 1192, 1197 (Fed. Cir. 1991) and *Tubular Rollers, LLC v. Maximus Oilfield Products, LLC*, 2021 WL 5991758, *3–*5 (S.D. Tex. 2021)).

Finesse responds by highlighting Defendants' factual inaccuracies, emphasizing Dr. Bazelon's qualifications, and distinguishing the case law. Dkt. No. 156 at 4–8 (citing *Jones v.*

*Harley-Davidson, Inc.*, No. 2:14-CV-694-RWS-RSP 2016 WL 5234745, at *3 (E.D. Tex. Sept. 22, 2016)).

Here, the Court holds that Dr. Bazelon's opinions are sufficiently within his area of expertise to help the jury understand the evidence. Dr. Bazelon has published articles and presented evidence on wireless issues to the FCC, Congress, and in several courts. Dkt. No. 156-2 at 6, 74–118. He has consulted and testified regarding wireless auctions, spectrum valuation, and spectrum management. *Id*. In contrast to *Abbott Laboratories* and *Tubular Rollers*, Dr. Bazelon has experience and knowledge uniquely tailored to Finesse's "salvaged spectrum" damages theory. *Id.* Cross-examination is the appropriate means to determine the accuracy of Dr. Bazelon's opinions and assumptions concerning the underlying technology. *Daubert*, 509 U.S. at 596.

### 2.  *Dr. Bazelon's Unsupported Assumptions*

Second, Defendants argue that Dr. Bazelon's opinions include unsupported assumptions that require speculative leaps and are not tied to the facts of the case. Dkt. No. 132 at 9–10 (citing *Power Integrations, Inc. v. Fairchild Semiconductor* 711 F.3d 1348, 1373 (Fed. Cir. 2013) *cert. denied,* 139 S. Ct. 1265 (2019), and *ACP Master, Ltd. v. SprintCorp.*, 2017 WL 3421142, at *38 (Del. Ch. July 21, 2017).

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer…." 35 U.S.C. § 284. "A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations,* 904 F.3d at 977. Accordingly, royalties must be apportioned between the infringing and non-infringing features of the product. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *VirnetX,*

*Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Uniloc*, 632 F.3d at 1318; *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 136–37 (Fed. Cir. 2009). If the patentee fails to tie the theory to the facts of the case, the testimony is excluded. *Uniloc*, 632 F.3d at 1315.

Defendants argue that Dr. Bazelon relies on three assumptions not tied to the facts of the case: (1) Nokia's remote radio heads with PIMC software activated are experiencing PIM; (2) Ericson and ISCO products can be used to calculate damages for Nokia; and (3) the spectrum cost can be used as a proxy for PIMC savings when real-world evidence indicates carriers use site hygiene to address PIMC. *Id.* at 10–19.

Finesse asserts that Defendants mischaracterize Dr. Bazelon's opinions. Dkt. No. 156 at 8. Finesse argues that Dr. Bazelon focuses on certain Nokia test data to determine the actual PIM cancelled and then he calculates a per-remote radio head royalty rate for the hypothetical negotiation. *Id.* at 9–10. Finesse also argues that Dr. Bazelon does not rely on Ericsson and ISCO products, but instead relies on AT&T's measured relationship between key performance indicators (KPIs) and PIM levels to determine the performance of AT&T's network. *Id.* at 10–11. Furthermore, Finesse argues that site hygiene is not a substitute to address internal PIM, and Dr. Bazelon properly values the improvement of the spectrum currently owned by AT&T by comparing the value of the spectrum with and without PIMC. *Id.* at 13-14.

Here, the Court holds that Dr. Bazelon's opinions are sufficiently supported and tied to the facts of the case. Dr. Bazelon uses Nokia test data for the performance of Nokia equipment that does not provide details on throughput. Dkt. No. 156-2 at ¶ 130. Since throughput levels are missing from the Nokia test data, Dr. Bazelon then uses the AT&T standalone test data as a proxy to predict throughput levels in the Nokia equipment. *Id.* Dr. Bazelon recognizes that the AT&T test data quantifies the effectiveness of the ISCO and Ericsson P614 products that are no

longer accused, but he notes that the AT&T test data remains relevant because it also quantifies the KPI degradation due to PIM generated on the downlink signal. *Id.* at ¶¶ 59–60, 130–131. In addition, Dr. Bazelon explains that he only considers the subset of test results from the Nokia data in which PIM is an active issue. *Id.* at ¶ 137. Dr. Bazelon also cites to Dr. Wells who states that none of the hygiene techniques cancels internal PIM. *Id.* at ¶ 43.

The types of speculative leaps that occur in the cases Defendants cite are not present here. *Power Integrations, Inc.*, 711 F.3d at 1373 (Fed. Cir. 2013) (holding that the district court erred in admitting Dr. Troxel's expert testimony because both the underlying data source and methodology were unreliable); *ACP Master, Ltd.*, 2017 WL 3421142, at *38 (Del. Ch. July 21, 2017) (refusing to adopt expert valuation analysis because it relied on four separate assumptions, one of which was a flawed engineering model that itself depended on a series of assumptions). Rather, Dr. Bazelon offers opinions that are based on Defendants' testing data and evidence from discovery, and then uses that information to apportion the value attributable to the accused technology in the AT&T network, albeit in the form of an unconventional damages model.

Accordingly, the Court **DENIES** the motion to the extent it contends that Dr. Bazelon offers technical or unsupported opinions.

### B.    Dr. Bazelon's Use of Defendants' Revenues as a "Reasonableness" Check

Does Dr. Bazelon impermissibly reference Defendants' revenues? The Court holds that he does.

An alternative to the general rule of apportionment is the entire market value. *Power Integrations*, 904 F.3d at 977–78 (citing *VirnetX*, 767 F.3d at 1327). "The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing

several features, when the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336 (quoting *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986); *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (*en banc*). Without satisfying the entire market value rule, referencing total revenues from an allegedly infringing product "cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Uniloc*, 632 F.3d at 1320.

Defendants argue that Dr. Bazelon should not be permitted to discuss Defendants' wireless revenues (Dkt. No. 156-2 ¶¶ 115–117, Table 6) to give "context" or show the reasonableness of the royalties because doing so skews the damages horizon, and Finesse has not demonstrated that the entire market value rule applies to the accused products. Dkt. No. 132 at 19–20 (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319 (Fed. Cir. 2011)).

Finesse responds that the calculations in Table 6 of Dr. Bazelon's report are required to demonstrate how to obtain the revenues/MHz-pop per year, which is the correct measure for a reasonableness check and represents the units that would have been bargained over in the hypothetical negotiation. Dkt. No. 156 at 15. According to Finesse, the common metric to value spectrum is $/MHz-pop, and the revenue/MHz-pop and royalties/MHz-pop provide a basis for the percentage that AT&T and Verizon should pay on a per MHz-pop basis for the demonstrated need to salvage additional spectrum. *Id.*

Consistent with the Court's ruling on Defendants' MIL E (Dkt. No. 230 at 6), the Court holds that Dr. Bazelon impermissibly references Defendants' total revenues. For example, Dr. Bazelon's report states that "[t]he reasonableness of the royalties calculated can also be shown in relation to revenue AT&T and Verizon derive from their spectrum assets," and concludes the same paragraph with "[c]onsequently, 1.66 percent to 2.52 percent of revenues is not an

excessive payment for access to spectrum." Dkt. No. 156-2 at ¶ 117. Furthermore, Table 6 includes column [6], titled "Annual Wireless Revenue ($) Millions," and column 9, titled "Annual Royalty as a % of Revenue." Even if Dr. Bazelon directly compares unitized royalty and revenue values (per MHz-pop), the total revenues are still shown in Table 6 and embedded in the "reasonableness" check. Without having satisfied the entire market value rule, Dr. Bazelon cannot offer opinions referencing Defendants' total revenues, or comparing Defendants' total revenues to the royalty because doing so skews the damages horizon for the jury. *Uniloc*, 632 F.3d 1292 at 1320; *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012).

Accordingly, the Court **GRANTS** the motion to the extent that Dr. Bazelon references total revenues or compares Defendants' total revenues to any part of the reasonable royalty, and **STRIKES** such portions of the report.

### VII.    Motion to Strike the Expert Testimony of Jonathan Wells (Dkt. No 133)

On November 4, 2021, Finesse served infringement contentions. Dkt. No. 133 at 7. Finesse indicated that the "signals of interest" of the '134 Patent correspond to received signals. Dkt. No. 133-7 at 3. Finesse's infringement contentions also invoked the doctrine of equivalents at a high level and to the extent that certain elements were not literally present. Dkt. No. 133-4 at 6–9.

On August 23, 2022, Finesse served the infringement report of its technical expert, Dr. Jonathan Wells (the "Wells Report"). Dkt. No. 151 at 8. In his report, Dr. Wells generally applies the doctrine of equivalents to any claim element not literally present. Dkt. No 133 at 14 (citing multiple paragraphs of the Wells Report). Dr. Wells. also offers opinions as to the "signals of

interest" claim term and relies on source code as evidence supporting his infringement analysis throughout his report. *Id.* at 7, 16 (citing numerous paragraphs of the Wells Report).

On August 24, 2022, the Court issued the claim construction order. Dkt. No. 109. As a result of certain constructions, Finesse and Defendants jointly moved to supplement their export reports on September 2, 2022. Dkt. No. 124. Finesse sought to supplement Dr. Wells' report, and Defendants sought to amend the report of their invalidity expert, James Proctor. *Id.* The Court granted the motion (Dkt. No. 125), and Finesse served the supplemental report of Dr. Wells (the "Wells Supplemental Report") that expressly applies the doctrine of equivalents to four claim limitations and revises certain opinions based on the Court's Order. Dkt. No. 151 at 9; Dkt. No. 151-3.

Defendants move to strike Dr. Wells' opinions because, according to Defendants, Dr. Wells improperly (1) introduces infringement theories not previously disclosed in the contentions (2) offers opinions that he is not qualified to render and that do not reflect his own work, and (3) provides opinions with respect to the UHFA (AB) product that is not in the case. Since the Court denied Finesse's request to amend its infringement contentions (Dkt. No. 222), Finesse has agreed that Dr. Wells will no longer testify as to the UHFA (AB) product. Dkt. No. 151 at 11. Therefore, the Court **DENIES** the motion as moot with respect to Dr. Wells' opinions regarding the UHFA (AB) product.

The issues remaining before the Court are (1) whether the Dr. Wells' infringement opinions are adequately supported by Finesse's infringement contentions, and (2) whether Dr. Wells' opinions are sufficiently reliable under Rule 702.

### A.    Dr. Wells' Opinions and Finesse's Infringement Contentions

Are Dr. Wells' opinions supported by Finesse's infringement contentions? The Court holds that they are.

"[A] party claiming patent infringement must serve on all parties" infringement contentions. P.R. 3-1. These "contentions must be reasonably precise and detailed . . . to provide a defendant with adequate notice of the plaintiff's theories of infringement, [but] they need not meet the level of detail required, for example, on a motion for summary judgment on the issue of infringement." *Realtime Data, LLC v. Packeteer, Inc.*, No. 6:08-cv-144, 2009 U.S. Dist. LEXIS 73217, 2009 WL 2590101, at *5 (E.D. Tex. 2009). "Nevertheless, a party may not rely on vague, conclusory language" in its infringement contentions. *Global Sessions LP v. Travelocity.com LP*, No. 6:10-cv-671, 2012 U.S. Dist. LEXIS 73153, 2012 WL 1903903, at *2 (E.D. Tex. 2012).

Expert infringement reports may not introduce theories not previously set forth in infringement contentions. *See Anascape, Ltd. v. Microsoft Corp.*, No. 9:060cv0158, 2008 U.S. Dist. LEXIS 111917, 2008 WL 7180756, *4 (E.D. Tex. May 1, 2008) (striking portions of expert report that exceeded scope of invalidity contentions); *Visto Corp. v. Seven Networks, Inc.*, No. 2:03-cv-333, 2006 U.S. Dist. LEXIS 98445, 2006 WL 5153146, *1 (E.D. Tex. Mar. 27, 2006) (striking portions of expert report relying on prior art not disclosed in invalidity contentions). Nevertheless, the scope of infringement contentions and expert reports are not coextensive.

Infringement contentions need not disclose "specific evidence nor do they require a plaintiff to prove its infringement case," *EON Corp. IP Holdings, LLC v. Sensus USA Inc.*, No. 6:09-cv-116, 2010 U.S. Dist. LEXIS 4973, 2010 WL 346218, *2 (E.D. Tex. Jan. 21, 2010), whereas expert reports must include a complete statement of the expert's opinions, the basis and reasons for them, and any data or other information considered when forming them. Fed. R. Civ.

P. 26(a)(2)(B).

Defendants argue that (1) Dr. Wells' opinions as to the "signal of interest" term of the '134 Patent are inconsistent with Finesse's infringement contentions, and (2) Dr. Wells offers new doctrine of equivalents opinions because the infringement contentions only included a boilerplate invocation of alleged equivalents without sufficient analysis. Dkt. No. 133 at 6.

### 1.    *"Signal of interest"*

According to Defendants, the '134 Patent purports to provide a solution to unwanted interference in wireless communication systems by generating and using cancellation signals for intermodulation products. Dkt. No. 133 at 9. Defendants assert that there are "two sets of key signals discussed in the patent—those signals that *generate* the unwanted interference and those signals that are *affected* by that inference." *Id.* (emphasis in original). The '134 Patent describes "source signals" as signals that produce intermodulation products that fall inband of the signal of interest, which Defendants contend are signals that *generate* the unwanted interference. Dkt. No. 133-20 at 6:18–20. The '134 Patent describes "signals of interest" as signals that the receiver is trying to receive and send, in digital form, to the baseband processor, which Defendants contend are the signals *affected* by the interference. *Id.* at 6:7–9.

Finesse's infringement contentions map the "signals of interest" term to received signals. Dkt. No. 133-7 at 3. Dr. Wells offers opinions that a "combined TX path" is an example of a "received signal" that includes the "DL (TX) reference" signal and the "modeled PIM signal." Wells Report at ¶ 343 (quotations omitted). Dr. Wells continues to explain that the "DL (TX) reference" signal is, with respect to the receiver, a signal that the receiver is trying to receive and send, in digital form, to the baseband processor, and thus meets the agreed construction of a "signal(s) of interest." *Id*. (quotations omitted).

Turning to the arguments, Defendants argue that Dr. Wells' report maps "signals of interest" to transmitted signals rather than to received signals, which conflicts with Finesse's infringement contentions. Dkt. No. 133 at 8–12. Therefore, Defendants argue, Dr. Well's infringement theory was not properly disclosed and should be stricken. *Id.*

Finesse responds that Dr. Wells' analysis of certain Nokia products references a "DL (TX) reference" signal as the "signal of interest," but notes that Dr. Wells clearly explained that "[t]he 'DL (TX) reference' signal is, with ***respect to the receiver, a signal that the receiver is trying to receive*** and send, in digital form, to the baseband processor, and thus meets the agreed construction of a "signal of interest." Dkt. No. 151 at 5 (emphasis in original) (citing Wells Report at ¶ 343). Finesse further argues that Defendants' expert was perfectly able to understand Finesse's infringement theory and offer rebuttal opinions to it. *Id.* at 6.

Here, the Court agrees with Finesse. The parties agreed to a construction for the "signals of interest" term (Dkt. No. 88-1 at 1–5), and the '134 Patent itself states that a "signal of interest" is "with respect to the receiver, a signal that the receiver is trying to receive and send, in digital form, to the baseband processor." Dkt. No. 133-20, 6:7–9. In his report, Dr. Wells reproduces a figure from a Nokia document showing the "DL (TX) reference" signal as being sent on a path toward a receiver ("received") rather than away from the receiver ("transmitted"). Dkt. No. 151-2 (Wells Report at ¶ 343. In addition, Dr. Wells consistently uses apostrophes around the "DL (TX) reference" signal to reflect that it does not refer to a transmit signal. *Id.* (paragraphs throughout). The Court holds that Dr. Wells' opinions as to the "signal of interest" term of the '134 Patent are supported by Finesse's infringement contentions and are therefore properly disclosed.

22

2.      *Opinions Regarding the Doctrine of Equivalents*

Before the Court issued the claim construction order, Finesse's infringement contentions and Dr. Wells' opinions included high-level invocations of the doctrine of equivalents. Dkt. No. 133-4 at 6–9; Wells Report (multiple paragraphs). After the Court issued the claim construction order, Dr. Wells prepared a supplemental report that expressly applies the doctrine of equivalents to four claim limitations and revises certain opinions based on the Court's order. Dkt. No. 151 at 9; Dkt. No. 151-3 (Wells Supplemental Report).

Defendants argue that Finesse's boilerplate paragraphs were insufficient to establish a doctrine of equivalents theory in Finesse's infringement contentions, and similar boilerplate language in Dr. Wells' opening report was insufficient to support Finesse's doctrine of equivalents theory. Dkt. No. 133 at 13–14. In addition, Finesse never amended or supplemented its infringement contentions to the specificity required by P.R. 3-1(d). Dkt. No. 133 at 14. Therefore, according to Defendants, any opinions in Dr. Wells' opening report applying the doctrine of equivalents should be stricken. *Id.* at 15.

Finesse responds by pointing out that the opening expert report deadline occurred before the Court issued the claim construction order, the parties agreed to serve supplemental reports after receiving the claim construction order, and Dr. Wells' supplemental report provides more detail with respect to certain doctrine of equivalents arguments. Dkt. No. 151 at 8–11. Nevertheless, Finesse agrees to limit Dr. Wells' doctrine of equivalents opinions to those articulated in his supplemental report. *Id.* at 11.

Here, the Court holds that the doctrine of equivalents assertion in Finesse's infringement contentions satisfied the notice requirements under the circumstances. Similarly, because Dr. Wells' opening report was due before the claim construction order, it is understandable that Dr.

Wells did not include detailed analysis as to the doctrine of equivalents. Therefore, the Court holds that Dr. Wells' doctrine of equivalents opinions in his supplemental report are adequately supported by Finesse's infringement contentions.

Accordingly, the Court **DENIES** the motion with respect to Dr. Wells' opinions about infringement of the '134 Patent and Dr. Wells' doctrine of equivalents opinions in his supplemental report, and **GRANTS** the motion with respect to Dr. Wells' doctrine of equivalents opinions that solely appear in his opening report.

### A.    *The Reliability of Dr. Wells' Opinions*

Are Dr. Wells' opinions sufficiently reliable under Rule 702? The Court holds that they are.

As previously discussed, expert testimony is admissible if it satisfies requirements of Rule 702 of the Federal Rules of Evidence. Notably, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Defendants argue that Dr Wells (1) improperly incorporates by reference Finesse's infringement contentions and (2) incorporates another undisclosed expert's analysis regarding Nokia's source code into his report. Dkt. No. 132 at 8–20.

### 1.    *Incorporation of Infringement Contentions*

Paragraph 11 of Dr. Wells' report states "I incorporate by reference the infringement contentions ('Infringement Contentions') included in Exhibits 3-12, as well as any references therein, to this report." Wells Report at 11.

Defendants argue that Dr. Wells adopts Finesse's infringement contentions and conclusions without analyzing them, and without indicating what purpose they serve in his

analysis or opinions. Dkt. No. 133 at 12. Therefore, according to Defendants, Dr. Wells incorporation by reference fails to satisfy the requirements of Rule 702 and will not help helpful to the jury. *Id.* (citing *Zoch v.Daimler, A.G.*, No. 4:17-CV-578, 2018 WL 4610569, at *7-8 (E.D. Tex. Sept. 25, 2018) and *Tech Pharm. Serv., LLC v. Alixa Rx LLC*, No. 4:15-CV-766, 2017 WL 3388020, at *2 (E.D. Tex. Aug. 3, 2017).

Finesse responds by distinguishing the cases Defendants cite as circumstances in which the expert adopted opinions developed entirely by counsel, whereas Dr. Wells provides his own detailed analysis of infringement. Dkt. No. 151 at 7. Finesse asserts that Dr. Wells incorporates the infringement contentions charts into his report in case supplemental evidence is needed for certain opinions. *Id.* at 8. Finesse asserts that this provides fair notice to Defendants as to what Dr. Wells may cite at trial, and any issues related to Dr. Wells' lack of involvement in the contentions is a proper issue to be raised at trial. *Id.* (citing *Salazar v. AT&T*, No. 2:20-cv-4-JRG, ECF No. 227, at 3 (E.D. Tex. July 28, 2021)).

Here, the Court agrees with Finesse. Defendants fail to identify any specific parts of Dr. Wells' report that rely on the incorporation of the infringement contentions. There is no showing of prejudice from the incorporation by reference.

### 2.     *Opinions on Source Code*

Dr. Wells' report contains various citations to Nokia's source code to support his infringement opinions. Wells Report (citations throughout). During depositions, Dr. Wells admitted that he has experience with source code, but certain of his opinions rely on Finesse's source code expert, Jay Bhatia. Dkt. No. 133-3 at 18–31; Dkt. No. 151-4 at 3-5. While Dr. Wells visited Nokia's counsel's office to review source code himself, he discussed the code with Mr. Bhatia who also helped Dr. Wells draft sections of his report regarding source code. Dkt. No.

151 at 12. Finesse did not offer Mr. Bhatia for depositions. Dkt. No. 133 at 17.

Defendants argue that Dr. Wells is unqualified to offer opinions related to source code, he relies on Mr. Bhatia's source code analysis, Mr. Bhatia wrote portions of Dr. Wells' opinions, and Defendants did not have an opportunity to depose Mr. Bhatia. Dkt. No. 133 at 16–17. Therefore, according to Defendants, Dr. Wells' opinions derived from his review of and citations to the source code are unreliable and should be stricken. Dkt. No. 133 at 16.

Finesse responds that Mr. Bhatia's role in this case was limited to helping Dr. Wells identify relevant source code, understand the source code, and assist drafting portions of Dr. Wells' report regarding the code. Dkt. No. 151 at 12. Finesse contends that Dr. Wells offers his own opinions as to the source code—and he testified to that effect in his deposition. *Id.* (citing Dkt. No. 155-4 at 137:19–23).

Here, the Court holds that Dr. Wells' opinions relying on the source code are sufficiently reliable. While Dr. Wells sought assistance as to the source code underlying his opinions, Defendants can explore the accuracy of his opinions as to the source at trial. *Daubert*, 509 U.S. at 596.

Accordingly, the Court **DENIES** the motion with respect to Dr. Wells' incorporation by reference of Finesse's infringement contentions and with respect to Dr. Wells' opinions based on source code.

**VIII.   Conclusion**

For the reasons previously discussed, the motion to supplement (Dkt. No. 215) and the motion to strike (Dkt. No. 131) are **DENIED**, and the motions to strike (Dkt. Nos. 129, 130, 132, 133) are **GRANTED-IN-PART** and **DENIED-IN-PART**.

**SIGNED this 21st day of December, 2022.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE