1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                     MARSHALL DIVISION

3    FINESSE WIRELESS, LLC,        (  CAUSE NO. 2:21-CV-316-JRG
                                    )
4              Plaintiff,          (
                                    )
5    vs.                           (
                                    )
6    AT&T MOBILITY, LLC, et al.,   (  MARSHALL, TEXAS
                                    )  JANUARY 9, 2023
7              Defendants.         )  8:30 A.M.
     _____

8

9                          VOLUME 1

10   _____

11                     TRIAL ON THE MERITS

12          BEFORE THE HONORABLE RODNEY GILSTRAP
             UNITED STATES CHIEF DISTRICT JUDGE

13   _____

14

15

16

17

18

19

20

21               SHAWN McROBERTS, RMR, CRR
22                 100 E. HOUSTON STREET
                 MARSHALL, TEXAS  75670
23                   (903) 923-8546
             shawn_mcroberts@txed.uscourts.gov
24

25

```
 1                        A P P E A R A N C E S

 2          FOR THE PLAINTIFF:      SUSMAN GODFREY, LLP - HOUSTON
                                    1000 LOUISIANA ST., SUITE 5100
 3                                  HOUSTON, TEXAS  77002
                                    (713) 651-9366
 4                                  BY: MS. MENG XI
                                        MR. JOSEPH GRINSTEIN
 5
                                    WARD, SMITH & HILL, PLLC
 6                                  1507 BILL OWENS PARKWAY
                                    LONGVIEW, TEXAS  75604
 7                                  903-757-6400
                                    BY:  MS. ANDREA FAIR
 8                                       MR. JOHNNY WARD

 9          FOR THE DEFENDANT:      BAKER BOTTS, LLP - DALLAS
            (AT&T)                  2001 ROSS AVENUE, SUITE 900
10                                  Dallas, TEXAS  75201-2980
                                    (214) 953-6747
11                                  BY:  MR. DOUG KUBEHL

12                                  THE DACUS FIRM, PC
                                    821 ESE LOOP 323, SUITE 430
13                                  TYLER, TEXAS  75701
                                    (903) 705-1117
14                                  BY:  MR. DERON DACUS

15
            FOR THE DEFENDANT:      QUINN EMANUEL URQUHART &
16          (NOKIA)                 SULLIVAN, LLP - CHICAGO
                                    500 WEST MADISON, SUITE 2450
17                                  CHICAGO, ILLINOIS  60661
                                    (312) 705-7400
18                                  BY:  MS. BRIANNE STRAKA
                                         MS. DAVE NELSON
19
20          OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                                    100 E. HOUSTON STREET
21                                  MARSHALL, TEXAS  75670
                                    (903) 923-8546
22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| FRANCIS SMITH | |
|     Direct By MS. XI ..................................................... | 198 |
|     Cross By MR. NELSON ............................................... | 254 |
|     Redirect By MS. XI ............................................... | 277 |
| MICHAEL CALLOWAY | |
|     Direct By BY VIDEO DEPOSITION .................................. | 283 |
| DAVID JOHN BREWER | |
|     Direct By BY DEPOSITION ........................................ | 295 |
| ALEXANDER JAMES CASILLAS | |
|     Direct By BY DEPOSITION ........................................ | 299 |

1          THE COURT:  Thank you.  Be seated, please.

2     Good morning, ladies and gentlemen.  It's good to see you

3  again.  Welcome back.  I appreciate, again, as I know the

4  parties and counsel do, your cooperation.  Even though you

5  were here Friday, it's good to see you again on Monday

6  morning.

7     As I told you last Friday, my name is Rodney Gilstrap.

8  I'm the chief United States district judge here in the U.S.

9  District Court for the Eastern District of Texas.  I have

10  lived in Marshall since 1981.  I practiced law in this area in

11  this general East Texas area for 30 years before I was

12  nominated by the president and confirmed by the Senate as a

13  United States district judge.

14     I've been on the bench here since 2011, and I'll start

15  this morning with a confession.  They say confessions are good

16  for the soul.  I was not born in Texas, ladies and gentlemen,

17  but I got here just as quick as I could.  At the ripe old age

18  of 18, I left Florida for Waco, Texas, to enroll as a student

19  at Baylor University.  I stayed there and completed my

20  undergraduate degree, and then I moved across the street to

21  Baylor Law School and attended law school for the next three

22  years there.

23     I am married.  I had two children.  We lost one a few

24  months ago.  They are both grown.  And my wife owns and

25  operates a retail floral business here in Marshall.

1        Now, I tell you all these things about me because in a

2    few minutes as a part of this process, I'm going to ask each

3    of you to tell all of us similar type information about each

4    of you.  And I think you're entitled to know as much about me

5    as I'm shortly going to find out about each of you-all.

6        We are engaged or about to be engaged this morning in the

7    selection of a jury in the civil case involving allegations of

8    patent infringement.  If you'd indulge me, though, for just a

9    minute, I'd like to briefly review with you at this juncture

10   how we came to have our American civil jury trial system.

11       If you go back in ancient history, if you start with the

12   first five books in the Old Testament, the Pentateuch, you

13   will find that the ancient Hebrew nation impaneled juries to

14   decide issues of property ownership and property value.

15       The Greeks, the ancient Greeks, began using a jury system

16   about 1500 B C.  The Romans, as with many other things, copied

17   the jury system from the Greeks and implemented a jury system

18   as a part of ancient Rome.  And, in fact, it was the Romans

19   that brought the jury system to Europe across the English

20   channel into what we now know as Great Britain when they

21   conquered Great Britain in the fourth century A.D.

22       Now, by the 12th century A.D., the jury system had been

23   in place in England, what we now know as England, for 800

24   years.  But in the 12th century A.D., a rather tyrannical king

25   came to the throne of England and his name was King John.  And

1   he became embroiled in various disputes with his nobles that

2   nearly led to the verge of a civil war.

3       One of those disputes was the king's efforts to do away

4   with the right to trial by jury.  Thankfully, the civil war

5   did not take place at that time, and the king and his nobles

6   resolved their many disputes, including this one, by entering

7   into a written agreement that they signed at a place in

8   England called Runnymede.  And this agreement that settled all

9   these disputes and laid out a structure for that country going

10  forward, including guarantees of the right to trial by jury,

11  is a document many of you may have heard of called the Magna

12  Carta.

13      And so you can see, ladies and gentlemen, that our

14  British forefathers who came to this continent as colonists

15  brought the jury trial system with them.  And the jury trial

16  system flourished in colonial America for over a hundred

17  years, until another tyrannical king came to the throne of

18  Great Britain.  This time his name was King George III.  I'm

19  sure you've have studied him in American history that led up

20  to our American revolutionary war.  And the king, prior to

21  that, became embroiled in many disputes with his American

22  colonists.

23      One of those disputes was King George III efforts was to

24  do away with or to substantially curtail the right to trial by

25  a jury.  In fact, ladies and gentlemen, when Thomas Jefferson

1    sat down to write the Declaration of Independence which spells

2    out -- it really was a letter to the king telling the king all

3    of the reasons why his subjects in America felt they had no

4    other option but to revolt, declare their independence, and

5    form their own independent nation, one of those reasons set

6    forth by Thomas Jefferson in the Declaration of Independence

7    for that separation between America and Britain was King

8    George III's efforts to do away with or curtail substantially

9    the right to trial by jury.

10        And as you're all aware, we did revolt against Great

11   Britain, we did form our own independent nation, and shortly

12   thereafter we adopted the governing document for our country,

13   the supreme law of the land, the Constitution of the United

14   States.

15        And immediately after the Constitution was ratified,

16   there were ten additions or amendments added to the

17   Constitution.  Many of the states made it clear they would not

18   vote to ratify the Constitution without a commitment to

19   immediately add these ten amendments.  And these ten

20   amendments you've all studied about in school.  They're called

21   the Bill of Rights.

22        And in those first ten amendments to the Constitution,

23   you will find the Seventh Amendment to the Constitution, which

24   guarantees, ladies and gentlemen, the right to every American

25   citizen to have their civil disputes resolved through a trial

1    by jury.  Those ten amendments, the Bill of Rights, were all

2    ratified in 1791.  So since 1791, well over 200 years ago,

3    every American has had a constitutionally guaranteed right to

4    have their civil disputes settled through a trial by jury.

5        So by being here this morning, with that brief background

6    and overview of how we got to have the jury trial system that

7    we're implementing today, I want you to realize in the Court's

8    view every one of you here are doing a very important part to

9    preserve, protect, and defend the right to trial by a jury as

10   part of our constitutionally guaranteed rights.

11       I always tell citizens who appear for jury duty as you

12   have this morning that, in my personal view, the jury duty or

13   jury service rendered by any citizen is the second highest

14   form of public service any American can render for their

15   country.  In my personal view, the highest form of public

16   service are those men and women that serve in our armed

17   forces.

18       Now, later in the process this morning, the lawyers for

19   both sides are going to address you.  They're going to ask you

20   questions.  I want you to understand none of them are seeking

21   to inquire unduly into your personal affairs.  Said another

22   way, none of them are trying to be nosy and to ask you about

23   things that are not relevant to this case.  They will be

24   asking you questions as a part of working with the Court to

25   secure a fair and an impartial jury from among you to hear the

1    evidence in this case.

2        I want you to also understand when the lawyers ask you

3    questions later as a part of this process, there are no wrong

4    answers, as long as the answers you give are full, complete,

5    and truthful.  As long as they're full, complete, and

6    truthful, there are no wrong answers.

7        Now, I don't know if it will happen this morning, it

8    could but it's very rare, but it's possible that you could be

9    asked a question that in your own individual view calls for an

10   answer that is so personal, that you're not comfortable

11   answering it in front of everybody else in the room.

12       If that should happen, and again I don't think it's

13   likely, but if that should happen, you have the option to

14   simply say in response you'd like to discuss that with Judge

15   Gilstrap.  And if that's your answer, then I'll provide an

16   opportunity for you to answer that outside of the presence of

17   everyone else on the panel.  But, again, that doesn't come up

18   very often, but I want you to know about it.

19       End of file 1.

20       Now, the trial in this case, ladies and gentlemen, is

21   going to begin today right after we get the jury selected,

22   seated, and sworn, and I expect that the trial will go through

23   the remainder of this week.  I also expect that we'll have a

24   verdict and the trial will be finished sometime on Friday of

25   this week.  That's my expectation.

1          Today is the 9th, and Friday -- I hope none of you are

2    superstitious, but Friday is Friday the 13th, and that's my

3    best estimate that we'll be done by that period of time.  Now,

4    that's not a guarantee, but I've been doing this a long time.

5    I've tried more than a hundred civil jury trials since I've

6    been on the bench, so I have a pretty good idea of how long

7    this is going to take.

8          Now, what I need to ask you is if there are any of you on

9    the panel that, if you were selected to serve on this jury,

10   could not be here through the remainder of this week?  And by

11   that, I mean you have a very serious conflict that would make

12   it nearly impossible for you to be here.  As I told you on

13   Friday, jury service is by its nature a sacrifice.  And I'm

14   not talking about inconvenience.  I'm not talking about

15   disruption of your ordinary routine because that's just part

16   and parcel of serving on a jury.

17         Let me give you an example.  If you or an immediate

18   family member who's dependent upon you has a surgical

19   procedure scheduled this week and that can't easily be

20   rescheduled, that would be the kind of thing that I'm asking

21   about.  If there's some reason that in your mind would make it

22   very difficult in a serious sense to be here all week if you

23   were selected to serve on this jury, then I need to know about

24   it.

25         If there's anybody that falls in that category, please

1    raise your hands and let me make a note of it.  Okay.  No. 9,

2    No. 11, No. 20, No. 25.  Anybody else?  No. 25, 20, 11, and 9.

3        Thank you very much, ladies and gentlemen.

4        At this time I'm going to call for announcements in the

5    case of Finesse Wireless, LLC., versus AT&T Mobility, LLC, and

6    others.  This is Civil Case No. 2:21-CV-316.  And, counsel, as

7    you offer your announcements on the record, please not only

8    identify yourselves but the members of your trial team and any

9    corporate representatives you have in the courtroom at this

10   time.

11       What says the Plaintiff?

12       MR. GRINSTEIN:  Your Honor, good morning, Your

13   Honor.  For Plaintiff Finesse, my name is Joe Grinstein.

14       With me at counsel table is Ms. Meng Xi, Mr. Johnny Ward,

15   Ms. Andrea Fair also, who are lawyers for our side.

16       Also, our corporate representative is with us, Mr. Frank

17   Smith.

18       And Mr. Johnny Ward will be conducting voir dire for us

19   this morning, and we are ready to proceed.

20       THE COURT:  All right.  Thank you, counsel.

21       What says the Defendant?

22       MR. DACUS:  Good morning, Your Honor.  I'm Deron

23   Dacus.  And along with Dave Nelson and Brianne Straka, we are

24   here representing AT&T and Nokia.

25       Also with us today is Adam Loddeke.  Adam is the director

1    of technical staff at AT&T.

2        And we're ready to proceed Your Honor.

3            THE COURT:  All right.  Thank you (Loddeke)

4        As I've told you, ladies and gentlemen, this case arises

5    under the patent laws of the United States, and the Plaintiff

6    in this case is claiming that it holds certain patents and

7    that those patents have been infringed by both AT&T and Nokia,

8    the Defendants in this case.

9        And let me stop here and explain something to you.  I

10   don't want to be overly technical, but the Defendant in this

11   case is AT&T Mobility.  They were sued by Finesse Wireless.

12   After the lawsuit was filed, Nokia intervened.  They came in

13   to the court and said, we want to join the lawsuit together

14   with the Defendant AT&T.  And the Court granted that.

15       So technically Nokia, which is going to be a big part of

16   this trial and they're going to participate and these lawyers

17   on this side of the room represent both AT&T and Nokia,

18   technically Nokia is what's called an intervenor because they

19   intervened or joined the lawsuit after it was originally

20   filed.

21       But for all intents and purposes, they are in the same

22   position as AT&T, they have the same set of lawyers, they're

23   going to present one set of evidence in this case, and it's

24   even possible that somewhere along the way somebody, including

25   me, might refer to them jointly as Defendants.  But

1   technically Nokia intervened after the suit was filed, and so

2   they're called an intervenor and not a defendant.  But they're

3   in the same posture and on the same side of the case with the

4   same group of lawyers defending it.  So I want to explain that

5   before we get any further in case that creates or potentially

6   could create any confusion for anybody.

7        Now, the Plaintiff contends that its patents have been

8   infringed, and the Defendant and the intervenor AT&T and Nokia

9   deny that there's been any infringement of the Plaintiff's

10   patents.  I know that all of you have seen the video last

11   Friday prepared by the Federal Judicial Center regarding

12   patent litigation and you, already having seen that, know more

13   about this kind of case than most people do when they appear

14   for jury duty.

15        Now, as I told you earlier, the lawyers for both sides as

16   a part of this jury selection process are going to ask you

17   questions, and they are doing that as a part of their efforts

18   with the Court to secure a fair, impartial jury to hear the

19   evidence.  Again, any questions they ask you will have no

20   wrong answers as long as the answers you give are full,

21   complete, and truthful.

22        If for any reason you should be asked a question in this

23   process by one of the lawyers that I think is improper or

24   irrelevant or should not be asked for any reason, I will not

25   hesitate to stop them.  But I want you to understand, ladies

1   and gentlemen, these are very experienced trial lawyers, some

2   of the most experienced trial lawyers in the United States.

3   They are well familiar with the Federal Rules of Civil

4   Procedure, the rules and the orders of this Court, and I don't

5   expect that to happen.  But I'll be watching just so you're

6   aware.

7        One thing I want to call your attention to before the

8   lawyers begin with any questioning, because I think it's

9   possible they may ask you about your ability to apply this if

10  you're selected to serve on this jury, is something we call

11  the burden of proof.

12       In a patent case like this, the jury may be called upon

13  to apply two different burdens of proof.  The jury may apply a

14  burden of proof called or known as the preponderance of the

15  evidence.  I'll say that again, the preponderance of the

16  evidence, as well as a second and different burden of proof

17  known as clear and convincing evidence.  I'll say that

18  again--clear and convincing evidence.

19       Now, when responding to any possible questions from the

20  lawyers about the burden of proof, I need to instruct you that

21  when a party has the burden of proof on any claim or defense

22  by a preponderance of the evidence, that's the first burden of

23  proof I mentioned to you, that means that you, the jury, must

24  be persuaded by the credible or believable evidence that that

25  claim or defense is more probably true than not true.

1          Let me say that again for emphasis--more probably true

2     than not true.  Sometimes this is talked about and referred to

3     as being the greater weight and degree of credible testimony.

4          Let me hopefully give you an example that may be helpful

5     to you.  In front of me is Mr. McRoberts, our court reporter.

6     In front of him, you'll see a statue in the courtroom of the

7     Lady Justice.  I think the ancient Greeks called her Justicia.

8     But she is blindfolded.  Her right hand holds the sword of

9     justice, which is lowered to her side.  Her left hand holds

10    the scales of justice raised above her.

11         Those scales of justice are what I want you to focus on,

12    ladies and gentlemen.  They are balanced and exactly equal,

13    and that's where the plaintiff and the Defendants in this

14    case, the Defendant and the intervenors, that's where all the

15    parties start out in this case--exactly in the same position,

16    balanced and equal.

17         Over the course of the trial, each side is going to put

18    on their evidence.  Think of it this way:  The Plaintiff will

19    put all of their evidence on one side, the Defendant and

20    intervenor will put all their evidence on the other side, and

21    when all the evidence has been placed on those scales, the

22    jury is going to be asked to answer certain questions.

23         And if the party who has the burden of proof on any

24    question that's been asked to the jury has those scales in the

25    jury's view have them tip toward the party who has that burden

1   of proof by a preponderance of the evidence, even if those

2   scales tip ever so slightly in that party's favor, then in

3   that event they have met their burden of proof by a

4   preponderance of the evidence.

5       Now, if the issue -- there's a second burden of proof,

6   and I'm going to talk to you about that.  The second burden of

7   proof, which I mentioned to you, is clear and convincing

8   evidence.  Clear and convincing evidence means an abiding

9   conviction that the truth of the party's factual contentions

10  are highly probable.  Let me say that for emphasis--an abiding

11  conviction that the truth of the party's factual contentions

12  are highly probable.  That is a higher standard, ladies and

13  gentlemen, than the preponderance of the evidence standard.

14      Let's go back to the same example.  Throughout, the

15  parties start out equal.  The scales start out balanced and

16  equal.  During the trial, one side's evidence goes on one of

17  those scales, and the other side's evidence goes on the other

18  side of those scales.

19      Then when the jury's asked to answer certain questions,

20  if the party who has the burden of proof on an issue has the

21  burden of proof controlled by clear and convincing evidence,

22  then for that party to prevail on that to meet their burden of

23  proof by clear and convincing evidence, those scales must tip

24  in that party's favor or direction, and they must tip more

25  than ever so slightly.  They must definitely tip in that

1    party's direction to meet the burden of proof of clear and

2    convincing evidence.

3         Now, in addition to these two burdens of proof, there is

4    a third burden of proof in the law, but it has absolutely no

5    application in this case, and it's something you probably all

6    heard about on television or in the media, and that different

7    third burden of proof is called beyond a reasonable doubt.

8    Beyond a reasonable doubt is the burden of proof applied in a

9    criminal case, and it has absolutely no application whatsoever

10   in a civil case such as this one.  In this case, the two

11   burdens of proof that the jury who is selected will apply to

12   the evidence are the preponderance of the evidence and clear

13   and convincing evidence.

14        Clear and convincing evidence is not as high a burden of

15   proof as beyond a reasonable doubt, but it is a higher burden

16   of proof than the preponderance of the evidence.

17        Again, I give you these instructions because it is

18   possible that one or more of the lawyers will ask you about

19   your ability to faithfully apply these two standards, these

20   two burdens of proof to the evidence, if you're selected to

21   serve on this jury.

22        Now, before the lawyers address you and begin with their

23   questions, I'm going to ask each of you to tell me as much

24   about you as I told you about me when we started this morning.

25        Each of you have either in written form or on the screens

1     in front of you nine written questions.  I'm going to ask each

2     of you to answer these questions for us one at a time, and

3     we'll begin with Panel Member No. 1 and we'll go to the very

4     end of the panel, our last panel member.

5          And let me explain to you, ladies and gentlemen, how

6     we're going to do this.  We have two Court Security Officers

7     with us in the courtroom.  Mr. Mitchell is in the back and Mr.

8     Turner is here in the front.  They each have a handheld

9     microphone.  When it is your turn to answer these questions,

10    one of These Court Security Officers will bring you a handheld

11    microphone.  When you get that, please stand up -- take the

12    microphone, stand up, and then answer those nine questions.

13         And please, ladies and gentlemen, hold the microphone

14    near your mouth so that it will amplify your voices.  Don't do

15    like some jurors do and hold it down in the middle of their

16    stomach or at their waist.  It won't do any good down there.

17    Hold it up near your mouth.  This is a large room.  We've got

18    a lot of people in here.  It's important that everybody hears

19    your answers.

20         Once you stand with that microphone and answer those nine

21    questions, then when you're finished, you can have a seat.

22    We'll pass the microphone to the next person, it will be their

23    turn, they'll stand, they'll answer those nine questions using

24    the microphone.  And we'll go through that same process until

25    everyone on the panel has had an opportunity to answer these

1    nine questions.

2         Now, I want to say this.  After that's done and after the

3    lawyers go to the podium and begin their part of the process

4    of asking you questions, they may call on one or more of you

5    individually to answer a question, probably will.  If you're

6    called on individually to answer a question, please wait until

7    the Court Security Officer brings you the handheld microphone.

8    When you get it, please stand up, please hold the microphone

9    in the appropriate location, and answer the question.  Then

10   hand the microphone back to the Court Security Officer and

11   have a seat.

12        That's the way we're going to do it, and we're going to

13   do it the same way for questions that may come up individually

14   later, and we'll do it in the same way that we are doing right

15   now as you answer these nine already standard or fixed

16   questions that you have before you.

17        So with that, we'll begin the process.  We'll start with

18   panel member No. 1.

19        And if you will take her a microphone, Mr. Turner.

20        As soon as she gets it, we'll ask her to stand and answer

21   these nine questions for us.

22             THE PANEL MEMBER:  My name is Rachael Troquille.  I

23   live in Waskom, Texas.  I have one child.  I work for myself.

24   I clean houses.  Before that, I worked for Signature Cleaning

25   for 10 years.

1          THE COURT:  How long have you cleaned houses, ma'am?

2          THE PANEL MEMBER:  For myself.

3          THE COURT:  For yourself, yes.

4          THE PANEL MEMBER:  Over a year.

5          THE COURT:  Okay.

6          THE PANEL MEMBER:  High school.  I didn't graduate

7    high school.  I dropped out.

8       I'm -- Raine Ricky is my spouse.  We've been together

9    seven years.  He works for Halliburton in Louisiana.  He's

10   been there probably two years.

11      And this is my first time on a jury.

12         THE COURT:  Thank you.  Appreciate that.  If you'll

13   hand the microphone next to Mr. Gunstream, No. 2.

14      If you'll proceed.

15         THE PANEL MEMBER:  Yes.  My name is Chris Gunstream.

16   I live here in Marshall.  I have three children.

17      I used to be a -- I am a retired PGA professional.  I

18   don't work anymore.  I was in that profession for about 15

19   years.  Before that, I am retired chief petty officer from the

20   United States Navy, 24 years of service.  I have a high school

21   education.

22      My spouse is Linda Gunstream.  She is not employed.

23      And this is my first time for a jury service.

24         THE COURT:  All right, sir.  Thank you very much.

25      If you'll hand the microphone next to Panel Member No. 3,

1   Mr. Wilder.

2            THE PANEL MEMBER:  My name is Mike Wilder, and I

3   live in -- outside of Naples, Texas, in a rural area way up in

4   the northeast corner -- west corner of Cass County.  I've got

5   three adult children.

6       I work for Donaldson Manufacturing Company.  We make

7   filters.  I'm the hydraulics guy in that division.  I've been

8   in that business for 30-plus years.  I have a Bachelor's and

9   MBA from Baylor University.

10      My spouse is Stacy Wilder.  She's a teacher at Chapel

11  Hill Independent School District, small -- right outside of

12  Mt. Pleasant.  And she has been a teacher for 10 years.

13       And prior jury service, I have been on a criminal case,

14  but --

15            THE COURT:  Where was that, Mr. Wilder?

16            THE PANEL MEMBER:  Cass County.

17            THE COURT:  All right.  How long ago was that?

18            THE PANEL MEMBER:  That's been a couple of years

19  ago.

20            THE COURT:  All right.  That's your only prior jury

21  service?

22            THE PANEL MEMBER:  Yes.

23            THE COURT:  Thank you, sir.

24      Next is Panel Member No. 4, Mrs. Ragsdale.

25            THE PANEL MEMBER:  I am Judy Ragsdale.  I have two

1  children.  I live in Linden, Texas.

2       I work for Brookshire's in Daingerfield.  I'm a

3  pharmacist there.  I've worked there for 15 years.  I have a

4  Bachelor's in pharmacy.

5       I'm widowed, so do you want his name?

6            THE COURT:  No, ma'am.

7            THE PANEL MEMBER:  Okay.  And I've never been on a

8  jury.

9            THE COURT:  What did your husband do before he died?

10           THE PANEL MEMBER:  He was a truck driver, and he was

11 retired.

12           THE COURT:  Where did you get your pharmacy degree?

13           THE PANEL MEMBER:  University of Oklahoma.

14           THE COURT:  Thank you very much, ma'am.

15      Next is Panel Member No. 5, Mrs. Henderson?

16           THE PANEL MEMBER:  My name is Ann Henderson.  I have

17 two grown children.  I work for Collom & Carney Clinic in

18 Texarkana, Texas.  Been there 18 years as a lab technician.  I

19 have a year of college.

20      My spouse's name is Sam Henderson.  He works for Wellburn

21 Mechanics in Longview.  He's done that for about 50 years.

22      And I've never been on a jury.

23           THE COURT:  Never served on a jury.

24           THE PANEL MEMBER:  No, sir.

25           THE COURT:  Thank you, ma'am.

1      Next is No. 6, Mrs. Reese.

2           THE PANEL MEMBER:  Betty Reese.  I live here in

3   Marshall.  We have five grown children between us.  It's a

4   blended family.

5      Work for Hall Eye Clinic here in Marshall.  I'm a medical

6   receptionist and billing clerk.  I've worked there

7   four-and-a-half years.  I've had a little bit of college

8   education.

9      My husband's name is Tony Reese, and he works for a

10  replacement parts warehouse out of Little Rock, Arkansas, but

11  he works all over 14 states' area here.  He's been there for

12  21 years.

13     And I served on a civil case in county court here in

14  Marshall probably close to 20 years ago.  It's been a while.

15          THE COURT:  Never served on a jury in federal court?

16          THE PANEL MEMBER:  No.

17          THE COURT:  All right.  Thank you very much, Mrs.

18  Reese.

19     All right.  Next is No. 7, Mrs. Jarrett?

20          THE PANEL MEMBER:  My name is Christina Jarrett.  I

21  live in Hallsville, Texas.  I have one grown son.  He is a

22  freshman at LSU, proud member of the band, and he plays the

23  snares.  So Go Tigers.

24     I work at Hallsville ISD.  I'm a high school English

25  teacher.  I have a degree in English, journalism, and

1    marketing.  Also have a graduate degree in an LSU campus.  So

2    Go Tigers again.  I've been currently back on campus for about

3    the last seven to eight years.  I took a proactive extended

4    sabbatical to be a stay-at-home mom and attended grad school,

5    and I've also taught adjunct classes for the LSU system as

6    well.

7         And what else?  My husband, Ben, is from the Dallas area,

8    originally Highland Park.  He was a professional fisherman,

9    then went to work in the marine industry for about 20-plus

10   years, and changed industries about five or six years ago?

11   Don't remember exactly.  And he works for a company called

12   Smart Earth Technology where he's a regional director of five

13   different states.  He's currently en route to California right

14   now.  He's worked there, like I said, about five years.

15        I served on one criminal case, and that's about it.

16             THE COURT:  What's the company do that your husband

17   now works for?

18             THE PANEL MEMBER:  It's cellular technology that is

19   a water meter system.

20             THE COURT:  All right.  Thank you very much, ma'am.

21        All right.  Next?  We'll start on the second row of the

22   jury box with No. 8, Mr. Grissom.

23             THE PANEL MEMBER:  Good morning.  My name is Patrick

24   Grissom, born and raised in and live in Atlanta, Texas.  I do

25   not have any children.

1    My current place of employment for the past year and a

2    half, I'm self-employed where me and my father are growing his

3    homemade salsa and a couple of other things.  We're in the

4    process of getting that into grocery right now.

5        Before then, I spent six-plus years working with a

6    forestry consulting company out of Texarkana where we managed

7    private landowners' land and timber.  Also big teemos (ph),

8    big corporate landowner, land ownership.  I left all that to

9    chase the American dream and build this company with my dad.

10   So here we are with that.

11       Background education, I got a Bachelor of Science in

12   forest management from Stephen F. Austin.

13       No spouse.  Last -- I've served on one jury, criminal, in

14   Cass County several years ago.

15           THE COURT:  All right, sir.  Thank you very much.

16       No. 9 is next.

17           THE PANEL MEMBER:  My name is Rhonda Ehrlish.  I

18   live in Omaha.  I have one daughter.  I work for Goodman

19   Insurance as an insurance agent.  I've worked there for 29

20   years.  I have a high school diploma.

21       I'm married to Brent Ehrlish.  He works for Graphic

22   Packaging as an electrician.  He's been there two years.

23       And I was on a civil jury in Titus County about 15 years

24   ago.

25           THE COURT:  What was that jury about, ma'am?  Do you

1      remember?

2              THE PANEL MEMBER:  I don't remember.  I'm sorry.

3              THE COURT:  Never served on any other juries?

4              THE PANEL MEMBER:  No.

5              THE COURT:  Thank you very much.

6         Next is No. 10.  Go ahead, please.

7              THE PANEL MEMBER:  My name is Bettina Viramontes.  I

8      do not talk in public very well.

9              THE COURT:  Take your time.

10             THE PANEL MEMBER:  I have three children.  Right now

11     I am a stay-at-home mom.

12         I did -- I was in retail management for 20 years before

13     that, and a corrections officer after that.  I have some

14     college.

15         My spouse's name is John Viramontes.  He is a general

16     area foreman for power.  He clears the tree lines for the

17     power companies throughout Texas, Arkansas, and Louisiana.

18     He's done that for the past five years.

19         And I have never served on a jury.

20             THE COURT:  Does your husband actually work for the

21     electric companies or does he work for a contractor?

22             THE PANEL MEMBER:  They are subcontracted through

23     the power company.

24             THE COURT:  What's the name of his employer?

25             THE PANEL MEMBER:  Wright Tree Service.

1          THE COURT:  Thank you, ma'am.  You did very well

2     speaking in public.

3          No. 11, Mr. Alexander.

4          THE PANEL MEMBER:  Matison Alexander.  Have two

5     grown children.

6          I work for Etex Communications, been there for 15 years.

7     Have a Bachelor's degree in electronics.

8          My wife's name is Wendy.  She works for Anytime Fitness.

9     She's been there for 10 years.

10         And never served on a jury.

11         THE COURT:  All right, sir.  Thank you.

12         No. 12 is next, Mr. Morey.

13         THE PANEL MEMBER:  My name is Brian Morey.  I work

14    at O'Riley Auto Parts, been there for almost seven years.

15         I have two grown children.

16         My wife is Linda Morey.  She's retired.  She worked 10

17    years at East Texas Baptist University in the library.

18         I was on a grand jury about 10 years ago here in

19    Marshall.

20         THE COURT:  Never served on a jury in a trial of any

21    kind.

22         THE PANEL MEMBER:  No, sir.

23         THE COURT:  Thank you.

24         No. 13 is next, Mr. Miles.

25         THE PANEL MEMBER:  Hello.  I am Tommy Miles.  I live

1    in Bivins, Texas.  I have three daughters.

2         And place of employment, I'm a regional network leader

3    for Owens Illinois.  They are a glass container company, make

4    everything from Gerber baby food jars to beer bottles to

5    catsup bottles.  Been there nine years.  Before that, 31 years

6    at Libby Glass in Shreveport.

7         Went to LSU Shreveport.

8         My spouse's name is Tammy.  She retired from General

9    Motors after 30 years.

10        And I was on a criminal case in Jefferson about 12, 13

11   years ago.

12             THE COURT:  Is that your only prior jury service?

13             THE PANEL MEMBER:  Only one.

14             THE COURT:  Thank you, sir.

15        Next is No. 14, Mrs. Davis.

16             THE PANEL MEMBER:  My name is Kristine Davis.  I

17   live in McCloud, Texas.  I have four grown children.

18        As of now, I work at Dollar General in Jefferson, Texas.

19   I've been there for 16 years.  Before that was Walmart, and I

20   am a vet.

21        I have a high school education and one semester of

22   college.

23        My spouse is deceased.

24        And I have not been on jury service.

25             THE COURT:  What did your husband do before he died?

1    THE PANEL MEMBER:  He was actually on disability.

2  He used to build scaffolding for different companies for wells

3  and things like that.

4    THE COURT:  Okay.  Thank you very much, Mrs. Davis.

5    THE PANEL MEMBER:  Thank you.

6    THE COURT:  Next is No. 15, another Mrs. Davis.

7    THE PANEL MEMBER:  My name is Melissa Davis.  I have

8  three grown children.  I work at Hallsville ISD.  I live in

9  Longview.

10    I work at Hallsville, ISD.  I'm a teacher's aide, a bus

11  driver, and then on weekends I work for Community Health Corp.

12  I work in -- with IDD adults.  At the school, I've been there

13  10 years.  Community Health Corp., I've been there two.

14    I've been in college for three years now.

15    And my husband's name is Michael Davis.  He is a bus

16  monitor.  Before that, he was a meat cutter for 30 years.

17    And I've never been on jury.

18    THE COURT:  All right.  Thank you, ma'am.

19    Next is No. 16, Miss McClorey.

20    THE PANEL MEMBER:  Hi.  My name is Elana McClorey.

21  I live in Douglassville, Texas.  I don't have any children.

22    Right now I am a closing apparel associate at Wal-Mart in

23  Texarkana, Texas.  I've been there for a little over two

24  years.  I recently graduated college at TNUT with a Bachelor's

25  of a psychology.

1          I'm not married, and this is my first time doing jury

2     services due to college.

3               THE COURT:  What was your degree in?

4               THE PANEL MEMBER:  Psychology.

5               THE COURT:  Thank you, ma'am.

6          No. 17 is next.  Mr. Brannon?

7               THE PANEL MEMBER:  My name is Stan Brannon.  I live

8     in Hallsville, Texas.  I have two children, one of which we

9     lost five years ago.

10         I am retired, semiretired.  My wife and I do consulting

11    and advocacy work.  Previous work was quality manager at a

12    local wellhead manufacturing company called Stream Flow.  Did

13    that for nine years.  And then prior to that was four other

14    places in heavy manufacturing.  So all my experience is in

15    heavy manufacturing.

16         My education is Bachelor's degree from A&M in

17    manufacturing engineering.

18         My wife's name is Michelle Brannon.  She's also a retired

19    CPA, and she is semiretired as in she does consulting as well

20    as the advocacy work with us.  We have both been doing

21    full-time semiretired for two years.

22         And prior jury service, been called up to county juries

23    several times, never been selected.  This is my first time in

24    fed.

25              THE COURT:  Mr. Brannon, briefly tell me about this

1    consulting and advocacy stuff that you're doing.

2            THE PANEL MEMBER:  Consulting work is -- because all

3    my background is in manufacturing and quality assurance, my

4    consulting work is doing quality systems implementation,

5    maintenance, and consulting.

6            THE COURT:  All right.

7            THE PANEL MEMBER:  My wife is a CPA, accounting,

8    financial style stuff.

9        Advocacy work is due to us losing our youngest five years

10   ago due to an accident on a local lake involving a low-hanging

11   power line.  And so the purpose of our advocacy is to

12   eliminate or drastically reduce the number of power line

13   strikes from the public through various means.  I mean, we've

14   got a whole mission statement and --

15           THE COURT:  That's fine.  You answered my question,

16   sir.  Thank you very much.

17       No. 18 is next, Ms. Dale?

18           THE PANEL MEMBER:  My name is Stacey Dale.  I'm from

19   Waskom.  I have two children.

20       I work for Lee Water Supply.  I'm the office manager.

21   I've been there for seven-and-a-half years.  I'm a high school

22   graduate.

23       I am divorced, and I've never served on a jury.

24           THE COURT:  All right.  Thank you very much.

25       Next is No. 19, Mr. Hawley?

1          THE PANEL MEMBER:  Good morning.  My name is Daniel

2     Hawley.  I live in Big Sandy, Texas.  I have one son, seven

3     weeks old today.

4          I work for the international ALERT Academy, which is

5     training school post high school for young guys to learn

6     emergency service.  We do disaster relief and things like

7     that.  I've worked there for approximately eight years.  And

8     graduated high school and then got post high school skills

9     training as a firefighter in the MT basic.

10         My wife's name is Sarah Ann.  She worked as a dental

11    assistant for approximately two-and-a-half years at Forest

12    Square Dental in Longview until the birth of our son.

13         And I have no prior jury history or service.

14          THE COURT:  Thank you, sir.

15         No. 20 is next, Mrs. Carlisle?

16          THE PANEL MEMBER:  My name is Sheila Carlisle, and

17    I'm from Hallsville, Texas.  I have three grown children.

18         I was forced into retirement last year because I have a

19    cancer diagnosis.  I worked there for 23 years at First United

20    Methodist Church in Hallsville.  I was preschool director.  I

21    attended two years of college in early childhood education.

22         My spouse's name is Charles, and he works at Kamatsu and

23    has been there for 40 years.  He's a lead machinist.

24         And I've served on one jury about 25 years ago, a civil

25    case.

1          THE COURT:  Where was that, ma'am?

2          THE PANEL MEMBER:  It was in Judge Mike Smith's

3   office in Hallsville, Texas.

4          THE COURT:  Justice of the peace?

5          THE PANEL MEMBER:  Yes, ma'am.

6          THE COURT:  Thank you very much, ma'am.

7      Next is No. 212.  Mr. Mullins?

8          THE PANEL MEMBER:  My name is Hunter Mullins.  I

9   live in Ore City.  I don't have any kids.

10      I work at C. Miller Drilling as a diesel mechanic.  I

11  went through Kilgore College's automotive technician program

12  where I graduated with an Associate's.

13      Don't have any kids, don't have any spouse, and I've

14  never served on jury.

15          THE COURT:  All right, sir.  Thank you very, Mr.

16  Mullins.

17      No. 22 is next, Mr. Heller.

18          THE PANEL MEMBER:  My name is Chris Heller.  I live

19  in Gilmer.  I have two daughters.

20      I work at McCoys Building.  I am a CDL driver.  High

21  school education.

22      My wife's name is Holly.  She works at Diamond C

23  Trailers.  She's a welder, and she has been there about 11

24  months.

25          And I've been on a criminal jury.

1              THE COURT:  Where was that?

2              THE PANEL MEMBER:  Upshur County.

3              THE COURT:  And how long ago?

4              THE PANEL MEMBER:  Probably three years ago.

5              THE COURT:  And when you say McCoys, you are talking

6    about off of the loop over in Longview?

7              THE PANEL MEMBER:  Yes, sir.

8              THE COURT:  Thank you, sir.

9         Next is No. 23, Mrs. Lee.

10             THE PANEL MEMBER:  My name is Carol Lee.  I live in

11   Longview, Texas.  I have two grown children.

12        I retired from Spring Hill State Bank, worked there 22

13   years.  Had 49 years of financial industries.  Finished high

14   school.

15        My husband's name is Billy Lee.  He's retired.  Last job

16   was at Diana Hardware, and he was there two years.

17        And I've been on a criminal case here in Harrison County,

18   grand jury in Harrison County, and federal jury in Tyler.

19             THE COURT:  You served on a federal jury in Tyler?

20             THE PANEL MEMBER:  Uh-huh.  About 30 years ago,

21   William Wayne Justice.

22             THE COURT:  Do you remember what kind of case it

23   was?

24             THE PANEL MEMBER:  It was manufacturing.

25             THE COURT:  All right.  Thank you, ma'am.

1          Next is Panel Member, No. 24.  Mr. West?

2               THE PANEL MEMBER:  Good morning.

3               THE COURT:  Morning.

4               THE PANEL MEMBER:  My name is Tracy West.  I live in

5     Waskom, Texas, lived there for 10 years.  I have one adult

6     male son.  Of course, he's a male.  He's a son.

7          Place of employment is with Hill Oil Company, which is

8     owned by Reladyne, a large corporation.  I've worked there for

9     10 years.  I have high school diploma and one year of college.

10         My spouse's name is Jan.  She works for Calumet Refinery.

11    She is in purchasing there, and she's worked there about five

12    years.

13         And I was on one criminal case about five years ago in

14    Waskom.

15              THE COURT:  In the municipal court?

16              THE PANEL MEMBER:  Yes, sir.

17              THE COURT:  Thank you very much.

18         Next is No. 25, Mr. Thomas.

19              THE PANEL MEMBER:  My name is Stan Thomas.  I live

20    in Diana, Texas.  Two kids.  I own Thomas Falls Outdoor

21    Adventures and Ziplines.  My wife and I work together there.

22    My education background is some college.

23         My wife's name is Debbie Thomas.  She works with me

24    obviously, and she's worked with me there nine years.

25         And I have no prior jury service.

1        THE COURT:  Thank you, sir.

2     No. 26 is next, Mrs. Best.

3        THE PANEL MEMBER:  I am Hilary Best.  I live here in

4     Marshall.  I have two sons.  I'm a stay-at-home mom.

5     I have an Associate of Applied Science in nursing degree.

6     My spouse's name is Brian Best.  He works for ProFrac

7     here in Marshall.  He's a safety supervisor, and he's been

8     there about four or five years.

9     And never served on a jury or anything.

10        THE COURT:  What does ProFrac do?

11        THE PANEL MEMBER:  ProFrac, they are an oil field

12     fracking company.

13        THE COURT:  Okay.  Thank you, Mrs. Best.

14     No. 27 is next, Mrs. Cody.

15        THE PANEL MEMBER:  My name is Michelle Cody.  I live

16     in Pittsburg, Texas.  I have two children.  One of them is 19,

17     and she is in the Army set to graduate boot camp later this

18     month.  My son is a junior in high school.

19     I work at Pittsburg Elementary School.  I teach English

20     language arts for third grade.  I've worked there for 11

21     years, 10 years as a paraprofessional.  This is my first year

22     as a full teacher.  I earned my Bachelor's of General

23     Science -- General Studies, sorry, at A&M-Texarkana.

24     My spouse's name is Henry Cody.  He works at Big Tex

25     Trailers as a CDL driver.  He's worked there for approximately

1    13 years.

2         And I've never served on a jury.

3              THE COURT:  Thank you, ma'am.

4         No. 28 is next.

5              THE PANEL MEMBER:  Good morning.  My name is Bruce

6    Duits.  I live in Atlanta, Texas.  I have five children.  We

7    are a blended family.  My 17-year-old daughter just graduated

8    high school early this year.

9         I'm currently employed at Cooper Tire, which is now

10   Goodyear.  I've worked there since 2011.  I was previously in

11   the U.S. Army, served in Desert Storm.

12        My educational background, I attended Michigan State

13   University and Austin P. State University.  So I've been in

14   college probably about 14 years in total.

15        My spouse's name is Julie.  She's a secretary for the

16   senior pastor for First Baptist church in Atlanta, Texas, and

17   she has worked there since 2009.

18        And I have no prior jury service.

19             THE COURT:  All right, sir.  Thank you very much.

20        No. 29 is next, Mrs. Barr.

21             THE PANEL MEMBER:  Good morning.  My name is Gina

22   Barr, and I live in Gilmer, Texas.  I have three grown

23   children.

24        I work at First National Bank of East Texas.  I'm the

25   human resource director there.  I have a high school diploma

1    and about three years of college.

2        My spouse's name is Todd Barr.  And he is semiretired

3    from the Gilmer Independent School District as a coach, and he

4    now teaches elementary PE.  He's been there probably about 30

5    years.  I've been at First National Bank of East Texas, I'm

6    sorry, for about two-and-a-half years.

7        And I have had prior jury service.  I have been on a

8    criminal case in Tyler, Texas, Smith County, about 20 years

9    ago, and I did serve on a civil case a long time ago.  I don't

10   remember anything about it, but it was actually in Smith

11   County also.

12            THE COURT:  All right.  It was in state court, I

13   gather.

14            THE PANEL MEMBER:  I think -- yes, I think, yes, it

15   was.

16            THE COURT:  Okay.  Long time ago?

17            THE PANEL MEMBER:  Yes.  Thank you.

18            THE COURT:  Thank you, Mrs. Barr.

19        Next is No. 30, Mr. Foster.

20            THE PANEL MEMBER:  Good morning, sir.

21            THE COURT:  Good morning.

22            THE PANEL MEMBER:  My name is Steve Foster.  Let's

23   see.  I just moved to Jefferson in -- I was in Cass County,

24   well, Linden for 20 years, but I worked in south Texas,

25   Oklahoma, everywhere else.  Two sons, a retired naval officer

1    in Colorado and an electronics engineer who is in Dallas.

2        I'm retired right now, but I did 27 years in the

3    newspaper business as a journeyman pressman, assistant

4    technician.  I've been an ambulance driver, truck driver,

5    dispatch for oil field, blah, blah, blah.

6        Education GED.  Associate's in computer technician.

7    About a thousand technical manuals.

8        I'm not married and no jury service.

9        THE COURT:  All right.  Thank you very much, Mr.

10    Foster.

11        Next is No. 31?

12        THE PANEL MEMBER:  Good morning.  My name is Charity

13    Boozier.  I live in Longview, Texas.  I have two daughters.

14    One has moved out of the house and one that is still at home

15    with us.

16        I am self-employed as a piano teacher.  I am also the

17    main pianist for our church that we attend in Longview.  And I

18    home school the daughter who's still at home.  I've been a

19    piano teacher for 17 years and I've home schooled -- this is

20    my fourth year.  I have a Bachelor of Science in industrial

21    management from LeTourneau University.

22        My husband is William Boozier.  He works for McClung

23    Energy in Kilgore.  He is a buyer/planner, and they are

24    somehow involved in the oil field industry, but I don't

25    understand it, so -- he has been there for almost four years.

1        And in May of 2022, I served on a criminal case just

2   across the street there for Harrison County.

3                THE COURT:  Is that your only jury service?

4                THE PANEL MEMBER:  That's the only time I actually

5   served, yes, sir.

6                THE COURT:  You've been called before, but that's

7   the only time you actually served.

8                THE PANEL MEMBER:  Yes, sir, that is correct.

9                THE COURT:  Okay.  Thank you, Mrs. Boozier.

10       No. 32 is next.

11               THE PANEL MEMBER:  Good morning.  My name is Bethany

12   Vanderford.  I live in Big Sandy, Texas.  I do not have any

13   children.

14       At this point I am working for the Institute in Basic

15   Life Principles.  We create resources for families to help

16   them deepen their relationship with God.  I do data entry

17   things there.  A lot of communications as well.  I've worked

18   there for about five-and-a-half years.

19       I graduated from a small Bible college with a Bachelor of

20   Arts in Christian ministry with an emphasis in women's

21   ministry.

22       I am not married, and I have had no prior jury service.

23               THE COURT:  What was the name of the college you

24   attended?

25               THE PANEL MEMBER:  Chambers College in Colorado.

1          THE COURT:  Thank you very much, Miss Vanderford.

2      All right.  No. 33 is next, Ms. Jones.

3          THE PANEL MEMBER:  I'm Tamara Jones.  I have two

4      kids.

5      I work as a manager for Creek Gas and Food in

6      Mt. Pleasant.  I've been there for a month because they just

7      took over the company.  They sold out, the previous owner.  I

8      worked for them for Night and Day Food before the new company

9      took over.  I have a high school diploma.

10     My husband is Cavin Dotty.  He works for Advantage Home

11     Health for my mother because my mother is bedridden, and he's

12     been working there for my mother for about a year.

13     And I've been called to jury duty but never -- been

14     canceled every time before this.

15         THE COURT:  You've never selected or served.

16         THE PANEL MEMBER:  No, sir.

17         THE COURT:  Thank you very much, Mrs. Jones.

18     Thank you, ladies and gentlemen.  We appreciate that

19     information.  Now, I need to say just a couple of more things

20     to you before I turn over the questioning to the lawyers.

21     The jurors that will actually be selected from this panel

22     to serve in this case will serve in the role as the judges of

23     the facts and the selected jurors in this case will make the

24     sole determination about what the facts are in this case.

25     Now, my job as the judge is to rule on questions of law,

1    evidence, and procedure, to main the decorum of the courtroom,

2    and to oversee an efficient flow of the evidence during the

3    trial.

4         Let me also say a couple of things to you about our

5    judicial system that I hope will put things in the proper

6    perspective for you.  In any jury trial, besides the parties

7    themselves, there are always three participants--the jury, the

8    judge, and the lawyers.

9         Now, with regard to the lawyers, it's important for each

10   of you to understand that our judicial system is an adversary

11   system, which simply means that during the trial each of the

12   parties will seek to present their respective cases to the

13   jury in the very best light possible.

14        Now, it's no surprise to you that lawyers are sometimes

15   criticized in public, but the Court has concluded that at

16   least some of that criticism comes from a basic

17   misunderstanding of our adversary system in which the lawyers

18   act as advocates for the competing parties.  And as an

19   advocate, a lawyer is ethically and legally obligated to

20   zealously assert his or her client's position under the rules

21   of our adversary system, and by presenting the best case

22   possible on behalf of their clients, the lawyers hopefully

23   will enable the jury to better weigh the relevant evidence, to

24   determine the truth, and arrive at a just verdict based on

25   that evidence.

1          This adversary system of justice has served our nation

2     well for over 200 years.  America's lawyers have been, are

3     now, and will be in the future an indispensable part of that

4     process.  So as we go forward with the trial, even though it's

5     possible that I may from time to time roll my eyes or growl a

6     little bit at the lawyers, it's because I'm simply trying to

7     make sure that their advocacy doesn't get outside of and go

8     beyond the bounds of our adversary system.

9          But it's important for each of you to know and those of

10    you that are selected on this jury to know that the lawyers

11    are just doing their jobs, and I think it's important for you

12    to keep that in mind as we go forward.

13         Also, ladies and gentlemen, for the eight of you that are

14    selected as jurors in this case, over the course of the trial

15    I'm going to do my very best to make sure that you have no

16    idea about what I think about the evidence in this case

17    because deciding the facts from the evidence is the jury's

18    job.  It is not my job as the judge in this case.  So those of

19    you selected for the jury should not take anything you see or

20    hear or you think you hear or see as coming from me as a

21    factor to consider in making your ultimate conclusions and

22    decisions about what the facts are in this case.

23         All right.  At this time the lawyers will address the

24    panel.  I allow each side, if they choose, to use up to three

25    minutes of their designated time to give a very high-level,

1    non-argumentative overview of what's at issue here.  But then

2    they will get on to specific questions with you if they choose

3    to do that.

4        So with that, the Plaintiff may address the jury panel.

5        Mr. Ward, would you like a warning on your time?

6            MR. WARD:  I would, Your Honor, if I could have a

7    five-minute warning.

8            THE COURT:  I'll warn you when you have five minutes

9    remaining.  You may proceed.

10           MR. WARD:  Thank you.

11       Good morning.  Mr. Grinstein told you my name is Johnny

12   Ward.  I'm going to tell you a little bit about myself just

13   like you-all did.

14       I live in Longview, Texas.  I've been practicing law over

15   there for right at 25 years.  I've been out of law school for

16   28 years.  I went to undergraduate at the University of

17   Oklahoma, law school at Texas Tech.

18       My wife's name is Mel.  We've been married for 25 years.

19   She was a schoolteacher for five years and then stopped

20   teaching school to raise our three children who are all out of

21   the house now.  She went back after they left the house and

22   got cured of that after about three years.  I have been to

23   multiple jury selections where you-all are sitting, but I've

24   never been selected to be on a jury.

25       This is an important case.  We need you-all's help to

1    resolve a dispute that you're going to learn we're not going

2    to resolve amongst ourselves.  I represent, along with my

3    co-counsel, a company called Finesse Wireless.  The gentleman

4    seated at the table, Mr. Frank Smith, is the founder of

5    Finesse Wireless.  He's the inventor on the two patents

6    you-all are going to hear about, the '134 and the '775.

7    You-all filled out questionnaires and that helps speed things

8    up.  We learned a lot about you.  I'm going to ask questions

9    about those -- those things.  And I don't think anyone had

10   heard of Finesse Wireless, which doesn't surprise me.  It's

11   only five employees.

12       The patents at a very high level are basically an

13   improvement in wireless cellular communication.  They help

14   reduce interference.  There's a lot more that you-all are

15   going to hear about those inventions.  But at a very high

16   level, that's what it's about.

17       As you-all have figured out, we are here because we

18   contend that AT&T is using this property without permission.

19   They are employing some radios in their network, and you-all

20   will hear about our contention about why those radios

21   infringe.  AT&T buys that equipment from Nokia, and that's

22   part of the reason that Nokia has joined in this case.

23       They dispute that they infringe.  They say, we're not on

24   our property, we're not using it.  We say, you are and you owe

25   us up to $166 million.  They say, no, no, no; even if we're on

1     the property, we owe no more than a million dollars or

2     thereabouts.  So big disagreement.

3          That's all I'm going to tell you about the facts.  And

4     you-all might say, well, that's not a very convincing

5     argument.  As His Honor just told you, this is not my chance

6     to argue to you.  Although I believe strongly in the case, I

7     don't want to argue my case to you right now.

8          What I want to find out is whether or not you-all can be

9     fair and impartial in this case, to see if you're the right

10    juror for this case.  Some of you might be thinking, well, if

11    I don't raise my hand, if I don't answer a question, maybe he

12    won't ask me any questions.

13         First of all, the first 20 of you, I'm going to try and

14    ask all of you something.  I want to talk to each one of you.

15    I'm going to refer to you-all in the jury box as the box and

16    then the gallery, first row, second row, and the last two

17    rows.  I'm probably not going to talk to the last two rows.

18    You-all are pretty safe today.  I don't think that we'll get

19    to striking that far back, but we'll have to wait and see.  I

20    might be speaking to you.

21         There are absolutely no wrong answers.  The only wrong

22    answer is the one that you don't give.  Okay?

23         The first question:  When you-all found out that you were

24    going to potentially be on a jury in federal court, how many

25    of you said, I would like to be fair to the parties in this

1    case?

2        Let me ask it this way:  Is there anyone that says, you

3    know what, I'm angry about being here and I'm going to take it

4    out on somebody, I don't want to be fair?  Anybody?

5        We chuckle, but I'm not kidding you in March of this year

6    in this courtroom I asked that question, a gentleman raised

7    his hand, and he said he was angry about being here, he didn't

8    want to be here, and he was going to take it out on somebody.

9    Guess what happened to him.  Nothing happened to him.  He got

10   in no trouble.  You know why?  Because he told us what he was

11   thinking, he told us how he felt.  And that's what we want to

12   find out.  And it just means you can lean one way or the

13   other.

14       You might love your cell service with AT&T or you might

15   hate it.  You might lean one way or the other because of that

16   or because some experience.  That doesn't disqualify you.

17   What disqualifies you is if you lean so far that you can't

18   decide this case based upon the facts of this case.  All

19   right?  You can set your leanings aside and decide the case

20   based upon the facts that are going to be presented to you.

21   And that's what I want to find out about.

22       And you're going to find out I'll be talking about

23   leaning, do you lean, and can you decide the case based upon

24   the facts.  You'll hear me repeat that, and those are the

25   types of questions that I'm going to be asking you.

1    And I'll start out with you-all -- the questionnaires

2    that you filled out, several people said, I've got some strong

3    feelings about AT&T, whether they were unhappy with their bill

4    or they'd had some type of negative experience.  Is there

5    anyone sitting there right now that says, you know what, I've

6    had this negative experience, or I don't like my cell phone

7    bill, it's too high, that would be unable to set those

8    feelings aside and be unable to decide this case based upon

9    the evidence?  Anyone sitting there right now that would be

10   unable to -- to set those types of feelings aside?  All right.

11       Is everyone excited when they get their cell phone bills

12   at the end of every month?  No?  We don't like those, do we,

13   but we've got to pay for our service.  Correct?

14       All right.  Mr. Deron Dacus is the local counsel for AT&T

15   in this case.  Mr. Dacus has a law firm in Tyler.  He

16   practices with his wife, Shannon.  Mr. Dacus and I have known

17   each other.  For as long as I've been practicing law, we've

18   been against each other.  He's a good lawyer.

19       But what I want to know is, does anyone know Mr. Dacus?

20   And when I say know, I'm using it in the broadest sense of the

21   term--I recognize him, he's from Gilmer, I went to high school

22   with him, I know his family, anything like that?

23       Anyone -- yes, sir.  Juror No. 11.  Mr. Alexander.

24            THE PANEL MEMBER:  Yes, sir.

25            MR. WARD:  Mr. Turner is going to hand you the

1    microphone.

2        Tell me how you know Mr. Dacus.

3            THE PANEL MEMBER:  I've known him since first grade.

4            MR. WARD:  Okay.

5            THE PANEL MEMBER:  We went to school together.  Our

6    moms taught school together.

7            MR. WARD:  Okay.

8            THE PANEL MEMBER:  I've known him a long time.

9            MR. WARD:  That's the kind of information I need to

10   know.  Hold on.  I'm not through yet.

11           THE PANEL MEMBER:  All right.

12           MR. WARD:  I'm not through with you.

13       Let me ask you this.  The fact that you know Mr. Dacus,

14   you've known him basically your whole life, do you start out

15   leaning in favor of his client or could you decide this case

16   based upon the facts of the case without regard to your

17   knowing Mr. Dacus?

18           THE PANEL MEMBER:  Well, in my line of work, I do a

19   lot of cellular backhaul transport.  AT&T Wireless is one of

20   my big customers, so they help pay my salary.

21           MR. WARD:  Okay.  So would it be difficult for you

22   to go do business with AT&T and call upon them and say, by the

23   way, I was on that jury that we awarded $166 million against

24   you and now could I have your business?

25           THE PANEL MEMBER:  Yeah, that wouldn't happen.

1          MR. WARD:  All right.  That's not something you feel

2     like you could do.

3          THE PANEL MEMBER:  No.

4          MR. WARD:  And that's an example of you might not be

5     the right juror for this case.  Fair?

6          THE PANEL MEMBER:  Yes, sir.

7          MR. WARD:  You start out leaning in favor of AT&T

8     because of your business relationship, which I understand,

9     before you hear any evidence.  Correct?

10          THE PANEL MEMBER:  Correct.

11          MR. WARD:  And since your livelihood depends upon

12     AT&T, in part, is that something you feel like you'd have

13     trouble setting aside in this case?

14          THE PANEL MEMBER:  Possibly.

15          MR. WARD:  Okay.  Thank you, Mr. Alexander.

16       Anybody else in the jury box that knows Mr. Dacus or does

17     business with AT&T?  I'll broaden that out a little bit.

18     Anyone in the first or second row in the gallery know Mr.

19     Dacus?

20       Mr. Heller, are you -- do you live in Gilmer?

21          THE PANEL MEMBER:  Yes.

22          MR. WARD:  And that's Juror No. 22.

23       Are you from that area?

24          THE PANEL MEMBER:  No.

25          MR. WARD:  Okay.  You don't know Mr. Dacus from back

1    in high school or first grade or anything like that?

2            THE PANEL MEMBER:  No.  I just moved there 14 years

3    ago.

4            MR. WARD:  Okay.  Thank you, sir.

5        There are two other firms, and I'm going to ask you just

6    real briefly.  I don't expect you'll know the lawyers there.

7    They don't practice out in East Texas or they don't live out

8    in East Texas.  One is Quinn Emanuel.  They represent Nokia in

9    this case.  Anyone have a relationship with a law firm called

10   Quinn Emanuel?  They are all over the country.  You might have

11   a relative or a friend or maybe in a prior line of work you

12   were represented by Quinn Emanuel.  Anybody?

13       And then AT&T is represented by Baker Botts.  Some of you

14   might have heard of Baker Botts.  The lawyers are from Dallas.

15   Anybody have relatives, friends, any relationship whatsoever,

16   been represented by Baker Botts in the box or in the gallery?

17       Anybody on the panel own stock in AT&T or think they

18   might own stock in AT&T?

19            THE PANEL MEMBER:  No idea.  My husband manages all

20   of that, so I don't know.

21            MR. WARD:  Mrs. Jarrett?

22            THE PANEL MEMBER:  Mrs. Jarrett, yeah.

23            MR. WARD:  It's possible you do, but you don't know.

24            THE COURT:  Just a minute.  Mrs. Jarrett, please

25   stand up, use the microphone per my instructions.

```
 1            THE PANEL MEMBER:  Okay.  Yeah, I don't look at

 2    those things, so --

 3            MR. WARD:  Okay.

 4            THE PANEL MEMBER:  He does work for the company that

 5    has, you know, connections with cellular devices, and I don't

 6    know much about that, either.

 7            MR. WARD:  Okay.

 8            THE PANEL MEMBER:  So the company that he sells and

 9    distributes and works with, it does the cellular-based device.

10            MR. WARD:  While I've got you up, let me ask you,

11    you said you're an adjunct professor or you have been an

12    adjunct.

13            THE PANEL MEMBER:  I have been, yes, and I've been

14    recently asked to as well, but teaching high school in an

15    EOC-tested subject, so I declined.

16            MR. WARD:  What were you teaching as an adjunct

17    professor?

18            THE PANEL MEMBER:  Graduate level, master's level

19    reading classes.

20            MR. WARD:  Okay.  On your questionnaire, we asked

21    you a question about do you have an opinion about lawsuits,

22    and you said, unsure.

23            THE PANEL MEMBER:  I mean that based on a per-case

24    basis --

25            MR. WARD:  Okay.
```

 1              THE PANEL MEMBER:  -- because my background is in

 2    journalism.  So I don't try to immediately think of anything

 3    other than what's factual.

 4              MR. WARD:  Okay.  Anything about your background in

 5    journalism, keeping up with litigation maybe sometime, that

 6    starts you leaning one way or the other in this case?

 7              THE PANEL MEMBER:  Absolutely not.

 8              MR. WARD:  Okay.  And I think we have one other hand

 9    go up.  Yes.  Mrs. Ehrlish, Juror No. 9.

10        And I think you were responding to my question about

11    stock?

12              THE PANEL MEMBER:  Yes.  We have stock in AT&T.

13              MR. WARD:  You do have stock in AT&T.

14              THE PANEL MEMBER:  Yes, we do.

15              MR. WARD:  All right.  Thank you.

16              THE PANEL MEMBER:  Uh-huh.

17              MR. WARD:  Okay.  Mrs. Troquille, Juror No. 1.

18        I'm just going to go down the row, and try to talk to

19    many of you as I can as long as I've got a little bit of time.

20        I think on your questionnaire, you indicated that you

21    also on opinions of lawsuits, you said, unsure?

22              THE PANEL MEMBER:  Uh-huh.

23              MR. WARD:  Can you tell me why you said unsure?

24              THE PANEL MEMBER:  I don't know.  I'm just unsure.

25    I mean, I don't really --

1          MR. WARD:  Okay.

2          MR. WARD:  I'm sorry to talk over you.

3          THE PANEL MEMBER:  You're fine.  Go ahead.

4          MR. WARD:  It's not that you have an opinion one way

5    or the other.  Are you telling us it would depend on the case?

6          THE PANEL MEMBER:  It depends on who I feel is right

7    or wrong.

8          MR. WARD:  All right.  We're going to get in trouble

9    because there's a court reporter taking down everything we

10   say.

11         THE PANEL MEMBER:  Oh, I'm sorry.

12         MR. WARD:  So if I talk over you, I get in trouble

13   because he can't understand.

14         THE PANEL MEMBER:  I understand.

15         MR. WARD:  Okay.  This is a new experience for a lot

16   of people.

17         THE PANEL MEMBER:  Uh-huh.

18         MR. WARD:  So you don't start out leaning one way or

19   the other in this case.

20         THE PANEL MEMBER:  I do not.

21         MR. WARD:  Thank you, ma'am.

22      All right.  Next to you, Mr. Gunstream, first, thank you

23   for your service, 24 years in the U.S. Navy.

24         THE PANEL MEMBER:  You bet.

25         MR. WARD:  You indicated on your questionnaire that

1    you felt like damages were too high.

2              THE PANEL MEMBER:  Always do.

3              MR. WARD:  Okay.  And, again, there's no wrong

4    answer.  You've heard me say that we're seeking up to $166

5    million.

6              THE PANEL MEMBER:  Correct.

7              MR. WARD:  Without knowing anything about the facts

8    of this case, are your feelings about damages being too high

9    such that you say to yourself, I don't care what the facts

10   are, I could never consider an award of hundreds of millions

11   of dollars?

12             THE PANEL MEMBER:  I'd never say that, never.  No.

13   I just think that damages are too high because it passes on to

14   those of us who help support your clients.

15             MR. WARD:  Well, my clients aren't AT&T and Nokia.

16             THE PANEL MEMBER:  I understand.  But either way, it

17   would it affect me some -- some way down the line.

18             MR. WARD:  Okay.  Given that feeling, do you start

19   leaning one way or the other about, you know what, I might not

20   be the right juror in this case because I don't think I could

21   consider damages that high?

22             THE PANEL MEMBER:  I don't think I would say I lean

23   either one way or the other.  I just think that the damages

24   are a little bit high.  I'll say that.

25             MR. WARD:  Okay.  But it doesn't start you leaning

 1     in this case.

 2               THE PANEL MEMBER:  No.

 3               MR. WARD:  All right.  Thank you, Mr. Gunstream.

 4               THE PANEL MEMBER:  Uh-huh.

 5               MR. WARD:  Who agrees with Mr. Gunstream, just raise

 6     your hand in the box, that feel like damages are too high?

 7     Juror No. 5, 9, 10, 11, and 12.

 8          Let me ask you the same questions.  Any of you feel that

 9     because of your opinion that damages are too high, that you

10     could not consider the full range of damages in this case?

11          And I'll start with you, Juror No. 12, Mr. Morey.

12               THE PANEL MEMBER:  Yeah.  I'd have a hard time

13     giving that much.

14               MR. WARD:  Okay.  Regardless of what the evidence

15     was?

16               THE PANEL MEMBER:  Yes.  That's just too much money.

17               MR. WARD:  Too much money.  And regardless of what

18     the facts were, you're saying, I couldn't do it regardless of

19     what the facts are or what the evidence --

20               THE PANEL MEMBER:  Not -- not that much.

21               MR. WARD:  Okay.  That's the kind of the information

22     we need to know.

23          Juror No. 11, I think I've talked to you.

24          Juror No. 10, did you also raise your hand about damages

25     too high?

1          THE PANEL MEMBER:  Yes, sir.

2          MR. WARD:  And same question.  Is it a feeling that

3  I feel like damages are too high, but I could consider the

4  evidence in this case, or I don't care what the evidence is, I

5  could never consider an award of damages --

6          THE PANEL MEMBER:  I could still consider.

7          MR. WARD:  You could still consider it?

8          THE PANEL MEMBER:  Yes.  I just feel like it's too

9  high.

10          MR. WARD:  Pardon?

11          THE PANEL MEMBER:  It's too much.  I just feel like

12  it's too much, but it wouldn't hinder me making a decision for

13  what's right or what's wrong.

14          MR. WARD:  Okay.  All right.  Thank you, ma'am.

15      And next to you, Mrs. Ehrlish, let me ask you that same

16  question.  You felt like damages are too high.  Is it a

17  feeling that's so strong that you could never consider that

18  amount of damages regardless of the evidence, or do you think

19  you could set that feeling aside and decide this case based

20  upon the evidence?

21          THE PANEL MEMBER:  I can set that aside.

22          MR. WARD:  Okay.  Thank you, ma'am.

23      First and second row, anyone agree with what Mr. Morey

24  said, that he feels like damages are too high and there is no

25  way he could consider an award in the hundreds of millions of

1    dollars regardless of the evidence?

2        Anyone in the first -- yes, sir, Mr. Heller?

3            THE PANEL MEMBER:  I believe -- I believe it can be

4    unsettled, but I would just like to know why that amount or

5    why that high of amount.

6            MR. WARD:  And those of you that make it on the jury

7    panel are going to hear that -- that evidence, and this isn't

8    the chance I get to tell you.

9        All I can tell you is that we're seeking a large damage

10   award, and what I need to know is whether or not your feelings

11   about damages would override your ability to listen to the

12   evidence and consider that evidence.

13           THE PANEL MEMBER:  No.

14           MR. WARD:  Okay.  You could consider the evidence

15   and base your decision on that evidence.

16           THE PANEL MEMBER:  Yes.

17           MR. WARD:  All right.  Thank you, Mr. Heller.

18       Mr. Wilder, good morning.

19           THE PANEL MEMBER:  Good morning.

20           MR. WARD:  You indicated that you'd been on a

21   criminal jury.  Is that right?

22           THE PANEL MEMBER:  Yes.

23           MR. WARD:  And were you the foreperson in that case?

24           THE PANEL MEMBER:  No.

25           MR. WARD:  Okay.  You also indicated that you'd been

1    a plaintiff in a corporate dissolution case.

2              THE PANEL MEMBER:  Yes.

3              MR. WARD:  How long ago was that about?

4              THE PANEL MEMBER:  Twenty-five years.

5              MR. WARD:  Okay.  Anything about that experience

6    that starts you leaning one way or the other before you hear

7    the evidence in this case?

8              THE PANEL MEMBER:  No.

9              MR. WARD:  You didn't have a negative experience or

10   a positive experience.  It's just something that you could

11   decide this case based upon the evidence in this case?

12             THE PANEL MEMBER:  Yes.

13             MR. WARD:  Is that correct?

14             THE PANEL MEMBER:  Correct.

15             MR. WARD:  All right.  Thank you, sir.

16        Next to you, Juror No. 4, Mrs. Ragsdale, good morning.

17             THE PANEL MEMBER:  Good morning.

18             MR. WARD:  You're a pharmacist?

19             THE PANEL MEMBER:  Yes, sir.

20             MR. WARD:  Up in --

21             THE PANEL MEMBER:  Daingerfield.

22             MR. WARD:  In Daingerfield at the Brookshire's.  Is

23   that correct?

24             THE PANEL MEMBER:  Yes, sir.

25             MR. WARD:  How long have you been there?

```
 1                    THE PANEL MEMBER:  15 years.

 2                    MR. WARD:  Do you know my friend, Kenny Powers?

 3                    THE PANEL MEMBER:  Yes, sir.

 4                    MR. WARD:  Good man.

 5                    THE PANEL MEMBER:  Yes, sir.

 6                    MR. WARD:  Before you were a pharmacist, I think you

 7      indicated on your questionnaire that you'd work for AirBorn

 8      Electronics?

 9                    THE PANEL MEMBER:  Yes, sir.

10                    MR. WARD:  Building circuits?

11                    THE PANEL MEMBER:  Uh-huh.  That's when I was in

12      college.

13                    MR. WARD:  Did you have any dealings with something

14      called passive intermodulation, PIM.

15                    THE PANEL MEMBER:  I'm not sure what all our

16      parts were.  I know some of them went to mines and things like

17      that.

18                    MR. WARD:  Okay.  But PIM isn't something that rings

19      a bell in your mind.

20                    THE PANEL MEMBER:  No.  It's been many years ago.

21                    MR. WARD:  Okay.  Anything that you've heard so far,

22      the other questions that I've asked folks, where you'd say,

23      based upon what he's saying, I might lean one with way or the

24      other in this case?

25                    THE PANEL MEMBER:  No, sir.
```

1           MR. WARD:  All right.  You're starting out both

2    sides are equal.  I'm sorry.  Mrs. Ragsdale, are both sides

3    starting out equal?

4           THE PANEL MEMBER:  Yes, sir.

5           MR. WARD:  All right.  Thank you, ma'am.

6       Next to you, Mrs. Henderson.  I think you indicated you

7    were a lab tech or are a lab tech at Collom & Carney.

8           THE PANEL MEMBER:  Yes, sir.

9           MR. WARD:  You are a phlebotomist?

10           THE PANEL MEMBER:  I actually am a full lab

11    technician.  I can do everything the technologists do.

12           MR. WARD:  Okay.  How long have you been doing that,

13    18 years?

14           THE PANEL MEMBER:  I've been with the company 18

15    years, but I've been in the medical business for 30.

16           MR. WARD:  And that was my question, what you did

17    before Collom & Carney?

18           THE PANEL MEMBER:  I worked pre-cert receptionist,

19    ER.

20           MR. WARD:  Okay.  Anything about your life

21    experience or the things you've heard so far that would be

22    responsive to me that would be saying, you know what, I'm

23    leaning one way or the other in this case?

24           THE PANEL MEMBER:  No, sir.

25           MR. WARD:  We're starting out equal?

1          THE PANEL MEMBER:  Yes, sir.

2          MR. WARD:  All right.  Thank you, ma'am.

3      Next to you, Mrs. Reese.  Good morning, ma'am.

4          THE PANEL MEMBER:  Good morning.

5          MR. WARD:  I think on your questionnaire, you said

6  you had some special training in IT?

7          THE PANEL MEMBER:  Just part of the college that I

8  did was just an introduction to computers, and then years ago

9  my employment, I was kind of like our IT person at work.  It

10  was on a mainframe system so it's been a while.

11          MR. WARD:  It's been a while?  Well, I'm the kind of

12  person, when I need help, I call somebody.  All right?  Are

13  you the person that everyone calls?

14          THE PANEL MEMBER:  I still doodle with it and, yeah,

15  a lot of times I help people out.

16          MR. WARD:  All right.  Anything that you've heard so

17  far that you would say, you know what, I'm leaning one way or

18  the other?

19          THE PANEL MEMBER:  No, sir.

20          MR. WARD:  We're starting out equal.

21          THE PANEL MEMBER:  Equal.

22          MR. WARD:  All right.  Thank you.

23      I've spoken with Mrs. Jarrett.

24      Let's go to Mr. Grissom, Mr. Turner, Juror No. 8.

25  Maybe I -- did you have your hand raised when talking about

1    damages being too high?

2              THE PANEL MEMBER:  No, sir.  No, sir.

3              MR. WARD:  Okay.  On your questionnaire, I had a

4    note here that said that you felt like damages were too high.

5    Did I get that wrong?

6              THE PANEL MEMBER:  I may have just misunderstood the

7    question on the questionnaire.

8              MR. WARD:  Okay.

9              THE PANEL MEMBER:  But damages, to your question, it

10   doesn't -- that amount of money does not bother me one bit.

11             MR. WARD:  Okay.  You also indicated on your

12   questionnaire that if you have a claim, you better bring it?

13             THE PANEL MEMBER:  Yeah.

14             MR. WARD:  What did you mean by that?

15             THE PANEL MEMBER:  If you're going to -- in this

16   case, I mean, you-all are, you know, have a claim towards AT&T

17   that they're using some of your technology, and if -- I mean,

18   if you're going to go to the point of, you know, coming to

19   trial, I mean, I would assume you got a pretty good argument

20   so you're probably going to bring it.

21             MR. WARD:  All right.  They might disagree with me.

22   I think we do, but the jury will figure that out.

23             THE PANEL MEMBER:  Yes, sir.

24             MR. WARD:  Thank you, sir.

25          Let's go to Mr. Miles, Juror No. 13, Mr. Turner.

1                    THE PANEL MEMBER:  Yes, sir.

2                    MR. WARD:  I think you had indicated on your

3     questionnaire that you've been in a juror in a criminal

4     case --

5                    THE PANEL MEMBER:  Yes.

6                    MR. WARD:  -- involving drugs?

7                    THE PANEL MEMBER:  Yes, drugs.

8                    MR. WARD:  Were you the foreperson in that case?

9                    THE PANEL MEMBER:  No.

10                   MR. WARD:  Did you render a verdict?

11                   THE PANEL MEMBER:  Yes.

12                   MR. WARD:  Guilty?  Innocent?

13                   THE PANEL MEMBER:  It was guilty.

14                   MR. WARD:  All right.  Anything about your

15    experience or anything that you've heard so far where you'd be

16    saying, Mr. Ward needs to know I'm leaning one way or the

17    other in this case?

18                   THE PANEL MEMBER:  Not at all.

19                   MR. WARD:  We start out equal.

20                   THE PANEL MEMBER:  A hundred percent.

21                   MR. WARD:  All right.  Next to you, Juror No. 14,

22    Mrs. Davis.

23                   THE PANEL MEMBER:  Hello.

24                   MR. WARD:  Good morning.  Eleven years in the U.S.

25    Army?

1          THE PANEL MEMBER:  Yes, sir.

2          MR. WARD:  Okay.  Thank you for your service.

3          THE PANEL MEMBER:  Thank you.

4          MR. WARD:  What type of helicopters did you work on?

5          THE PANEL MEMBER:  UH-1 Hueys.

6          MR. WARD:  Okay.  Did you enjoy that?

7          THE PANEL MEMBER:  Oh, yes.

8          MR. WARD:  All right.  Anything about -- anything

9     that you've heard so far where you'd say, Mr. Ward needs to

10    know I'm leaning one way or the other in this case?

11         THE PANEL MEMBER:  No, sir.

12         MR. WARD:  We're starting out equal.

13         THE PANEL MEMBER:  Yes, sir.

14         MR. WARD:  Thank you, ma'am.

15       Juror No. 15, another Mrs. Davis, she's in -- thank you,

16    Mr. Mitchell.

17       Good morning.

18         THE PANEL MEMBER:  Good morning.

19         MR. WARD:  You said you've been in college for three

20    years?

21         THE PANEL MEMBER:  Yes.

22         MR. WARD:  What are you studying?

23         THE PANEL MEMBER:  Elementary education.

24         MR. WARD:  Same question that I've been asking

25    folks:  Anything that you've heard so far that you need to

1   tell me, Mr. Ward needs to know I'm leaning?

2           THE PANEL MEMBER:  No, sir.

3           MR. WARD:  We're starting out equal?

4           THE PANEL MEMBER:  Equal.

5           MR. WARD:  Thank you, ma'am.

6       Next to you, Juror No. 16, Miss McClorey.

7           THE PANEL MEMBER:  Hi.

8           MR. WARD:  Hi.  On your questionnaire, you said

9   damage awards, if you had an opinion, I think you said it

10  depends.

11          THE PANEL MEMBER:  Yeah.  I totally -- I already did

12  that after work.  I got home at like 12:00 that night.

13          MR. WARD:  It was tiny print?

14          THE PANEL MEMBER:  I would have to say, at the time

15  I was just reading through it.  So I was, like, waiting until

16  I got here to, like, figure out what was going on.  I think

17  the damages that needed to be rewarded after hearing just this

18  little bit is a little high, but not to persuade me to one

19  direction.

20          MR. WARD:  Are you telling me that if the evidence

21  supported it, you could consider it?

22          THE PANEL MEMBER:  Yes.

23          MR. WARD:  It's not a situation like Mr. Morey told

24  us where it doesn't matter what the evidence is, it's just too

25  much money, he could never consider it regardless of the

1    evidence.  That's not what you're telling me?

2            THE PANEL MEMBER:  No.  In my opinion, I'm kind of

3    leaning towards them because you have physical evidence behind

4    you that you showed us of the patent, but the damages that

5    you're wanting aren't pushing me in any way.

6            MR. WARD:  No one's going to disagree that $166

7    million is a lot of money.  Right?  We can all agree on that.

8    All right?  What you're telling me is we are starting out fair

9    before you've heard evidence?

10           THE PANEL MEMBER:  Yes war.

11           MR. WARD:  Start out equal?

12           THE PANEL MEMBER:  Uh-huh.

13           MR. WARD:  Thank you, ma'am.

14       Mr. Brannon, I think you also indicated that you had an

15   opinion about lawsuits, that they're frivolous?

16           THE PANEL MEMBER:  Yes, sir.

17           MR. WARD:  Damages too high.

18           THE PANEL MEMBER:  Yeah.

19           MR. WARD:  And, again, there's no wrong answers.

20   What I need to know is, do you start leaning one way or the

21   other before you start hearing evidence in this case?

22           THE PANEL MEMBER:  No.

23           MR. WARD:  We start out equal.

24           THE PANEL MEMBER:  We start out equal.

25           MR. WARD:  And you could consider the full range of

1    damages?

2              THE PANEL MEMBER:  Correct.

3              MR. WARD:  All right.  Thank you, sir.

4         Next to you, Ms. Stacey.  I don't think we had a juror

5    questionnaire from you, but you just told us you worked at Lee

6    Water Supply?

7              THE PANEL MEMBER:  Yes.

8              MR. WARD:  You've been there seven years?

9              THE PANEL MEMBER:  Seven and a half.

10             MR. WARD:  Okay.  And what did you do before that?

11             THE PANEL MEMBER:  I worked in the medical office

12   doing -- I was a receptionist.

13             MR. WARD:  Okay.  Anything that you've heard so far

14   where you'd say, I need to respond to that question and Mr.

15   Ward needs to know that I'm leaning one way or the other?

16             THE PANEL MEMBER:  No, sir.

17             MR. WARD:  We're starting out equal?

18             THE PANEL MEMBER:  Yes, sir.

19             MR. WARD:  All right.  Thank you, ma'am.

20        Juror No. 19, Mr. Hawley.

21             THE COURT:  You have five minutes remaining,

22   counsel.

23             MR. WARD:  Thank you, Your Honor.

24        Good morning.

25             THE PANEL MEMBER:  Good morning, sir.

1          MR. WARD:  On your questionnaire, I think you

2   indicated that you worked as an insurance examiner in the

3   state of Missouri?

4          THE PANEL MEMBER:  I don't believe so.

5          MR. WARD:  That's the problem with all my little

6   handwritten notes.  What did you do before -- are you at ALERT

7   Academy?

8          THE PANEL MEMBER:  Correct, yes.

9          MR. WARD:  Okay.  What did you do before?

10          THE PANEL MEMBER:  I went to training there as well.

11   And then before that, I just worked as a farm hand in southern

12   Ontario.

13          MR. WARD:  Okay.  What brought you to Texas?

14          THE PANEL MEMBER:  For the training and -- yeah.

15          MR. WARD:  You came and stayed.

16          THE PANEL MEMBER:  Correct.

17          MR. WARD:  A little bit warmer than Ontario?

18          THE PANEL MEMBER:  Quite a bit, yes.

19          MR. WARD:  Okay.  Anything that starts you leaning

20   one way or the other?

21          THE PANEL MEMBER:  No.  Just can't fathom that

22   amount of money, but nothing in particular.

23          MR. WARD:  Okay.  But even though you can't fathom

24   it, could you consider that amount if the evidence supported

25   it?

1          THE PANEL MEMBER:  If the evidence supported, yes.

2          MR. WARD:  Okay.

3          THE PANEL MEMBER:  Believe so.

4          MR. WARD:  All right.  Thank you, sir.

5     And then, Mrs. Carlisle, real quick, Juror No. 20.  I

6  think you indicated that you had a friend who had a patent

7  application?

8          THE PANEL MEMBER:  Yes.  They're in the process of

9  it.  It's a doctor friend of ours, and they're trying to

10 patent a device that will help kidney dialysis.

11         MR. WARD:  Okay.  Anything about that that starts

12 you leaning one way or the other?

13         THE PANEL MEMBER:  No, because I don't know that

14 much about it.

15         MR. WARD:  Okay.  Anything that you've heard so far

16 that starts you leaning one way or the other?

17         THE PANEL MEMBER:  No.

18         MR. WARD:  Could you consider the evidence and

19 consider the full range of damages if the evidence supported

20 it?

21         THE PANEL MEMBER:  Yes.

22         MR. WARD:  All right.  Thank you, ma'am.

23     Let me wrap up with this.  One thing that I think His

24 Honor will instruct you in a patent infringement case is that

25 you don't have to have knowledge of the patent to be held

1    responsible for patent infringement.  All right?  You don't

2    have to know about the patent.

3         Some people say, you know what, that might be the law,

4    but if you're seeking damages of $166 million, you're going to

5    have to prove to me that AT&T knew about this patent before

6    the lawsuit was filed.  All right?

7         So that's my question.  Anyone on the panel or anyone in

8    the jury box who says, if you're going to seek that much money

9    in damages, I don't care what the law is, you're going to have

10   to prove to me that they knew about the patent claims before

11   they started using these products that we say infringe?

12        Anybody in the jury box?  Anybody in the first or second

13   row?

14        And if you think about it, it's kind of like if

15   ExxonMobil came out and they drilled a well next to your

16   property and they struck oil and they started taking your oil

17   and gas, do you think it would be reasonable for them to come

18   in and say, oh, well, we didn't know that was your property,

19   we've been taking the oil and gas for six years, but we didn't

20   know it was your property?  That wouldn't be a very good

21   defense, would it?

22        Anybody on the jury think that that would be a good

23   defense for ExxonMobil?

24        Juror No. 13, Mr. Miles, what do you think about that as

25   a defense, we didn't know it was your property?

1          THE PANEL MEMBER:  It's too easy to find out who

2     owns the property.

3          MR. WARD:  All right.

4          THE PANEL MEMBER:  That should have been done

5     beforehand.

6          MR. WARD:  Patent cases are the same.  That's why

7     the law says you don't have to know about patents to be held

8     liable for infringement.  Could you apply that law?  Could you

9     follow it?

10          THE PANEL MEMBER:  Yes.

11          MR. WARD:  Thank you.

12     First or second row, anyone disagree that, to consider

13     that amount of money, you're going to have to prove to me that

14     AT&T knew about these patents before I will award you $166

15     million?

16     No. 17, Mr. Brannon, let me ask you that -- that

17     question.

18          THE PANEL MEMBER:  No.

19          MR. WARD:  No?

20          THE PANEL MEMBER:  No, you don't have to prove that

21     to me.

22          MR. WARD:  Okay.  You could follow the --

23          THE PANEL MEMBER:  Follow the evidence.

24          MR. WARD:  If I'm correct and the Court instructs

25     the jury that's seated in this case that to be held

1    responsible for patent infringement, you don't have to prove

2    that the Defendant knew about your patent, you could follow

3    that law?

4              THE PANEL MEMBER:  Yes, sir.

5              MR. WARD:  All right.  Anyone disagree with Mr.

6    Brannon, that they would be unable to follow that law?

7              THE COURT:  Time's expired, counsel.

8              MR. WARD:  All right.  Thank you very much for your

9    time.  We look forward to presenting our case to the eight of

10   you that are seated on this panel.

11             THE COURT:  Mr. Dacus, you may address the panel on

12   behalf of Defendant and intervenor.  Would you like a warning

13   on your time?

14             MR. DACUS:  If you'd let me know when I have five

15   minutes, please, Your Honor.

16             THE COURT:  I will do that.  You may proceed,

17   counsel.

18             MR. DACUS:  Thank you.

19        Good morning.  As I said earlier, I'm Deron Dacus and I

20   represent AT&T and Nokia in this case.

21        The first thing I want to do is say to you on behalf of

22   the men and women who work at AT&T and Nokia a very sincere

23   thanks.  It is not at all lost on us that you have other

24   things you need to be doing today.  You need to be at your

25   job, you need to be tending to kids and grandkids.  We realize

1    that this is an inconvenience, and I want to tell you up front

2    we would not be here if this was not an important case.  It is

3    to AT&T and Nokia.

4        I feel like I need to do the same thing that everyone in

5    the courtroom's done, and that is tell you a little bit about

6    myself.  I wish it was interesting enough that someone was

7    going to make a movie or write a book.  Unfortunately, it's

8    not.

9        As you already heard, I grew up in Gilmer, graduated from

10   Gilmer High School, was fortunate enough to get a baseball

11   scholarship and go to Texas A&M.  I know we've got a few LSU

12   participants in here and I'm going to need to talk about that

13   before we're done.

14       After, I was fortunate enough to graduate from A&M and,

15   like His Honor, went to Baylor Law School where I met my wife

16   who was also in law school.  We've been married now for 28

17   years.  We've got two kids.  They are out of the house now,

18   making their own way in life.  And we're empty nesters, and

19   that's -- for anyone who's also experiencing that, that's a

20   new -- that's a new event and trying to figure out exactly

21   what I'm supposed to be doing now that I'm not chasing kids at

22   sporting events.

23       His Honor said that he gives us just a couple of minutes

24   to say a few things about the case, and so I want to do that

25   because you've heard a little bit from the Plaintiff Finesse's

1    perspective.  You already heard that Finesse sued AT&T in this

2    case related to some equipment, essentially a radio that goes

3    on a cell tower that AT&T uses.  That radio equipment is made

4    by Nokia.

5        And so after AT&T got sued, as the Judge told you, Nokia

6    voluntarily came to the court, did what we call intervene, and

7    they're here to defend their product because they do not

8    believe that they infringe or use these patents.

9        As Mr. Ward said, it's not the time for me to talk to you

10   about the evidence, but I will say to you that at the end of

11   this week, what we believe the evidence will show is that

12   these radios that Nokia makes and AT&T uses, they do not

13   infringe, meaning they don't use this -- this patented method

14   that Finesse has.

15       In addition to that, you may remember from the video, I

16   know you heard it last Friday rather than this morning, and

17   you'll hear more from Your Honor about it, the jury is the

18   last resort for whether or not a patent is valid.  That may

19   have been news to you when you heard it on the video last

20   week.

21       What we believe the evidence will show in this case is

22   that these two patents should have never been issued.  You

23   heard from the video that it has to be a new or a novel

24   concept, and we believe that these were not new and novel and

25   the patents not valid.

```
 1              THE COURT:  Let's get on to specific questions,

 2   counsel.

 3              MR. DACUS:  Absolutely, Your Honor.  Thank you.

 4       So I want to do what Mr. Ward did, and that is, Mr.

 5   Ward's from Longview.  I know we have some folks from

 6   Longview.  Anyone else or does anyone know Mr. Johnny Ward?

 7   If you do, would you raise your hand and let me know?  Okay.

 8       Also at their table is Andrea Fair.  Ms. Fair also lives

 9   in Longview.  Does anyone know Ms. Fair?  Okay.

10       And then, finally, the other lawyers at that table work

11   at Susman Godfrey.  That's a firm down in Houston.  They have

12   offices in other places.  Anyone familiar with, know anything

13   about, the Susman Godfrey firm?  Would you raise your hand and

14   let me know that?  Okay.

15       Now, I'll ask a silly question.  It won't be the last one

16   probably.  How many people have heard of AT&T?  Okay.  That's

17   pretty much everybody.  I think Mr. Ward touched on it, but he

18   also touched on the fact that most of us get cell phone bills.

19   Most of us have cell phones and most of us get cell phone

20   bills.  And probably most of us aren't happy to get the bill,

21   but it's part of the service.

22       So what I need to know is, since I represent AT&T, does

23   someone have any unfavorable feelings, unfavorable leanings in

24   any way towards either AT&T and Nokia?  Would you raise your

25   hand and just let me know.  You understand why I'm asking
```

1    that.  Right?  Does anybody have those types of feelings?

2    Okay.

3         Let me ask this.  And before I ask it, let me say that

4    I'm not going to ask you any details about it and I'm not

5    asking in a formal setting, but has anyone here ever been

6    falsely accused?  I mean, I'm just talking about just in your

7    everyday life.  Generally I get a lot of hands for people to

8    say, yeah, I've been falsely accused of things.  Who's been

9    falsely accused?  Lots of people.  Right?  I'm not talking

10   about in a courtroom.

11        So let me talk to you, Mrs. Reese, if I could, please,

12   ma'am.  I told you up front I'm not going to ask details so

13   don't start telling me any.  All I want to know is how did it

14   make you feel?

15             THE PANEL MEMBER:  I was hurt.

16             MR. DACUS:  Okay.  Did you feel like you had the

17   right to defend yourself?

18             THE PANEL MEMBER:  I did.

19             MR. DACUS:  Okay.  Did you defend yourself?

20             THE PANEL MEMBER:  In the situation, I couldn't.

21             MR. DACUS:  Okay.  Was that frustrating?

22             THE PANEL MEMBER:  Yes.

23             MR. DACUS:  You understand that, fortunately, AT&T

24   and Nokia, they have an avenue to defend themselves here in

25   this federal courthouse.  Do you understand that?

1            THE PANEL MEMBER:  Yes, sir.

2            MR. DACUS:  Do you fault them in any way for coming

3    to the courthouse when they believe they've been falsely

4    accused and defending themselves?

5            THE PANEL MEMBER:  No, sir.

6            MR. DACUS:  Okay.  Does anybody -- and actually,

7    Miss McClorey, let me ask you, because you said something a

8    minute ago that piqued my interest:  Do you think AT&T and

9    Nokia have the right to come to the courthouse and defend

10   themselves if they believe they've been falsely accused?

11           THE PANEL MEMBER:  Yes.

12           MR. DACUS:  Okay.  And here's why I asked that.

13           THE PANEL MEMBER:  Uh-huh.

14           MR. DACUS:  I heard you say a minute ago that -- Mr.

15   Ward got up here and waved those patents around, that maybe

16   you sort of lean that way because he waved a patent around.

17   Did I hear you right?

18           THE PANEL MEMBER:  Yes.

19           MR. DACUS:  Okay.  You understand what they have to

20   show is not just that they have a patent, but that these

21   radios they accuse of infringement actually use their patented

22   technology.  You understand that?

23           THE PANEL MEMBER:  Yes.

24           MR. DACUS:  And so what I need to know from you is,

25   would you, if you sat on this jury, would you be willing to

1    sit and listen to the evidence before you made a decision?

2            THE PANEL MEMBER:  Yes.

3            MR. DACUS:  Okay.  So even though -- and you

4    understand I've got to go home and sleep tonight.  Right?

5            THE PANEL MEMBER:  Yes.

6            MR. DACUS:  So when you say, I'm kind of leaning

7    that way, what you're -- although you said that, you really

8    would just wait until you hear the evidence before you make a

9    decision.  Is that right?

10           THE PANEL MEMBER:  Yes.

11           MR. DACUS:  Okay.  Thank you very much.

12       Does anybody fault AT&T and Nokia for defending

13   themselves?  I mean, every now and then people raise their

14   hand and say, yeah, we shouldn't be here.  Okay.  Very good.

15       Mrs. Davis, can I ask you a question, please, ma'am?

16           THE PANEL MEMBER:  Yes, sir.

17           MR. DACUS:  Did I hear you say you had four kids?

18           THE PANEL MEMBER:  Four adult children, yes, sir.

19           MR. DACUS:  All right.  Boys or girls?

20           THE PANEL MEMBER:  I had all girls, and I have 11

21   grandkids, six boys, five girls.

22           MR. DACUS:  Well, congratulations.  You heard me say

23   I'm an empty nester.  I didn't tell you the truth.  I'm ready

24   for some grandkids myself.

25           THE PANEL MEMBER:  Well, I got one of those families

1    living with me, and they've got the five kids.

2         MR. DACUS:  Let me ask you this:  When those four

3    girls were growing up, did they ever get in little squabbles

4    or scuffles when they were growing up?

5         THE PANEL MEMBER:  Yes, sir, being there was 11

6    years between the oldest set of two and the youngest set.

7         MR. DACUS:  And here's what I want to know.  I bet I

8    know the answer, but when they got in little squabbles or

9    scuffles and they got caught doing so, did they run to you to

10   tell their story first?

11        THE PANEL MEMBER:  One or the other would usually

12   try to, yes, sir.  But I'd probably end up punishing both.  I

13   can't remember.

14        MR. DACUS:  And here's why I ask that.  It's not

15   just to know about your family affairs, but there's something

16   inside of us that tells us, even as a kid, that we want to

17   tell our story first because we think people will believe it

18   if we get to tell our story first.  Do you agree with that?

19        THE PANEL MEMBER:  Yes, sir.

20        MR. DACUS:  Here's what's going to happen in this

21   courtroom.  Well, let me ask you this:  Did you always just

22   believe what that first kid told you and just accept that

23   story?

24        THE PANEL MEMBER:  No, sir.  I always looked at both

25   sides.

1          MR. DACUS:  I figured you were a good mom like that.

2     Okay.  And that's my point here.  These people brought this

3     lawsuit, they're going to get to go first, they're going to

4     get to stand up just the way the Court's rules work, they're

5     going to get to stand up, tell their story first, we're going

6     to have to sit there quietly while we do.

7          Can you, like you did with your daughters, can you wait

8     until you hear both sides of the story before you make a

9     decision?

10          THE PANEL MEMBER:  Yes, sir.

11          MR. DACUS:  Okay.  Sounds like you've done that in

12     the past so you've got practice with it.

13          THE PANEL MEMBER:  Yes, sir.

14          MR. DACUS:  Okay.  Thank you.

15          THE PANEL MEMBER:  You're welcome.

16          MR. DACUS:  Here's what I want to know from

17     everyone.  This is an important question.  We are going to

18     have to sit here for a couple of days and just bite our

19     tongue.  Can everyone agree -- and I want to know by raising

20     your hand, if you would, can everyone agree that you will wait

21     to hear both sides of the evidence before you make a decision?

22     Can you raise your hand and let me know that you'll do that?

23          Mr. Grissom, you were a little slow there.

24          THE PANEL MEMBER:  Sometimes I just --

25          MR. DACUS:  Let Mr. Turner bring the microphone to

 1    you, if you would, please, sir.

 2            THE PANEL MEMBER:  Sorry about that, sir.  I wasn't

 3    trying to speak out of turn.

 4        I was slow to raise the hand.  Sometimes I tend to lean

 5    towards the little man and the underdog of the bite.

 6            MR. DACUS:  I appreciate your honesty.  I am very

 7    appreciative of you raising that issue because I want to ask

 8    you a question about it.

 9            THE PANEL MEMBER:  Sure.

10            MR. DACUS:  So you heard Mr. Ward say that Finesse

11    has five employees.  Right?

12            THE PANEL MEMBER:  Yes, sir.

13            MR. DACUS:  You think AT&T has more than five?

14            THE PANEL MEMBER:  Oh, just a few.

15            MR. DACUS:  Okay.  Just a few.  So that's -- we're

16    laughing about it, but it's serious.  Right?

17            THE PANEL MEMBER:  Sure.

18            MR. DACUS:  Because of that fact, would you lean a

19    little bit, even a little bit, in their favor because they're

20    a smaller company than AT&T and Nokia?

21            THE PANEL MEMBER:  Yes, sir.

22            MR. DACUS:  Okay.  Would that leaning be enough

23    that, as a lawyer for AT&T and Nokia, I should be worried

24    about it?

25            THE PANEL MEMBER:  Yes, sir.

1          MR. DACUS:  Okay.  Is your lean far enough that you

2   put them far enough ahead to start with that, no matter what

3   the evidence is, you could not render a verdict?

4          THE PANEL MEMBER:  I'm not that far.  No, sir.

5          MR. DACUS:  You're down the path, but you hadn't

6   gone over the cliff.

7          THE PANEL MEMBER:  That's right.  Just leaning.

8          MR. DACUS:  I very much appreciate --

9          THE PANEL MEMBER:  Yes, sir.

10          MR. DACUS:  -- you being honest with me?

11          THE PANEL MEMBER:  Sure.

12          MR. DACUS:  Thank you, sir.

13       Who feels like Mr. Grissom?  Because, look, this is --

14   Finesse is a smaller company; AT&T and Nokia are larger, more

15   successful companies.  Who feels like they lean towards the

16   smaller company?  Raise your hand and let me know if you're in

17   that category.

18       Let's see.  Mr. Morey, you'd be in that category?  Let

19   Mr. Turner bring you the microphone, please, sir.

20       You'd be in that category?

21          THE PANEL MEMBER:  Yes, sir.

22          MR. DACUS:  So although you feel like they're asking

23   for too much money, you still might lean towards them because

24   they are smaller than AT&T and Nokia.  Am I understanding you

25   correctly?

1          THE PANEL MEMBER:  Yes, sir.

2          MR. DACUS:  Is your leaning so far that you feel

3    like you couldn't be fair and listen to the evidence?

4          THE PANEL MEMBER:  No, sir.

5          MR. DACUS:  Okay.  You'd be willing -- even though

6    you lean that way, you'd be willing to listen to the evidence

7    and just render a verdict based on the evidence?

8          THE PANEL MEMBER:  Yes, sir.

9          MR. DACUS:  Thank you very much, sir.  Appreciate

10   you being honest with us.

11        Anyone else in that category that you'd lean towards the

12   small guy?  I see hands in the back.  I tell you what I'm

13   going to do.  As Mr. Ward said, you-all are pretty safe today

14   so I'm not going to take up everybody's time, but I appreciate

15   you letting me know that.

16        Let's see.  There's some individuals -- Mrs. Ragsdale,

17   can I speak with you, please, ma'am?

18        THE PANEL MEMBER:  Yes, sir.

19        MR. DACUS:  I saw on your questionnaire, I think,

20   that your nephew has a patent?

21        THE PANEL MEMBER:  Yes.  Target owns it.

22        MR. DACUS:  Okay.  He was the inventor?

23        THE PANEL MEMBER:  Uh-huh.

24        MR. DACUS:  Okay.  You understand that these folks

25   here are the claimed inventors and they have a patent.

1    Anything about the fact that your nephew has a patent that

2    would have you leaning in their direction even the slightest

3    bit?

4              THE PANEL MEMBER:  No.

5              MR. DACUS:  Okay.  I'm trying to remember in your

6    questionnaire.  Did you say you knew other people with patents

7    also?

8              THE PANEL MEMBER:  My dad had one back '60s, '70s,

9    through Texas Instruments, but I have no idea what it was.

10             MR. DACUS:  He worked at Texas Instruments?

11             THE PANEL MEMBER:  Yes, sir.

12             MR. DACUS:  Okay.  They've got a lot of patents,

13   don't they?

14             THE PANEL MEMBER:  They sure do.

15             MR. DACUS:  Anything about that experience --

16             THE PANEL MEMBER:  No, sir.

17             MR. DACUS:  -- that would have you leaning towards

18   the folks here who claim they have a patent and want money

19   from AT&T and Nokia?

20             THE PANEL MEMBER:  No, sir.

21             MR. DACUS:  You're going to sit there and listen to

22   the evidence and you're going to render your verdict based on

23   the evidence?

24             THE PANEL MEMBER:  Yes, sir.

25             MR. DACUS:  All right.  Thank you very much.

1        Mr. Wilder?  You might just hand that to Mr. Wilder

2    because I had a similar question for him.

3              THE PANEL MEMBER:  Yes, sir.

4              MR. DACUS:  I think in your questionnaire, you said

5    you worked at Donaldson.  Right?

6              THE PANEL MEMBER:  Yes.

7              MR. DACUS:  Donaldson has patents?

8              THE PANEL MEMBER:  Many.

9              MR. DACUS:  Many.  Did you have some direct

10   involvement in those patents or --

11             THE PANEL MEMBER:  No, sir.

12             MR. DACUS:  Do you know if they ever asserted or

13   brought lawsuits on those patents?

14             THE PANEL MEMBER:  Yes, there has been legal issues

15   over patents.  There is over 600 in play today that they

16   advertise, so there's -- yes.

17             MR. DACUS:  Okay.  Anything about that experience

18   that would have you leaning one way or the other in particular

19   towards the Plaintiff in this lawsuit?

20             THE PANEL MEMBER:  No, sir.  I fly way too far under

21   the radar.

22             MR. DACUS:  Okay.  You're just going to sit there

23   and listen to the evidence --

24             THE PANEL MEMBER:  Absolutely.

25             MR. DACUS:  Okay.  Thank you very much, sir.

1    Mrs. Carlisle, I think you may have already answered

2  this, but you said you had a doctor friend who has a patent?

3              THE PANEL MEMBER:  Yes.  For years they've been

4  creating a device that will help with kidney dialysis.

5              MR. DACUS:  Okay.  Anything about that experience

6  that would have you leaning towards the Plaintiff Finesse in

7  this case?

8              THE PANEL MEMBER:  No.

9              MR. DACUS:  I can sleep well and comfortable tonight

10 that if you were on this jury, you're going to just listen to

11 the evidence?

12             THE PANEL MEMBER:  Yes.  Being a preschool director

13 for years, I've had to combat a lot of little kids arguing

14 their case.

15             MR. DACUS:  So you know a little bit about the first

16 person who tells you their story, you better get the second

17 story also.

18             THE PANEL MEMBER:  Uh-huh.

19             MR. DACUS:  And you agree with that.  Right?

20             THE PANEL MEMBER:  Yes.

21             MR. DACUS:  All right.  Thank you very much.

22             THE COURT:  Two things, ladies and gentlemen.  Try

23 to wait until the question is finished before you give your

24 answer.  That way we'll avoid two people talking at the same

25 time and it will keep the record straight.

1          Number two, unverbalized answers, uh-huh, don't translate

2     well into the record in the court.  So if it's yes, say yes.

3     If it's no, it's no.  But huh-huh and uh-huh is not a good

4     answer.

5          Go ahead, Mr. Dacus.

6          MR. DACUS:  Thank you, Your Honor.

7          Let me ask a broad question.  How many people on the

8     panel consider yourself to be a leader?  And I'll give you a

9     second to think about it.  You know, there's leaders, there's

10    followers.  There's nothing wrong with either.  But how many

11    people consider themselves to be a leader?  Would you raise

12    your hand and let me know?

13         So that's 2, 5, 8, 10, 11, 12, 14, 19, and then I'm going

14    to stop there.  But thank you-all for raising your hands on

15    the last two rows.  All right.  Very good.

16         Let me ask you this, Mr. Hawley.  You said you consider

17    yourself a leader.  I know you're at the ALERT Academy.

18         THE PANEL MEMBER:  I have been, yes, sir, for the

19    last while.

20         MR. DACUS:  All right.  Let me ask you about a

21    little different issue in this case.  You remember the patent

22    video from last Friday?

23         THE PANEL MEMBER:  Yes, sir.

24         MR. DACUS:  Okay.  You remember that that patent

25    video said that the ultimate determination on the validity,

1   whether or not a patent's valid, is made by a jury.  Do you

2   remember that?

3              THE PANEL MEMBER:  Yes, sir.

4              MR. DACUS:  Did you know that before you heard that?

5              THE DEFENDANT:  I did not, no, sir.

6              MR. DACUS:  That's not surprising.  A lot of people

7   don't know that.  So here's what I want to ask you.  If the

8   evidence in this case shows or proves that, in fact, this is

9   not a new concept and the patent should not have been issued,

10  would you be able to render a verdict that says the patent is

11  invalid even though it's been issued?

12             THE PANEL MEMBER:  I -- yes.  I would do my best to,

13  yeah, make whatever --

14             MR. DACUS:  Do you remember from that video that it

15  said that the Patent Office doesn't have or might not have all

16  the information that you're going to be given in this

17  courtroom?  Do you remember that?

18             THE PANEL MEMBER:  Yes, sir.

19             MR. DACUS:  In the course of your -- just your life

20  and your professional life, have you ever made a decision that

21  was wrong, but it was wrong because you didn't have all the

22  information?

23             THE PANEL MEMBER:  Absolutely.

24             MR. DACUS:  That happens, doesn't it?

25             THE PANEL MEMBER:  Yes.

1            MR. DACUS:  Okay.  Thank you, Mr. Hawley.

2       So here's what I need to know from the panel.  I've told

3  you that we believe these two patents are invalid, they should

4  not have been issued.  Is there anyone who says, I'm just not

5  sure if I could find that the patent's invalid if the Patent

6  Office issued it?  Anybody in that camp, even a slight feeling

7  in that direction?

8       Okay.  Good.  I don't see any hands.

9       Let me try to speak with some folks I haven't.

10      Mrs. Jarrett, can I speak with you, please?  The first

11  and most important thing I need to know, is you know I'm an

12  Aggie.

13            THE PANEL MEMBER:  I was at the game.

14            MR. DACUS:  You know I'm Aggie.  Right?

15            THE PANEL MEMBER:  Yes.  And my son was also

16  admitted into the biomedical program but turned it down.

17            MR. DACUS:  Well --

18            THE PANEL MEMBER:  So we're getting a lot of flak

19  about that.

20            MR. DACUS:  So how many times do you thing I've

21  said, Go, Tigers, in my life?

22            THE PANEL MEMBER:  Well, I'll see you next year.

23            MR. DACUS:  Not very many.  Is there anything about

24  that that would prevent you from sitting there and listening

25  to the evidence in this case?

1          THE PANEL MEMBER:  Oh, absolutely not.  Several of

2    my son's best friends go there.  I have many, many friends

3    there.  It's a healthy, vigorous, and fun relationship.

4          MR. DACUS:  It absolutely is.

5          THE PANEL MEMBER:  And I was at the game when they

6    beat us when they shouldn't have, so --

7          MR. DACUS:  Understood.  So no problem for AT&T and

8    Nokia.

9          THE PANEL MEMBER:  No.

10          MR. DACUS:  All right.  Great.  Thank you.

11     Let's see.  Mr. Miles.  I feel like I need to ask you the

12    same thing.  LSU-Shreveport.  Right, sir?

13          THE PANEL MEMBER:  I'm an LSU-Shreveport, but I got

14    three daughters for Texas A&M.  So I'm kind of split.

15          MR. DACUS:  Congratulations.  Are they there now or

16    graduated?

17          THE PANEL MEMBER:  No.  They are graduated, married,

18    got grandkids now.

19          MR. DACUS:  Very good.  My daughter, who's my

20    youngest, went there.  My son escaped to the north

21    unfortunately for a little while.  But thank you, sir.

22     Let's see.  Mr. Gunstream, may I speak with you for just

23    a bit, please, sir?  Have you ever been on a jury before, sir?

24          THE PANEL MEMBER:  No.

25          MR. DACUS:  Not even a criminal jury?

1             THE PANEL MEMBER:  None at all.

2             MR. DACUS:  Okay.  Good.  I know you had lots and

3   lots of naval military service, but then a PGA professional?

4             THE PANEL MEMBER:  Strange transition, isn't it?

5             MR. DACUS:  It is.

6             THE PANEL MEMBER:  Yeah.

7             MR. DACUS:  Do you give golf lessons now?

8             THE PANEL MEMBER:  Sure, if somebody wants to pay

9   me.

10             MR. DACUS:  All right.  Anything about what you've

11   heard so far that would have you leaning either one way or the

12   other in this lawsuit, sir?

13             THE PANEL MEMBER:  Not in particular, no.

14             MR. DACUS:  You feel like you can just sit and

15   listen to the evidence, render a verdict?

16             THE PANEL MEMBER:  I do, yes.

17             MR. DACUS:  Okay.  Great.  Thank you, sir.

18        Let's see.  Mrs. Veramontes.  And to make you feel

19   better, ma'am, I know you had some reluctance about public

20   speaking.  If it makes you feel better, I'm not that great at

21   it, either.

22        I did see on your questionnaire that you said there was a

23   question about do you think a small business doesn't have an

24   equal or a fair chance against a larger corporation.  Do you

25   remember that type of question on the questionnaire?

1                    THE PANEL MEMBER:  Yes.

2                    MR. DACUS:  And you checked strongly agree.  Do you

3      remember that?

4                    THE PANEL MEMBER:  Yes.

5                    MR. DACUS:  So you understand why that would cause

6      me some concern because I represent the company that is the

7      larger of the two here?

8                    THE PANEL MEMBER:  Right.

9                    MR. DACUS:  Right.  My question is, I appreciate you

10     being honest with us on your questionnaire, does that have you

11     leaning in favor of Finesse or the Plaintiff in this case

12     because they're a smaller company?

13                   THE PANEL MEMBER:  I answered that before I knew

14     what was the situation.

15                   MR. DACUS:  Understood.

16                   THE PANEL MEMBER:  So before you hear any facts,

17     yeah, that's -- honestly I lean towards the smaller.

18                   MR. DACUS:  Not uncommon.  Right?

19                   THE PANEL MEMBER:  Right.

20                   MR. DACUS:  But now that you're here and the Judge

21     pointed out the statue of justice here that has a blindfold on

22     it -- do you remember him doing that?

23                   THE PANEL MEMBER:  Yes.

24                   MR. DACUS:  So you're supposed to make a decision

25     just based on the evidence without looking at who's big or

1    who's small.  You understand that?

2              THE PANEL MEMBER:  Yes.

3              MR. DACUS:  And is that something you would be able

4    to do now that you're at court and not just answering a

5    questionnaire in a vacuum?  Is that something you can do?

6              THE PANEL MEMBER:  Yes.

7              MR. DACUS:  Okay.  Great.  Thank you very much.

8         Let's see.  Mrs. Ehrlish, I think you checked the same

9    box on that questionnaire to say that you strongly agree that

10   a small corporation might not have a fair shake or may have

11   difficulty getting a fair shake against the large corporation.

12   Do you remember that?

13             THE PANEL MEMBER:  Yes, I did.

14             MR. DACUS:  Okay.  Now that you're at the

15   courthouse, do you still feel that way?

16             THE PANEL MEMBER:  No.

17             MR. DACUS:  Okay.  You -- if you're seated on this

18   jury, you'd be able to sit there and make a determination

19   based on the evidence that you hear.  Is that right?

20             THE PANEL MEMBER:  Yes.

21             MR. DACUS:  Okay.  Thank you very much.

22        I want to ask a question to the panel as a general

23   matter.  There are people in sort of their everyday matters

24   and affairs who, once they're presented with an issue or a

25   problem, make a decision just like that, very quick knee-jerk

1    reaction.  There are others who like to take their time, look

2    at both sides of the facts, survey the facts, and then make a

3    decision after some measured time.  People fall in two

4    different categories, no right or wrong.

5         Who is it here that considers yourself to be sort of a

6    quick decision-maker, you see the facts, you assess them, and

7    you make a pretty quick decision?  Who's in that category?

8         Okay.  2, 4, 11, 12.  Anybody else?  Okay.

9         The rest of you are in the category of you like to make a

10   more measured decision.  You review both sides of the

11   evidence, then make a decision.  If you're in that category,

12   raise your hand.  Pretty much everybody else.  Okay.

13             THE COURT:  You have five minutes remaining,

14   counsel.

15             MR. DACUS:  Thank you, Your Honor.

16   Juror No. 1 -- and please tell me how to pronounce your

17   name so I don't mispronounce it.

18             THE PANEL MEMBER:  Troquille.

19             MR. DACUS:  Mrs. Troquille.  So you are in that

20   category of you like to make more measured decisions?

21             THE PANEL MEMBER:  Correct.

22             MR. DACUS:  Perfect.  Have you heard anything in the

23   course of this morning that would have you leaning either way

24   towards either party?

25             THE PANEL MEMBER:  No.

1           MR. DACUS:  Thank you very much.  Here's what I'm

2  going to do.  I'm going to give the Court back a few more

3  minutes of its time, which I'm glad to do.  I'm very

4  appreciative of everyone's participation and responses this

5  morning.

6       There is one thing that I want to do before I sit down.

7  I've done this long enough that I know I do not always ask the

8  right questions, and sometimes there are people sitting in

9  your spot and they're thinking, You know what?  That lawyer

10 just -- he didn't ask me this, but, man, he probably wanted to

11 know it even though he didn't ask it, and I'm probably not the

12 right person for him on this jury.

13      Is there anyone that has that thought that you think I

14 didn't ask you something that I probably wanted to know?

15 Anybody in that camp?  Okay.  Good.

16      That's all I have for you this morning.  For the eight of

17 you that are selected on this jury, I very much look forward

18 to presenting the evidence to you.

19      And I thank you for the time, Your Honor.

20          THE COURT:  All right.  Counsel, approach the bench,

21 please.

22          (The following was had outside the hearing of the

23          jury panel.)

24          THE COURT:  Let me ask this question of all of you

25 before we go any further.  Does everybody agree that Ms.

1    Ehrlish should not serve?  She's an AT&T stockholder.  Anybody

2    disagree with that?

3             MR. DACUS:  No.

4             THE COURT:  She's excused.

5        Now, having done that, Mr. Ward, does the Plaintiff have

6    any challenges for cause?

7             MR. WARD:  Yes, Your Honor.  Juror No. 11 indicated

8    livelihood.  One of the customers is AT&T, he knew Mr. Dacus,

9    didn't feel like he could set those things aside and decide

10   this case based on the evidence.

11            THE COURT:  All right.  Anybody besides No. 11?

12            MR. WARD:  Yes, Your Honor.  Juror No. 12 could

13   never consider an award of hundreds of millions of dollars

14   regardless --

15            THE COURT:  Just identify them.  We'll talk about

16   the reasons later.

17            MR. WARD:  I'm sorry.  Juror No. 2.

18            THE COURT:  Mr. Gunstream?

19            MR. WARD:  Yes, sir.

20            THE COURT:  So 2, 11, 12.  Anybody else for cause?

21            MR. WARD:  No. 9 is excused?

22            THE COURT:  Excused because they are a stockholder.

23       Mr. Dacus, does Defendant and Intervenor have any

24   challenge for cause?

25            MR. DACUS:  Yes.  Juror No. 8, Your Honor.

1          THE COURT:  Okay.

2          MR. DACUS:  That's the only one.

3          THE COURT:  Okay.  All right.  No. 11 and No. 20

4    indicated that they had scheduling issues, as did No. 25.

5    Obviously No. 11 we need to talk about because she's -- he's

6    been challenged for cause by the Plaintiff.  I think I ought

7    to bring up No. 20 as well.

8        Does anybody think we could get as far as 25?  I don't

9    think I need to bring up No. 25.

10         MR. WARD:  I don't think so.

11         THE COURT:  Okay.  So in addition to those

12   challenges for cause, which would be 2, 8, 11, and 12, I'll

13   ask No. 20 to be available to speak with me here at the bench.

14       Does anybody see anybody else within the potential strike

15   range that needs to be talked to here at the bench?

16         MR. WARD:  Not from Plaintiff.

17         MR. DACUS:  Not for the Defendants.

18         THE COURT:  All right.  If you'll return to your

19   seats, please.

20             (The following was had in the presence and hearing

21             of the jury panel.)

22         THE COURT:  Ladies and gentlemen of the panel, I am

23   going to need to talk with just a few of you at the bench.

24   Everybody else, I'm going to let you have a recess while

25   that's going on.

1       For those of you that I don't ask to stay behind and talk

2   with me here one at a time at the bench, for those of you that

3   is -- who will have a recess, I'm going to ask you to exit

4   through the double doors in the back of the courtroom.

5   While you're on recess, a couple of things you might want to

6   know.

7       Number one, when you go out those double doors, if you

8   turn left and go around the corner you will find two important

9   things--the water fountain and the restrooms.

10      Number two, please don't leave the building or go to any

11  other floor.  Stay on this floor and stay in this building

12  during the recess.

13      Number three, you're welcome to talk with anybody else on

14  the panel during the recess, whether it's about colleges or

15  whether it's about children or whether it's about

16  grandchildren or the weather or anything else.  Do not discuss

17  what's happened in the courtroom this morning.

18      Let me tell you this:  You have heard zero evidence in

19  this case.  Nothing that's been said in this courtroom this

20  morning is evidence in this case.  So talk about what you do,

21  talk about what you have as hobbies, talk about anything you'd

22  like to with anybody else on the panel during the recess, but

23  don't discuss anything that's happened in the courtroom this

24  morning.

25      Now, those of you I'd like to stay behind so I can talk

1    to you here at the bench one at a time are as follows:

2    Mr. Gunstream No. 2; Mr. Grissom, No. 8; Mr. Alexander, No.

3    11; Mr. Morey, No. 12; and Mrs. Carlisle, No. 20.  Those of

4    you that I just called out your names, I'm going ask you to

5    stay behind.

6         If someone needs to get around you to exit the courtroom,

7    please just stay in your seats, let them move around you as

8    they exit the courtroom, and then I'll bring you up here one

9    at a time to talk with you.

10        Except for the people that I called out specifically that

11   I've asked to stay behind, the rest of the panel is excused

12   under those instructions for recess at this time.

13        Mrs. Jarrett, if you want to lead us, please exit through

14   the double doors.

15             (Whereupon, the jury panel left the courtroom.)

16             THE COURT:  Be seated, please.

17        Counsel, approach the bench.

18        And, Mr. Gunstream, would you come up and join us,

19   please?

20        Good morning, sir.

21             THE PANEL MEMBER:  Good morning.

22             THE COURT:  This is our microphone.  If we can just

23   talk quietly here together.

24             THE PANEL MEMBER:  Yes, sir.

25             THE COURT:  You said during the questioning this

1    morning that damages are always too high.  You also said that

2    damages -- as I heard you, that damages, no matter what they

3    are, always impact me down the line.

4         Do you believe you can listen to the evidence in this

5    case about damages if you're selected as a juror and make any

6    decision in that regard solely on the evidence that's

7    presented and nothing else, or do you believe that these

8    opinions that you, like everybody else in the world, brought

9    with you this morning would keep you from being able to make

10   your decision based solely on the evidence?

11             THE PANEL MEMBER:  To be honest with you, I think

12   that the -- I would have a hard time reaching that number for

13   anybody.

14             THE COURT:  For anybody under any circumstances?

15             THE PANEL MEMBER:  It doesn't matter.  It's just too

16   much money.

17             THE COURT:  All right.  I appreciate your candor.

18   It's a whole lot better for us to find it out now than later.

19        Mr. Ward, do you have any questions for Mr. Gunstream?

20             MR. WARD:  I do not, Your Honor.

21             THE COURT:  Mr. Dacus?

22             MR. DACUS:  I do not.

23             THE COURT:  Mr. Gunstream, I'm going to let you join

24   the rest of the panel outside the courtroom for recess.  Just

25   don't discuss what we talked about in here.

1           THE PANEL MEMBER:  You bet.

2           THE COURT:  Thank you, sir.

3           (The panel member left the courtroom.)

4           THE COURT:  I'm going to excuse Mr. Gunstream for

5   cause.

6       Mr. Grissom, would you come up, please?

7       Good morning.

8           THE PANEL MEMBER:  Good morning, sir.

9           THE COURT:  This is the microphone.  If we can

10  quietly talk to it while you are here.

11      There was a lot of discussion on both sides this morning

12  about leaning one way and leaning the other way.

13          THE PANEL MEMBER:  Yes, sir.

14          THE COURT:  And you indicated that you tend to lean

15  toward the underdog.

16          THE PANEL MEMBER:  Yes, sir.

17          THE COURT:  And I think when asked further about it,

18  you said something like, And you ought to be concerned about

19  that.

20      So what I need to know is how much leaning is there in

21  your case and can you set that aside and make the

22  evidence--excuse me--make the decisions that this jury is

23  going to be called upon to make based on just the evidence

24  that's presented during the trial?

25          THE PANEL MEMBER:  Yes, sir.

1          THE COURT:  Because the jury that's selected in this

2   case is going to hear me say more times than they care to

3   recall that they must base their decisions solely and only on

4   the evidence and nothing else.

5       And everybody comes to the courtroom with their own

6   preconceived notions and opinions and biases.  We're all

7   human.  We all have that.  What I need to know is, can you

8   leave those outside the courtroom and base your decision

9   solely on the evidence, or are they such that you can't do

10  that?

11          THE PANEL MEMBER:  Yes, sir.

12          THE COURT:  Can you answer that for me?

13          THE PANEL MEMBER:  After the questions and after I

14  answered, I was sitting over there still mulling on what I

15  said and if I can put those aside.  And I want to.  The

16  Christian man inside of me tells me to put some of those

17  opinions beside me, but I can't find it in my spirit to -- I

18  don't know why I have an admiration to the little dog from the

19  get-go.

20      I would hope that I could put those opinions aside, but

21  truly, Your Honor, I was asking myself if I could, and I don't

22  know if I can.

23          THE COURT:  So you're not sure.

24          THE PANEL MEMBER:  I'm not sure.

25          THE COURT:  Okay.  Mr. Dacus, do you have questions?

1          MR. DACUS:  Nothing further, Your Honor.

2          THE COURT:  Mr. Ward?

3          MR. WARD:  Nothing.

4          THE COURT:  Okay.  Mr. Grissom, I'm going to let you

5    join the rest of the panel outside for recess.  Just don't

6    discuss anything we talked about in here.

7          THE PANEL MEMBER:  Yes, sir.

8          THE COURT:  Thank you.

9          THE PANEL MEMBER:  Yes, sir.

10         (The panel member left the courtroom.)

11         THE COURT:  I'm going to excuse Mr. Grissom.  He

12   can't affirmatively represent that his prior biases won't

13   impact his decision-making.

14      Mr. Alexander, would you come up, please?

15      Good morning, sir.

16         THE PANEL MEMBER:  Good morning.

17         THE COURT:  This is the microphone.  If we can just

18   talk quietly here at the bench.

19      You've known Deron Dacus since the first grade?

20         THE PANEL MEMBER:  Yes, sir.  Actually kindergarten.

21         MR. DACUS:  First grade.

22         THE COURT:  All right.  Did you play together

23   growing up?  Were you friends growing up?

24         THE PANEL MEMBER:  Absolutely.  Our moms taught

25   school together.  We took vacations together, all kinds of

1    stuff.

2            THE COURT:  I had a mother who was a second grade

3    schoolteacher, and I know about the other teachers' friends

4    and how I related to them.

5        Can you tell me that you can completely set that aside

6    and it won't impact any decisions you make in this case if

7    you're selected to serve?

8            THE PANEL MEMBER:  Being honest, no, sir, I can't.

9    There's always --

10           THE COURT:  I wouldn't expect you to.

11           THE PANEL MEMBER:  You weigh one side or the other,

12   so, yeah.

13           THE COURT:  Okay.  Any questions, Mr. Ward?

14           MR. WARD:  No, Your Honor.

15           THE COURT:  Mr. Dacus?

16           MR. DACUS:  No, Your Honor.

17           THE COURT:  Mr. Alexander, I'm going to let you join

18   the panel outside for recess.  Just don't talk about what we

19   have discussed here.

20           THE PANEL MEMBER:  Yes, sir.

21           (The panel member left the courtroom.)

22           THE COURT:  I'm going to excuse Mr. Alexander.

23       Mr. Morey, please come up.

24       Good morning, sir.

25           THE PANEL MEMBER:  Good morning.

1          THE COURT:  This is the microphone.  If you and I

2     can just talk quiet here.

3          During the questioning this morning, the issue of damages

4     came up.  Mr. Ward told the panel that the Plaintiff in this

5     case was going to ask them to return a verdict in or near the

6     figure of $166 million, and my recollection and my notes from

7     the questioning that followed indicated that you said you

8     could never award that amount of money no matter what the

9     facts were.  Is that right?

10          THE PANEL MEMBER:  Correct.

11          THE COURT:  Okay.  So no matter what the evidence

12    is, you couldn't award that amount of money?

13          THE PANEL MEMBER:  No, not for something that didn't

14    cause some physical damage to someone.

15          THE COURT:  Okay.  So maybe if a high-rise building

16    collapsed or something blew up and killed 50 people, and there

17    was blood on the street, but not in a patent case.

18          THE PANEL MEMBER:  Correct.  Because all it's going

19    to do is if they were going to give $160 million in its favor,

20    AT&T is going to turn right around and raise the rates for

21    everything else.  They're not going to lose anything.

22          THE COURT:  Okay.

23          All right.  Mr. Ward, do you have any questions of

24    Mr. Morey?

25          MR. WARD:  I don't have any questions.

1          THE COURT:  Mr. Dacus?

2          MR. DACUS:  No, sir.

3          THE COURT:  I'm going to let you join the rest of

4     the panel outside during the recess.  Just don't talk about

5     anything we discussed in here.

6          THE PANEL MEMBER:  Yes, sir.

7          THE COURT:  Thank you very much.

8          (The panel member left the courtroom.)

9          THE COURT:  I'm going excuse Mr. Morey for cause.

10         Mrs. Carlisle, would you come up, please?

11         Good morning.

12         THE PANEL MEMBER:  Good morning.

13         THE COURT:  This is the microphone.  If you and I

14    can just talk quietly here.

15         THE PANEL MEMBER:  Okay.

16         THE COURT:  At the beginning of the process I talked

17    about my belief that it will take the entirety of this week to

18    try this case to completion.  And when I asked about people

19    that would be seriously impacted about being here each day if

20    they were selected, you raised your hand.  Can you tell me

21    about that?

22         THE PANEL MEMBER:  I've got bile duct cancer, and I

23    have a chemotherapy treatment on Thursday, and I'm seeing my

24    oncologist on Monday.  I can reschedule those things, I've

25    already called, if I need to.

1          THE COURT:  Okay.  That's what I was going to ask

2     you.  Is this something that has to be done this week or

3     something you could reschedule?

4          THE PANEL MEMBER:  My cancer is incurable so it

5     doesn't really matter.

6          THE COURT:  Okay.  Do you have these chemo

7     treatments every week or --

8          THE PANEL MEMBER:  No.

9          THE COURT:  -- just periodic?

10         THE PANEL MEMBER:  Uh-huh.

11         THE COURT:  Okay.  And you're not telling me that if

12    you had to reschedule it for the next week, it could have any

13    medical impact on you, that you know of?

14         THE PANEL MEMBER:  No.

15         THE COURT:  Okay.  I know that's inconvenient and I

16    appreciate you being candid with me.  Is there anything else

17    about your situation that would make it difficult for you to

18    serve as a juror that we haven't talked about?

19         THE PANEL MEMBER:  Can I bring a blanket?  It's so

20    cold in here.  I was freezing.

21         THE COURT:  You wouldn't believe the number of times

22    I hear that.  I hate to tell you, but there's not anything I

23    can do about that.

24         THE PANEL MEMBER:  That's fine.

25         THE COURT:  You can certainly wear warm clothes if

1    you are selected.

2              THE PANEL MEMBER:  Thank you.

3              THE COURT:  Mr. Ward, do you have any questions for

4    Ms. Carlisle?

5              MR. WARD:  I do.

6         And I'm sorry that you're going through that.  I just

7    want to know, do you feel like you can sit and listen to the

8    evidence and base a decision in this case based upon the

9    evidence, or do you feel like what you're going through might

10   impact your ability to sit and listen for long days?

11             THE PANEL MEMBER:  No.  I may get tired, you know,

12   but --

13             MR. WARD:  We take breaks.

14             THE PANEL MEMBER:  -- while we're sitting, we're

15   good.

16             MR. WARD:  Okay.  I don't have any other questions.

17             THE COURT:  Mr. Dacus, any questions?

18             MR. DACUS:  No, sir.  Thank you.

19             THE COURT:  Mrs. Carlisle, my mother taught second

20   grade for 38 years, and if you can manage a preschool, you've

21   got a lot of stamina.

22             THE PANEL MEMBER:  Thank you.

23             THE COURT:  I'm going to let you join the rest of

24   the group outside for recess.  Just don't discuss what we've

25   talked about in here.

1          THE PANEL MEMBER:  Sure.  Thank you, sir.

2          THE COURT:  Thank you, ma'am.

3          (The panel member left the courtroom.)

4          THE COURT:  I'm not going to excuse Mrs. Carlisle.

5      That means I've excused five members of the panel.  We're

6  going to seat eight.  Each side has four peremptory

7  challenges, so 8 and 8 is 16 and 5 is 21.

8      Do we all agree that the parties will strike through No.

9  21?

10          MR. DACUS:  Yes, sir.

11          MR. WARD:  Yes, sir.

12          THE COURT:  All right.  I've got about eight or nine

13  minutes until 11:00.  Why don't I give you until 10 minutes

14  after 11:00.  That will give you almost 20 minutes.  Will that

15  be adequate?

16          MR. DACUS:  Yes, Your Honor.

17          MR. WARD:  Yes, Your Honor.

18          THE COURT:  You may be excused to strike your list.

19      While counsel exercise their peremptory challenges, the

20  Court will stand in recess.

21                      (Brief recess.)

22          THE COURT:  Be seated, please.

23      All right.  Ladies and gentlemen, if you'll listen

24  carefully, as your name is called by our Courtroom Deputy

25  Ms. Brunson, at that time if you'll come forward and take your

1   place in the jury box.

2      Let me tell you how I'd like to do this.  We're going to

3   seat eight jurors in this case.  I'd like the first four to

4   position themselves on the front row or the first row of the

5   jury box, the second four jurors 5, 6, 7, and 8 on the back

6   row of the jury box.

7      When the first person is called and as you come forward,

8   I'd like you to enter the front row of the jury box and walk

9   all the way to the end and stand in front of the last chair.

10  When the second person is called, I'd like you to enter the

11  jury box on the front row and walk toward the first person but

12  stand in front of the third chair.  Leave a vacant chair

13  between you.  The third person will leave a vacant chair

14  between No. 2 and themselves, and the fourth person will leave

15  a vacant chair between No. 3 and themselves.

16     And then the second four of you, the second half of you

17  will do the same thing on the second row, and that way we'll

18  have four on the first row, four on the back row, and

19  everybody will have a vacant chair between them and the next

20  juror.  And if all eight of you will remain standing and in

21  place until all of you are in the jury box and I've given you

22  further instructions, I'd appreciate it.

23     So with that, I'm going to ask Ms. Brunson to call the

24  names of our eight selected jurors for this case.

25          THE CLERK:  Rachael Troquille, Judy Ragsdale, Anna

1    Henderson, Betty Reese, Bettina Viramontes, Tommy Miles, Jr.,

2    Kristine Davis, Stacey Dale.

3                THE COURT:  Thank you, ladies and gentlemen.  I'm

4    going to ask our Courtroom Deputy to administer the oath to

5    you at this time.  If you'd each raise your right hands,

6    please.

7                (Whereupon, the oath was administered by the Clerk.)

8                THE COURT:  Please have a seat.

9        For those of you on the venire panel who were not

10   selected to serve on this case, I'm about to excuse you in

11   just a couple of minutes.  But as I excuse you, ladies and

12   gentlemen, I want to thank you on behalf of the Court, the

13   Court staff, the parties in this case, the counsel in this

14   case, everyone on this side of the bar.

15       We all recognize that each of you had other places to be

16   today, other things going on in your lives, and you set those

17   aside and you made the sacrifice to appear and present

18   yourself for jury duty.  In this particular case you've done

19   that twice.  You did it on Friday and you did it again this

20   morning on Monday.  And I want you to know all of us

21   appreciate what you've done, we recognize the sacrifice that

22   you've made, and I want you to understand you have rendered

23   very real and important public service by being here.

24       I could not select this jury without all of you here.  We

25   could not try this case without this jury.  The dispute

1    between these parties could not be brought to a peaceful

2    resolution without this trial.  So all of you have done very

3    real and important public service by being here, and I want

4    you to know we recognize that, we appreciate it, and we

5    applaud it.

6         As you leave the courtroom in a few minutes, if you will

7    exit to your right toward the front of the building, you will

8    pass the Clerk's Office.  Will you please leave those very

9    valuable plastic numbers pinned to your chest with the Clerk.

10   Those are not souvenirs and, believe it or not, we will use

11   them again with another panel.  So please don't take those

12   home with you.

13        If you need a written record of where you've been this

14   morning for an employer, if you have any questions about

15   anything related to you being present for jury duty, either

16   Friday or today, please pose those questions to Ms. Clendening

17   and the Clerk's Office and they will be more than happy to

18   help you.

19        Again, ladies and gentlemen, thank you so much for your

20   presence and your service.

21        Those not selected to serve on this jury are now excused.

22            (Whereupon, the jury panel left the courtroom.)

23            THE COURT:  Please be seated.

24        Ladies and gentlemen of the jury, and I'm glad we've got

25   one man so I can say 'ladies and gentlemen of the jury',

1   because I would probably say it even if it was all women.

2   I've had that before and I just say it the way I've always

3   said it.  So, ladies and gentleman of the jury, we appreciate

4   you being here.  I look forward to trying this case with you.

5   Let me give you some very early instructions, and then I'm

6   going to excuse you for lunch.

7        The first thing I need to tell you is that during this

8   trial the Clerk's Office is going to provide you lunch each

9   day in the jury room.  You do not need bring a lunch.  You do

10  not need to worry about going out into this community and

11  finding a place to eat and getting back.

12       Bringing you or having the Clerk's Office provide you

13  with lunch does two very important things.  Number one, it

14  makes it such that we do not have to take as long a break for

15  lunch as we would if you had to leave the building and go out

16  into the community.

17       Number two, I don't have to worry about somebody losing

18  track of the time and not getting back here so we can't get

19  back on the record and continue the trial.  So for those

20  reasons, and there may be others, but at least for those

21  reasons I've instructed the Clerk's Office to provide you with

22  lunch each day in the jury room.

23       I know Ms. Clendening alternates around the various

24  vendors in the Marshall community.  If you've got any kind of

25  a food allergy, take it up with Ms. Clendening.  But you do

1    not need to worry about bringing food for lunch during the

2    trial.

3         Second of all, let me give you a very rough idea about

4    the kind of schedule we're going to keep through this trial

5    process.  Every judge in the United States that tries cases

6    like this has the latitude to try them the way they think is

7    best, and so there's a great diversity in the scheduling and

8    the timing and how trials are tried.  There are fellow judges

9    in this district who are my colleagues who I think the world

10   of, and they will take twice as long to try this case as I

11   would, but the reason is they'll start at 10:00 in the morning

12   and they'll quit at 4:00 p.m. and they'll take an hour and a

13   half for lunch.

14        And I've been told over my 11-plus years now on the bench

15   that jurors in East Texas would much rather start early and go

16   longer and be away from their homes and their families and

17   their work a shorter number of total days than if we started

18   late and quit early and it took twice as many days to try the

19   case.  I know several of you have got distances to drive from

20   where you live coming and going each day, so the fewer number

21   of times you have to do that I think the better off everybody

22   will be.

23        So my practice is to start early, so I'm going to let you

24   know that my intention is to start every day at 8:30.  I'd

25   like to have you assembled in the jury room by about 7:15

1    [sic], and if I'm not mistaken Ms. Clendening will have juice

2    and coffee and pastries and snacks for breakfast each morning

3    as well.

4        But if you can plan your schedules and let those know

5    that you live with and work with that you will be here -- need

6    to be here by 8:15 so we can start as close to 8:30 as

7    possible, that would be good.  Again, lunch will be provided

8    for you, so you won't be leaving the courthouse to go find

9    lunch or have to bring it in.

10       Third, I won't stop for the day at 4:00, I probably won't

11   stop for the day at 5:00, and in most cases we'll probably go

12   to somewhere in the neighborhood of 6:00.  That is not an

13   exact science.  Some of these witnesses are going to be on the

14   witness stand for only a few minutes.  Some of these witnesses

15   are going to be on the witness stand for several hours.

16       It's my preference and I think it gives us a better trial

17   for you to follow the evidence if I try to get the witness on

18   and off the same day.  I hate to have to break a witness and

19   get halfway through their testimony and send everybody home

20   and then pick back up the next morning.  I think you will

21   follow their evidence and their testimony better if you can

22   get the full presentation from both in the same day.

23       So that means if we have a long witness who to finish

24   their testimony we've got to go to 6:15, I'm probably going to

25   be inclined to go to 6:15 and get them finished.  If we have a

1    witness that's going to stop at 5:45 and the next witness is

2    going to be an hour and a half, we're not going to start that

3    next witness.

4          So it won't be 6:00 on the dot, but you can bet on the

5    fact, you can count on the fact, it's not going to be 4:00 or

6    5:00 in the afternoon.  But if we will start at 8:30, if we

7    will take regular breaks but keep them reasonable in duration,

8    and if we'll go to 5:30 or 6:00, or somewhere in that range

9    each day, we can finish this case and you can complete your

10   jury service, in my best estimate, by the end of this week.

11         As I say, I have seven other colleagues in this district.

12   There are eight active district judges in the Eastern District

13   of Texas, everywhere from Beaumont to Lufkin to Marshall to

14   Texarkana, to Tyler, to Sherman, and to Plano, and they all do

15   it differently.  And I have some that I truly admire and

16   appreciate, but it would take them two weeks to try this case

17   because they will do it the way they think it needs to be done

18   and it won't be the kind of schedule that I like to use.

19         So I want you to know that.  I want you to be able to

20   tell those that you live with or those that you need to

21   coordinate with, those that may be depending on you, I will

22   need you to be able to let them know what to expect in a

23   general sense as far as schedule goes.  But I have routinely

24   been told by jurors after cases are over, We'd much rather

25   work a long day every day but be away from our homes and our

1   work half as many days as it would if we did it another way.

2   So that's the approach I'm going to take.

3        I know this time of the year by 6:00 it's probably going

4   to be dark outside and you're going to need to plan your

5   schedule to come and go, your travel to be here under those

6   circumstances.  Please check the weather each night, too.  You

7   know, they always say in Texas, If you don't like the weather,

8   wait five minutes and it will change.  I've had jurors not

9   check the weather and it took them an extra half an hour to

10  get here than they planned on.

11       And a jury trial is like a convoy of ships--we can move

12  only as fast as our slowest ship.  So if seven of you are here

13  and ready to go at 8:30 and one of you is not, we can't start

14  with seven; we have to have all eight of you here.  So please

15  keep that in mind, ladies and gentleman.  And I know that you

16  will.

17       Also while you are on this lunch break we're going to

18  start in a few minutes, I'd like you to take an opportunity to

19  make sure Ms. Clendening has a good cell phone number for each

20  of you.  It is possible, not very likely, but it is possible

21  something could occur that would necessitate us getting in

22  touch with you overnight or before you're back here the next

23  day.  I don't think that's likely, but I'd like to be prepared

24  for all circumstances.

25       I was a Boy Scout.  I think 'be prepared' is a pretty

1    good motto.  So we're going to try to be prepared, so please

2    let Ms. Clendening have a good working cell phone number for

3    you that would be able to reach you overnight when you're not

4    here at the courthouse.

5          Speaking of cell phones, I'm also going to ask you not to

6    bring your cell phones into the courthouse starting tomorrow.

7    If you've got them with you today, leave them in the jury room

8    when you come back from lunch.  Cell phones in today's world

9    are just small computers, and one of the things you're going

10   to hear from me more times than you probably want to hear it

11   over the course of this trial is that you're not to

12   communicate with each other or anyone else about this case.

13         And that goes back to a very fundamental principle that

14   at the end of this trial when you will be asked to answer

15   certain questions that will be presented to you in writing,

16   you must have only the sworn testimony presented in this

17   courtroom and those documents that the Court has admitted into

18   evidence as exhibits as the sole universe of the information

19   that you draw upon to answer those questions.

20         And if you have a cell phone with you and something's not

21   completely familiar, you, like many of us, might be tempted to

22   pick it up and Google this or do a search on that, and any

23   outside information runs counter to that underlying

24   fundamental principle that only the sworn testimony of the

25   witnesses subject to cross examination and only the exhibits

1    admitted into evidence by the Court constitute the proper and

2    appropriate and correct evidence for you to base your

3    decisions on as you answer those questions.

4         So understanding that you might be tempted to use those

5    cell phones for something else, I'm going to ask that you

6    leave them at home or leave them in your car when you come

7    back tomorrow.  If you have them with you, leave them in the

8    jury room when you come back in after lunch.

9         If you're expecting an important text message or email or

10   phone call related to work, there will be a time when you can

11   step to your vehicle and check your cell phone if necessary,

12   but please don't bring them back into the building starting

13   tomorrow.

14        And we will take breaks during the trial.  I usually take

15   two breaks in the morning and try to take two breaks in the

16   afternoon.  That's not a hard-and-fast rule.  It may be three

17   one day.  But we will take periodic breaks.  I get tired of

18   sitting and I like to stand up and move around a little bit,

19   too.  So don't think you're going to be glued to those chairs

20   from 8:30 in the morning until 6:00 clock at night.

21        Also, ladies and gentlemen, let me give you a few other

22   instructions that I think are very important, and I'll start

23   with the one I just mentioned.  Don't discuss this case with

24   anyone.  And when I say don't discuss it, I mean don't

25   communicate in the broadest sense of the term with anyone

1       about this case.

2               And as I just mentioned, trials by jury in a United

3       States District Court such as this are based on the

4       fundamental principle that the jury should have and must rely

5       on only--the evidence presented in the courtroom during the

6       trial when they answer the questions that they'll be asked to

7       answer after the evidence is complete.  Those questions will

8       come to you in a written document.  That document is called

9       the verdict form.  Your answers to those questions must be

10      unanimous, they must be in writing, and they must draw on only

11      the evidence presented during this trial from this courtroom

12      as the source of information from which to answer those

13      questions.

14              So don't communicate with anyone in any way about

15      anything related to this trial, because if you do, you'll

16      violate that fundamental principle, and if you do that, you

17      will put at risk the entirety of the trial and all the

18      hundreds, if not thousands, of hours of work that have gone

19      into it.  So that's why you're probably going to hear this

20      from me over and over and over during the trial--don't

21      communicate with anyone in any way about the case.

22              And when I say don't communicate with anyone about the

23      case, that means the eight of you, too.  We take a recess

24      during the day, don't go back in the jury room and talk about

25      what you thought of that last witness that was on the witness

1  stand, whether you believed them, whether you thought they

2  were credible.  That's not proper, either.  Don't discuss the

3  case with anyone, including the eight of yourselves, until

4  you've heard all the evidence and until I have instructed you

5  to deliberate on your verdict.

6      Now, after all the evidence, after you received my

7  instructions on the law that you are to apply, after you've

8  heard the closing arguments from the attorneys in the case, at

9  that point I will tell you, "Ladies and gentlemen, you may now

10  retire to the jury room to deliberate on your verdict."

11  There's something magic about those words, because when I say

12  those words, you go from being prohibited from talking to each

13  other about the case to being required to talk to each other

14  about the case.  When you retire to deliberate, you must

15  discuss the evidence, the witnesses, everything about the

16  trial with each other in an effort to reach a unanimous

17  agreement as to how to answer those written questions that

18  will be in the verdict form.

19      It's often thought of as being like a light switch.

20  Before I tell you to retire and deliberate on your verdict

21  after all the evidence has been presented, you must not

22  discuss the case with each other or anyone else.  When I tell

23  you to retire and deliberate on your verdict, the light switch

24  changes, it goes on from off and you must discuss in your

25  deliberations the case and the evidence and the trial with

1    each other in an effort to reach a unanimous decision on those

2    questions.  I hope that's clear to you.

3         But because a violation of that puts at risk the entirety

4    of the process, you're probably going to hear me say over and

5    over again, probably pretty much every time you get out of

6    those chairs you're going to hear me say, "Please follow all

7    my instructions, including not to discuss the case with anyone

8    in any way."  So I'm just giving you fair warning, you're

9    probably going to be tired of hearing that by the time the

10   trial is over, but it's so fundamentally important I have a

11   tendency to repeat it often.  So I'm giving you fair warning.

12        And when I say don't communicate about the case in any

13   way, again, that's the broadest sense of the term.  That not

14   only means don't have a conversation with somebody, that also

15   means don't communicate in any other way.  Don't send an email

16   to somebody.  Don't send a text message to somebody.  Those of

17   you that use social media, for heaven's sake don't post

18   something on Facebook or tweet on Twitter or use any social

19   media platform.  All of that is communication.  So in the

20   broadest sense of the term you must not communicate with

21   anyone, including the eight of yourselves, about the case

22   until I tell you to retire and to deliberate on your verdict.

23        And I'll tell you this, ladies and gentlemen.  Unless you

24   live alone, when you get home tonight, wherever that is, and

25   you walk in the door, the first thing you're going to hear is,

1    Well, what happened in federal court in Marshall today?  Don't

2    even try to answer that question, because if you even try to

3    answer that question, you're going to almost assuredly violate

4    this instruction.  Just blame it on me.  That's part of why I

5    get paid.  Just say, That very stern federal judge told me not

6    to talk about this with you until the case was over and I had

7    been released.  Now, when that happens I can talk to you, but

8    until the case is over, he has told me not to discuss anything

9    about the case and, therefore, I'm not even going to try to

10   answer that question.  Blame it on me and that's just part of

11   what I get paid for.

12       Also, ladies and gentlemen, in this same vein, don't do

13   any outside research of any kind.  You're going to hear about

14   new things and new concepts and new sets of facts that you

15   probably haven't heard of before during this trial.  Don't be

16   tempted to do any outside research, whether it's an

17   encyclopedia off the shelf or an online internet search or

18   anything else.  Don't attempt to do any outside research in

19   any way.

20       Now, one other thing you've heard these lawyers say

21   during jury selection this morning is that this is an

22   important case.  It is an important case, and there are no

23   unimportant cases that get to a trial before a jury in a

24   United States District Court.  That means -- although it's

25   very unlikely, that means it is within the realm of

1    possibility that during this trial some third party could

2    attempt to contact you and could attempt to influence your

3    decisions in this case.  I don't think that's likely, but I

4    will tell you it is possible.

5         If at anywhere in the process you are contacted by anyone

6    or there's any communication to you from anyone that you feel

7    awkward about or uneasy about or you're not sure it's what it

8    ought to be in any way, immediately you should let Ms.

9    Clendening know, Ms. Clendening will advise me and, if

10   necessary, the Court will deal with it.  But, again, it's not

11   likely, but this is not an unimportant case and it is within

12   the realm of possibility, so I want to let you know about

13   that.

14        Also, ladies and gentlemen, over the course of this trial

15   as you come in in the mornings, as you leave in the evenings,

16   and at other times it's quite possible that you're going to

17   pass by either on the front steps, in the hallway, somewhere,

18   one or more of the lawyers in this case, one or more of the

19   representatives of the parties in this case, one or more of

20   the support staff in this case.  And when that happens,

21   they're not going to talk to you.

22        So if you come in the front steps tomorrow morning and

23   one of these lawyers is passing you in the opposite direction

24   and you say, good morning, they're going to walk right by you

25   and they're not going to say good morning back to you.  And

1    when that happens, don't think they're being rude, don't hold

2    it against them, don't think they're being unfriendly; those

3    are my instructions to them.

4        Again, there must be no communications of any kind that

5    could influence your decisions in this case except the sworn

6    testimony from the witness stand during the trial and subject

7    to cross examination and the documents and tangible things

8    that the Court under the rules of evidence has admitted into

9    evidence as exhibits in this trial.  That's it.  That's the

10   entirety of the universe of proper information for you to know

11   about and to consider in this trial.

12       So if somebody affiliated with this case one way or the

13   other doesn't speak, doesn't have a conversation, isn't

14   gregarious and friendly as we are used to here in East Texas,

15   it's because I've instructed them not to.  And don't hold it

16   against them and don't think they're being rude or unfriendly;

17   understand that they're complying with my instructions and my

18   rules.

19       Briefly let me give you one more instruction.  Then I'm

20   going to release you for lunch.  I want to give you a

21   structural overview of how the trial will take place.

22       After lunch and when you come back in, I will have some

23   preliminary instructions to give you, which I'll give to you

24   orally.

25       After I've given you my preliminary instructions, then

1    the lawyers for both sides will present their opening

2    statements.  Opening statements are not arguments.  Opening

3    statements should be a roadmap where each side tells you what

4    they expect they will be able to show and prove to you by way

5    of the witnesses and the evidence that they're going to

6    present at the trial.  It's an overview, a roadmap, if you

7    will, from both the Plaintiff's side and the Defendant and

8    Intervenor's side.

9         Once they've given you those opening statements from both

10   sides, the Plaintiff will go first, and then the Defendant and

11   Intervenor will go second, then the Plaintiff will put on its

12   evidence and will call its first witness.  That's called the

13   Plaintiff's case in chief.  And they will call their

14   witnesses, they will examine their witnesses, the other side

15   will then get a chance to cross examine their witnesses.  And

16   then we'll move on to the next witness, and we'll go through

17   each of the Plaintiff's witnesses until they've presented all

18   their evidence.  And when that's completed, the Plaintiff will

19   rest its case in chief.

20        When the Plaintiff rests its case in chief, then we will

21   turn to the Defendant and Intervenors, AT&T and Nokia, and

22   through their counsel they will call their witnesses, and they

23   will examine their witnesses and the Plaintiff's counsel will

24   get a chance to cross examine their witnesses.  And we will go

25   through each of the AT&T and Nokia witnesses until they have

1    presented all their witnesses and all their evidence.  At that

2    point AT&T and Nokia will rest the Defendant and Intervenor's

3    case in chief.

4        Once they have rested their case in chief, then the

5    Plaintiff Finesse has an opportunity, if they choose to, to

6    call to the witness stand what are known as rebuttal

7    witnesses, to rebut any of the testimony put on by Defendant

8    and Intervenors.  They may call rebuttal witnesses, they may

9    not call rebuttal witnesses.  They are not required to, but

10   they have that option.  If rebuttal witnesses are called we

11   will go through the same process--Plaintiff will call them,

12   the Plaintiff will examine them under oath, the Defendant will

13   cross examine them under oath, and then we'll finish how many

14   ever, if any, witnesses on rebuttal the Plaintiff calls.

15       Once we've completed the Plaintiff's rebuttal case, if

16   they have one, or if the Plaintiff doesn't call rebuttal

17   witnesses and we've concluded at the end of the Defendant and

18   Intervenor's case in chief, then you will have heard all of

19   the evidence in this case.  And once you've heard all the

20   evidence in this case, I will give you final instructions on

21   the law that you are to apply in answering the questions in

22   the verdict form.

23       After I have given you my final instructions, those are

24   sometimes called the Court's charge to the jury, once I have

25   done that, then counsel for the competing parties will present

1     their closing arguments and that's when they get to argue the

2     case.  That's when they get to tell you what they think you

3     need to do as far as reaching a result and why and what

4     evidence that they've presented supports you reaching the

5     conclusions and the results that they think are proper.

6          So you'll hear from the Plaintiff for closing argument,

7     and then you'll hear from the Defendant and Intervenor, and

8     the Plaintiff gets to reserve some of their time and do a

9     final closing argument, if they choose to, and I suspect that

10    they will.  That's typical.  Each side gets the same amount of

11    time to present closing argument, but the Plaintiff gets to

12    divide theirs to go first and last because the burden of proof

13    rests on the Plaintiff, which I'm sure the Defendant and

14    Intervenor will point out to you over the course of the trial.

15         After you've heard closing arguments from both sides and

16    after you've received the Court's charge to the jury, my final

17    instructions to you, that's when I will say those magic words,

18    "Ladies and gentlemen of the jury, you may now retire to the

19    jury room to deliberate on your verdict," and that's when you

20    go from being prohibited to discussing the evidence and the

21    trial with each other to being required to discuss the

22    evidence and the trial with each other in an effort to reach a

23    unanimous decision about how to answer the written questions

24    in the verdict form that I will send back with you when you

25    retire to deliberate.

 1          So that's the structure of how this is going to happen,

 2    and I want you to have that in mind so you can follow along as

 3    we go through the trial and know which step in the process

 4    we're on as we get there.

 5          Now, with that, ladies and gentlemen, I'm going to excuse

 6    you for lunch.  It should be waiting for you in the jury room.

 7    And it is about a quarter until 12:00.  We will probably take

 8    close to -- we'll take, give or take, an hour for lunch today.

 9    So I should have you back in here about a quarter until 1:00

10    or thereabouts.

11          With those instructions, please enjoy your lunch.  And

12    the members of the jury are excused for lunch at this time.

13               (Whereupon, the jury left the courtroom.)

14               THE COURT:  Please be seated.

15          Does Plaintiff have anything to raise with the Court

16    before we recess for lunch?

17               MR. GRINSTEIN:  Nothing from the Plaintiff, Your

18    Honor.

19               THE COURT:  How about Defendant and Intervenor?

20               MR. DACUS:  We do not, Your Honor.  Thank you.

21               THE COURT:  All right.  We'll try to make it

22    approximately an hour.  But, as I mentioned to you this

23    morning in chambers, I have an obligation at 12:15 that should

24    take me about 20 minutes.  It's away from the courthouse.

25    I'll get back here as quick as I can.  Hopefully we can start

1    in about 60 minutes.

2         With that, we're excused for lunch.

3         And the Court stands in recess.

4                        (Lunch recess.)

5         THE COURT:  Be seated, please.

6         Counsel, I have been told by my law clerks that when we

7    met in chambers this morning and we talked about the fact that

8    the overnight binders were late, I said 7:30.  They should be

9    here by 7:00 each morning so that we can meet by 7:30.  I

10   think you already knew that, but just to make sure there's no

11   doubt, I wanted to clarify that.

12        All right.  Is there anything I need to take up with

13   counsel before I bring in the jury and proceed with the

14   Court's preliminary jury instructions?

15             MR. GRINSTEIN:  Nothing from the Plaintiff, Your

16   Honor.

17             MR. DACUS:  Nothing from the Defendant, Your Honor.

18             THE COURT:  All right.  Let's bring in the jury,

19   please.

20             (Whereupon, the jury entered the courtroom.)

21             THE COURT:  Please be seated, ladies and gentlemen.

22        Welcome back from lunch.  I now have some preliminary

23   instructions that I need to give to the members of the jury

24   and on the record before we proceed with counsel's opening

25   statements from the parties and then get onto the evidence.

1     You've now been sworn as the jurors in this case and, as

2   the jury, you are the sole judges of the facts, and as such,

3   you will decide and determine what all the facts are in this

4   case.  As the Judge, I will give you instructions on the law,

5   decide questions of law, evidence, and procedure that arise

6   during the course of the trial, and I'm responsible for

7   maintaining an efficient flow of the evidence and maintaining

8   the decorum of the courtroom.

9     At the end of the evidence, ladies and gentlemen, I'll

10   give you detailed instructions about the law to apply in

11   deciding this case and I'll give you a list of questions that

12   you are then to answer.  This list of questions, as I

13   mentioned, is called the verdict form.  Your answers to those

14   questions will need to be unanimous and your unanimous answers

15   to those questions will constitute the jury's verdict in this

16   case.

17     Now, let me briefly tell you what this case is about.  As

18   you know, this involves disputes regarding two United States

19   patents.  Now, I know that you've all seen the patent video

20   prepared by the Federal Judicial Center, but I need to give

21   you these instructions now and on the record about a patent

22   and how one is obtained.

23     Patents are either granted or denied by the United States

24   Patent and Trademark Office, which is sometimes referred to

25   for short simply as either the Patent Office or the PTO.  A

1   valid United States patent gives the patentholder the right

2   for up to 20 years from the date the patent application is

3   filed to prevent others from making, using, offering to sell,

4   or selling the patented invention within the United States or

5   importing it into the United States without the patentholder's

6   permission.

7       A patent is a form of property, and it's known as

8   intellectual property, and like all forms of property, a

9   patent may be bought or sold.

10      The violation of a patentholder's rights is called

11  infringement.  A patentholder may try to enforce a patent

12  against persons it believes to be infringing by filing a

13  lawsuit in federal court, and that's what we have before us in

14  this case.

15      The process of obtaining a patent from the PTO is called

16  patent prosecution.  To obtain a patent, one must first file

17  an application with the Patent Office.  The Patent Office is

18  an agency of the United States government.  It's actually a

19  part of the U.S. Department of Commerce, and it employs

20  trained examiners who review patent applications and they

21  review patents as well.

22      Patent application, I should say, includes within it

23  something that is called a specification.  The specification

24  contains a written description of the claimed invention

25  telling what the invention is, how it works, how to make it,

1    and how to use it.  The specification concludes or ends with

2    one or more numbered sentences.  These numbered sentences are

3    called the patent claims.  When a patent is granted by the

4    PTO, it is the claims, ladies and gentlemen, that define the

5    boundaries of the patent's protection and give notice to the

6    public of those boundaries.

7         Now, patent claims may exist in two forms or two types

8    referred to as either independent claims or dependent claims.

9    An independent patent claim does not refer to any other claim

10   in the patent.  It is independent.  It stands alone.  It's not

11   necessary to look at any other claim within the patent to

12   determine what an independent claim covers.

13        On the other hand, a dependent patent claim refers to at

14   least one other claim within the patent.  A dependent claim

15   includes the elements or limitations of the other claim or

16   claims to which it refers or, as we sometimes say, from which

17   it depends, as well as the additional elements or limitations

18   of the dependent claim itself.  Therefore, to determine what a

19   dependent claim covers, it's necessary to look at both the

20   dependent claim itself and the independent claim or claims

21   from which it refers or from -- to which it refers or, as we

22   say, from which it depends.

23        Now, the claims in the patents-in-suit use the

24   word 'comprising.'  Comprising means including or containing.

25   A claim that includes the word 'comprising' is not limited to

1    the methods or devices having only the elements that are

2    recited in the claim, but also covers methods or devices that

3    add additional elements.

4        Let me give you an example.  If you take the example of a

5    claim that covers a table, if the claim recites a table

6    comprising a table top, legs, and glue, the claim will cover

7    any table that contains these three structures, even if it

8    also contains other structures, such as leaves to expand the

9    size of the tabletop or wheels to go on the ends of the legs.

10   Now, that's a very simple example using the word

11   'comprising' and what it means.  In other words, ladies and

12   gentlemen, it could have other features in addition to those

13   that are covered by the patent now.

14       After the applicant files his or her application with the

15   Patent Office, an examiner is assigned to that application by

16   the Patent Office, and the examiner reviews the application to

17   determine whether or not the asserted claims are

18   patentable--that is to say, appropriate for patent

19   protection--and whether or not the specification adequately

20   describes the invention that is claimed.

21       In examining a patent application, the examiner reviews

22   certain information about the state of the technology at the

23   time the application was filed.  The PTO, the Patent Office,

24   searches for and reviews this type of information that's

25   publicly available or that was submitted by the applicant, and

1    this type of information is called prior art.  The examiner

2    reviews this prior art to determine whether or not the

3    invention claimed is truly an advance over the state of the

4    art at the time.

5        Now, prior art is defined by law, and I'll give you

6    specific instructions at a later time as to what constitutes

7    prior art.  However, in general, prior art includes

8    information that demonstrates the state of the technology that

9    existed before the claimed invention was made or before the

10   application for a patent was filed.

11       Now, a patent also contains within it a list of certain

12   prior art that the examiner has considered in reviewing the

13   application.  The items on this list -- the items of prior art

14   on this list are called the cited references.

15       Now, after the prior art search and examination of the

16   application, the examiner informs the applicant in writing of

17   what the examiner has found and whether the examiner considers

18   any claim within the application to be patentable, in which

19   case it would be allowed.  And this writing from the examiner

20   to the applicant is called an office action.

21       Now, if the examiner rejects the claims, the applicant

22   has an opportunity to respond to the examiner to try to

23   persuade the examiner to allow the claims.  The applicant also

24   has a chance to change or amend the claims or to submit new

25   claims.

1          Now, the papers generated in this back and forth between

2     the examiner and the applicant are called the prosecution

3     history, and this process, this prosecution history, may go

4     back and forth between the applicant and the examiner for some

5     time until the examiner is satisfied that the application

6     meets the requirements for a patent and, in that case, the

7     application issues as a United States patent.  Or, in the

8     alternative, if the examiner ultimately concludes that the

9     application should be rejected, then no patent is issued.

10         Sometimes patents are issued after appeals within the PTO

11    or to a court.

12         Now, to help you follow the evidence, I'll give you a

13    brief summary of the positions of the competing parties in

14    this case.

15         As you know, the party that brings the lawsuit is called

16    the Plaintiff.  The Plaintiff in this case is Finesse

17    Wireless, LLC., which you will hear sometimes referred to

18    during the trial simply as the Plaintiff.  You may hear them

19    simply referred to as Finesse.  And as you know, the party

20    against whom a lawsuit is brought is called the defendant.  In

21    this case, the Defendant is AT&T Mobility, LLC, which you will

22    hear referred to during the trial either as the Defendant or

23    more likely as simply AT&T.

24         Now, after this lawsuit was filed, Nokia of America

25    Corporation, which you will hear called simply Nokia, joined

1    the case on the same side as AT&T.  As I mentioned,

2    technically Nokia is called an Intervenor in this case because

3    they intervened or joined the case after it was filed.  But

4    for the purposes of this trial, ladies and gentlemen, Nokia

5    and AT&T are in the same posture and, practically speaking,

6    you may even hear people refer to them together as Defendants

7    during the trial.  Technically, we have a Defendant and an

8    Intervenor, but they're standing shoulder to shoulder and in

9    the same position in this case, and it is important for you to

10   consider it in that fashion.

11        Now, as I told you during jury selection, this case

12   involves allegations of patent infringement brought by Finesse

13   against Defendant AT&T and, of course, participating in the

14   trial with AT&T is Nokia.  And as I've already mentioned,

15   these are two United States patents asserted by Finesse.  They

16   are specifically United States Patent No. 7,346,134 and United

17   States Patent No. 9,548,775.  And as you may recall from the

18   patent video, patents are commonly referred to by their last

19   three digits in the patent number.  So in this case Patent No.

20   7,346,134 is going to be referred to as the '134 patent.  You

21   may hear it be called the '134 Patent.  And Patent No.

22   9,548,775 will be referred to as the '775 Patent.  You might

23   hear it called the '775 Patent.  They will be referred to by

24   their last three digits.

25        And these patents will be referred to in all likelihood

1    during the trial from time to time jointly or collectively as

2    the patents-in-suit.  You may hear them referred to

3    collectively or jointly as the asserted patents.  And these

4    two asserted patents generally relate to radio receivers and

5    signal interference.

6         Now, the Plaintiff in this case, Finesse, contends that

7    AT&T and Nokia are directly infringing certain claims of the

8    patents-in-suit by importing, using, offering for sale, and

9    selling mobile networks and networking equipment that include

10   its patented technology.  Plaintiff contends that it's

11   entitled to money damages as a result of that asserted

12   infringement.

13        Now, AT&T and Nokia deny that there is any infringement

14   of the patents-in-suit by AT&T or by Nokia, and they contend

15   that the patents-in-suit, the asserted claims from the

16   patents-in-suit, that is, are invalid because they are obvious

17   in the light of prior art.

18        Now, I know, ladies and gentlemen, there are many new

19   words and concepts that have been thrown at you today and

20   since you appeared for jury duty.  I'm going to define a lot

21   of those terms and concepts for you as we go through these

22   instructions.  The attorneys are going to discuss them and

23   talk about them in their opening statements.  The witnesses

24   called to testify in this case are going to help you through

25   their testimony to understand these terms and concepts.  So,

1   please, do not feel overwhelmed at this stage.  I promise you

2   it will all come together as we go through the trial.

3        Now, one of your jobs in this case is to decide whether

4   or not the asserted claims of the patents-in-suit have been

5   infringed.  You'll also be asked to decide whether or not

6   certain of the asserted claims from the patents-in-suit are

7   invalid.  If you decide that any of the asserted claims from

8   the patents-in-suit have been infringed and are not invalid,

9   then you'll need to decide what amount of money damages, if

10  any, should be awarded to the Plaintiffs as compensation for

11  that infringement.

12       Now, my job is to tell you what the law is, to handle

13  rulings on evidence and procedure, and to oversee the conduct

14  of the trial as efficiently and effectively as possible, and

15  to maintain the decorum of the courtroom.  In determining the

16  law, ladies and gentlemen, it is specifically my job to

17  determine the meanings of any claim language from within the

18  asserted patents that needs to be construed or needs to be

19  interpreted.

20       I've already determined the meanings of certain claim

21  language from the patents-in-suit, and you must accept those

22  meanings as I give them to you and you must apply those

23  meanings when you decide whether or not any particular claim

24  has been infringed and when you decide whether or not any

25  particular claim is or is not invalid.

1          Now, you're going to be given a document in a few minutes

2     that refers to these meanings or instructions that the Court

3     has already put forward.  For any claim term, any claim

4     language that the Court has not provided you with a definition

5     or an instruction, you are to apply the plain and ordinary

6     meaning of that claim language.

7          Now, if you're provided with a definition or a

8     construction coming from the Court, you must apply the Court's

9     definition or construction to those terms throughout the case.

10    However, my interpretation of some of the language from the

11    claims should not be taken by you to indicate that the Court

12    has any personal opinion or any opinion at all regarding the

13    issue of infringement because that, ladies and gentlemen, is

14    yours as the jury to decide and yours alone.

15         Now, I'll provide you with more detailed instruction on

16    the meanings of the claims before you retire to deliberate and

17    reach your verdict.

18         In deciding the issues that are before you, you will be

19    asked to consider specific legal rules, and I'll give you an

20    overview of those rules now, and then at the conclusion of the

21    case I'll give you much more detailed instruction.

22         The first issue that you are asked to decide is whether

23    the Defendant has infringed any of the asserted claims of the

24    patents-in-suit.  Infringement, ladies and gentlemen, is

25    assessed and determined on a claim-by-claim basis.  And the

1    Plaintiff must show you by a preponderance of the evidence

2    that a claim has been infringed.  Therefore, there can be

3    infringement as to one claim but no infringement as to another

4    claim.

5         There are also a few different ways that a patent can be

6    infringed, and I'll explain the requirements for each of these

7    types of infringement to you in detail at the conclusion of

8    the case.  But, in general, a defendant may infringe an

9    asserted patent by making, using, selling, or offering for

10   sale in the United States or importing into the United States

11   a product meeting all of the elements or requirements of the

12   claim asserted from the patent or one that practices all of

13   the required steps of an asserted claim.  And I'll provide you

14   with more detailed instructions on the requirements for

15   infringement, as I said, at the conclusion of the case.

16        Now, the second issue that you'll be asked to decide is

17   whether or not the two asserted patents are invalid.

18   Invalidity, ladies and gentlemen, is a defense to

19   infringement.  Therefore, even though the United States Patent

20   and Trademark Office has allowed the asserted claims and even

21   though an issued United States patent is presumed to be valid,

22   you, the jury, must decide whether those claims are invalid

23   after hearing all the evidence presented during this case.

24   You may find a patent claim to be invalid for a number of

25   reasons.  These reasons include because the patent claim is

1    obvious to a person of ordinary skill in the art.

2         Now, as I mentioned, a way that a claim can be found to

3    be found invalid is that it may have been obvious.  A claim

4    may be invalid if it would have been obvious to a person of

5    ordinary skill in the field of the technology of the patent at

6    the relevant time.  Now, you'll need to consider a number of

7    questions in deciding whether the invention claimed in the

8    asserted patents is obvious, and I'll provide you with more

9    detailed instructions on these questions at the conclusion of

10   the trial.

11        Now, if you decide that any claim from the

12   patents-in-suit has been infringed and is not invalid, that

13   is, the presumption of validity has been maintained, then at

14   that point you will need to go further and decide what amount

15   of money damages should be awarded to the Plaintiff to

16   compensate it for the infringement of its patent claims.

17        A damages award, ladies and gentlemen, must be adequate

18   to compensate the patentholder for the infringement, and in no

19   event may a damages award be less than what the patentholder

20   would have received had it been paid a reasonable royalty for

21   the use of its patents.  However the damages that you award,

22   if any, are meant to compensate the patentholder, and they are

23   not meant to punish the Defendant.  You may not include in any

24   damages award an additional amount as a fine or a penalty

25   above what is necessary to fully compensate the patentholder

1    for the infringement.

2        I'll give you more detailed instructions on the

3    calculation of damages for this alleged infringement of the

4    patents-in-suit at the conclusion of the trial, including by

5    giving you specific instructions with regard to the

6    calculation of a reasonable royalty.  However, ladies and

7    gentlemen, the fact that I'm instructing you on damages at all

8    does not mean that the Plaintiff is or is not entitled to

9    recover damages.

10        Now, over the course of this trial, you're going to be

11   hearing from a number of witnesses in this case, and I want

12   you to keep an open mind and listen to all the evidence and

13   not decide any of the facts until you have heard all the

14   evidence.  This is important.  While the witnesses are

15   testifying, remember you, the jury, will have to decide the

16   degree of credibility and believability to allocate to each of

17   the witnesses and the evidence and testimony that they give.

18        So while the witnesses are testifying, you should be

19   asking yourselves things like this:  Does the witness impress

20   you as being truthful?  Does he or she have a reason not to

21   tell the truth?  Does he or she have a personal interest in

22   the outcome of the case?  Does the witness seem to have a good

23   memory?  Did he or she have an opportunity and ability to

24   observe accurately the things that they've testified about?

25   Did the witness appear to understand the questions clearly and

1    answer them directly?  And, of course, does the witness'

2    testimony differ from the testimony of other witnesses?  And

3    if it does, how does it differ?  These are some of the kinds

4    of things that you should be thinking about while you are

5    listening to the testimony of each and every witness over the

6    course of this trial.

7         Now, I want to briefly talk to you about expert

8    witnesses.  When knowledge of a technical subject may be

9    helpful to you as the jury, a person who has special training

10   and experience in that particular field, we call them an

11   expert witness, is permitted to testify to you about his or

12   her opinions on those technical matters.  However, ladies and

13   gentlemen, you are not required to accept an expert witness'

14   or any witness' opinions at all.  It's up to you to decide

15   whether you believe what a witness says, whether you believe

16   it's correct or incorrect, whether you want to believe it,

17   whether you want to give it any weight or not give it any

18   weight at all.  That is part of your job as jurors in this

19   case.

20        Now, I expect that there will be expert witnesses

21   testifying in support of each of the sides in this case.  But

22   when they do, it will be up to you to listen to their

23   qualifications, and when they give an opinion and explain the

24   basis for that opinion, you will have to evaluate what they

25   say, whether you believe it, and to what degree, if any, you

1    want to give that opinion weight.

2        Remember, ladies and gentlemen, judging and evaluating

3    the credibility and the believability of each and every

4    witness is an important part of your job as the jury.

5        Now, during the course of the trial, it's possible that

6    there will be testimony from one or more witnesses that will

7    be presented to you through what's called a deposition.  In

8    trials like this, it's very difficult to get every witness

9    here at the same place at the same time to testify live from

10   the witness stand.  So before the trial begins, the lawyers

11   for each side take the depositions of the witnesses.

12       In a deposition, a court reporter is present, the witness

13   is there, they are sworn and placed under oath, and counsel

14   for the competing parties are also there.  Counsel will ask

15   the witness questions and the witness will answer those

16   questions under oath and both the questions and the answers

17   will be taken down and transcribed by the court reporter in

18   writing.  Often those depositions are also videoed so that you

19   have both the written transcript and a video recording of the

20   witness answering the questions.

21       Now, it's important for you to understand that over the

22   course of this trial, witnesses can be presented to you by

23   deposition if they cannot be here in person.  That means you

24   will see a video presentation of the witness' testimony rather

25   than the witness sitting in the witness box live.  If there

1   wasn't a video recording, you will see the transcript and hear

2   people read the questions and answers back and forth into the

3   record.

4         It's important for you to understand, ladies and

5   gentlemen, that these depositions are taken under oath and you

6   should judge that testimony as to its believability and

7   credibility and in all respects to the best of your ability as

8   if the witness were physically present and gave their

9   testimony from the courtroom.

10        Also, as a practical matter, I want you to understand

11  that if witnesses are presented to you by video deposition

12  during this trial, it's likely that there will be breaks or

13  splices or changes in the voice and sound of the person asking

14  the questions, and let me explain to you why this will likely

15  be the case.

16        Most depositions of witnesses take seven hours to

17  complete.  There may be 15 minutes' worth of testimony that

18  the parties believe you ought to hear as a part of this trial.

19  So rather than playing seven hours of video recordings for you

20  to hear 15 minutes, the questions and answers related to those

21  15 minutes will be spliced or cut out of the video and will be

22  put together and you will be played that 15 minutes' worth of

23  tape rather than having to sit through seven hours of the

24  video presentation.

25        And because of that process of cutting out those relevant

1    portions and putting them together, there may be a little

2    glitch or a skip.  There may well be a little something that

3    makes it look like it's not completely continuous.  You might

4    hear a different voice asking a question because a different

5    lawyer is asking a question for a different party.  There may

6    be little small irregularities in that process.

7         If that happens, and that's very common, don't focus on

8    those irregularities.  Focus on the questions asked and the

9    answers given.  And understand that, by doing that, you are

10   saving yourselves and everybody here an awful lot of time by

11   allowing just the relevant portions to be presented to you as

12   opposed to the entire unedited, uncut deposition.  But whether

13   it's long or whether it's short, you should to the best of

14   your ability judge video depositions and deposition testimony

15   in the same way as to credibility and believability as you

16   would an ordinary witness who appears live and testifies under

17   oath in the courtroom.

18        Also, ladies and gentlemen, you're going to be shown

19   several documents over the course of the trial, and it's

20   possible that there will be documents shown to you that may

21   have one or more provisions in those documents redacted or,

22   said another way, blacked out.  That happens because there are

23   sometimes included portions in documents that are not relevant

24   or the Court has determined should not be shown to the jury

25   for other reasons.

1    If you are shown exhibits in this trial that have

2    anything within them redacted or blacked out, don't focus on

3    what's blacked out, don't try to guess what was not visible to

4    you, don't speculate about that.  Focus on what you can read,

5    focus on what is not redacted and the meaning and the

6    importance of that material as presented that is visible to

7    you and presented to you.  Don't get confused or sidetracked

8    by those redactions, don't try to guess why they're redacted.

9    Just ignore the redacted parts, focus on the parts that are

10   presented to you that are legible and readable and that you

11   have been given to consider.

12       Now, over the course of the trial, notwithstanding all

13   the pretrial effort that's gone into preparing this case for

14   presentation to you, the jury, it's possible that the lawyers

15   from either side or both sides will make objections during the

16   course of the trial.  It's the duty of an attorney to object

17   when the other side presents or purports to present evidence

18   to the jury that the attorney believes is not proper under the

19   rules of evidence or the rules of the Court.

20       Now, upon allowing the testimony or other evidence to be

21   presented over the objection of an attorney, the Court does

22   not, unless expressly stated, indicate any opinion about the

23   weight or effect of that evidence.  As I told you, you, the

24   jury, are the sole judges of the credibility and believability

25   of all the witnesses and the weight and what effect to give to

1   all the evidence.

2        Now, I'd like to compliment counsel in this case because

3   through various and lengthy pretrial procedures that took

4   place long before you were summonsed to appear, much work has

5   gone into preparing this case for you, and a lot of the

6   exhibits that are shown to you during this trial have already

7   been presented to the Court.  And if there were objections

8   from the other side to those proposed exhibits, the Court

9   heard those objections and considered those arguments, and the

10  Court has already ruled on which exhibits should be admitted

11  and shown to you when the trial takes place and which exhibits

12  are not admissible and should not be shown to you during the

13  trial of the case.

14       That means, ladies and gentlemen, I'm not sure you

15  appreciate this, but this means a lot of time has been saved

16  so that during this trial these documents do not have to be

17  presented for the first time, objections raised, arguments

18  presented, the Court consider those arguments and rule on

19  those exhibits.  All that's been done in advance so that when

20  an exhibit is presented to you during this trial, you will

21  know the Court has already found it to be admissible and it's

22  proper for you to consider.

23       So there probably are more hours than I can count that

24  have been saved that you will not have to go through because

25  those efforts have already been undertaken by the Court and by

1    counsel in advance of the trial.  So any exhibit that's shown

2    to you means that the Court's already ruled on its

3    admissibility and the lawyers will present it and ask

4    questions about it and put it in a proper context.

5         Now, even though that's the case, it is still possible

6    that objections may arise over the course of this trial.  If I

7    should sustain an objection to a question addressed to a

8    witness, then you must disregard the question entirely and you

9    may draw no inference from its wording or speculate or guess

10   about what the witness would have said if I had permitted them

11   to answer the question.  On the other hand, if I overrule an

12   objection to a question addressed to a witness, then you

13   should consider the question and the answer just as if no

14   objection had been made.

15        Now, you should understand that the law of the United

16   States permits a United States district judge to comment to

17   the jury on the evidence in a case, but the comments by the

18   judge on the evidence are only an expression of the judge's

19   opinion as to that evidence and the jury is free to disregard

20   those comments in their entirety because, as I've told you,

21   you, the jury, are the sole judges of the facts, you are the

22   sole judges of the credibility of the witnesses, and you are

23   the sole judges as to how much weight, if any, you will give

24   to all the testimony that is presented.

25        And even though the law permits me as a United States

1    district judge to comment to you on the evidence, as I told

2    you earlier, I am going to work very hard not to do that, not

3    to comment on the witnesses or the evidence because, as I say,

4    considering that testimony, determining the facts from it,

5    judging the credibility and believability of all the evidence

6    presented, is your job in this case.

7        Now, Mr. McRoberts, our court reporter, who is seated in

8    front of me, will take down everything that is said in the

9    courtroom.  He did that beginning with jury selection today.

10   That's why I gave instructions about making sure the question

11   was finished before the answer was given, because when two

12   people talk at the same time, it's almost impossible for the

13   court reporter to accurately put down in writing what was

14   said.

15       All of what is said during this trial will be included in

16   this written transcript that the court reporter is preparing.

17   But, ladies and gentlemen, the written version of everything

18   that's said, the transcript of this trial, is not going to be

19   available for you to take with you to the jury room to review

20   when you deliberate on this -- in this case and when you

21   address the questions contained in the verdict form.  The

22   transcript is prepared in case there is an appeal of the

23   decision in this case to a higher court.  So that means you're

24   going to have to rely on your memories of the evidence

25   throughout the trial.

1          In a minute each of you are going to be given a juror

2     notebook, and in the front of that notebook you will find

3     various places where you can take notes during the course of

4     the trial.  There should be a new legal pad included in there

5     and a pen that you can use to take notes, if you choose to.

6     It's up to each of you, ladies and gentlemen, to determine if

7     you want to take notes at all during the trial and, if you

8     decide to take notes, how extensive you want those notes to

9     be.  That is up to you.

10         But, remember, any notes you take over the course of the

11    trial are for your own personal use.  You still have to rely

12    on your memory of the evidence, and your notes should not

13    predominate over your independent recollection of the

14    evidence, which means you must pay close attention to the

15    testimony of each witness as they testify over the course of

16    the trial.  And you should not abandon your own recollection

17    because some other juror's notes indicate something different.

18    Your notes, if you take them, are meant to refresh your

19    recollection, and that's the only reason you should be keeping

20    them.

21         I'm going to ask our Court Security Officer to pass out

22    these juror notebooks to the members of the jury at this time.

23                    (Pause in proceedings.)

24              THE COURT:  As you open these notebooks, ladies and

25    gentlemen, you'll find at the front you should have a complete

1    copy of each of the two patents that are at issue in this

2    case.

3        You'll also find in there a ledger or a side-by-side

4    comparison showing you certain language from the asserted

5    claims that the Court has already interpreted or construed,

6    and those are the prior constructions or definitions that I

7    mentioned earlier that I am giving to you and that you must

8    apply in deciding the issues in this case.

9        Then behind that area of the notebooks, you should find

10   tabbed witness pages with a page for each witness that may

11   testify in this case.  On each of those pages you should find

12   a head-and-shoulders photograph of the witness and their name.

13   The Court's found over many years that it's very helpful to

14   the jury when you retire to deliberate after hearing many,

15   many witnesses to be able to flip back and see a picture of

16   each witness to recall his testimony.  Those pages also have

17   ruled lines on them for additional note-taking if you wish to

18   take additional notes there.

19       And then behind those tabbed witness pages you should

20   find, as I mentioned, a new legal pad that you can take

21   additional notes on.  And there should be, I think in the

22   front pocket, a new pen for each of you to use for note-taking

23   just to be convenient.

24       Now, these notebooks, ladies and gentlemen, they should

25   be in your possession at all times.  They should not be left

1    around where somebody might pick them up and start to look

2    through them.  So they should either be with you as they are

3    now in the jury box while you're in the courtroom or they

4    should be in the jury room where you can leave them there.

5         When you leave each evening to go home, I'm going to ask

6    you to take those notebooks and leave them closed in the jury

7    room on the table so they will be there in the morning when

8    you request get back.  And if you leave the courtroom, either

9    I will let you take those notebooks with you or there will be

10   certain times where we will take short breaks where you will

11   not be out of the courtroom very long and I'll simply say,

12   ladies and gentlemen, you may leave your notebooks closed and

13   in your chairs, in which case you can just close them and

14   leave them in your seat because we'll be back in here pretty

15   quickly.

16        But I'll either give you instructions as to whether to

17   leave them in your chairs during the short break or, if I

18   don't, you should take them with you when you leave the

19   courtroom into the jury room.  Again, it is important these

20   not be left laying around where people other than members of

21   the jury would have access to them.

22        Now, in a moment we are going to hear opening statements

23   from the lawyers for the competing sides in this case.  As I

24   mentioned, opening statements are designed to give you, the

25   jury, a roadmap of what each side expects to present by way of

1    its evidence.

2        And you should remember throughout the trial, ladies and

3    gentlemen, that what the lawyers tell you is not evidence.

4    The evidence is the sworn testimony of the witnesses from the

5    witness stand subject to cross examination and given in open

6    court, as well as the deposition testimony of witnesses who

7    are presented that way, as I've already discussed with you,

8    rather than physically being in the courtroom, and those

9    exhibits which the Court has already considered, found to be

10   admissible under the rules of evidence, and has admitted into

11   evidence.  The testimony of the witnesses, either live or by

12   deposition, and the exhibits the Court has already admitted,

13   those are the totality of the evidence in this case.  What the

14   lawyers tell you is not evidence.

15       Now, the lawyers have a duty to point out to you what

16   they believe the evidence is and what they believe the

17   evidence will show.  But, remember, what they tell you is not

18   evidence.

19       Now, after the opening statements are given, the

20   Plaintiff will proceed to present the Plaintiff's evidence.

21   As I mentioned, that's called the Plaintiff's case in chief.

22   Once the Plaintiff completes the Plaintiff's case in chief,

23   then we'll turn to the Defendant and Intervenor's case in

24   chief.  Once that's completed, we will see if the Plaintiff

25   elects to call rebuttal witnesses.  If they do, we'll finish

1    those rebuttal witnesses.  If they don't, then I will give you

2    at that point my final instructions on the law called the

3    Court's charge to the jury and the counsel for the competing

4    parties will present their final closing arguments to you.

5         Then once you've heard those closing arguments from

6    counsel, then I will direct you to retire to the jury room, to

7    take the verdict form with you with those written questions

8    contained in it, and to deliberate on your verdict and arrive

9    at, as best you can, unanimous answers to those questions in

10   the verdict form.  That's the structure of the trial.

11        Let me repeat my earlier instruction to you that when you

12   retire to the jury room to deliberate on your verdict, the

13   only evidence, the only information you should have to draw

14   upon to answer those questions, is the sworn testimony of the

15   witnesses and the exhibits presented during the trial; nothing

16   else.

17        And that is a fundamental principle.  So you must not

18   discuss, communicate in any way with anyone anything about

19   this case, including any discussions or communications among

20   the eight of you, until I have directed you to retire to the

21   jury room to consider and to deliberate on your verdict.  And

22   as I mentioned, at that particular time in the future, then it

23   will become your duty to discuss the evidence and the

24   witnesses in light of those questions in the verdict form to

25   reach unanimous conclusions as to how to answer those

1    questions.

2        Also, one other time let me remind you, it's very likely

3    over the course of this trial you're going to come in close

4    contact with one or more persons associated with these two

5    trial teams.  When that happens, they're not going to talk,

6    they're not going to speak, they're not going to engage in

7    conversation, they're not going to be friendly, they're just

8    going to walk right by you.

9        Don't hold that against them.  Understand they're

10   following my instructions and I instructed them to do that

11   because, again, most of these things all come back to that

12   first original principle that the only information you should

13   have to draw upon to answer the questions in the verdict form

14   is the sworn testimony of the witnesses and the admitted

15   exhibits during the trial.  Most of these instructions I give

16   to you are based on that fundamental principle.

17       So when these parties or lawyers or witnesses or support

18   staff don't speak, they're not friendly, they're not engaging,

19   don't hold it against them, don't be offended, don't think

20   they're being rude, simply understand they are following my

21   instructions and what the Court requires of them.

22       All right, ladies and gentlemen.  With that, we will

23   proceed to hear opening statements from the parties in the

24   case.

25       Plaintiff may present its opening statement to the jury.

1              Would you like a warning on your time, Mr. Grinstein?

2              MR. GRINSTEIN:  Two minutes, please, Your Honor.

3              THE COURT:  I'll warn you when you have two minutes

4    remaining.  You may proceed with the Plaintiff's opening

5    statement.

6              MR. GRINSTEIN:  Good afternoon, ladies and gentlemen

7    of the jury.

8         Respect.  It's something we're all taught at a very early

9    age.  Respect your elders, respect your mom and dad, respect

10   the law, respect property.  If you see a piece of property and

11   it's got a fence line, you don't cross over that fence unless

12   you've got permission.

13        Well, even though we're all taught about respect at an

14   early age, sometimes that lesson doesn't take, and that's why

15   we're here today.  We're here because we contend that the

16   Defendants AT&T and Nokia don't respect Finesse's intellectual

17   property, its property lines, or what it says its property is

18   worth.

19        Now, of course, the parties disagree with that, and they

20   disagree about that, and that's why you are here.  You are

21   here to tell us who is right.

22        Are Finesse's property lines being respected?  That's the

23   first issue in this case.  That's the issue of infringement.

24   Is AT&T using Finesse's intellectual property?

25        The second issue in this case is validity.  Are Finesse's

 1   patents good and valid, kind of like having good title to

 2   land.

 3        And the third issue in this case is damages--what does

 4   AT&T owe to Finesse for its use of Finesse's property?

 5        Now, over the next 30 minutes or so, I'm going to share

 6   with you what I expect the evidence to show about those three

 7   issues and how I expect that evidence to show that lack of

 8   respect.  But first things first.  Let me make some

 9   introductions.

10        My name is Joe Grinstein.  I am one of the lawyers for

11   the Plaintiff in this case, a company called Finesse Wireless.

12        And with me here at counsel's table is Mr. Frank Smith.

13   Mr. Smith is the CEO of Finesse, and he is also the inventor

14   of the two patents that are at issue in this case.

15        Now, as you have probably heard, this is a business

16   dispute about patent infringement.  My client Finesse Wireless

17   owns two United States patents, the '134 patent and the '775

18   Patent.  And Finesse contends that the Defendant in this case,

19   AT&T, infringes on Finesse's patents by using certain

20   equipment in its cell phone towers.  And the name of that

21   equipment is a radio.  Those radios are manufactured by the

22   other party in this case, Nokia.  And it is the Nokia radios

23   on AT&T's cell phone towers that are the equipment that's used

24   to transmit and receive signals.

25        Now, during the course of my statement today, I'm

1   probably going to refer to both of those parties as the

2   Defendants just to save a few words here and there.

3       Before I go any further, though, I do want to talk to

4   you-all about the patent system in the United States.  Now,

5   patents are so important and were so important to our founding

6   fathers that they put the patent system into the United States

7   Constitution.  It's right there in Article I, Section 8.

8       And the idea behind the U.S. patent system is to

9   encourage inventors to file their new inventions publicly with

10  the U.S. government instead of keeping it to themselves.  And

11  the idea there is that by filing these inventions publicly,

12  other people in the industry could learn from those

13  inventions, be inspired by them, maybe even improve on them

14  And in exchange for filing your inventions publicly with the

15  U.S. government, the U.S. government issues you a patent.

16      And what does a patent give to you?  Well, it says it

17  right there on the very first page of a patent:  A patent

18  gives the person who owns it for a period of time the right to

19  exclude others from making, using, or selling products that

20  employ the patented inventions.

21      Now, you know, one thing you can do is think of a patent

22  like a deed to a piece of property.  You know, every piece of

23  property has got its boundary lines, and sometimes people even

24  put fences around those boundary lines.  Well, patents are

25  kind of like intellectual property, and to find the boundaries

1    of a patent, you look to the very last section of the patent,

2    the section called the claims, and that is where the inventor

3    declares to the whole world where his invention starts and

4    where it stops.

5         Now, of course, if you've got a piece of property, you

6    have the right to tell people stay off my property.  And so,

7    you know, if an oil company thinks you've got oil under your

8    land, they can't just come on your property and start

9    drilling.  That would be trespassing.  And that's true even if

10   you yourself aren't drilling on your property.  You know, the

11   oil company can't say, you know what, you're not using your

12   property so I'm going to use it for you.  That's still

13   trespassing.

14        Well, intellectual property is similar.  Intellectual

15   property, patent defines your property rights and no one can

16   use those property rights without your permission.  Even if

17   you yourself aren't using them, even if you're not making a

18   product using your patent, that doesn't mean someone else can

19   do it for you.

20        So let me now talk to you a little bit about my client

21   Finesse.  Finesse is a company that was founded in 2001 by Mr.

22   Frank Smith, and Mr. Smith founded Finesse with the goal of

23   creating a new and improved type of wireless communications

24   technology.  And one of the things he really wanted to work on

25   improving was how the wireless industry dealt with the problem

1    of interference.

2         What is interference?  Well, it's kind of like when

3    there's two signals out there in the world and they overlap

4    with each other so it makes it kind of hard to hear the one

5    signal that you're interested in.  You-all might have

6    experienced interference, say, in driving in your car and

7    you're listening to a radio station from one city, and you

8    drive and get closer to a new city, that city's radio station

9    starts interfering with the first radio station, it gets all

10   staticky, hard to hear.  That's an example of interference.

11        Now, around this time in 2001, Mr. Smith got interested

12   in trying to address an interference problem that he had

13   previously encountered in his career, and it was a problem

14   called passive intermodulation interference.  You're going to

15   hear a lot about this particular term.  It's often abbreviated

16   PIM, P-I-M.  Now, Mr. Smith is going to testify he's going

17   explain to you all about PIM, but suffice it to say, it is a

18   particular kind of interference that arises from physical

19   objects in the world.

20        Now, physical objects in the world can put off signals

21   that are unwanted.  Sometimes those come from cell phones,

22   cell tower equipment.  Sometimes those can come from a nearby

23   metal roof or nearby car.  But when they put off those

24   signals, they can interfere with the actual cell signals that

25   are trying to be transmitted from the cell phone tower.

1    That's going to carry the sort of things that we're interested

2    in receiving, cell phone customers want, like voice, text,

3    data, that sort of thing.

4         Now, Mr. Smith, when he testifies to you, is going to

5    explain to you all about what passive intermodulation

6    interference is all about. But, you know, one thing we should

7    focus on is how important the issue of interference is to the

8    cell phone industry because interference causes all sorts of

9    problems for you when you use your cell phone. It can cause

10   you to drop calls, it can cause your data to be really slow,

11   the sort of things cell phone customers don't like.

12        And it's a particularly big problem for cell phone

13   companies like AT&T because it diminishes the value of a very

14   important asset that they own called spectrum. What is

15   spectrum? Spectrum, another word for it is bandwidth. It's

16   kind of the capacity to carry all this data through the air

17   waves.

18        And you will hear evidence in this case that spectrum is

19   very, very expensive. Cell phone companies spend billions of

20   dollars to acquire the rights to this spectrum from the U.S.

21   government, which is the entity that sells it. And so because

22   spectrum is so important, companies like AT&T are really

23   focused on ways to maximize the efficiency, that they use

24   their spectrum, because they spent so much money on it. And

25   that is where Mr. Smith's invention comes in.

1           Now, around this time in 2001, Mr. Smith started to think

2      about the problem of passive intermodulation interference, and

3      he realized no one has ever really solved this problem before.

4      Now, there were ways to reduce this passive intermodulation.

5      One of those ways was to send workers up to cell phone towers

6      where they could fix the connections on the towers, straighten

7      up the wires, do things like that to try to improve this

8      interference problem.  That is something that is known as site

9      hygiene.

10          But you will hear evidence in this case that, not

11     surprisingly, site hygiene is not a perfect solution to this

12     problem because things like rust and the weather mean that

13     you're constantly having to send out technicians to your cell

14     phone towers to fix things and that can be expensive and

15     inefficient.

16          So Mr. Smith started thinking of ways how can we deal

17     with this intermodulation problem, and at first he considered

18     what was a more conventional approach to it which is known as

19     filtering.  What does that mean?  Well, it's kind of like just

20     trying not to listen to the problematic interference.  But as

21     Mr. Smith thought about this more and more, he concluded that

22     the better tactic wasn't just to filter this interference but

23     it was to cancel it altogether.  And that's what Mr. Smith

24     invented was a system for something called passive

25     intermodulation cancellation.  That's another term you're

1    going to hear a lot of in this case, PIM-C.

2         Now, I want to be clear about this.  Mr. Smith did not

3    invent the entire concept of PIM-C.  He was not the first

4    person to ever think, you know, it would be really useful to

5    cancel passive intermodulation.  People have thought of that

6    before, but they'd never really come up with a workable way to

7    do it.  And that's what Mr. Smith did.  Mr. Smith invented the

8    first effective technique for conducting passive

9    intermodulation cancellation, so effective that AT&T and Nokia

10   use it extensively today.

11        So what did Mr. Smith do with his new invention after he

12   developed it?  Well, he went out to the market and he tried to

13   interest other companies in either buying equipment with his

14   PIM-C invention in it or licensing his technology from it.

15   And this was in early years, 2001, 2002, before the U.S.

16   Patent Office had even granted him patents.  And he went to a

17   variety of companies to talk about these sort of business

18   issues, companies like L3, Qualcomm, AT&T, Nokia.

19        And when he went to those companies, he encountered a

20   problem that has really plagued inventors for hundreds, maybe

21   thousands, of years, and that problem was he was ahead of his

22   time.  You see, back at this time, 2002, who would have known

23   that we use so much spectrum today for doing things like

24   sending videos to our family or watching streaming movies.

25   You know, the iPhone, that wasn't even introduced until 2007.

 1   Netflix, they didn't start streaming movies to people until

 2   years after that.

 3       So over the years spectrum has become more and more

 4   valuable to these cell phone companies.  I mean, they just

 5   can't get enough of it.  But that wasn't the case back in 2001

 6   and 2002.

 7       And so, for example, Mr. Smith communicated with Nokia,

 8   and he shared with them the basis of his technology and he

 9   told them what he thought about the technology.  There was

10   some back and forth with them.

11       Now, the evidence will show that Nokia didn't respond to

12   Mr. Smith and say, you know, there's no need for PIM-C.  They

13   didn't respond to Mr. Smith and say, your technology is no

14   good, it will never work.  They didn't respond to Mr. Smith

15   and say, your technology is old, people have thought of this

16   before.

17       Instead, Nokia just wasn't interested at that time.  They

18   for whatever reason didn't think that they were ready for that

19   technology.  And that is largely the response he got from the

20   other companies in this time period who Mr. Smith went and

21   talked to.  For example, around 2011, Mr. Smith had some

22   conversations with a company called Intellectual Ventures to

23   talk about buying these patents.  But because the market for

24   PIM-C hadn't really developed, Intellectual Ventures didn't

25   offer him very much money and the deal didn't happen.

1        So I'm not saying that all these companies 10, 20 years

2    ago that were talking to Finesse were disrespecting Finesse.

3    I don't think they were.  They were just not ready for his

4    technology when he was presenting it to them.  That being

5    said, eventually the industry caught up with Mr. Smith and

6    spectrum started to get more and more important to companies

7    like AT&T.  And, therefore, AT&T started to worry more and

8    more about interference generally and passive intermodulation

9    specifically.

10        So, for example, we expect to show you in this case an

11    exhibit, Exhibit 611, in which an internal AT&T memo describes

12    this passive intermodulation problem as the grim reaper of its

13    network.  Now, with this document I want to say a couple of

14    things.

15        You are likely to hear in this case AT&T explaining

16    documents like this one and others as saying they deal with a

17    kind of PIM called external PIM, and it's even in the title of

18    this document, and the Nokia radios that are accused of

19    infringement in this case deal with a different kind of PIM,

20    internal PIM.  I will say that's sort of right, at least from

21    our perspective.

22        First of all, the documents in this case tend to mix and

23    match their discussions of this external versus internal PIM.

24    I will also note that we will expect the evidence to show that

25    the Nokia radios in this case actually took some of that

1    external PIM and moved it internal into the radio and then

2    canceled it.

3         So, in any event, what if a company could come up with a

4    solution to take care of that grim reaper, to take care of

5    that big problem for AT&T, and that's what Nokia did.  Nokia

6    started offering PIM-C in its radios to handle passive

7    intermodulation.

8         Now, why did it choose PIM-C as its solution?  You will

9    see that in documents we will introduce like Plaintiff's

10   Exhibit 999.  In this particular exhibit, Nokia notes that

11   this passive intermodulation problem is a problem out there

12   that they need to deal with.  Filtering is not the way to fix

13   the problem.  They need to fix it by cancellation, which

14   interestingly this document is from 2018, is the exact same

15   solution that Mr. Smith had thought of 17 years earlier.

16   Finally, the industry had caught up with him.

17        So Nokia started making these radios with PIM-C, AT&T

18   started buying them and using them.  And we will show you

19   during the course of this trial internal documents from AT&T

20   in which AT&T expresses that it's satisfied and it likes those

21   PIM-C radios from Nokia.

22        So, for example, we will show you Plaintiff's Exhibit

23   707.  This is an internal email from AT&T with a bunch of AT&T

24   engineers talking about these Nokia PIM-C radios.  What do

25   they say?  It's really good stuff here, pretty sweet, and this

1    product makes band-29, our bandwidth, much more valuable to

2    AT&T.

3          So let's talk about the three issues in this case that I

4    mentioned.  The first issue in this case will be the issue of

5    infringement, and that is the question:  Are AT&T and Nokia on

6    Finesse's property?

7          Now, this is our burden to prove to you infringement, and

8    we will have to prove infringement by what is known as a

9    preponderance of the evidence.  The Judge will explain to you

10   what that means.  For our purposes, I like to think of it as

11   we have to show you that it is more likely than not that the

12   Defendants infringe these patents.

13         To help you come to that conclusion, we are going to

14   offer the testimony of Dr. Jonathan Wells, who is out there in

15   the audience.  Doctor Wells is -- has a Ph.D. from the

16   University of Bath in England.  So I hope you-all enjoy his

17   accent.  He has more than 30 years of experience in wireless

18   technologies.  He's even written a book on a key aspect of 5G

19   technology.  We will be presenting him as an expert witness.

20         And what Doctor Wells has done is conduct an extensive

21   investigation of the way that Nokia's radios operate on AT&T's

22   cell towers, and he's taken that investigation and he has

23   applied it to the language of the claims of the Finesse

24   patents element-by-element.

25         Now, I'm not going to go through all that analysis right

1    now.  I don't have the time to do that.  I will leave that

2    hard work to Doctor Wells.  I will say it will probably take

3    him a couple of hours to go through that analysis.  He's going

4    to try to do it as quickly and efficiently as he possibly can,

5    but do know it is our burden to prove infringement.  And so

6    Doctor Wells is going to go element-by-element and show you

7    what he needs to show you to prove that infringement to you.

8         Now, while we're on the subject of infringement, I do

9    want to say one other thing about that topic, and that is

10   infringement is not the same thing as copying.  So to prove

11   that the Defendants are infringing Finesse's patents, we do

12   not have to show that the Defendants looked at those patents

13   and copied Finesse's designs.  That is not what we have to

14   show.  In fact, someone can be liable for patent infringement

15   even if they don't know about the patent.  So, in other words,

16   if you step onto somebody's land, you have trespassed on that

17   land, even if you don't know or don't see some no trespassing

18   signs.  You still don't have permission to be on that land.

19        Let's talk about the next issue in this case which is the

20   issue of validity.  Now, this the Defendants' defense.  This

21   is something they have to prove.  And with respect to the

22   issue of validity, what I expect to -- what I expect the

23   argument to be in this case is that, you know, even if we, the

24   Defendants, infringe these patents, that's okay because these

25   patents are not valid and never should have been issued by the

1   Patent Office.

2       In other words, in this case the Defendants I think will

3   argue to you that the Patent Office made a serious mistake in

4   reviewing Finesse's patents because other people out there had

5   invented these inventions before Finesse did.  That's going to

6   be their argument.

7       Now, with respect to that argument, there's something

8   important to remember, and that is, the United States Patent

9   and Trademark Office has issued Finesse these patents.

10  Because they are duly issued patents, they are entitled to

11  what is known as the presumption of validity.  That means that

12  in order to invalidate Mr. Smith's patents, Defendants have to

13  come to you with something known as clear and convincing

14  evidence of invalidity.  And so I should note it is a higher

15  burden of proof on Defendants to invalidate Finesse's patents

16  than the burden of proof for Finesse to show infringement.

17      Now, do you remember earlier when I told you that one of

18  Mr. Smith's commercial problems when he first tried to start

19  selling his inventions was that he was ahead of his time.

20  Well, that may have been a commercial problem for him back in

21  2001, 2002, but we expect the evidence to show that it will be

22  an even bigger problem for Defendants when they try to

23  establish invalidity.

24      Because Mr. Smith was so far ahead of his time, the

25  Defendants are not going to be able to point to one person out

1    there who had actually developed Mr. Smith's invention ahead

2    of Mr. Smith.  Instead, what they're going to do is they are

3    going to take one part of one person's invention and then

4    another part of another person's invention or their journal

5    article or something, smash them together and say, voila,

6    there is Mr. Smith's invention.  That is a defense called

7    obviousness.

8        I will let the Defendants explain that all to you, but

9    suffice it to say we don't think they're going to have clear

10   and convincing proof that Finesse's patents are invalid, which

11   brings us to a third issue in this case.  Now, we think that

12   the evidence in this case will compel you to conclude that

13   Finesse's patents are infringed and invalid [sic].  And when

14   they do, when that evidence does, Finesse will be entitled to

15   what is known as a reasonable royalty as damages.

16       Now, what is a reasonable royalty?  Well, it's kind of

17   like if an oil company, with permission, comes onto your land

18   and starts drilling, then they owe you a royalty for every

19   barrel of oil they take off your land.  The statute in the

20   United States that sets up patent damages says that when you

21   find infringement and validity, then the inventor, the

22   patentholder, is entitled to a reasonable royalty for the use

23   made of the invention by the infringer.  And that is each and

24   every use.

25       So, for example, if an oil company comes on your land and

1    takes barrels of oil off your land, they have to pay you a

2    royalty on each and every one of those barrels even if you

3    know they don't actually make a profit on that oil.  Same deal

4    here--we will argue that AT&T needs to pay a royalty on each

5    and every Nokia radio that it uses with this PIM-C feature.

6         Now, to help you understand what that reasonable royalty

7    is, we will be presenting the testimony of an expert witness

8    on damages, Dr. Coleman Bazelon, who is also back there in the

9    audience today.

10        Doctor Bazelon is one of the foremost experts in the

11   United States on the issue of wireless economics.  He's

12   published articles on the subject, he's testified to the U.S.

13   Senate, testified to the Federal Communications Commission.

14   He's even himself participated in spectrum options.

15        And what Doctor Bazelon did is create a model that

16   considers what would AT&T and Finesse have agreed to as

17   reasonable compensation for Finesse's inventions back in 2018.

18   Where does 2018 come from?  Well, you will hear that the law

19   requires you, in considering damages, to think about what AT&T

20   and Finesse would have agreed to back in 2018 right before

21   infringement started.  So infringement started in 2018.

22   That's when we start to think about what this negotiation

23   would have been like.

24        And Doctor Bazelon's analysis and his model considers

25   what would AT&T have been thinking back then, what would AT&T

1    have considered to be the value of this spectrum that

2    Finesse's inventions are allowing AT&T to use much more

3    efficiently.

4              THE COURT:  Two minutes remaining, counsel.

5              MR. GRINSTEIN:  Now, of course, to understand what

6    that value is, you first have to understand how valuable

7    spectrum is in the first place.  And that's why we will expect

8    to show evidence like PX 518, which shows that the wireless

9    companies out there have spent as much as $44 billion bidding

10   on spectrum.  So taking that into account, Doctor Bazelon will

11   testify that a reasonable royalty for the infringement of

12   Finesse's patents through today at trial is about $58 million.

13   And if you take that royalty forward into the future, it grows

14   to about $166 million through the life of the patent.

15        Now, Defendants are going to have their own damages

16   expert, a gentleman by the name of Dr. Stephen Becker.  Doctor

17   Becker is going to testify that damages are only about a

18   million dollars.  We'll have our own issues with Doctor

19   Becker's analysis.  We'll hash that out with him on cross

20   examination.

21        So thank you, ladies and gentlemen of the jury.  Thank

22   you for your time and your attention today.  Thank you, of

23   course, for your jury service.

24        Like I said before, we believe that Mr. Smith was ahead

25   of his time with his PIM-C inventions.  He was so ahead of his

1    time that now the Defendants have caught up and recognized his

2    foresight.  He may have been ahead of his time back then, but

3    now is the time for him to get the respect and compensation

4    that he has earned.

5          Thank you.

6          THE COURT:  Defendants may present their opening

7    statement to the jury.  Would you like a warning on your time,

8    counsel?

9          MR. DACUS:  Yes, Your Honor.  If you would let me

10   know when I have five minutes left, please.

11         THE COURT:  I will warn you when you have five

12   minutes remaining.  Please proceed with opening statement.

13         MR. DACUS:  Thank you very much.

14      Good afternoon.  Let me start this afternoon where I

15   started this morning and that is to say, on behalf of the men

16   and women who work at Nokia and AT&T, a very sincere thanks to

17   you.  It was one thing to say thanks this morning when you're

18   talking about a couple of hours of your time.  It's a

19   different thing to say thanks when we're talking about a week

20   of your time.

21      I told you this morning that we would not be here if this

22   case was not important to AT&T and Nokia, and it is important

23   and I want to give you a glimpse of why.  You may be sitting

24   there thinking that because AT&T and Nokia have been sued in a

25   federal courthouse for patent infringement, that they are mad

1   at or do not respect the Patent Office and the patent system.

2   In fact, the Plaintiff's lawyer just told you expressly

3   straight up that he wants you to believe that we do not

4   respect the patent system.

5       I know the very first thing these people would want me to

6   say to you is nothing could be further from the truth.  In

7   fact, the truth is 180 degrees opposite and here is why.  Both

8   of these companies have been absolute innovators in

9   telecommunications for the better part of a century, the

10  better part of a century.  Combined, they themselves have

11  thousands of patents, thousands of patents.  So the integrity

12  of the U.S. patent system and respect of the U.S. patent

13  system is of the utmost importance to them, and that's why

14  we're here.

15      They'll tell you very quickly that folks who have real

16  legitimate inventions that other people are using, they're

17  entitled to fair compensation, but folks who come to the

18  courthouse without valid claims and point fingers and claims

19  of infringement that are unfounded and not valid in an attempt

20  to get a windfall, you need to stand up and defend yourself,

21  just like we talked about this morning, and that's really what

22  brings us here.

23      You know from what the Judge said this morning, what the

24  video you heard last Friday, that when you're accused of

25  infringement, you have to turn to a jury for help, and if we

1    were just speaking in short terms, that's why we're here is

2    for your help.  The way we ask for your help is to ask you to

3    answer three questions that the Judge has already told you

4    about--the question of infringement, the question of whether

5    or not these patents are invalid, and the question of whether

6    or not there is any reasonable money due to these folks.

7        The Judge just spent, by my count, well over 30 minutes

8    us reading instructions to you about how you view the

9    evidence.  You knew before you came in that door this morning

10   that the way you answer those questions is through the

11   evidence.

12       The thing I want to emphasize to you and spend just a

13   couple of minutes talking about is the evidence in this case

14   that you're going to hear many times is going to be like two

15   ships passing in the night.  It just is.  The Judge has told

16   you, and he spent many minutes talking about credibility, and

17   I was listening closely because that is what you're going to

18   have to judge--the credibility, the believability, which

19   version sounds right, which version sounds wrong, because

20   there are going to be two versions.

21       Now, a lot of times when we talk about credibility,

22   people instantly think, oh, one side or the other must have

23   bad motive or bad intent.  That can be the case, but it's not

24   necessarily the case.  A lot of times you wind up with two

25   versions because folks have two different perspectives and two

1    different sets of information available to them.

2        And so I want to give you just a road map of what I think

3    you'll hear in this case and something that I want you to view

4    the evidence through the lens of as you hear the evidence.

5        So at this table sits Finesse and Mr. Smith.  Their

6    perspective is they want you to believe that they have this

7    invention that is very important to these telecommunications

8    companies and that is worth a whole lot of money.  They're

9    certainly not the first inventor to want a whole lot of money

10   or to believe sincerely their invention is important.  The

11   fact is there is over 10 million patents in the United States.

12   Very few of them are worth any, if much, money.

13       Also at the Finesse table sits Mr. Smith who, no personal

14   criticism to him, but he's not worked at telecom service

15   providers like AT&T, Verizon, T-Mobile, and Sprint.  So he

16   believes that he understands and knows about this internal PIM

17   issue and to what extent it is a problem.

18       He also and his lawyers believe and they'll try to

19   convince you how AT&T takes care of that problem.  And I'm

20   going to tell you that that's going to be part of the two

21   ships passing in the night.  At the end of the day, the paper

22   solution that Finesse and Mr. Smith put down on paper that

23   they got a patent on is a theoretical way to correct a

24   problem.

25       I listened closely and Mr. Grinstein said that Mr. Smith

1     came up with the first effective way of PIM cancellation.  I'm

2     telling you that's not the case.  And you may say, well, of

3     course you are, you're the AT&T lawyer.  But what I'm going to

4     ask you to listen for during the course of this case is the

5     evidence because I think the proof is in the pudding and

6     they -- they touched on it just a bit.

7          And here's what the proof is.  Finesse has never made a

8     product using this patented invention.  They've been in

9     existence over 20 years.  They've told you how important it

10    is, how effective it is.  They've never made a product using

11    it.

12         In addition to that, as they admitted, they've been

13    to -- they put four or five people on that slide that they had

14    gone to and attempted to partner with, attempted to get them

15    to take a license to this patent.  I think Mr. Smith will

16    testify he's been to more people than he can remember, more

17    companies than he can remember, and each one of those folks

18    from 2001 through today, so it's not just the issue if he was

19    ahead of his time, all the way through today, all of those

20    folks have said, thanks but no thanks.

21         And I would submit to you the reason they've said that is

22    because the solution in that patent, to the extent there is

23    one, was a theoretical rather than a practical solution that

24    could be used by these telecom companies.

25         Now, the perspective of AT&T and Nokia is much different.

1    AT&T sits here with a bird's eye view of this internal PIM.

2    I'm not going to call it passive intermodulation.  I'm just

3    going to call it PIM.  They know exactly whether and to what

4    extent that is an issue and is a problem, and I'm going to

5    tell you and the evidence is going to show you that in the

6    grand scheme of things, internal PIM, and we're going to talk

7    about what that means because there's a distinction between

8    internal and external and it's very important, internal PIM is

9    just not a big problem for them.  It's present in

10   substantially less than two percent of the cell towers and

11   radios that are deployed by AT&T.

12       When it is present--I'm not telling you it's never

13   present; I'm telling you it's very rarely present--they need a

14   cost effective and practical means to reduce and prevent that

15   internal PIM.  And, overwhelmingly, the way they do it, Mr.

16   Loddeke and another engineer will testify about it, is they

17   simply repair it.  They do this thing called hygiene.  You saw

18   that slide where the gentleman was climbing the tower, making

19   repairs.  They send a repairman out there.  Overwhelmingly,

20   that's how they fix this problem.

21       At times this PIM cancellation process, they do utilize

22   it.  It's very rare, but it is utilized in the Nokia radios.

23   But what you're going to learn is the Nokia radios that have

24   the PIM cancellation operate in a different way than what the

25   patent describes, and the reason they operate in a different

1    way goes back to this theoretical solution versus practical

2    solution.

3         Now, let me dig into the details a bit.  I don't really

4    need to spend any time talking to you about AT&T.  Everyone

5    raised their hand this morning.  You know AT&T's one of the

6    leading telecommunications companies in the country, they have

7    some of the best and brightest engineers in the country, and

8    have for the better part of a century.

9         Nokia, you may have heard about Nokia, you may not have

10   heard about Nokia.  Nokia is a company with its U.S.

11   headquarters in Dallas.  Nokia makes the equipment in this

12   case, the radios that go on cell towers, but they make a lot

13   of equipment that goes in these cellular networks.  They have

14   innovation centers across the country where they do research

15   and development.  They have the best and brightest engineers

16   who do nothing but work hard and devote their lives to

17   telecommunications and the products that they develop.

18        I'm going to show you this slide.  And I'm not going to

19   belabor it, but if we were to draw or to chart out sort of a

20   family history or a genealogy of Nokia, within the Nokia

21   organization you would find companies like Bell Laboratories,

22   Lucent Technologies, Alcatel-Lucent, literally all the way

23   back to Alexander Graham Bell.  And what you would know is

24   those companies, in combination, are responsible for the

25   transistor, the laser, new inventions related to satellite

1    communications, all the way through cellular communications.

2        Bell Labs.  The work at Bell Labs, the people at Bell

3    Labs have received nine Nobel prizes for their work from Bell

4    Labs.  So these are folks who spend their life devoted to

5    telecommunications devoted to research and development and

6    devoted to making and bringing folks better products.

7        Let's talk about what is at issue here, and that is the

8    passive PIM intermodulation.  I was very glad to see the

9    Plaintiff's lawyer to say to you that Mr. Smith did not

10   discover PIM.  He did not discover that, nor did he invent PIM

11   cancellation or the first method of PIM cancellation.  So

12   let's talk about PIM.  And I want to spend a moment on this

13   internal versus external, and I'm going to go slowly here

14   because I think this is very important in the case and I think

15   it's a part that sometimes gets confused.

16       So there are two kinds of PIM--external and internal.

17   External is also known as air PIM, and external is created by

18   objects that are outside of the cell tower.  So what you see

19   here on the left is a picture of a cell site on top of a

20   building.  That's where those sites are often located in large

21   towns or cities.  And what we have circled there is an air

22   conditioner, and that air conditioner can create interference

23   with the cellular signal.  That is external to the cell tower

24   or the cell site.  That's why we call it external.

25       What you're going to learn from the testimony in this

1   case is external PIM is hard to find and locate, and it's very

2   difficult to cure, and it's very expensive to cure.

3         On the other hand, internal PIM is interference that

4   occurs within the line on the actual radio cell tower or cell

5   site.  Somewhere between, it can occur between the antenna and

6   the radio itself.  What we've circled here, there are

7   connectors for those wires.  Those connectors can become

8   loose, they can become rusted.  Internal PIM is much, much

9   easier to identify, much cheaper to solve, much easier

10  problem.

11        Here's why I say it's important.  You're going to see

12  lots of documents in this case that refer to PIM.  They're

13  just going to say PIM.  You've already actually seen some,

14  either intentionally or unintentionally.  The Plaintiffs in

15  this case do not always distinguish between external and

16  internal.  This case is only about internal PIM.

17        So what I would ask you to do is any time you see in a

18  document the word PIM, I would ask that you have an alarm bell

19  go off in your head and you would instantly say, hey, I need

20  to know if we're talking about external or internal.  I wish I

21  had an alarm at my table I could sound because this is going

22  to happen.  I can guarantee you.  It's already happened.  So

23  any time we're talking about PIM, we need to know if we're

24  talking about internal or external.

25        Here's another -- here's why that matters.  I told you

1    that external is difficult to find, difficult to solve,

2    expensive to solve.  Internal, much less so.  You're going to

3    see documents, and you don't -- I'm not going read through all

4    this and you don't need to right now.  You're going to see

5    this document in the course of the evidence, and you'll see

6    that AT&T has very prescribed procedures for how they deal

7    with PIM, both internal and external.

8        And for internal PIM, they find it and fix it.  If

9    there's interference they go find the source of the

10   interference and they repair it.  They do what's called

11   hygiene or maintenance.  It's like personal hygiene, but

12   they're doing hygiene on the line.  That's how they -- in the

13   overwhelming majority of cases, that's how they fix it, not

14   with PIM cancellation that's in the radio.

15       In addition, Mr. Loddeke will explain to you, they have

16   the ability if they have internal PIM to simply lock down or

17   turn off some of the receivers on the cell tower.  And they

18   can do that without degrading or affecting the cell signal

19   that's coming from that a specific location.

20       Now, there are times when the radios that contain the

21   PIM-C function, there are times that that actually cancels the

22   internal PIM.  It's rare, it's very rare, but it -- I'm not

23   going to tell you it doesn't happen.  It does happen at times.

24       This is an internal document from Nokia related to those

25   radios, and all I want to show you here is this emphasizes and

1    reiterates the fact that these radios do not relate to

2    external PIM.  You see it says, it does not reduce PIM that is

3    created outside the radio frequency connector, cable, or

4    antenna.  So the only thing at issue in this case is internal

5    PIM.

6         So the question becomes for these radios that have the

7    PIM-C or the PIM cancellation, do they do it the same way that

8    the patent describes.  That's the question of infringement.

9    Right?

10        I'm confident that before you came to this courthouse

11   today, you've probably never done an infringement analysis,

12   you've probably never compared a product to a patent.  So I

13   want to spend just a couple of minutes walking through that

14   process.

15        All three of these questions that you're going to answer

16   are for you to answer.  I'll tell you that, from our table,

17   the way we view this is our job is to the best of our ability

18   to bring you the evidence as best we can, not to tell you how

19   to answer these questions.  You know how we think they should

20   be answered.  But to give you the evidence so that you can

21   make a decision.

22        So for infringement, the Judge has told you, a patent is

23   infringed if the accused product, that's the radio here,

24   includes each and every element in the patent claim.  You

25   remember the patent claim is the words that actually define

1    what the alleged invention is.

2         And I'll give you an example and I'll admit it's kind of

3    a simple example.  It's an example that someone gave me of how

4    this analysis should be conducted.  The reason I give it to

5    you is so that, as you hear the evidence from the stand, you

6    kind of know how to put this puzzle together.

7         So assume that someone had a patent on a soccer ball and

8    the patent said it's made of leather stitched together, filled

9    with air, and round in shape.  And assume that that

10   patentowner of the soccer ball patent sued a football maker.

11   The football maker would come to Court and say, yeah, my

12   football is made of leather stitched together, filled with

13   air, but it's oblong in shape, oblong versus round.  Only one

14   word missing from the claim.

15        But as the Court just instructed you, that means there is

16   no infringement.  If there's one word or one element missing

17   from the claim, then there is no infringement.  And that makes

18   sense.  A football is very different from a soccer ball.

19   That's how the process works.

20        So how does it work in this case?  I want to walk you

21   through at a high level how, the evidence you're going to

22   hear.  So let's look at the '134 Patent.  Let me say this up

23   front.  Jim Proctor is one of the country's leading experts in

24   this area.  Nokia and AT&T retained him in this case to look

25   at this infringement issue.  He's done an analysis.  He's

1    going to come present that to you from the witness stand.

2         Here's an excerpt from the patent, not the claim yet,

3    just the abstract describing the invention, and what Mr. Smith

4    said the purpose was was for a receiver described herein that

5    samples the entire band in which there can be signals of

6    interest or signals that can generate interference.  And then

7    the last sentence says, those isolated interfering signals are

8    then canceled out.

9         What we want to focus on are the signals that can

10   generate interference.  That's what his theoretical solution

11   was--sample the band, find the signals that can generate

12   interference.  That's the theoretical solution.

13        I'm going to tell you that in practice, Nokia and AT&T

14   don't need to go find those interference generating signals.

15   They know within which transmission channel they're

16   transmitting because they're transmitting the phones.  They

17   know exactly where those signals lie.  As a practical matter

18   they don't need to go find a passband of receive signals that

19   includes both a received signal of interest and interference

20   generating signal.

21        This just highlights that point.  If you look at the

22   claim, it says you must receive a passband of received signals

23   including both, and we don't do both because we don't have a

24   practical need to do both, nor from a practical matter could

25   we do both.  These are things that operate, and what I'm going

1    to say is not a misnomer, at millions of times a second is

2    what these things are being processed at.  And as a practical

3    matter, Mr. Smith's application and patent wouldn't work as a

4    practical matter.

5         Now, I told you that Mr. Proctor's going to testify to

6    you from the witness stand.  Here's one thing I would -- I'll

7    just suggest to you, certainly not mandating.  The Court's

8    told you that you can take notes.  I would recommend to you

9    that when Mr. Proctor is testifying, you have the patents, he

10   is going to go through all these words in the patent and he's

11   going to show you which ones are not met or which ones are

12   missing.  If you agree with him, you can just put a little X

13   out beside that word or that element that's missing.

14        The reason I suggest that to you is you're going to hear

15   about many claims and many words.  When you go back in the

16   jury room, you can simply look at your -- your notebook, and

17   if you have one X on a claim, you know that that means we do

18   not infringe.  You may have more than one X.  But if you have

19   at least one, you know we don't infringe.

20        This same claim, this is claim 1 from the '134 Patent,

21   it's a method, it also requires performing phase and amplitude

22   adjustment--that's just the waves, that's characteristics of

23   the wave--in a closed loop manner.  It's very clear how that

24   should occur.  I'm not going to attempt to explain what a

25   closed loop manner is.  Mr. Proctor will, and he'll also

1    explain to you why we don't do it in that manner and why, as a

2    practical matter, it just simply -- it wouldn't work if we

3    did.

4        Let's look at the '775 Patent.  The '775 Patent talks

5    about a very specific way for creating interference canceling

6    signals.  So if you go look at claim 1 of that patent, it

7    says, a method for performing interference cancellation.  And

8    then let's go down to the highlighted part and it tells you

9    very specifically how that has to occur in the patent.  It

10   says, it includes--ICS is interference canceling

11   signals--giving three signals, and then there is certain math

12   that has to be done on those three signals.  And that's what

13   you're going to learn from Mr. Proctor is the Nokia products

14   don't have three signals.

15       The Court's given you a construction here, and I want to

16   be very clear, what the Court says is, the three signals must

17   be separately identifiable but are not limited to three unique

18   input signals.  The evidence will be that there are not three

19   separately identifiable signals and, as a result, that math

20   that is required by the claim is not done, cannot be done, and

21   again it goes back to the practical versus the theoretical.

22       That's a roadmap of what I think you'll hear on

23   infringement.  Just like the Plaintiffs, when Mr. Proctor

24   testifies, he's very likely to testify for a couple of hours.

25   He's going to give you the kind of detail that you need to

1    make an infringement decision.  And I'll tell you up front,

2    it's probably going to be more detailed than you want, but

3    that's -- that's what we think we should do.  We should give

4    you all the information that you need to make an informed

5    decision on that infringement question.

6         Let me turn to the question of invalidity.  We talked a

7    little bit about it this morning.  You now know from what the

8    Court has said to you that the ultimate determination for

9    invalidity of a patent is made by a jury.  It's not made by

10   the Patent Office.

11        And that's for a very good reason.  The Patent Office

12   doesn't have all the information that you have.  The patent

13   process is a process where the applicant and the Patent Office

14   meet and talk and communicate.  No one else is a part of this

15   process.  We don't have the opportunity to show up in that

16   process and say, hey, what about this or look at this.  No one

17   else does.  That's why the jury makes the ultimate

18   determination.

19        And the evidence -- I think -- I heard Mr. Grinstein say

20   we are going to try to convince you that the Patent Office has

21   made a serious mistake.  That's not true.  That's not what

22   we're going to do.  What we're going to do is say the Patent

23   Office did not have all the information.

24        And you remember when we talked in jury selection this

25   morning, we said, has anyone ever made a decision and it was

1   wrong because you didn't have all the information that you

2   needed?  Everyone's done that.  We're not saying these folks

3   made a mistake.  We're saying they didn't have all the

4   information that they need, they didn't have near the evidence

5   that you're going to have to make this decision, and once you

6   have all the available information, the fact is these things

7   that Mr. Smith put in his patent, they're not new.  They are

8   not new solutions.  And that's really the test.  Right?

9        You know from the video you heard and from what the Court

10  said, in order to have a valid patent, your solution and your

11  concept has to be new, and if others had it before you, even

12  if you combine things together such that they would be

13  obvious, then your patent is not valid.

14            THE COURT:  Five minutes remaining.

15            MR. DACUS:  Thank you, Your Honor.

16       I just want to -- again, Mr. Proctor is going to talk to

17  you in detail.  I want to give you a high-level roadmap of

18  what I think you'll hear.

19       So what you see on the screen is a patent by a gentleman

20  by the name of Kim.  So it's not one of the patents in this

21  case.  It's a valid United States patent.  The thing I want to

22  emphasize to you is you see when it was filed?  December 29th

23  of 1998.  That's before either one of the two patents in this

24  case came to be or were filed.

25       And what this patent deals with by Mr. Kim, you see it on

1    the bottom, intermodulation product signals are eliminated.

2    Now, they use the word 'eliminated' rather than canceled.  But

3    here we are with the same solution that Mr. Smith claims in

4    his '134 Patent, and it's before his patent was applied for.

5         The same is true for the '775.  Here is a patent by a

6    gentleman by the name of McCalister.  Look at the date,

7    January of 2007.  That is before this '775 Patent.  This

8    McCalister patent deals specifically with how to create

9    intermodulation products.  That's canceling signals.  And it

10   does it in a very specific way with specific math, and we'll

11   show you that essentially this is how the Nokia products work.

12   And the point of emphasis here, the thing I want you to watch

13   for is, I've already told you that these folks are going to

14   try to stretch that '775 Patent.  We really have two signals.

15   They're going to try to convince you that our two signals are

16   three.  They're really trying to stretch their patent beyond

17   what it is.  And if they are successful in doing that, then

18   this McCalister patent describes exactly how they want to

19   stretch their patent and they can't have it both ways.  It's

20   either we don't infringe or this patent is invalid.

21        I'll close with this.  I'll say just a short word about

22   damages and the amount of money they want.  I don't want to

23   talk about damages because we don't believe that we owe them

24   anything.  But this is what I will say about damages.  They've

25   told you what they think this case is about, but you can learn

1  a lot about what a case is truly about if you look at the

2  amount of money that folks ask for and if you listen to the

3  methodology and the process they go to in order to try to get

4  to a calculation on that amount of money.

5      So what I would ask you to do is when they put up their

6  expert to talk about how to calculate this, please listen

7  closely to the methods and the process that he uses and goes

8  through to get to that amount because we do think that bears

9  not only on the credibility of the damage claim but the

10  credibility of the claim in general here.

11      I want to thank you very much for your attention this

12  afternoon.  We very much look forward to the opportunity to

13  present the evidence to you over the course of the next week

14  and appreciate your attention.  I do want to remind you before

15  I sit down, we will go second, so please don't make any

16  determination until you hear all the evidence.

17      Thank you.

18      Thank you, Your Honor.

19          THE COURT:  Ladies and gentlemen, before we proceed

20  with the Plaintiff's case in chief and call their first

21  witness, we're going to take a short recess.  This first

22  witness is going to be close to two hours on the witness

23  stand, so this is our chance to stretch our legs and get a

24  drink of water before we start with a lengthy witness.

25      If you will simply take your notebooks and close them and

1    leave them in your chairs, I don't expect this to be a long

2    recess, and we'll be back shortly to continue and, as I say,

3    begin with the Plaintiff's first witness.

4        Please follow all my instructions, including not to

5    discuss the case with each other, and we'll be back shortly.

6        The jury's excused for recess.

7            (Whereupon, the jury left the courtroom.)

8            THE COURT:  Be seated, please.

9        Mr. Nelson, could you point out to me Nokia's corporate

10   representative who's here at trial to represent that entity?

11           MR. NELSON:  We don't have a corporate

12   representative.  We will have a witness testifying, Your

13   Honor, but we don't have a corporate --

14           THE COURT:  Nokia's intervened in this case.  They

15   asked to participate.  They're going to participate in the

16   trial.  We need someone that is the face and the physical

17   presence of that entity.

18           MR. NELSON:  We'll have a witness, Mr. Davis.  He

19   will testify, but --

20           THE COURT:  We need a corporate representative for

21   each party participating in the trial throughout the trial.

22           MR. NELSON:  He'll be here tomorrow, Your Honor.  He

23   actually is not coming into town until tonight, and that's --

24   that's the issue, Your Honor.

25           THE COURT:  Okay.  Well, as we all know,

1    corporations don't exist in corporeal form.  They're

2    represented by human beings, and your client needs to be

3    represented by a human being at the counsel table during the

4    trial.

5              MR. NELSON:  Understood, Your Honor.

6              THE COURT:  All right.  We'll take about a 10-minute

7    recess, and then we'll continue.

8         Court stands in recess.

9                        (Brief recess.)

10             THE COURT:  Be seated, please.

11        Plaintiff, are you prepared to call your first witness?

12             MR. WARD:  We are, Your Honor.  We would like to

13   invoke the Rule as well.  If you want us to do it in front of

14   the jury --

15             THE COURT:  I'll ask you as soon as the jury's back

16   in the room.

17             MR. WARD:  Okay.  We're good.

18             THE COURT:  Let's bring in the jury, Mr. Mitchell.

19             (Whereupon, the jury entered the courtroom.)

20             THE COURT:  Please be seated.

21        Counsel, does either party wish to invoke the Rule?

22             MR. WARD:  The Plaintiff does, Your Honor.

23             THE COURT:  All right.  Do I understand that the

24   request is to invoke the Rule as to fact witnesses but not

25   expert witnesses?

1          MR. WARD:  Correct, Your Honor.

2          THE COURT:  All right.  That means if you are

3   present in the courtroom and are not a designated expert

4   witness and you are not a designated corporate representative

5   but you intend to testify in this case, you must wait outside

6   the courtroom until you are called to the witness stand to

7   testify.

8        And, counsel, I will rely on you to make sure anyone

9   subject to the Rule complies and doesn't somehow remain in the

10  courtroom.  The Rule is invoked.

11       Plaintiff, call your first witness.

12         MS. XI:  Good afternoon, Your Honor.  Meng Xi for

13  Finesse.  Plaintiff calls Francis Smith.

14         THE COURT:  All right.  Come forward and be sworn,

15  Mr. Smith.

16         (Whereupon, the oath was administered by the Clerk.)

17         THE COURT:  Please come around, have a seat on the

18  witness stand, sir.

19       Are there witness binders to distribute in regard to

20  direct examination?

21         MS. XI:  Yes, sir.  They should be with you already,

22  with the witness, and I just with distributed two copies to

23  the Defendants.

24         THE COURT:  All right.  Then let's proceed with

25  direct examination.

1      MS. XI:  Thank you.

2           FRANCIS "FRANK" SMITH, SWORN,

3      testified under oath as follows:

4                DIRECT EXAMINATION

5      By Ms. Xi:

6      Q.   Sir, could you please state your name for the jury?

7      A.   My name is Francis Smith.  I go by Frank.

8      Q.   And where do you live, Mr. Smith?

9      A.   I live in Park City, Utah.

10     Q.   What is your relationship to the Plaintiff in this case,

11     Finesse Wireless?

12     A.   I am the founder, CEO, and the inventor of the

13     inventions.

14     Q.   Are you married?

15     A.   Yes, I am, to my wife of -- Shelly of 30 years.

16     Q.   Do you have any kids?

17     A.   Yes.  I have two sons, Raymond and Cody.

18     Q.   And when you're not in court testifying, what do you like

19     to do for fun?

20     A.   Gardening with my son, running to stay in shape,

21     backpacking, and fishing with my sons.

22     Q.   How old are you, Mr. Smith?

23     A.   I'll be 69 this coming Saturday.

24     Q.   Are you aware that Finesse is accusing AT&T and Nokia of

25     infringing two patents in this lawsuit?

1    A.    Yes, I am.

2    Q.    And what do you have to do with those two patents?

3    A.    I am the inventor on both.

4    Q.    Where did you grow up, Mr. Smith?

5    A.    I grew up in Denver, Colorado.

6    Q.    And please tell the jury how you discovered that you

7    would become an engineer.

8    A.    I had the good fortune in high school of having a

9    wonderful math teacher in my sophomore year.  He was a

10   licensed civil engineer who was dedicated to teaching when he

11   wasn't doing civil engineering.  And every time he taught us a

12   mathematics technique or something of that nature, he would

13   tell us how we could really use it in real life.  And I found

14   using those tools to solve problems in an extremely

15   interesting way to go about doing things.

16        And he even got myself and several others involved in a

17   bridge building contest with the Colorado State Transportation

18   organization where we build bridges out of balsa wood and they

19   would put them under a press and see who could hold the most

20   weight.

21   Q.    Did you win that competition?

22   A.    Not even close.

23   Q.    So your high school math teacher inspired you to study

24   engineering?

25   A.    Yes, he did.

1    Q.    Where did you go to college?

2    A.    I went to the Colorado School of Mines in Golden,

3    Colorado.

4    Q.    Did you graduate with a degree?

5    A.    Yes, I did.

6    Q.    What is it?

7    A.    I got a Bachelor's of Science degree in geophysical

8    engineering.

9    Q.    And could you explain to the jury what is geophysical

10   engineering?

11   A.    Geophysical engineering is studying and measurement of

12   the properties of the earth, electromagnetics, gravity

13   density, things of that nature, to search for oil, search for

14   minerals, do earthquake prediction, all the different things

15   that are involved with the physical properties of the earth.

16   Q.    What did you do after you graduated?

17   A.    After I graduated, I was commissioned a second lieutenant

18   in the Army Corps of Engineers, and I was then stationed in

19   Fort Shafter, Hawaii.

20   Q.    What was your rank and what did you do while you were in

21   the Army?

22   A.    I was commissioned as second lieutenant and worked my way

23   up to captain four years later.

24   Q.    Okay.  What were your assignments in the Army?

25   A.    My first assignment was executive officer of a photo

1    mapping company, and my second assignment was to develop and

2    build from scratch a theater level geographical intelligence

3    unit to support our ground troops.

4    Q.    How large was the mapping company and what did it do?

5    A.    The mapping company was about 100 soldiers, the training

6    unit was about 20.  The mapping unit created specialized maps

7    that the soldiers could use to very quickly assess what they

8    were going to see on the ground.

9    Q.    How long did you serve in the Army?

10   A.    I served in the Army for four years, including my

11   training at Fort Belvoir, Virginia, through -- when I came off

12   active duty as a captain.

13   Q.    And did you continue with your service after active duty?

14   A.    Yes, I did.  I stayed in the Ready Reserve for about five

15   years.

16   Q.    Did you win any praise or accolades while you were in the

17   Army?

18   A.    Yes.  I was very fortunate for the development of the

19   theater training intelligence unit, I was awarded the Army

20   Officer of the Year in 1979 for the Western Command.

21   Q.    What did you do after you left the Army?

22   A.    After the Army, I went to work in industry for several

23   different defense companies where I was in the process of

24   working on developing intelligence and communication systems

25   in support of our soldiers.

1  Q.   What are the names of some of these companies that you

2  worked for?

3  A.   I worked for TRW, which NATO later became Northrup

4  Grumman.  I worked for Ford Aerospace, which eventually

5  involved in being Lockheed Martin.  GTE Government Systems and

6  Lucent and then L-3 Communications in Salt Lake City.

7  Q.   Lucent, is that the Lucent Technology that has gone

8  through several name changes over the years?

9  A.   Yes, I believe it has.  I think it became Alcatel-lucent

10  and then Nokia.

11  Q.   When did you start working with radio and cellular

12  communication systems?

13  A.   When I got out of the Army in 1981, went to work for TRW

14  for about a year.  And then for Ford aerospace, I was dealing

15  in satellite communications which, of course, are wireless,

16  and other terrestrial microwave system.

17  Q.   Were there cell phones back in 1981?

18  A.   I don't remember having them available at that time.  I

19  think they came in later with the original analog and then

20  digital later.

21  Q.   Did you do any graduate study?

22  A.   I did.  I got a -- when I got to Ford Aerospace and

23  looked around and saw satellite communications and

24  communications in general, I decided the future was in

25  communications.  And so I enrolled at the University of Santa

1    Clara in a master's electrical engineering program

2    specializing in RF communications.

3    Q.    What is RF communications?

4    A.    RF is radio frequency.  So they are the -- you know, the

5    radio signals you get on your radio or you get on your cell

6    phone now, or you get on your TV, those are all RF, radio

7    frequency.

8    Q.    Did you find out your service in the Army was valuable to

9    your work at these defense contractor firms?

10   A.    Oh, it was extremely valuable.  Four years as a company

11   grade officer leading troops, taking care of the troops,

12   translated into management very easily in industry, plus a

13   knowledge of how the military units worked and what their

14   needs were when we came to developing intelligence

15   communication systems, I could see the applications of it

16   directly and that was rather rewarding.

17   Q.    What was the last company that you worked for before you

18   started Finesse?

19   A.    The company called Parker Vision Wireless.

20   Q.    What did Parker Vision do?

21   A.    Parker Vision was trying to develop chipsets for handsets

22   for cellular.

23   Q.    When did you leave Parker Vision?

24   A.    January of 2001.

25   Q.    Why did you leave Parker Vision?

1   A.   I got -- I got let go.  The man that I was working for

2   that hired me got crosswise with management, and unfortunately

3   a few more of us were let go shortly thereafter.

4   Q.   Did management ever tell you why you were let go of?

5   A.   They told me I was being let go for violation of company

6   policy.  They wouldn't tell me what policy I violated.

7   Q.   What were you hoping to do with Finesse?

8   A.   Once I started Finesse after I left Parker Vision, I was

9   familiar with the intermod problems in cellular and other

10   communication systems.  As I found it a rather intriguing

11   problem because it was fairly complex, much more than just a

12   signal getting in the way.  And I was trying to find good ways

13   to filter it without doing damage to the desired signal that I

14   was looking for, and eventually came up with intermod

15   cancellation in a different paradigm.

16   Q.   And how long did you devote your life to Finesse full

17   time?

18   A.   I did it from about 2001 to 2004 when my life savings ran

19   out and I had to get another job to support my family.

20   Q.   So what happened after the three years with Finesse?

21   A.   I went to work for L-3 Communications in Salt Lake City,

22   a defense contractor who developed communication systems for

23   the military, air-to-air, air-to-ground, ground-to-ground,

24   air-to-satellite--all the different types of communications

25   that our troops needed to be safe and get their job done.

1    Q.   And how long were you at L-3?

2    A.   I was there from 2004 to 2020 when I retired, so about 16

3    years.

4    Q.   Did Finesse disappear once you were working at L-3 for 16

5    years?

6    A.   No.  We were still working on it in the background,

7    continuing to look for investors and whatnot.  But I couldn't

8    do it full time because I had my responsibilities to my

9    primary employer.

10   Q.   Have you worked since your retirement?

11   A.   Yes, I have.  I've been more focused on Finesse since I

12   now have time to put more time into it, and I started a

13   consulting company called Blue Spruce Consulting where I do

14   consulting for different companies in telecommunications,

15   mostly satellite.

16   Q.   And what kind of clients do you have for Blue Spruce?

17   A.   I have several different clients.  Some of them are

18   defense contractors.

19   Q.   And what kind of work did you bring them?

20   A.   The only thing I can go into is that I do mostly

21   satellite communications, but most of it's classified due to

22   the nature of my customers.

23   Q.   If it's -- by classified, do you mean that you hold a

24   security clearance?

25   A.   Yes.  I hold a top secret clearance, plus special access

1    clearances and have an extended background in investigation.

2    Q.   Are those clearances easy to get?

3    A.   They take time and they are difficult and they require

4    extensive background investigation, will typically take at

5    least a year to get and sometimes involve polygraphs.

6    Q.   Have you won any awards for your work in industry?

7    A.   My team at L-3 was inducted into the Space Technology

8    Hall of Fame for new development of algorithms to put

9    non-linear processing into amplifiers with NASA Glenn where

10   they could put up to 20 gigabits per second through this

11   amplifier.  Think about that in terms of your internet is

12   normally one gigabit.  It would be 20 times faster than that

13   and it was 1995.

14   Q.   Let's switch gears to talking about your -- the Finesse

15   solution to interference intermod problem if that's okay with

16   you.

17   A.   That will be fine.  Thank you.

18   Q.   What is interference?

19   A.   Interference is any time there is one signal impeding

20   your ability to look at the signal, your desired signal that

21   you're trying to get, like two radio stations interfering with

22   each other.  Maybe your cell phone, you've just got five bars

23   and you lose the signal or got a really bad signal but you

24   don't know why, those sorts of things can be caused by

25   interference.

```
 1   Q.   And did you hear the parties for both -- I'm sorry,

 2   counsel for both parties in the opening statements talking

 3   about passive intermodulation, or PIM?

 4   A.   Yes, I did.

 5   Q.   Would you tell the jury what PIM is and what does it have

 6   to do with interference?

 7   A.   PIM is passive intermodulation interference.  And

 8   intermodulation is it multiplies two signals together that are

 9   in whatever the non-linear element is and creates new signals

10   that you don't want, tend to interfere with signals that you

11   do want.

12       It can be -- they could be caused in active or passive

13   elements.  An active element is an amplifier.  That's called

14   an active intermod.  Passive intermods are caused by physical

15   devices that the radio waves might be incident on.  You can

16   get a rusty bolt or oxidation, misaligned connectors, and a

17   number of the other items like physical structures outside,

18   sheds, other antennas, your antenna, et cetera.

19   Q.   How does a rusty bolt, I think you said oxidation, but

20   I --

21   A.   I'm sorry.  That's rusting.

22   Q.   How can a rusty bolt on a cellular tower create a signal?

23   A.   It creates discontinuities that can induce electron flow,

24   and electron flow can then radiate back as a second signal.

25   Q.   And how does PIM affect cellular networks?
```

1    A.    PIM affects it by interfering with the received signals

2    that they are trying to receive, making some parts of the

3    spectrum unusable, reducing the available spectrum, thus

4    reducing the capacity of the cell sites or satellite systems

5    or whatever it is that you're dealing with.

6    Q.    We've been hearing this word 'spectrum' a bunch in the

7    opening statements and now you just mentioned it.  What is

8    spectrum?

9    A.    Spectrum is bandwidth.  You can think of it, as you know,

10   like do you have a hundred megabits or a gigabit going through

11   and how much radio space does that cover.  And spectrum is

12   very, very valuable.  And if you can't use it effectively,

13   that's tough.

14   Q.    Why is or what makes spectrum valuable?

15   A.    Valuable of spectrum is, one, it's a great revenue

16   generator for the cellular companies because then they can

17   sell services.  It's a very -- it's a finite and scarce

18   resource, and it's a resource that is auctioned off by the

19   U.S. government.  So scarcity and the demand for it, the two

20   make it very expensive.

21   Q.    And how expensive are we talking?

22   A.    We are talking billions of dollars.

23   Q.    Has PIM been a problem for the communications industry

24   generally?

25   A.    PIM has been known since at least the 1940s.  The problem

1   has been known.  The solutions were much, much later.  But,

2   yes, it has been known for a long, long time.  The math and

3   the physics of the problem has been known.

4   Q.   Okay.  And when did PIM become a problem for this

5   cellular industry specifically?

6   A.   I started to hear about it, read about it, in

7   the -- about 10 years ago.  And then since then, it seems to

8   be getting significantly worse which is exactly what we

9   expected to see happen because spectrum gets more crowded,

10  more signals, et cetera, and it just becomes even a more

11  valuable resource.

12  Q.   When you came up with your invention, were there existing

13  ways to deal with PIM specifically in the cellular industry?

14  A.   Yes.  I can think of three.  Number one was site hygiene

15  you've heard talked about before.  You go out and keep things

16  cleaned up.  That's labor intensive.  You are using expensive

17  equipment.  It tends to -- you have to keep going out and

18  doing it because things do rust or oxidize after that or they

19  get misaligned or had a rainstorm.  All kinds of things in the

20  environment can do that.

21      Number two would be you manage the spectrum.  If you can

22  get more spectrum, which is expensive, or you're using it less

23  effectively, you've got to move the signals apart from the

24  interfering signals so you can get your signals through.  And

25  when you do that, you've got a lot of spectrum you're leaving

1    idle.

2         Third way is to try to put filters over the interference

3    that are in the band.  That will work to some effect.  But

4    once you filter the stuff that's in band, you end up filtering

5    out some of the desired signal you're looking for at the same

6    time so you're doing damage to that signal and you're not

7    getting a totally clean cancellation signal because you've got

8    some of your desired signal in there as well.

9    Q.   Okay.  That was a lot.  Let's unpack it just a little bit

10   for the jury.  Who did this first method that you were talking

11   about which was site hygiene?

12   A.   Site hygiene is often done by people called PIM hunters

13   in some quarters, and the cell companies will hire these

14   people to go out and look for the PIM signals and then climb

15   the towers and try to clean things up, aligning equipment,

16   cleaning rust off of the components.  Hygiene or just cleaning

17   things up.

18   Q.   And were there drawbacks to site hygiene and using PIM

19   hunters?

20   A.   Well, number one, it tends to be labor intensive.  You

21   have to pay people, and people are always very expensive.  And

22   then you have to keep going back and doing it again.

23   Q.   How many towers or cell towers are there in the United

24   States, if you know?

25   A.   No, I don't know, but I would think they have to measure

1   in the millions.

2   Q.   Okay.  The second approach that you said about dealing

3   with PIM is to purchase more spectrum?

4   A.   Yes.

5   Q.   And what did you see as the problem to this approach?

6   A.   Well, one, it has to be available to be auctioned off by

7   the U.S. government, and that's getting more and more scarce,

8   and it's very expensive.  So those would be the two reasons.

9   So when you go out looking for more spectrum, you're competing

10  with everybody and who's going to be the highest bidder and

11  that drives the cost up.

12  Q.   Okay.  And the third way that you testified about was

13  filtering signals?

14  A.   Yes.  Putting filters over the -- the interfering signal

15  to try to remove it out of your desired signal.  And the

16  unfortunate thing there is you're going to get some of the

17  desired signal taken out.  Any filter will distort the signal

18  to some degree.  So now you're introducing some more

19  distortion.

20  Q.   So by staying -- by saying that you're going to take some

21  of the desired signal out when you're applying this filter, is

22  that like throwing the good out with the bad?

23  A.   Yes.  Throwing the baby out with the bath water is

24  another analogy that's commonly used.  But, yes, you are

25  throwing away good signal with bad signal.

1   Q.   And what does the cellular industry typically call this

2   approach of filtering signals?

3   A.   Typically it's just that.  It's -- it's trying to filter

4   out interference.

5   Q.   Okay.  Could you give the jury one succinct way of

6   thinking about the Finesse solution to PIM?

7   A.   Yes.  Intermods are caused by signals outside of the

8   signal you're looking for or your desired signal.  And when

9   they encounter a non-linearity, they mix together in a

10  deterministic manner, which I figured out, and then dropped

11  the signals inside of the signal that you're looking for.

12  Q.   You mentioned a term, non-linearity?

13  A.   Yes.  A non-linearity is any element that does not have a

14  continual transfer function, which means if you put in two

15  watts and you get out four, then you put in three and you get

16  out six, everything's times two.  But at some point there's a

17  limit to what that amplifier can put out and you'll start ---

18  you'll be putting in more power and getting less power out.

19  And that compression is called non-linear distortion.

20       You may have experienced it with turning your car radio

21  up too high, turning your stereo up too high, and you really

22  start getting that nasty noise and distortion.  That's

23  non-linear distortion.

24  Q.   And what does non-linear distortion have to do with

25  interference?

1    A.   Non-linear distortion will create these intermods and

2    create interference, create new signals that you did not want

3    that are now in there, and they start falling places that you

4    don't want them.

5    Q.   How did you come about your invention to get rid of PIM?

6    A.   It was kind of interesting.  One night about 2000, 2001,

7    February to March, I don't remember exactly when it was, but I

8    was up one night working on this problem trying to make new

9    filters.

10       My family had gone to bed, and I was just sitting there

11   staring at it and I suddenly realized these intermods are

12   totally predictable.  If I have the signals to create them so

13   if I filter off the signals that create them and use those to

14   create the canceling signal, I can not only predict exactly

15   where the intermods will fall, I can make a canceling signal

16   and I can cancel them out without damaging my desired signal.

17   Q.   And remind us, by intermods do you mean interfering

18   signals?

19   A.   Yes.  They are a particular type of interference.

20   There's lots of kinds of interference.  Intermodulation

21   interference is a type of interference.

22            THE COURT:  Mr. Smith, if you would, please slow

23   down a little bit.

24            THE WITNESS:  Yes, sir.

25            THE COURT:  We are not used to all this terminology

1    like you are.  So if you could go a little slower, it would be

2    helpful.

3              THE WITNESS:  Yes, sir.  My apologies.

4              THE COURT:  Thank you.

5        Go ahead, counsel.

6    Q.   (BY MS. XI)  What is important about being able to

7    predict intermods?

8    A.   Being able to predict them, I will know where they are

9    going to fall.  And if was trying to filter them, I would have

10   to see them.  But with this technique, I don't have to see

11   them.  I can predict where they will be.  And even if they are

12   lower in amplitude or height than the desired signal, they can

13   still damage the signal.  But with this technique, I can still

14   cancel them out because I know where they're going to fall and

15   I know what they're going to look like.

16   Q.   And when did you have this lightbulb moment that

17   cancellation is the way to go?

18   A.   When I was sitting up that night after my family had gone

19   to bed, looking at some of my block diagrams, and when I

20   suddenly realized I could create the canceling signals, as

21   long as I had those signals that were outside my desired

22   signal, once I got a copy of them, I could create, I could

23   predict where they were going to fall, and I could create

24   copies of them, very accurate copies of them, and cancel them.

25   Q.   And how did that make you feel once you had that

1   revelation?

2   A.   Oh, that was a -- it was an incredible moment.  It was

3   like, oh, my gosh, I just solved a problem that's been -- that

4   we've been battling for years and years and I knew exactly how

5   to solve it and I know I can do it effectively.  Now,

6   intellectually, I knew that.  We found ways of verifying that

7   later.

8   Q.   Is your PIM cancellation solution a physical filter that

9   you would go on a receiver line or an antenna?

10  A.   It's not a filter.  It's a process, it's an algorithm.

11  And it could be put in multiple different places inside the

12  radio system to take out the -- the interference.

13  Q.   And when you conceived of your invention, I think you

14  said February or March of 2001, did it seem pretty simple?

15  A.   I wouldn't call it simple.  I had to look at the problem

16  from a different direction.  It was a different way of looking

17  at it.  I wasn't looking at trying to cancel it.  I started

18  looking at how to predict it and then cancel it.  I wasn't

19  filtering it.  I was canceling it.  I wouldn't call it simple.

20  Q.   Okay.  And by canceling it, do you mean something like

21  noise canceling headsets or headphones?

22  A.   That's a very good analogy.  If you use noise canceling

23  headsets, you turn them on, and all of a sudden the noise is

24  less and you can better hear the signal you are looking for.

25  So, yes, noise canceling headset is a reasonable analogy.

1    Q.   After you came up with this idea about intermod

2    cancellation in February or March of 2001, what did you do?

3    Did you do anything with that idea?

4    A.   Yes, I did.  I realized it was very valuable, could solve

5    some very, very difficult problems in communications.  And so

6    I went out and got with a patent attorney to start drafting up

7    the patent to protect the technology.

8        I had worked at other companies where I had been a

9    co-inventor on different patents, and they always brought in

10   patent attorneys.  And I thought if this is that important, I

11   better bring in a professional to do it so I do it and get it

12   done right.

13   Q.   And did you and the patent attorney file a patent

14   application for these ideas?

15   A.   Yes, we did.  The initial patent, the provisional patent,

16   was filed in May of 2001.

17   Q.   Did the United States Patent Office grant that patent?

18   A.   Yes, they did.

19   Q.   And let me just show you Plaintiff's Exhibit 3, PX 3 on

20   the screen, and I'm also holding in my hand the patent that

21   you've all seen by now.  What is this patent?

22   A.   This is Patent '134, which was the result of the initial

23   invention.

24   Q.   Could you speak into the mic?

25   A.   I'm sorry.  Yes, this was the initial patent that I

1    created and it was the -- the first one that I did in 2001.

2    Q.    Okay.  And why does this one have the ribbon out on the

3    front?

4    A.    The first issue of patents from the Patent Office carry

5    that ribbon.

6    Q.    Let me direct you to the first page of this patent that's

7    on the screen right there.  What is the issue date of this

8    patent again?

9    A.    The issue date is March 18th, 2008.

10   Q.    Okay.  And when did you file this patent?

11   A.    It was filed initially in May 15th, 2001.

12   Q.    So it took about seven years for you to get the patent?

13   A.    That is correct.

14   Q.    Why did it take so long?

15   A.    The Patent Office does a rather extensive due diligence

16   looking at, you know, what things they think are right, what

17   things they think you need to fix, what claims they believe

18   are valid and what you have to do to make them valid, and they

19   compare it to prior art and you have to explain to them why

20   yours is different than the prior art.  And this back and

21   forth --

22            THE COURT:  Just a minute, Mr. Smith.

23        Yes, counsel?

24            MR. NELSON:  Object.  This is 702 and also calling

25   for legal conclusion as well, Your Honor.

1          MS. XI:  Your Honor, I'm asking for his personal

2    experience with the Patent Office.

3          THE COURT:  Well, and he can certainly testify to

4    his legal -- his personal experience with the Patent Office.

5    Him opining about what the Patent Office typically does goes

6    beyond his personal experience.  He needs to -- he needs to

7    limit his testimony to what happened with him --

8          MS. XI:  Yes, sir.

9          THE COURT:  -- not what he understands the Patent

10   Office generally does.

11       So I'll sustain it in part, but overrule it in part

12   following those instructions.

13         MR. NELSON:  Thank you, Your Honor.

14         MS. XI:  Thank you, Your Honor.  I'll rephrase the

15   question.

16   Q.   (BY MS. XI)  Mr. Smith, in your experience with the

17   Patent Office in those six-and-a-half years it took for you to

18   get this patent, what was it like?

19   A.   We had a number of what they -- we received called office

20   actions where the Patent Office would ask us for more

21   information, would ask us for clarification, would ask us for

22   a number of different items, and to tell them the difference

23   between what they found as prior art and what we were

24   patenting.

25         And these cycles can easily take six or seven months from

1    the time they send it to us, we respond to them, they come

2    back and respond to us.  So there were probably -- I don't

3    know.  There were quite a few of those that went back and

4    forth, and that's what took the time.

5    Q.    And you personally participated in that process with --

6    A.    Yes --

7    Q.    I'm sorry.  With your patent attorney?

8    A.    That is correct.

9    Q.    Was this your first patent?

10   A.    It was my first solely owned patent.  I had had a number

11   of other patents where I was co-inventor with different

12   companies that I'd worked for--Ford Aerospace, Lockheed, L-3,

13   et cetera.  So I've gotten patents with other companies, but

14   they -- the companies own them, I was a co-inventor on those.

15   Q.    Okay.  And what was it like when you found out the Patent

16   Office granted it?

17   A.    That was a pretty good day.  I was very proud of it so I

18   ended up going around and showing it to all my friends.  They

19   probably got tired of hearing about it.

20   Q.    Do you own this patent, the '134 Patent?

21   A.    No.  I have assigned it to Finesse Wireless, LLC.

22   Q.    Okay.  And where does it say this on the screen?

23   A.    On this one, it was -- we were originally Finesse

24   Wireless, Inc., and evolved into Finesse Wireless, LLC, and

25   ultimately assigned all of my patents with regard to intermod

1  cancellation to Finesse Wireless, LLC., who owns them all

2  today.

3  Q.    Okay.  And Finesse Wireless, LLC., is the Plaintiff in

4  this lawsuit?

5  A.    That's correct.

6  Q.    Okay.  I am holding in my hand Plaintiff's Exhibit 4,

7  which is the other patent-in-suit.  Could you just tell the

8  jury which patent this is?

9  A.    This is Patent 9,548,775, which we refer to in short as

10  Patent '775.

11  Q.    So did you apply for the '775 Patent about it looks like

12  six years after you had filed for the '134 Patent?

13  A.    Yes.  It was filed for in September of '07.

14  Q.    Okay.  Does the Plaintiff Finesse also own this patent?

15  A.    Yes, same as '134.

16  Q.    And can you tell us what the invention of the '775 Patent

17  is?

18  A.    It's focusing heavily on passive intermods and how to

19  handle them in multi-carrier environments and with dual band

20  radios, again with co-located antennas and environments.  So

21  it differed from the other patents in that regard.

22  Q.    Okay.  You said multi-carrier.  What does that mean?

23  A.    That means I've got multiple signals at the same time

24  where I might be sending signals to two or three different

25  cell phones.  Each cell phone needs its own signal.  That's a

1    multi-carrier environment.  For a satellite environment, I'm

2    sending multiple signals to the satellite to be distributed

3    around the earth.

4    Q.   Earlier you mentioned some other patents that you -- your

5    name is on the first page of.  How many patent do you have to

6    your name?

7    A.   I think I've got 12, plus about a half a dozen

8    applications.  I saw the list the other day, but I forget

9    counting exactly.

10   Q.   So that's 12 issued patents and more applications, patent

11   applications?

12   A.   That is correct.

13   Q.   And who owns those patents?

14   A.   The -- some of them belong to companies that I've worked

15   for where I was a co-inventor, and six of them belong to

16   Finesse.

17   Q.   Okay.  Are you proud of your patents?

18   A.   Very.  They were a lot of work, a lot of time thinking

19   hard about how to make things actually work, and it took a lot

20   of work to get them.

21   Q.   Okay.

22        MS. XI:  And, Mr. Boils, will you please put

23   Plaintiff's demonstrative No. 1 on the screen.

24   Q.   (BY MS. XI)  Mr. Smith, do you know what this slide is

25   trying to depict?

1    A.   It's showing a number of what are called forward

2    citations, and that's where when other people start doing

3    patents in a similar vein or similar field of these patents,

4    they reference these patents -- my patents.  And my patents

5    have been referenced by at least 50 other patents by members

6    of different companies.  This is a sample of these.  There's

7    been 50 last time I looked, and the number was still growing.

8    Q.   So there are, I'm counting, five companies on the screen.

9    Are you saying that these companies and all the patents that

10   are listed underneath their logos cite to the '134 and the

11   '775 Patents?

12   A.   That's correct.

13   Q.   Why do they cite to your patents?

14   A.   Well, number one, it's a --

15             MR. NELSON:  Objection.  That's speculation, Your

16   Honor.

17             THE COURT:  Sustained.

18   Q.   (BY MS. XI)  Okay.  What is a forward citation again?

19   A.   It's when you're doing your own patent or sometimes

20   technical papers, you cite previous work similar in the field

21   as part of the knowledge base of how one -- what's going on in

22   the industry.

23   Q.   Okay.  And you said that this list is growing does.  That

24   mean that from time to time you check on who else is citing to

25   your patents?

1    A.    Yeah.  We look at it occasionally and see who else is

2    because, if we were looking for more partners in business,

3    that's a good place to look.

4    Q.    Could you just read off this slide here for the jury some

5    of the company names who are citing to your patents?

6    A.    Well, there's Cisco, Qualcomm, Ericsson, Intel, and

7    Motorola.

8    Q.    Were you the first person to think of canceling signals?

9    A.    No.  No.  Noise canceling headsets cancel signals.

10   Q.    And, Mr. Smith, do you plan on walking through your

11   patents today with the jury?

12   A.    No, I wasn't going to do that.  Just let them know the

13   key parts of it that make it interesting.

14   Q.    And are you here to tell the jury how AT&T and Nokia

15   infringe on your patents?

16   A.    No.  I'm not an infringement expert.  There are other

17   persons who are better qualified to do that than I.

18   Q.    And if that's the case, then how did you come to the

19   conclusion that Defendants infringe your patents?

20   A.    We've been watching the industry cell sites advertisement

21   of different companies for the last several years.  We

22   understood the physics well.  We knew the problem sooner or

23   later was going to show up, and we were just looking for when

24   it finally did.  We tried to talk to other companies earlier

25   telling the problem was coming, can we help you fix it, but we

1    didn't get any takers at that point.

2    Q.   You mentioned that there are experts who are evaluating

3    the infringement case against AT&T and Nokia?

4    A.   Yes, that is correct.

5    Q.   Are you referring to Doctor Wells?

6    A.   Yes, I am.

7    Q.   And has he been having access to documents that you

8    haven't been given access to?

9    A.   That is correct.  I couldn't do the infringement analysis

10   because I was precluded from looking at AT&T and Nokia's

11   documents.

12   Q.   After you developed the idea of intermod cancellation,

13   did you do anything to make sure that your solution wasn't

14   merely theoretical like Mr. Dacus said, but actually worked?

15   A.   Yes, we did.  We did three tests.

16   Q.   And could you just generally give the jury a roadmap of

17   the tests that you conducted to make sure that your solution

18   worked?

19   A.   Yes.  Soon after we filed the provisional patent in May

20   of 2001, I hired an electrical engineer to create a Matlab

21   simulation for me of the architecture based on cellular

22   standards and show that the intermods would be created and

23   that we could cancel them out effectively.  And we had the

24   results of those -- those tests.

25   Q.   Was that one test?

1    A.    That was one test that was simulation.

2    Q.    Okay.  What was the second test?

3    A.    The second test we -- I was working with L-3

4    Communications, working at L-3, and we were looking at seeing

5    if we could mitigate the passive intermod problem in satellite

6    terminals.  And we ran a test there that showed it worked

7    extremely well on a real Satcom terminal.  So it wasn't

8    theoretical.  It was a real terminal that we ran the algorithm

9    tests on to show they worked.

10   Q.    What year was that?

11   A.    That was in 2008.

12   Q.    Okay.  And just at a very high level, what was the third

13   test that you conducted?

14   A.    The third test, we were looking at trying to set up a

15   business relationship with L-3 to do cellular products, so we

16   built a bread board focusing on the cellular bands that the

17   cellular users are actually doing, generated the intermods

18   within those so we could cancel them, and showed a good level

19   of performance after signal cancellation.

20   Q.    Okay.  Intermod, let's take a deeper dive into the first

21   place if that's okay with you.

22   A.    Yes.  Thank you.

23   Q.    What is Matlab?

24   A.    Matlab is a computer program that runs on a number of

25   different computers.  It's used for a wide range of

1    simulations.  They are used in telecommunications.  They are

2    used in mechanical engineering.  They are used in

3    biomechanical systems.  But it's just a modeling

4    infrastructure that one can build systems in and then test out

5    their validity.

6        We wanted to do that before we started putting a lot of

7    money into patent prosecution and before we went out and

8    started advertising that we had something good.  We wanted be

9    able to prove it would work.

10   Q.   And how did you make sure to set up realistic models to

11   be tested on Matlab?

12   A.   I gave the engineer doing the simulations my

13   architecture, explained it to him, and gave him the standards

14   that were used in cellular for intermod management.  And amps

15   and CDMAs are some of the cellular systems so that we were

16   doing something that was realistic.  And so that's what we

17   used for the basis of the test case.

18   Q.   And what were the results of the Matlab simulation like?

19   A.   They were really quite good.  We were extremely pleased.

20   We were originally looking for three to six DB suppression of

21   the intermods, and we were getting at least 15.

22   Q.   What is a DB?

23   A.   A DB is a decibel.  You can -- it's normally used to

24   measure power levels or signal-to-noise ratio.  So you might

25   say the signal-to-noise ratio is 10 DB.  That tells you the

1    difference between your signal and the noise.

2    Q.   And can you tell the jury what is does it mean to have

3    results that were at least 15 DB of improvement?

4    A.   15 DB is a factor of 32 because every time you do 3 DB,

5    you've multiplied by 2.  So 15 DB was the -- we got the

6    interference to be 1/32nd of the original power that it had,

7    which took them from being a very serious interfering signal

8    to not doing us any harm at all.

9    Q.   Is DB expressed in algorithmic form?

10   A.   Yes, it is.  It's similar to the Richter scale that we

11   hear about earthquakes being 5.5 6.5.  Well, 6.5 is 10 times

12   the 5.5.  7.5 is 10 times that.  So, yes, it's a algorithmic

13   scale.

14   Q.   And 15 DB is how many times the 3 DB that you were

15   looking for?

16   A.   Well,  it's -- it's a 32 DB improvement in the -- 32X.

17   So the -- we knocked the signal down to 1/32nd of what it was,

18   the interfering signal.

19   Q.   Okay.  Let me direct you to Plaintiff's Exhibit 343.  I'm

20   going to put it on the screen.

21        Can you tell me what this is, what this document at the

22   bottom of the screen is?

23   A.   Yes.  This was a communication with Qualcomm Partners,

24   who is a venture capitalist.  We were looking at seeing if we

25   could get investment.  It contains the Matlab code as well as

1    the test results of that.

2    Q.    Okay.  If you could please speak into the mic --

3    A.    I'm sorry.

4    Q.    -- or move it so everyone can hear you?

5    A.    My apologies.

6    Q.    What is the date of this email?

7    A.    The date of this is March of 2002.

8    Q.    And can you just walk the jury through the Matlab setup,

9    I think, which is appended to this cover email?

10   A.    Yeah.  There's a lot -- there's about a hundred pages of

11   code here, so I won't walk you through that.  But down at the

12   bottom of it are the block diagrams that show how the

13   simulation was set up, how the models were developed, and how

14   they were run.  These are examples of them that walk through

15   the different functions in the invention to perform the

16   intermod cancellation.

17   Q.    I'm going to show you Plaintiff's Exhibit 135.  What is

18   this document?

19   A.    This is a briefing deck that we used for a number of

20   potential partners or investors that we briefed.  This

21   particular one was given to Qualcomm in 2004, and it goes

22   through our architecture, our technology, the

23   anticipated -- they are the actual test results, and the

24   business cases that we might venture forward with different

25   players.

1    Q.   And we're talking again about the test results of the

2    Matlab simulation?

3    A.   That is correct.

4    Q.   Do you see on the top right-hand corner there, Patents

5    Pending?  What does that mean?

6    A.   That means that we had patents and application that were

7    being prosecuted.  We always put that on so that people knew

8    that we were protecting the technology and we considered it

9    very valuable.

10   Q.   And what does it mean to have proprietary and

11   confidential on the bottom legend of the document?

12   A.   So that's one more layer of protection.  We found the

13   stuff so valuable that we wanted to make sure that everyone we

14   talked to was very clear that we considered this our IP.

15   Q.   Okay.

16        MS. XI:  If we could please turn to page 16.

17   Q.   (BY MS XI)  Does this show the results from the Matlab

18   simulation?

19   A.   Yes, it does.

20   Q.   And directing your attention to the plot that is on the

21   top left-hand corner--thank you--can you explain to the jury

22   what we are seeing here?

23   A.   Yes.  Given the signals that create intermods, the

24   algorithm uses them to compute an estimate of what that

25   intermodulation signal would look like.  And this is the

1    result of the estimation of the intermod signal.

2    Q.    Okay.  And if we could just advance and call out the

3    second plot to the right of this.

4    A.    The second plot shows the desired signal we're looking

5    for right.  In the middle you see it sticking up, and you see

6    the intermod interference on the right.  That is the one

7    that's actually generated by the non-linearities in the test

8    system.

9    Q.    Okay.  Can you please, using the touch screen, show the

10   jury or circle for the jury which is the desired signal?

11   A.    This is the desired signal.

12   Q.    Okay.

13   A.    That's the desired signal.  That's the one we are

14   trying -- trying to get.

15   Q.    And which one are you trying to remove or cancel?

16   A.    The big one on the right.

17   Q.    Okay.  If we could please go to the third plot that's on

18   the page on the bottom?  What does this show?

19   A.    This is the result after intermod cancellation.  As you

20   can see with this one, the intermod is not measurable in the

21   system and we have a very clean desired signal now that we can

22   process and work with and capture.

23   Q.    So the spike on the right is --

24   A.    Gone.

25   Q.    Okay.  What was the plan for Finesse after you saw the

1    results of this test?

2    A.   Well, we realized that we actually were getting much

3    better results than we had hoped.  We realized it was a very

4    powerful technology we could use in many different

5    telecommunication industries that had to struggle with

6    intermods.  And we started talking to venture capitalists.  We

7    talked to a number of different industry partners showing them

8    what we could do and how we could do it and what we thought

9    the benefits were of it to see if we could find someone to

10   either invest in us or partner with us or license our

11   technology to put it into their products.

12   Q.   Let's take a look at Plaintiff's Exhibit 77.  What is

13   this document?

14   A.   This was our -- one of our marketing documents that we

15   created to go out to people to be able to explain to them what

16   it was we had to offer and the benefits that we could offer.

17   Q.   What is the date of this document?

18   A.   This document is -- oh, excuse me -- January 29th, '03.

19   Q.   And did you draft this document?

20   A.   I jointly drafted it with a gentleman by the name of Mr.

21   Ira Marks who unfortunately has passed away.

22   Q.   And who was Mr. Marks?

23   A.   Mr. Marks was one of my partners who was a good

24   businessman, very well connected in the Silicon Valley with

25   venture capitalists and a wide range of other companies,

1  getting us entree in to talk to people about what we could

2  provide.

3  Q.   And if you could turn -- actually, was Mr. Marks or did

4  he ever hold any position within Finesse?

5  A.   Yes.  He was operating as our COO, and I was operating as

6  the CEO/CTO.

7            MS. XI:  And if you could turn with me to page 7 of

8  this document.  Let's blow up the section on technology

9  validation.

10 Q.   (BY MS. XI)  What does this say?

11 A.   To summarize what it was, we went out to industry

12 specialists independent of us to do a due diligence and see if

13 what we thought we had -- they thought it would be as good as

14 what we thought we had.  And we went to two individuals, Gary

15 Kelson of the Berkeley Wireless Development Center and Dr. Tom

16 Lee, a double E professor at Stanford University, and just

17 asked them, what do you think of this?  Do you think it has

18 any problems?  Do you think it's doable?  And these were the

19 responses we got back.

20 Q.   So what does it mean to conduct due diligence?

21 A.   You find independent persons who are knowledgeable in the

22 field, objective and independent, to give you an assessment of

23 where you're at and what you you're doing.  Because if you

24 don't do that, if you're not sure you're not fooling yourself.

25 That's just not a good thing.

1       So we asked people to look at it who are outside of the

2   group that we were doing it.

3   Q.   And what did Mr. Kelson and Professor Lee find?  I'm

4   sorry.  Where did you find Mr. KelsonKeson and Professor Lee?

5   A.   They were part of a broad portfolio of Mr. Ira Marks'

6   contacts in Silicon Valley.  So he knew them and he brought

7   them to the party.

8   Q.   And do you recall what their reaction to your solution

9   was?

10  A.   They were very praiseworthy, thought it was something

11  totally unique they hadn't seen before, at least that's what

12  they told me, and that our assumptions on the quality of it

13  were valid, and that they thought it was disruptive and

14  elegant, which was rather important.

15       They also said it was something the entire

16  telecommunications industry could benefit from, be it from

17  cellular to terrestrial microwave to satellites, et cetera,

18  any place where this intermod problem was encountered.

19       Originally we were talking about 3 to 6 DB, and Doctor

20  Lee thought we would get at least 10 and maybe more and he was

21  right because we got 15 to 30.  We always got at least 15.

22       They looked -- we had them look at the architecture and

23  say, do you see any reason this can't be done?  Do you see

24  anything that would preclude it?

25       And they said, no, they didn't see any fly in the

1    ointment, looked totally implementable.  But like all good

2    technologists, they will always tell you the devil is in the

3    details.  They are right; you have to go through the details.

4    But at that point they saw nothing that would preclude the

5    development of this technology.

6    Q.   Why are the words 'disruptive' and 'elegant solution' in

7    quotes?

8    A.   Because it was looking at a very complex problem that had

9    been around since at least the 1940s, and a good clean

10   solution had not been developed at that point.  And if you do

11   something that is that much different, you can actually

12   disrupt the way business is doing.  So business does something

13   better now, a different way of doing it.

14   Q.   Okay.  Was this your paraphrase of what Doctor Lee said

15   to you?

16   A.   No.  Whenever I went to meetings with people, I always

17   carry a notebook.  So I wrote those things down, and then we

18   translated them into here.

19   Q.   Okay.  And did you solicit this praise from --

20   A.   Absolutely not.  We said we wanted an independent

21   assessment of what we had, what we were doing, and the

22   viability of that.  And then we got this -- this is the

23   feedback that we go got.

24       As a matter of fact, Doctor Lee was very praiseworthy and

25   told me if I wanted to apply to the Ph.D. program at Stanford,

1   he would have been more than happy to sponsor me for it based

2   on this technology.

3   Q.   Did you take him up on that?

4   A.   No, I didn't.  At that time I was trying to make a

5   business out of this.  I was trying to find investors and work

6   out all the more and more technical details.  And I had two

7   small children at home, and so that really -- they had to be

8   my highest priority.

9   Q.   Who did Finesse reach out to as partners and investors in

10  the next few years?

11  A.   There were a number of venture capitalist friends.  I

12  can't think of them all right at the moment.  We talked to

13  AT&T, we talked to Nokia, we talked to Qualcomm, we talked to

14  Samsung.  At least that's a set there.  There were a lot more.

15  But we were talking to a lot of people, try and find somebody

16  who would see the problem that we saw coming.

17          MS. XI:  Let's pull up Plaintiff's Exhibit 351 and

18  let's go down to the second page.

19  Q.   (BY MS. XI)  What is this document?

20  A.   Okay.  This is a document between Ira Marks and AT&T-Ron

21  Nelson, the CTO at that time, telling him that we thought

22  we -- we had something pretty valuable and we'd like to talk

23  to him about it.  We did brief the results to them, but we

24  didn't get what we were looking for.

25  Q.   What were you trying to pitch to AT&T Wireless?

1   A.   Well, we anticipated these intermod problems were going

2   to become a problem.  This was, you know, back in 2002.  And

3   as you can see, the problems really started showing up in the

4   mid 2013-2014 time frame.  But we were looking for someone to

5   help to fund our investment so we could develop products that

6   could mitigate these problems before they really heavily

7   manifested themselves.  We knew they would based on the

8   physics.

9   Q.   And looking at this document, what was the date of those

10  discussions?

11  A.   They were in January of 2002.

12          MS. XI:  And if we could go back up to the first

13  page?  Right there.

14  Q.   (BY MS. XI)  What did AT&T say in response to you?

15  A.   Long story short, they really weren't in the business of

16  developing technology or funding technology developments and

17  we were way too early of a company.  We just -- we didn't have

18  products.  And they said, when you have products in hand, you

19  know, you might come back and talk to us and include something

20  we can test, put into our system and test.  And we didn't have

21  that.

22  Q.   Do you have to have a product to have a patent?

23  A.   No, you do not.

24  Q.   Did you say that Finesse also spoke with Nokia during

25  this time period?

1    A.   Yes, we did.

2    Q.   Okay.

3         MS. XI:   Let's please pull up Plaintiff's Exhibit

4    352 and let's scroll to the email at the very bottom.

5    Q.   (BY MS. XI)   What is this document, sir?

6    A.   Ira Marks had been in contact with Zac Renner.  We

7    basically proposed a similar set of things to Nokia.  They

8    were praiseworthy and they were very polite, but they said

9    that they just -- they wanted to have products, too, before --

10   that they could test before they were ready, and our

11   technology was too early in development for them.

12   Q.   So is this around January of 2002?

13   A.   Yes, it is.

14   Q.   Okay.  And Mr. Zac Renner is somebody at Nokia?

15   A.   That is correct.  He was.

16        MS. XI:   Let's pull up Plaintiff's Exhibit 337.

17   Q.   (BY MS. XI)   What is this document?

18   A.   That was another one of the emails to -- to Zac where

19   they were asking questions of Mr. Renner, and I was trying to

20   answer his questions, showing him what we thought the

21   simulations, the technology would do, and what we thought the

22   benefits to the business would be for that, and possibly

23   exploring some sort of a joint venture or them including our

24   product -- our technology into their products.

25   Q.   And what is the date of these emails?

1    A.   These are also in the early 2002 time frame, March time

2    frame.

3    Q.   Okay.  So this is about two months after you first

4    reached out to Nokia?

5    A.   Yes, pretty close.  There was some ongoing conversations

6    between Mr. Ira Marks and Mr. Renner.

7              MS. XI:  Now, let's scroll to the bottom email on

8    the second page.

9    Q.   (BY MS. XI)  What did Nokia tell you at this time?

10   A.   It was basically that we were too early of a company, we

11   didn't have the maturity yet, and we -- we didn't have

12   products.  They might be interested in talking to us later,

13   but when we had something, we could come back that that they

14   could actually test.

15   Q.   Did you say that you also talked to Qualcomm?

16   A.   Yes, I did.

17             MS. XI:  Okay.  And let's pull up what was

18   previously displayed before, Plaintiff's Exhibit 135.

19             THE WITNESS:  Yes.  There were a couple of meetings

20   with Qualcomm with the engineers and the CTO where we briefed

21   the technology to them, we briefed to them how it worked, the

22   benefits that we would get, the results that we got from

23   simulations of what we anticipated.  At that point we were

24   trying to get a business case where they could put our

25   technology into their chipsets, into their cell phones, but

1    they weren't ready yet because they didn't see the problem big

2    enough yet.

3    Q.   (BY MS. XI)  Could you just walk the jury through this

4    presentation and describe it quickly?

5    A.   This is a very long presentation, but it actually goes

6    through and describes how the invention works to them and the

7    results, and proposes business cases that we might have for

8    working together.  Qualcomm declined for reasons similar to

9    AT&T and Nokia, but the CTO did suggest to me that I probably

10   ought to apply for employment there because he thought the

11   technology was pretty cool.

12   Q.   Did you ever make a value proposition for Qualcomm?

13   A.   The proposition we made was at a very high level.  We

14   didn't do a detail.  It was -- the value proposition was that

15   we would like them to consider taking our technology, our

16   algorithms, and putting them into their chips.  We had done

17   estimates on how many gates it would take and how much of the

18   chip it would take up and it came out to be a pretty small

19   percentage.  But cost to goods is always critical, and every

20   penny in the production is a business case, and they didn't

21   have a big enough problem yet that they needed to do it, so

22   they weren't ready to increase any of the cost on their goods.

23           MS. XI;  If you could pull up Plaintiff's Exhibit

24   117.

25           THE COURT:  Let me interrupt for just a minute.

```
 1        I think part of the reason, Mr. Smith, with following

 2   your testimony is these are long answers.  If we could break

 3   them up into shorter questions and answers, I think it would

 4   be easier to follow for the Court and the jury and the court

 5   reporter.  You're volunteering information that may be

 6   relevant but it's not called for by the question.  "Did you

 7   make a proposition?"

 8        "We did at a very high level."

 9        Well, that's a complete answer.  But then you go into

10   cost of goods and all kinds of other things that the question

11   doesn't call for.

12        Counsel, if you'll ask specific discreet questions, and

13   if you'll limit the answers to the questions asked and break

14   these up into smaller bites I think it will be better for

15   everybody.  So let's go forward on that basis.

16             MS. XI:  Yes, Your Honor.

17             THE WITNESS:  My apology, Your Honor.

18             THE COURT:  Not a problem.  I'm just trying to help

19   the process.

20             MS. XI:  Plaintiff's Exhibit 117.

21   Q.   (BY MS. XI)  Is this the document that discusses the

22   value proposition that Finesse made to Qualcomm?

23   A.   Yes.

24   Q.   And do you recall how Qualcomm reacted to your proposal?

25   A.   They weren't at a stage that they were ready to work with
```

1    this value proposition.

2    Q.   And what was your impression as to why they were not

3    ready to partner with you back in this time?

4    A.   My impression was that the problem wasn't bad enough yet.

5    Q.   Okay.  And what do you mean by 'the problem'?

6    A.   The intermod wasn't causing enough interference to

7    degrade their products.

8    Q.   And we're still talking about the 2004 time frame.

9    Right?

10   A.   Yes, we are.

11   Q.   Okay.  Did Finesse succeed in obtaining funding or a

12   partnership with any of these companies that it reached out

13   between the 2002 and 2004 time frame?

14   A.   No, we did not.

15   Q.   Let me show you an email, Plaintiff's Exhibit 269.  On

16   the bottom of the first page do you know what this email is?

17   A.   Yes.  There was a communication between Mr. Mark Chapman

18   and David Shively on third order intermods.

19   Q.   Okay.  Who is Mr. Mark Chapman?

20   A.   Mark Chapman is another member of Finesse Wireless who

21   was operating as our CEO and business development manager.

22   Q.   And who is David Shively?

23   A.   He was a key member at AT&T who was concerned with these

24   problems.

25   Q.   Okay.  And what is the date of this email?

1    A.    This was in the 2015 time frame.

2    Q.    So this is about 10, 11 years, maybe even 12 after you

3    had reached out to AT&T initially?

4    A.    That is correct.

5    Q.    And you said that this is a document that discusses third

6    order intermods.  What are third order intermods?

7    A.    The intermods that are of importance are odd numbers, but

8    basically the third order intermod is usually the most

9    damaging.  It's got the greatest amount of power in it.  As

10   they go up higher they become less.

11   Q.    Are third order intermods a particularly problematic

12   thing for wireless carriers?

13   A.    Yes, they are.  If they have an intermod problem, it's --

14   the third is the most prominent.

15   Q.    Okay.  Do you see the second sentence on this document

16   here?  It says, "Using PIM testers and other analysis, we know

17   that the PIM sources are external to our own antenna systems."

18   A.    Yes, I do see that.

19   Q.    And do you recall earlier how Mr. Dacus made a

20   distinction of air PIM or -- air PIM and internal PIM?

21   A.    Yes, I do remember that.

22   Q.    And does your patent solution deal with one or the other?

23   A.    It deals with both.

24   Q.    How so?

25   A.    Because it can look at all the signals and pick them off

1    individually and process them individually to cancel them.

2    Whether they're from outside or inside, the algorithm will not

3    care.  We can do them independently.

4    Q.   By being outside or inside the algorithm, do you mean the

5    signal is being generated from some source?

6    A.   Yes.  According to the distinction made by AT&T between

7    internal and external we never made that distinction.  We just

8    took care of all of them.

9    Q.   What does this 2015 email show you about the importance

10   of your invention?

11   A.   It showed us that AT&T was starting to recognize the

12   problem that we had been predicting for over 10 years.

13   Q.   Why did Finesse speak with AT&T again in 2015?

14   A.   Personal relationship between Mr. Mark Chapman and

15   Mr. David Shively.  I think that's how he pronounces it.  He

16   was aware of it and we thought we would re-engage to see if

17   they were interested.

18   Q.   When you showed your technology to AT&T, Nokia, and

19   Qualcomm 20 years ago, was their reaction to your technology

20   on the whole positive or negative?

21   A.   It was very positive.

22   Q.   And in your experience, did these companies develop and

23   implement new features and technologies in their equipment and

24   networks if there wasn't a problem that needed to be fixed?

25   A.   I wouldn't think so.

1    Q.    Okay.  And when you were pitching to AT&T Nokia and

2    Qualcomm 20 years ago, did any of them ever tell you that the

3    PIM cancellation solution that you described was old?

4    A.    No.

5    Q.    Did anyone ever tell you that they had already seen a

6    PIM-C solution like yours?

7    A.    No.

8    Q.    Did they ever tell you that your PIM-C technology was

9    obvious or not new or novel?

10   A.    No.

11   Q.    Did anyone tell you that your technology was no good?

12   A.    No.

13   Q.    Okay.  Let's move onto the third test that you conducted.

14   Was this in the 2008 time frame?  I'm sorry.  The second test

15   that you conducted.

16   A.    Okay.

17   Q.    I can't count.  Let's -- okay.  Is this in the 2008 time

18   frame?

19   A.    Yes.

20   Q.    And how did you go about conducting this demonstration?

21   A.    Well, we wanted to put our technology into a real-world

22   scenario, real-world hardware, so we, working with L-3 in one

23   of their satcom terminals, it was designed to only handle one

24   carrier because of PIM.  That was the big problem where they

25   could only do one carrier.  It was a tactical terminal.  And

1     we tested with real signals and generated the PIM and showed

2     that our algorithms canceled very, very well.

3                    MS. XI:  Let's pull up Plaintiff's Exhibit 370.

4     Q.    (BY MS. XI)  Do you recognize this document?

5     A.    Yes, I do.

6     Q.    And what is it?

7     A.    This is the report given to L-3 management on the results

8     of the Phoenix demonstration.  Phoenix is the name of the

9     satcom terminal.

10    Q.    I'll direct your attention to page 6 of this document.

11    What does that show on the left there?

12    A.    The left is the block diagram that we used for the test

13    setup and the test initiation.

14                   MS. XI:  And could we please blow up the two

15    diagrams -- or the two pictures on the right?

16    Q.    (BY MS. XI)  What are these pictures?

17    A.    Those are pictures of the Phoenix terminal.  It's a

18    tactical Army terminal for satcom for tactical troops, and

19    it's mounted on a Humvee with a complete communications system

20    that handles X-Band through different satellites.

21    Q.    What's the shed that's depicted on the photo on the left?

22    A.    That's where we put the test equipment then we ran cables

23    in and out so we didn't have to make the engineers sit out in

24    the rain.

25    Q.    You said satcom.  What is satcom?

1    A.    Satellite communications.

2    Q.    And what is X-Band?

3    A.    X-Band is a frequency between 7 and 9 gigahertz that's

4    used by the military, and has been since the early '60s, for

5    their tactical communications.

6    Q.    Okay.  And what did the testing involve in terms of the

7    Phoenix demonstration?

8    A.    We put two transmit signals into the terminal and they

9    would -- because there were two of them in the passive

10   intermods, they would generate interference signals, and then

11   we showed that the algorithms that we were using and the test

12   setup would cancel those intermods.

13   Q.    All right.  Directing your attention to page 16 of this

14   presentation --

15   A.    Uh-huh.

16          MS. XI:  Let's zoom in on the plot on the top left.

17   Q.    (BY MS. XI)  Could you tell the jury what this plot

18   illustrates?

19   A.    Yes.  We have two signals there toward the right.  They

20   are identical signals except that one of them has the intermod

21   that we talked about and one of them does not.

22   Q.    Does this show the results to the Phoenix test?

23   A.    It shows the result of the test before PIM cancellation.

24   Q.    Okay.  And could you just circle for the jury where the

25   two desired signals are?

1    And desired signals, are those the signals that you want?

2  A.   Yes; the ones we're trying to recover.

3  Q.   Okay.  And can you just clear the screen and show the

4  jury --

5         MS. XI:  After the blow-up, please, Mr. Boles.

6  Q.   (BY MS. XI)  And show the jury where the intermod is.

7  A.   Intermod.  The intermod is right there.

8  Q.   Okay.  So the intermod is sitting on top of one of the

9  desired signals?

10  A.   Yes, but it also goes all the way down to here; you just

11  don't see it.

12  Q.   Okay.  Sorry.  Please finish.

13  A.   It's a full range.  Very powerful signal.

14         MS. XI:  If we could turn to the next page of this

15  presentation, and blow up the plot on the left.

16  Q.   (BY MS. XI)  What does this graph illustrate?

17  A.   That's the signal -- the desired signal on the left that

18  never had a PIM and the desired signal on the right that had a

19  PIM and it was canceled out.  So you can see that they look

20  alike now and the spike on top of the one on the right is now

21  gone.

22  Q.   So is this the after of the before and after --

23  A.   Yes.

24  Q.   -- in terms of the --

25  A.   Yes.

1    Q.   --two graphs?  Okay.

2    A.   The one we just looked at before was before cancellation,

3    and this is the one after cancellation.

4    Q.   And could you circle for the jury where the intermod was

5    that you had removed?

6    A.   It was right there.

7    Q.   Okay.  Let's talk about the third test that you

8    mentioned.  What was that test?

9    A.   That's a test where we wanted to do it actually in the

10   cellular bands just to demonstrate to the L-3 management that

11   it was a viable solution.

12   Q.   And when was that run?

13   A.   That was in 2013-2014.

14   Q.   What was the purpose of it and how did you set it up?

15   A.   We set it up so that we were transmitting in the -- what

16   they call the BNG blocks of a cellular band, which are ones

17   used by cellular carriers, and those signals would then go

18   through a non-linearity, create the intermods, and then we

19   showed that the algorithms and the hardware could cancel them

20   out.  This was a breadboard desktop-type setup.

21   Q.   What is a breadboard?

22   A.   Breadboard is where we just put together components

23   that's not a product, but it does the same function the

24   product would do, so we can know that we can get the signal

25   integrity if we wanted to build a product to do the same

1    thing.

2             MS. XI:  Let's look at Plaintiff's Exhibit 104.

3    Q.   (BY MS. XI)   Is this the breadboard lab setup?

4    A.   Yes, it is.

5    Q.   And let me show you Plaintiff's Exhibit 242.  What is

6    this document?

7    A.   This was the briefing that we put together for management

8    to show them that we had a system that was viable and would

9    work in the cellular bands.

10   Q.   And was this -- so PCS band, what does that mean?

11   A.   Personal communication systems.

12   Q.   Okay.  And this is the results from your breadboard test

13   in 2013-2014?

14   A.   That is correct.

15   Q.   Okay.

16            MS. XI:  If we could please turn to page 20.

17   Q.   (BY MS. XI)  Can you talk about the results that you got?

18   A.   Yes.  Right here you have the signal plus the intermod,

19   and to make that work we would have to transmit power or

20   receive power at 7dB.  If we knock out the intermod, we're now

21   taking out all of this energy, so we can now recover this one

22   which is our desired signal, and we're able to do it 20 here,

23   or 15dB lower than we would have had before.  So we have

24   gotten a 15d improvement in the system performance.

25   Q.   What are the C and G blocks on the bottom?

1    A.    Those are a subset of the cellular bands that are called

2    the PCS bands from 1800 to 1900 megahertz.  So most of your

3    cell signals are in those bands and those are allocated bands

4    by the U.S. government.

5    Q.    And are these cellular -- well, are these blocks blocks

6    in which cellular carriers operate?

7    A.    Yes.

8    Q.    So, practically speaking, what kinds of benefit do you

9    get from a 15.6dB improvement here to the desired signal in

10   what looks like passband G?

11   A.    When you -- that kind of improvement you can transmit at

12   much lower levels so you could have more cell phones inside

13   the cell or you could increase the range at which those cell

14   phones could work.  It's kind of like if you're in a room of

15   people and everybody's whispering, everyone can hear; but if

16   everybody starts talking loudly, nobody can hear.  Well, you

17   get the same thing if people are transmitting really, really

18   high, there's lots of people putting a lot of energy out there

19   and it's much more difficult to hear and system performance is

20   much less.  So if you get the improvement of that, you can

21   increase range or you can increase the number of

22   communications devices being supported.

23   Q.    Did you show these results to anybody?

24   A.    We only showed these to L-3 management.

25   Q.    And what did you want to do with L-3?

```
1    A.   We were trying to get -- acknowledging that problems that

2    we had seen from AT&T.  Through their previous email you saw

3    we knew the passive was becoming a problem, so we were trying

4    to see if we could get L-3 to start developing cell tower

5    equipment that would incorporate this technology and provide

6    much better products than what the industry was getting right

7    at the moment.

8    Q.   And what was L-3's response?

9    A.   L-3 was impressed with the technology, thought it worked

10   very well, but they made it a business decision that their

11   concentration was tactical communications for the military,

12   and this did not fall into their core business and they didn't

13   want to get diverted from their core business.

14   Q.   Were you disappointed that they turned you down?

15   A.   Yes.  I think we would have made very good partners, but

16   I had to respect it as a valid business decision.

17   Q.   Who do you consider to be the core members of Finesse?

18   A.   The core members of Finesse would be myself, of course,

19   and one of them was Mr. Ira Marks before he passed away, Mark

20   Chapman, and -- Mr. Mark Chapman, Mr. Bob Short, Ph.D.,

21   electrical engineer, and Andy Grossman who is our counsel.

22   Q.   Do you pay these people a salary?

23   A.   No, we don't.

24   Q.   Have you yourself ever drawn a salary from Finesse?

25   A.   No, I haven't.
```

```
1    Q.    Why didn't Finesse pay anybody?

2    A.    We didn't have the money, we didn't have the investors to

3    do that, so people were joining us because they had faith in

4    the technology.

5    Q.    Did Finesse ever license its technology to anybody?

6    A.    No.

7    Q.    Did any company ever make an overture to buy the patents

8    from Finesse?

9    A.    Yes.

10   Q.    Who was that?

11   A.    A company called Intellectual Ventures.

12   Q.    When was that?

13   A.    About 2011.

14   Q.    Did you sell the portfolio?

15   A.    No, we did not.

16   Q.    Why not?

17   A.    We thought the offer was way too low.

18   Q.    What was their offer in 2011?

19   A.    2011 the offer was $1 million for the patent portfolio.

20   Q.    And what would you have taken for the patent portfolio

21   back then?

22   A.    At that time we probably would have taken on the order of

23   $10 million with a royalty stream behind it if they sold the

24   patents to others for building into products.

25   Q.    Did you realize that Finesse is asking for $166 million
```

1    in damages in this case?

2    A.   Yes.

3    Q.   So why would you have taken $10 million in 2011 when you

4    want $166 million today?

5    A.   At that point we predicted that the problem was going to

6    become severe, but it hadn't happened yet, and we didn't have

7    identified persons who thought they needed it, and we didn't

8    have identified persons who we thought were using it, so

9    consequently at that point its value would have been less and

10   we had much less investment at that point.

11   Q.   Did Finesse ever manufacture a chip that incorporated

12   your patented technology?

13   A.   No, we did not.

14   Q.   Has Finesse ever made any income?

15   A.   No, they have not.

16   Q.   Has Finesse ever partnered with anyone?

17   A.   No.

18   Q.   So would you consider Finesse a failure?

19   A.   Absolutely not.

20   Q.   Why not?

21   A.   We have a proven technology, as you have seen three

22   demonstrations we just did.  Every time we've tested it in

23   different configurations we have gotten at least 15dB,

24   sometimes 30.  It's a viable product and we think it solves

25   major problems.  And we think other people are using it and we

1    think we need to share in the benefit.

2    Q.   Mr. Dacus in his opening statements alleged that Finesse

3    is here for a windfall.  Do you agree with that statement?

4    A.   No.  I think we're here just looking for an equitable

5    share of the benefits that are realized from our technologies.

6    Q.   Thank you, Mr. Smith.

7              MS. XI:  Pass the witness.

8              THE COURT:  Cross examination?

9              MR. NELSON:  Yes, Your Honor.  Thank you.

10         May I have a moment to pass out the cross binders?

11             THE COURT:  You may.

12             MR. NELSON:  Thank you, Your Honor.

13             THE COURT:  All right, counsel.  Proceed with cross

14   examination.

15             MR. NELSON:  Thank you very much, Your Honor.

16                        CROSS EXAMINATION

17   BY MR. NELSON:  ?

18   Q.   Good afternoon, sir.

19   A.   Thank you.

20   Q.   My name is Dave Nelson.  I have some questions for you.

21   A.   Yes, sir.

22   Q.   All right.  So you talked about Finesse and some of the

23   other folks that are at Finesse.  Mr. Chapman used to be,

24   Mr. Marks, and there was another name that I'm -- Short?

25   A.   Dr. Bob Short.

1   Q.   Yes.  But in terms of ownership, you own more than 50

2   percent of Finesse.  Correct?

3   A.   That's correct.

4   Q.   Now, I want to talk a little bit about some terminology

5   that you talked about.  You talked about this idea of active

6   intermodulation.  Right?

7   A.   Yes.

8   Q.   Okay.  And maybe this will help if I show you -- in your

9   binder you should have DX 160.

10       Now, DX 160, if we go to the very last page, do you

11  recognize this as a presentation from Mr. Chapman of Finesse?

12  A.   Yes.

13  Q.   Okay.  So now if we could go to the second page, you see

14  the first bullet there, there are three main sources of

15  intermod interference.  Do you see that?

16  A.   Yes.

17  Q.   And the first one there is out-of-band components from

18  power amplifier.  Do you see that one?

19  A.   Yes.

20  Q.   And that would be what you called active intermodulation.

21  Is that correct?

22  A.   They could be if they're produced which the amplifier.

23  Q.   Okay.  And then the next one is passive intermod--PIM is

24  what we've been calling that--from antenna and feed system.

25  Do you see that?

1   A.   Yes.

2   Q.   So that would be caused by imperfections in your cabling

3   and your system between your radio and your antenna.  Right?

4   A.   Yes.

5   Q.   Including the antenna itself.  Correct?

6   A.   Yes.

7   Q.   Now, that's something that is referred to as internal

8   PIM.  Is that right?

9   A.   We have not referred to that, but I see that you do.

10  Q.   But you would understand that to be internal PIM.  That's

11  PIM that's caused by imperfections, so-to-speak, in the system

12  between the radio and the antenna.  Correct?

13  A.   I understand the definition.

14  Q.   And that would cause reflections of the signal that the

15  transmitter is trying to transmit.  Correct?

16  A.   Yes.

17  Q.   And that could cause intermodulation problems.  Correct?

18  A.   Yes.

19  Q.   And then the last one says passive intermod from external

20  reflections.  Do you see that?

21  A.   Yes.

22  Q.   And I think you mentioned some things like bouncing off

23  buildings and trucks or different things like that where there

24  would be reflections of signals external to the antenna.

25  Correct?

1    A.   Yes.

2    Q.   And that could cause what you say is intermodulation

3    products that make its way into the band of the signal that

4    that antenna is trying to receive.  Correct?

5    A.   Yes.

6    Q.   So we called call those external PIM.  Right?

7    A.   You could.

8    Q.   Okay.  So -- but in the internal PIM case that we talked

9    about where it's caused by imperfections in the cabling

10   between the radio and the antenna so that you're reflecting

11   the signal you're trying to transmit.  Okay?  Are you with me?

12   A.   Not entirely, no.

13   Q.   Okay.  So in the internal PIM system, you said -- excuse

14   me.  The internal PIM case, you said that the intermods are

15   caused by the signal that the transmitter is trying to

16   transmit.  Right?

17   A.   Yes.

18   Q.   Okay.  So if it's the signal that the transmitter is

19   trying to transmit, then the system knows what that signal is.

20   Correct?

21   A.   Correct.

22   Q.   So you wouldn't search for it when you know what it is.

23   Correct?

24   A.   Correct.

25   Q.   But in the external PIM situation, you don't know where

1   those interference-causing signals are.  Right?

2   A.   Not always.

3   Q.   Okay.  So that's -- I think in your system that's one of

4   the things you do is search for those.  Right?

5   A.   One of the things.

6   Q.   Yeah.  One of the -- in other words, in order to do the

7   math, to figure out how to cancel that intermod interference,

8   you need to first figure out what those interference-

9   generating signals are.  Right?

10  A.   If they're coming from your signals you know where they

11  are.

12  Q.   Right.  If they're coming from your signals then you

13  already know.  Correct?

14  A.   Uh-huh.

15  Q.   So then you wouldn't have to search for them.

16  A.   Correct.

17  Q.   Okay.  But if they are coming from some external source

18  where you don't know what these signals are, then you have to

19  search for them.  Correct?

20  A.   Correct.

21  Q.   It makes sense.  If I know something I don't need to look

22  for it, but if I don't know something I have to look for it.

23  Right?

24  A.   Correct.

25  Q.   Okay.  And that's one of the things you said about your

1    system here is that you can search the entire band that that

2    antenna can receive to look for signals that might generate

3    the interference into that band of the signal you're actually

4    trying to receive.  Correct?

5    A.    Partially.

6    Q.    Okay.  So then in the external PIM situation, that's

7    where you would want to do the searching.  Correct?

8    A.    Potentially.

9    Q.    If it's coming from your own transmission, there would be

10   no reason to do the searching.  Correct?

11   A.    Correct.

12   Q.    Okay.  Now, I want to talk some about your experience a

13   little bit.

14        So just to be clear, you haven't ever worked for a

15   network service provider like AT&T or Verizon.  Correct?

16   A.    No.

17   Q.    And you haven't worked for the companies that do

18   maintenance on cell towers.  Right?

19   A.    No.

20   Q.    And I think you said that in certain situations those

21   might be the companies that go out to deal with site hygiene

22   and things like that that you referred to.  Is that right?

23   A.    Yes.

24   Q.    Okay.  So then from your personal experience you don't

25   know what AT&T does in terms of site hygiene.  Right?

```
1    A.   I do not have access to their internal documents.

2    Q.   Okay.  And so then the answer is from your personal

3    information you don't know.

4    A.   No.

5    Q.   So they may send people out when they see some internal

6    PIM problem and fix it.  Right?

7    A.   Possibly.

8    Q.   Okay.  And I think -- if we go to the next page of this

9    document, this is --

10            MR. NELSON:  And I should say this for the record to

11   be clear.  DX 160.  So this would be page 3 of the document

12   now.  Actually let's go to page 4.  Excuse me.

13   Q.   (BY MR. NELSON)  So here the very first bullet under the

14   title 'Opportunities to Mitigate', you see 'transmit feed

15   system'.  Do you see that?

16   A.   Yes.

17   Q.   So is that -- that's a reference back to that internal

18   PIM situation that we saw a couple of slides earlier?

19   A.   By your definition.

20   Q.   Right.  By what we talked about, that would be a

21   reference back to that internal PIM situation.  Right?

22   A.   I don't totally agree with that, but close enough.

23   Q.   Right.  It would be where the imperfections are between

24   the radio up to and including the antenna.  Correct?

25   A.   If that's your definition.
```

1    Q.   Okay.  And if the definition of that is internal PIM,

2    that's fine with you?

3    A.   I'm sorry?

4    Q.   Is that fine with you?  If we just call that internal

5    PIM, is that fine with you?

6    A.   I -- yes.

7    Q.   Okay.  So now, if we look at that third bullet, it says

8    'Most impairments from installation', meaning most of the

9    internal PIM impairments would be caused by faulty

10   installation.  Is that what this is saying here?

11   A.   Generally.

12   Q.   Right.  You might have loose connectors in the cabling or

13   you didn't tighten the connectors all the way down, things

14   like that.  Right?

15   A.   There's a list underneath that.

16   Q.   Okay.  And that works even better.

17        So now, some of the things you can do to fix those are to

18   check loose connections at jumpers, antennas, and RRUs.

19   Right?

20   A.   Yeah.

21   Q.   So you could fix that internal PIM problem by fixing your

22   loose connections at your jumpers, antennas, and RRUs.

23   Correct?

24   A.   Probably.

25   Q.   And another one is incorrect band radius and support of

1    jumpers.  So, again, that would be an administration issue.

2    Right?

3    A.    Uh-huh.  Yes.

4    Q.    I'm sorry.  I'm sorry.

5    A.    My apologies.  I need to say yes.

6    Q.    And I need to remind you and I didn't and I apologize,

7    sir.

8            THE COURT:  Nothing for me to do.  You've already

9    explained it to each other.

10   Q.    (BY MR. NELSON)  So that would be another thing that you

11   could go out and fix if you saw that causing an internal PIM

12   problem.  Correct?

13   A.    Yes.

14   Q.    And same with inclusion of moisture and other impairments

15   in connections--you could go out and fix that if that was

16   causing an internal PIM problem.  Correct?

17   A.    I would assume so.

18   Q.    Okay.  So you'll agree from this document, this document

19   that came from Finesse itself, the opportunities to mitigate

20   this internal PIM problem, what's listed here are things to go

21   out and improve the site hygiene and clean up your

22   connections.  Correct?

23   A.    Say the question again, please.

24   Q.    Yeah.  So in the document that we're looking at, DX 160,

25   the examples of fixes, efforts to mitigate an internal PIM

1   problem, are to go out and fix things.  Correct?

2   A.   Yes.

3   Q.   Okay.  So you would agree that it's a very good strategy

4   that if you're seeing an internal PIM problem to go out and

5   fix the cause of those problems.  Correct?

6   A.   Not necessarily.

7   Q.   It would be a strategy that's referenced in your

8   document.  Correct?

9   A.   It would be a strategy.

10  Q.   Okay.  And you don't know what AT&T does in that regard.

11  Correct?

12  A.   I have no access to their internal documents.

13  Q.   Okay.  So now, sir -- and you don't know how big a

14  problem internal PIM is at AT&T, do you?

15  A.   I do not have access to their internal documents.

16  Q.   Okay.  So you don't know one way or the other.

17  A.   No.  I'm precluded from having those documents, so I

18  don't know.

19  Q.   By a court order.  Right?

20  A.   By I think Nokia and AT&T's request.

21          THE COURT:  Let's move on.

22          MR. NELSON:  Yes.

23  Q.   (BY MR. NELSON)  The -- now, a few times --

24      And maybe let's pull up that Qualcomm document that we

25  talked about, which was -- well, I have a version DX 151

1    that's in my -- and it should be in your binder in front of

2    you so let's go with that version.

3         So this is a presentation that you gave to Qualcomm in

4    April of 2004.  Isn't that right?

5    A.   Yes.

6    Q.   And you told us on direct about that meeting.  Correct?

7    A.   Yes.

8    Q.   Was that the only meeting with Qualcomm?

9    A.   We had a couple of others kind of as a follow-on to it,

10   but basically using the same briefing deck for discussion.

11   Q.   Were they all in that same time frame, that 2004 time

12   frame?

13   A.   Yes.

14   Q.   Okay.  So now if we look at page 11 of that document --

15   and I just want to get some terminology down here.  So here I

16   think what you said is that the document, DX 151 that we're

17   looking at, part of the purpose was to describe for Qualcomm

18   your intermod cancellation invention.  Correct?

19   A.   Yes.

20   Q.   Okay.  So here at the top it says 'search algorithm and

21   IMP estimate'.  Do you see that?

22   A.   Yes.

23   Q.   Okay.  And so the search algorithm--and we talked about

24   this a little bit earlier--is where you sample the entire band

25   that the antenna can receive, and you look for those signals

1    that can cause the interference into the band that you're

2    actually trying to receive the communication on.  Right?

3    A.   Yes.

4    Q.   Okay.  So again, here -- so you I think what it says

5    right to the left is you search the entire receive band for

6    source signals that can produce in-band intermodulation

7    products.  Do you see that?

8    A.   Yes.

9    Q.   And 'in-band' in this context means the band of the

10   signal of interest, that signal you're trying to receive.

11   Correct?

12   A.   The desired signal, yes.

13   Q.   Yeah.  And I think in these documents sometimes you say

14   'desired signal' and sometimes 'signal of interest'.  Right?

15   A.   Possibly.

16   Q.   I mean --

17   A.   Yeah.

18   Q.   Yeah.  And it's -- I think it will be on the next page.

19   I'll show you that when we get there.

20        So the idea, then, would be you find these signals.

21   They're out of band.  Right?  The interference causing signals

22   are out of the band of the signal you're trying to receive.

23   Right?

24   A.   Correct.

25   Q.   So those signals themselves you actually could filter

1  out, meaning they're not the concern; it's the intermodulation

2  products that they generate when they interact with each

3  other.

4  A.   Correct.

5  Q.   Okay.  So that's the idea.  So I have to know what those

6  are first in order to be able to calculate where that

7  interfering signal that we're calling the intermod signal is

8  going to be.  Right?

9  A.   Yes.

10  Q.   Okay.  But again, if I already know where those

11  interference generating signals are, because they happen to be

12  the ones I'm currently transmitting, I don't need to search

13  for them.  Right?

14  A.   Correct.

15  Q.   So now if we go a little bit farther down, and this is

16  page 11, we say, 'Isolate the source signals with programmable

17  filters and use them to generate an estimate of the IM'.

18      So here you're isolating the source signals.  Those are

19  the ones we're saying are the source of the interference.

20  Correct?

21  A.   Yes.

22  Q.   So the source signals would be the ones that are outside

23  that receive band but they interact to cause these

24  intermodulation products into the receive band.  Right?

25  A.   Not exactly.

```
1    Q.   Okay.

2    A.   The receive band has everything that's the signal of

3    interest.  The desired signal is the one inside that.

4    Q.   And I understand what you're saying, sir, so let me be a

5    little bit more precise.

6         So the receive band would be -- in this context what

7    you're saying is the entirety of the range of frequencies that

8    that antenna can receive.  Right?

9    A.   Yes.

10   Q.   So, for example, you know, a lot of us are familiar with

11   like a car radio, although maybe people don't have them

12   anymore, but the car radio would be FM, and that goes, you

13   know, from what's the bottom of FM, it's like 50 something

14   megahertz to the hundred and something megahertz.  Is that

15   right?

16   A.   I think so.

17   Q.   Yeah.  So we'll just go with that, if that's correct.

18   What we're receiving the receive band -- because your car

19   antenna -- you know, the antenna for your radio in the car

20   can receive all of those.  Right?

21   A.   Yes.

22   Q.   So that would be in this context the receive band.

23   Right?

24   A.   Yes.

25   Q.   But then the signal you're trying to receive in the
```

1   radio, you just tune it to 97.2 or whatever.  Right?

2   A.   Yes.

3   Q.   Usually they're odd so it's probably 97.3.  So that would

4   be tuning it, so that would be the signal that you're trying

5   to receive.  Correct?  In that example.

6   A.   Yes.

7   Q.   All right.  So then the -- just to get the terminology

8   right, the source signals are the ones -- not the ones

9   themselves that are interfering with the signal you're trying

10  to receive, but they're the ones causing the interference with

11  the signal you're trying to receive.  Right?

12  A.   Yes.

13  Q.   Okay.  So then you find those.  In other words, you

14  isolate that from the search that you did to find out where

15  those signals are.  Correct?  That's the next step.

16  A.   Yes.

17  Q.   And then you do the math and you figure out where the

18  interference is.  Correct?

19  A.   Yes.

20  Q.   And then you cancel it out by generating the inverse

21  signal.  Correct?

22  A.   Yes.

23  Q.   Okay.  All right.  So -- but -- and that was the way that

24  you described your invention to Qualcomm.  Correct?

25  A.   Correct.

1         MR. NELSON:  Okay.  Now, if we go to page 12, which

2    is the next page of this document.  And you'll see here --

3    yeah, if we blow up the bottom.

4    Q.   (BY MR. NELSON)  And this is what I was talking about.

5    You see here it's referred to as 'signal of interest'?

6    A.   Yes.

7    Q.   So -- and a lot of these documents, that terminology

8    sometimes you use the 'signal of interest' terminology,

9    sometimes 'desired signal'.  Right?

10   A.   Yes.

11   Q.   But the bottom line is that's the signal you actually

12   want to receive that's giving you your information.  Right?

13   A.   Yes.

14   Q.   So the -- with Qualcomm, then, you went to Qualcomm

15   -- and just so we might not all be familiar, Qualcomm is one

16   of the largest chip providers for cell phones.  Right?

17   A.   Yes.

18   Q.   And that was true back in 2004.  Right?

19   A.   Yes.

20   Q.   And it's true today.  Correct?

21   A.   I believe so.

22   Q.   So what you were trying to do was to interest Qualcomm in

23   your idea so they would put it in their chips.  Right?

24   A.   Correct.

25   Q.   And that's similar to a number of the other companies you

1    talked about, like -- well, you mentioned Nokia, you mentioned

2    Intel, I think, a number of companies.  I mean, so many I

3    think you said that you don't even remember them all.  Right?

4    A.    Yes.

5    Q.    Okay.  But those -- none of those companies said, Yes, we

6    want to license your technology or we want to partner with you

7    and put it into a chip.  Right?

8    A.    Not exactly.

9    Q.    None of them did that.  Correct?

10   A.    Most of them said they weren't ready yet.

11   Q.    But nobody did that.  Correct?

12   A.    Correct.

13   Q.    Okay.  So I think what you said on your direct was you

14   started to see a bunch of industry literature in around 2011

15   saying that this PIM, passive intermod, was going to be a big

16   problem.  Right?  Or was becoming a big problem, I think you

17   said.

18   A.    Yes.

19   Q.    Okay.  So that's 2011.  It was becoming a big problem.

20   A.    Yes.

21   Q.    Okay.  Now, in 2011 you didn't go back to Qualcomm.

22   Right?

23   A.    No.  Qualcomm was a handset maker.

24   Q.    2011 Qualcomm was a handset maker?

25   A.    They were in 2004.  But no, we did not go back to

1    Qualcomm.

2    Q.   Yeah.  And you didn't go back to the companies that you

3    talked about who said -- who you said, Well, we're not

4    interested because we don't see this as a big problem yet.

5    Right?

6    A.   At the time, no.

7    Q.   Okay.  So you didn't go back to them, but you did mention

8    that you went to a company called Intellectual Ventures in

9    2011--so this is when you're seeing industry literature this

10   is a big problem--to sell the patent.  Right?

11   A.   On or about.

12   Q.   But -- and then you told us about that, and I think we'll

13   get into some more of that later, but that deal didn't happen.

14   Correct?

15   A.   Correct.

16   Q.   So now after that 2011 you're seeing it's a big problem,

17   you tried to sell the patent to IV, no deal, but you didn't go

18   back to any of the companies that you talked about who had

19   said, Well, this is too early.  Right?

20   A.   Correct.

21   Q.   And, in fact, in 2016 -- so in 2016 you were seeing even

22   more industry literature saying that PIM was a problem.

23   Right?

24   A.   Yes, it was increasing.

25   Q.   Okay.  But now in 2016 you didn't go back to Qualcomm and

1    the other companies we talked about to say, Hey, it was too

2    early before but now you're interested.  Right?

3    A.   We did not.

4    Q.   Okay.  But you did go back to IV in 2016 and try to sell

5    them the patent again, didn't you?

6    A.   No.

7            MR. NELSON:  So can we pull up DX 154?

8    Q.   (BY MR. NELSON)  So this is an email, and we'll look at

9    this one, from yourself to Mr. Chapman.  Right?

10   A.   Yes.

11   Q.   And this is dated April 23rd, 2016.  Isn't that right?

12   A.   It does appear, yes.

13   Q.   Okay.  And this is -- the subject is 'Draft letter to

14   Intellectual Ventures'.  Right?

15   A.   Yes.

16   Q.   And you say, Mark, please review the letter proposal to

17   send to Intellectual Ventures, let's discuss the strategy if

18   it is correct.  We can discuss how much we want to tell them

19   up front and what documentation we want to disclose before a

20   phone conversation.  Do you see that?

21   A.   Yes.

22   Q.   Now, if we go a little bit farther down, you see one of

23   the patents there is the '134 Patent.  Do you see that?

24   A.   Yes.

25   Q.   And that's one of the patents in this case.  Correct?

```
 1   A.   Yes.

 2   Q.   And the letter there is, "Dear Sherri Richman."  She's at

 3   IV.  Correct?

 4   A.   Yes.

 5   Q.   "A couple of years ago we explored to you selling our

 6   patents for intermodulation cancellation.  At that time we did

 7   not come to closure on a deal with you.  At that time your

 8   review teams inquired as to the business case and customers

 9   and this technology might benefit."  Do you see that?

10   A.   Yes.

11   Q.   Then skipping down you say, "We find ourselves in a

12   position of now looking for a partner to bring product to

13   market or capitalize on the IP offering."  Do you see that?

14   A.   Yes, I do.

15   Q.   Now, Intellectual Ventures was -- they are in the

16   business, you understand, of licensing IP.  Correct?

17   A.   Yes.

18   Q.   They don't make products.  Correct?

19   A.   They do not.

20   Q.   Okay.  You said, "We have two patent awards and one in

21   application for this technology.  We have demonstrated the

22   technique in breadboard hardware and have test data."

23        So those -- you're referencing now the tests that you

24   were -- you talked about in your direct.  Right?

25   A.   Correct.
```

1    Q.   So this is in this 2016 time frame.  This is after all of

2    those tests that you ran that said prove the practicality of

3    the solution.  Correct?

4    A.   Yes.

5    Q.   But here even though in 2011, five years before this, you

6    are seeing all the market literature that PIM is a big problem

7    and that by 2016 it's even a bigger problem in the market,

8    you've run all these tests, you go to IV to offer them the

9    patent, not back to Qualcomm to say, Hey, let's develop

10   technology.  Correct?

11   A.   Yes.

12            MR. NELSON:  So now if I look at DX 345.

13   Q.   (BY MR. NELSON)  So DX 345, you'll see this is an email

14   from you back to the acquisitions team at Intellectual

15   Ventures.  Correct?

16   A.   Yes.

17   Q.   And this responds to an email that Intellectual Ventures

18   sent to you.  Correct?

19   A.   Yes.

20   Q.   And this from the acquisition teams at Intellectual

21   Ventures, to be clear.  Right?

22   A.   Yes.

23   Q.   And the acquisitions teams, you understand those are the

24   ones that look at whether they are going to buy patents from

25   people.  Correct?

1   A.   Correct.

2   Q.   So now it says, "Thank you for your interest in

3   Intellectual Ventures.  We have reviewed your submission.

4   Unfortunately your invention is not within the technological

5   areas that we are currently pursuing.  Intellectual Ventures

6   continues to expand its focus and we encourage you to submit

7   any patents and/or patent applications that you may have in

8   the future."  Do you see that?

9   A.   Yes, I do.

10   Q.   So does that refresh your recollection that you did in

11   2016 try to sell the patent -- the '134 Patent to Intellectual

12   Ventures?

13   A.   Yes, it does.  I had forgotten about it because it went

14   nowhere so it kind of got filed off into the cobwebs.

15   Q.   Okay.  So then -- let me see if I have this straight.  So

16   you went to more companies than you can remember in that

17   2004-2005 time frame to get them interested in your invention.

18   Correct?

19   A.   Correct.

20   Q.   And you said none of those deals worked out.

21   A.   Correct.

22   Q.   And I think what you said on direct, and I think we've

23   talked about it, too, but is the companies told you, Well

24   we're not interested; we don't see it as a big problem yet.

25   Right?

1    A.   Correct.

2    Q.   2011 now, so move forward five, six years, you see

3    literature out there -- so this is industry literature.  It's

4    public information.  Correct?

5    A.   Yes.

6    Q.   That PIM is becoming a big problem.  Right?

7    A.   As I remember it, yes.

8    Q.   Okay.  But now in 2011, rather than go back even to some

9    of those companies who you talked to in the 2005 time frame to

10   say, Hey, now is the time, we see it, it's not too early

11   anymore, you went to Intellectual Ventures to sell the patent.

12   Right?

13   A.   Yes.  As you've refreshed my memory on that, we did

14   re-engage with them for a short period of time.  Nothing came

15   of it, though.

16   Q.   Well, first it was 2011 where you did that.  That's the

17   deal that didn't -- you talked about on direct that didn't go

18   through.  Correct?

19   A.   Yes.

20   Q.   And now 2016, fast forward, we see even -- you're seeing

21   public literature that PIM is even a bigger problem.  Right?

22   A.   Correct.

23   Q.   But you still don't go back to Qualcomm and the various

24   companies that you talked about before who said it was too

25   early.  Instead, you tried to sell the patent to Intellectual

1    Ventures again.  Correct?

2    A.   We explored the option.

3    Q.   Okay.  Now --

4           MR. NELSON:  May I have a moment to confer with

5    Mr. Dacus?

6           THE COURT:  You may consult with co-counsel.

7           MR. NELSON:  Thank you.

8                  (Pause in proceedings.)

9    Q.   (BY MR. NELSON)  Well, sir --

10   A.   Yes, sir.

11   Q.   I thank you for your time.  I appreciate it.

12          MR. NELSON:  I have no more questions at this time

13   and I pass the witness, Your Honor.

14          THE COURT:  All right.  Is there redirect from the

15   Plaintiff?

16          MS. XI:  Yes, Your Honor.

17          THE COURT:  Let's proceed with redirect examination.

18                REDIRECT EXAMINATION

19   BY MS. XI:

20   Q.   Mr. Smith, do you regret not taking IV's or Intellectual

21   Property's [sic] $1 million offer in 2011?

22   A.   Definitely not.

23          MS. XI:  And if we could just pull up PX 3.  It's

24   the '134 Patent.

25   Q.   (BY MS. XI)  Is this your patent that you were talking

1    with Mr. Nelson about earlier?

2    A.    Yes.

3    Q.    And he asked you if search was going to be required for

4    internal PIM, searching for a signal.

5    A.    He did ask that.  I think we agreed, no, it was not.

6              MS. XI:  Let's go to the claims of this patent,

7    which would start --

8              THE COURT:  Yes, counsel?

9              MR. NELSON:  I'm going to object as beyond the

10   scope.  I didn't ask him about the claims of the patent.  We

11   were talking about his Qualcomm presentation at this time.

12             THE COURT:  Overruled.

13             MR. NELSON:  Okay.

14             MS. XI:  If we could go to the claims of this patent

15   towards the very end.

16   Q.    (BY MS. XI)  Is this a claim that defines the scope of

17   your invention, Mr. Smith?

18   A.    Of the '134, yes.

19   Q.    Yes.  And do you see the word 'search' anywhere in this

20   claim?

21   A.    No.

22   Q.    Okay.

23             MS. XI:  If we could go to claim 2.

24   Q.    (BY MS. XI)  Same question here.  Is this one of the

25   asserted claims in this lawsuit against the Defendants?

1    A.    Yes, it is.

2    Q.    And is the word 'search' part of this claim?

3    A.    No.

4    Q.    Okay.

5              MS. XI:  If we could go to claim 3.

6    Q.    (BY MS. XI)  Same question here.  Is search required as

7    part of claim 3 of the '134 Patent?

8    A.    No.

9              MR. NELSON:  Objection.  That calls for a legal

10   conclusion, Your Honor.

11             THE COURT:  What's your response, Plaintiff?

12             MS. XI:  I believe the inventor is able to testify

13   as to what he invented.

14             MR. NELSON:  But that wasn't the question, Your

15   Honor; it was whether search is required by a particular

16   claim.  It's a very different question.

17             THE COURT:  Rephrase your question, counsel.

18             MS. XI:  Yes, Your Honor.

19   Q.    (BY MS. XI)  Is the word 'search' part of this claim,

20   claim 3 of the '134 Patent?

21   A.    No.

22             MS. XI:  If we can pull up, please, Plaintiff's

23   Exhibit 4, which is the '775 Patent.  And let's go to the

24   claims of this patent as well.  Let's actually go to claim 4.

25   Q.    (BY MS. XI)  Mr. Smith, is this one of the claims that

1    you assert against the Defendants?

2    A.    Yes.

3    Q.    And just looking at the third line from the top, it says,

4    "Generating with a priori knowledge of a transmitter signal

5    set."  A priori, what does that mean to you?

6    A.    That means I know beforehand where those signals will be

7    located.

8    Q.    So where are the signals coming from, according to your

9    invention?

10   A.    A co-located transmitter can be the transfer that goes

11   with it or it could be a close transmitter.

12   Q.    So you already know the signals?

13   A.    That was the assumption here.

14   Q.    Okay.  And do you have to search for these signals?

15   A.    You wouldn't have to.

16   Q.    Do you agree that generally PIM hygiene is a good thing

17   for addressing problems of PIM?

18   A.    I think it's a good technique in combination with other

19   things.

20   Q.    And in combination with what other things?

21   A.    Intermod cancellation.

22   Q.    So would you agree with the statement that if you're

23   tackling the PIM problem then you want to use more than just

24   PIM hygiene?

25   A.    Yes.

1    Q.   How many shareholders are there of Finesse?

2    A.   I'd have to go back and look at the list.  I think

3    there's about 20.

4    Q.   And what is your -- the percentage of Finesse that you

5    own?

6    A.   Just over 50 percent; about 50.5.

7              MS. XI:  Can we pull up Defendants' Exhibit 160?

8    Q.   (BY MS. XI)  Mr. Smith, do you recognize that this is the

9    exhibit that you were discussing with Mr. Nelson?

10   A.   Yes.

11   Q.   Is this a presentation that you authored?

12   A.   No.

13   Q.   Who authored this presentation?

14   A.   Mr. Mark Chapman.

15   Q.   Did you testify earlier that you didn't work for a

16   cellular provider?

17   A.   Yes.

18   Q.   But you did work for Lucent Technologies?

19   A.   Yes.

20   Q.   And did Lucent eventually become Nokia?

21   A.   Yes.

22   Q.   And I assume that Nokia is a cellular product

23   manufacturer now?

24   A.   Yes.

25   Q.   Okay.  And that's your understanding, too.  Right?

```
 1    A.    Yes.

 2    Q.    Great.

 3              MS. XI:  No more questions.

 4              THE COURT:  You pass the witness, counsel?

 5              MS. XI:  Pass the witness.  Thank you.

 6              THE COURT:  Is there additional cross examination?

 7              MR. NELSON:  No, sir, Your Honor.

 8              THE COURT:  All right.  You may step down,

 9    Mr. Smith.

10              THE WITNESS:  Thank you.

11              THE COURT:  Plaintiff, call your next witness.

12              MS. FAIR:  Your Honor, at this time Plaintiff is

13    calling a witness by deposition, if I may.

14              THE COURT:  Please announce for the jury and the

15    record who you're calling by deposition, please.

16              MS. FAIR:  Thank you, Your Honor.

17        At this time the Plaintiff calls Mr. Michael Calloway by

18    deposition.  He is a cell system engineer for Nokia.  The

19    trial exhibits -- the exhibits to be used are going to be --

20    Exhibit 7 from the deposition is PX 886, Deposition Exhibit 6

21    is PX 954, Deposition Exhibit 8 is PX 999.  And the clip is 10

22    minutes 26 seconds all to be charged to the Plaintiff, Your

23    Honor.

24              THE COURT:  All right.  Proceed with this witness by

25    deposition.
```

1          MS. FAIR:  Thank you.

2                    MICHAEL CALLOWAY

3                  BY VIDEO DEPOSITION

4          THE REPORTER:  I'm going to ask you to please raise

5    your hand.  Mr. Calloway?  Thank you.

6        Do you solemnly swear under the penalty of perjury that

7    you are Michael Calloway and the testimony you are about to

8    give in the matter now pending shall be the truth, the whole

9    truth, and nothing but the truth?

10         THE WITNESS:  Yes.

11   Q.   Do you currently work for Nokia of America Corporation?

12   A.   I do.

13   Q.   Do you still hold the position of cell system engineer

14   today?

15   A.   Yes.

16   Q.   In your current role, do you currently -- do you

17   regularly meet or correspond with AT&T representatives?

18   A.   Yes.

19   Q.   When would you say you first heard the phrase 'passive

20   intermodulation'?

21   A.   2018.

22   Q.   And does that date hold any significance for you?

23   A.   Yes.

24   Q.   What significance does 2018 hold for you in connection

25   with the phrase 'passive intermodulation'?

1    A.    That was the date of a PowerPoint that had that subject

2    on it.

3    Q.    During the presentation of the PowerPoint about passive

4    intermodulation in 2018, were you informed that Nokia was

5    offering products that addressed passive intermodulation?

6    A.    Yes.

7    Q.    Have you discussed passive intermodulation with AT&T?

8    A.    Yes.

9    Q.    Have you had discussions with AT&T about passive

10   intermodulation in connection with any specific products?

11   A.    Yes.

12   Q.    Which products are those?

13   A.    Our dual-band radios.

14   Q.    To your knowledge, does Nokia offer any tri-band remote

15   radio heads for sale to AT&T or other carriers?

16   A.    Yes.

17   Q.    Which models are those?

18   A.    AHBBA.  Alpha, hotel, bravo, bravo, Alpha.

19   Q.    Does the AHBBA include the same three bands always, or

20   can those be configured to cover different bands?

21   A.    The same bands.

22   Q.    Which bands are those?

23   A.    Band 12, band 14, and band 29.

24   Q.    Are bands 12, 14, and 29, to your knowledge, particularly

25   prone to passive intermodulation?

1    A.   Yes.

2    Q.   I'm sharing Calloway 06 in the chart, which is a

3    spreadsheet with Bates stamp NOK_FIN_00025969.xlsx.

4         Do you recognize what's shown on the screen as Exhibit

5    Calloway 06?

6    A.   Yes.

7    Q.   What do you understand it to be?

8    A.   It's a listing of all ENodeBs and the -- the value of the

9    two parameters in column C and D, and then the radio type in

10   column E.

11   Q.   What's your understanding if any, of the difference

12   between the parameter shown in column C and the parameter

13   shown in column D?

14   A.   Column C is the feature PIM cancellation to use; column D

15   is enabling that.  My understanding is both need to be set to

16   true for PIM cancellation to be active and enabled at that

17   radio.

18   Q.   I'm going to share what I've marked as Calloway 07 in the

19   chart.  It has Bates stamp NOK_FIN_00016137.  I'm going to go

20   to Bates stamp 16138 within what I've marked as Exhibit

21   Calloway 07.

22        So this -- this slide is titled 'PIM scenarios and PIM

23   cancellation customer issues, comments, anecdotes.'  Correct.

24   A.   Yes.

25   Q.   And on the left in the top row of the table on the slide

1   ending 38 is the -- so it's the AT&T logo.  Do you see that?

2   A.   I do.

3   Q.   And then the first line in the description next to the

4   AT&T logo reads, "B29/B17 issues--AT&T purchased B29 for CA on

5   B17."  What would you understand the sentence "AT&T purchased

6   B29 for CA on B17" to mean?

7   A.   So AT&T purchased a band 29 remote radio head for carrier

8   aggregation with a band 17 remote radio head; so...

9   Q.   And then after that it reads "Bought E// equipment and

10  had B29 PIM desense B17, ALU B29 desensed B17." Do you see

11  that?

12  A.   Yes, I do.

13  Q.   So in this scenario, if one is speaking in the industry

14  about B29 PIM desensing B17, does that mean it's harder to

15  receive band 17 signals?

16  A.   Yes.

17  Q.   Do you remember any specific conversations with AT&T

18  representatives about difficulties with band 17 and 29 with

19  respect to Alcatel-Lucent products or equipment?

20  A.   Yes.

21  Q.   Do you remember what problems the AT&T representative

22  discussing on the topic of bands 29 and 17 with respect to

23  Alcatel-Lucent products?

24  A.   Yes.  There was -- there was a problem with our earlier

25  version of band 29 remote radio heads that was breaching the

1  band 17 spectrum, causing that -- that PIM.  And I instructed

2  them that we were going to have a re-tuned band 29 remote

3  radio head that would help mitigate that problem.  And

4  whenever they were going to use band 17 and band 29, they

5  used the band 29 re-tuned remote radio head.

6  Q.   I'm going to share in the chat what I've marked as

7  Calloway 08, with Bates stamp NOK_FIN_00027258.pdf.

8       And this document is titled LTE2863 PIM cancellation for

9  AirScale dual band radios.  Do you see that?

10  A.   Yes.

11  Q.   And the front page reads 'Carlos A. Cabrera, June 2018'.

12  Do you see that?

13  A.   Yes.

14  Q.   Do you recognize this document?

15  A.   Yes, I do.

16  Q.   What is it?

17  A.   It's a document covering the feature 2863.

18  Q.   Do you remember watching or reading this presentation?

19  A.   Yes.

20  Q.   When?

21  A.   Sometime in 2018.

22  Q.   What does LTE2863 refer to?

23  A.   That is the feature designation for PIM cancellation for

24  AirScale dual-band radios.

25  Q.   Would LTE2863 generally be a model-specific feature, or

1    is it one that, in your experience, may sometimes be deployed

2    across multiple radios?

3    A.   Multiple radios.

4    Q.   When you received this presentation, did you share any of

5    the information in it with AT&T representatives?

6    A.   Yes.

7    Q.   Do you remember discussing with AT&T representatives the

8    benefits of deploying dual-band radios as opposed to two

9    single-band radios?

10   A.   Yes, I do.

11   Q.   What were the benefits that you remember discussing with

12   AT&T representatives about dual-band radios we over

13   single-band radios?

14   A.   You could free up space on tower tops by eliminating

15   up to three or more remote radio heads by using a dual-band

16   radio.  It's more efficient.

17            THE COURT:  Does that complete this witness by

18   deposition?  Apparently not.

19            MS. FAIR:  I'm sorry, Your Honor.  There was one

20   more line.  I stood up prematurely.  That's the end of it,

21   though.

22            THE COURT:  Do you want to replay that line?

23            MS. FAIR:  No, we're okay.

24            THE COURT:  All right.  Then call your next witness.

25            MS. FAIR:  At this time the Plaintiff calls by

1  deposition Mr. Dan Edwards.  He is the AT&T lead product

2  development engineer.  For the record, Deposition Exhibit 1 is

3  PX 674, Deposition Exhibit 4 is PX 678, Deposition Exhibit 8

4  is PX 690.  The Plaintiff's time of this deposition is

5  8 minutes and 32 seconds, and the Defendants' time is 2

6  minutes and 35 seconds.

7          THE COURT:  All right.  Let's proceed with this

8  witness by deposition.

9                          DAN EDWARDS

10                      BY VIDEO DEPOSITION

11  Q.   Can you please state your name for the record?

12  A.   Daniel Edwards.

13  Q.   And what's your current title, sir?

14  A.   Lead product development engineer.

15  Q.   So looking at your job responsibilities today, as a lead

16  product development engineer what is your responsibility with

17  respect to the Nokia hardware and passive components that are

18  within your scope?

19  A.   Basically if there's a need for hardware if Nokia's

20  bringing out something new is to evaluate it and qualify it,

21  and if it passes, we put it in the toolbox for the local

22  markets to use.

23  Q.   So, Mr. Edwards, when Nokia -- sorry.  Scratch that.

24          When Nokia is presenting a new product for AT&T to

25  consider, would that be a product that AT&T typically had

1  asked for or would it be a new offering that Nokia presents?

2  A.   It could be either/or.

3  Q.   What's the last piece of hardware that you remember Nokia

4  presenting that AT&T had asked for or had input on?

5  A.   The AHLBBA tri-band radio.

6  Q.   Did AT&T ask for any of the specific features to be built

7  in to the tri-band radio?

8  A.   We provided five high-level bullet points that had to be

9  there to make it successful.

10  Q.   And the AHLBBA tri-band radio, is that the one that has

11  bands 14, 17, and 29?

12  A.   Correct.

13  Q.   What were the five high-level bullet points that AT&T

14  told Nokia were necessary to have the AHLBBA be successful?

15  A.   Well, the primary one was to make sure that the

16  out-of-band emissions from band 29 transmit were removed from

17  band 12's receive frequencies.  That was the key.  That all

18  three carriers, 12, 14, and 29, could transmit at full power.

19  It was going to require PIM mitigation.  And it had to draw

20  approximately 1300 watts of DC power.

21  Q.   Why was it desirable for all three to be transmitting at

22  full power?

23  A.   Because when you use it to design a coverage area you

24  need the full power.

25  Q.   And I think you mentioned that transmitting all three of

1    these bands at full power would require PIM mitigation.  Is

2    that right?

3    A.    Yes, ma'am.

4    Q.    And why is that the case?

5    A.    Because band 29 and band 12 produce a third-order

6    intermod back into the 12 receive, and band 14 and band 12

7    creates a third-order intermod into each one of those

8    receives, and then the band 29 and band 14 also creates a

9    third-order intermod into band 14 to receive.

10   Q.    With all of the intermodulation products that could occur

11   with those bands, why was it desirable to have all three in a

12   single radio rather than deploying, for example, dual-band

13   radio for 12 and 14 and then a single band radio for 29?

14   A.    One would need to control the IMs and the out-of-band

15   emissions for all three.  So, therefore, it's easier to

16   control it when they're all into one radio as in the --

17   separate.

18   Q.    Do you believe the AHLBBA today meets the specifications

19   that you mentioned before regarding the power PIM mitigation

20   bands and out-of-band emissions?

21   A.    It meets the high-level direction that we gave Nokia,

22   yes.

23   Q.    As they are installed or deployed right now in AT&T's

24   network, is AT&T able to use all three bands on the AHLBBA

25   radios?

1    A.    Yes, ma'am.

2    Q.    Are you currently able to transmit the 12, 14, and 29

3    bands at full power in the AHLBBA radios?

4    A.    Yes.

5    Q.    Are the AHLBBA radios including any form of PIM

6    mitigation right now?

7    A.    Yes.

8    Q.    Is there any trend that you've noticed that affects

9    whether the PIM or PIM cancellation is better or worse in the

10   field?

11   A.    Depending upon the length of coax connecting the radio to

12   the antenna.

13   Q.    So does a shorter coax mean that the internal PIM

14   cancellation is more effective?

15   A.    Yes.

16   Q.    And a longer coax means that the internal PIM

17   cancellation is less effective?

18   A.    Correct.

19   Q.    And this is what I'm going to mark as Exhibit 1, so

20   Edwards Exhibit 1.  The Bates stamp is AT&T_FW_90964.

21         Do you recognize this document?

22   A.    Yes.

23   Q.    What is it?

24   A.    An email from me to Brian Gavin.

25   Q.    Now, in the part A it says, "the decision to develop the

1    Nokia tri-band radio with PIM cancellation."  Do you see that?

2    A.    Yes.

3    Q.    Does this refer to an AT&T decision or a Nokia decision?

4    A.    Nokia decision.

5    Q.    And in the last sentence in that paragraph it reads,

6    "Therefore, the need for RRH that does as much as possible as

7    to eliminate or control PIM," why did you say "the need for an

8    RRH that does as much as possible as to eliminate or control

9    PIM" rather than mentioning a CPRI solution?

10   A.    Most likely the ease of deployment.

11   Q.    What makes it easier to deploy PIM cancellation in an RRH

12   compared to in a CPRI unit?

13   A.    Pim mitigation is already included in the RRH, and you're

14   deploying that.  CPRI is totally a separate product.  You'd

15   have to deploy both of them.  So it's two versus one.

16   Q.    And the next sentence reads, "From my recollection,

17   Ericsson developed the 614 on their own without asking AT&T

18   what they needed."  Is that right?

19   A.    Correct, yes.

20   Q.    Okay.  Does Nokia usually ask AT&T what it needs when it

21   develops products?

22   A.    Yes.  They discuss it with -- especially in the radio

23   they'll usually discuss it with me.

24   Q.    Do you see the email on your screen, sir?

25   A.    Yes.

1    Q.    Where I'm going now is up to an email from you on April

2    2nd to Brian Gavin and Adam Loddeke.  Do you see that?

3    A.    Yep.

4    Q.    And in the next paragraph it reads, "If you make a

5    dual-band or tri-band RRH that has bands 12, 14, and 29, along

6    with one that has 2/25 & 66, then you must use radio" -- I

7    think this was meant to be PIM-C.  "The math does not change."

8    Is that correct?

9    A.    Yep.

10   Q.    And why must one use radio PIM-C in these circumstances?

11   A.    You read the answer.  The math doesn't change.

12   Q.    Do you have any opinion as to what the most

13   PIM-challenged environments in North America are?

14   A.    No.  They're everywhere.

15   Q.    So would addressing PIM mitigation have any effect on the

16   receive sensitivity?

17   A.    Yes, it would.

18   Q.    What effect would it have?

19   A.    It would -- if you didn't have PIM mitigation, your

20   receive sensitivity would degrade.

21   Q.    And what's the practical effect of the receive

22   sensitivity degrading in a radio?

23   A.    The radio would not be capable of carrying the capacity

24   that it was designed for.

25   Q.    And then in the next line it reads, "Because of limited

1    processing power, external PIM is not addressed."  Do you see

2    that?

3    A.   Yes.

4    Q.   What do you mean by that?

5    A.   External PIM will give you a lot more combinations that

6    you have to go do the math on, and the processing power to do

7    that math is what's being addressed there.

8    Q.   So does it take less processing power to address internal

9    PIM than to address external PIM?

10   A.   Yes.

11          THE COURT:  Does that complete this witness by

12   deposition?

13          MS. FAIR:  Yes, Your Honor.

14          THE COURT:  Call your next witness, please.

15          MS. FAIR:  At this time the Plaintiff calls by

16   deposition Mr. Dave Brewer.  He is a Nokia account executive.

17   He testified as a corporate representative for Nokia.  And for

18   the record, Deposition Exhibit 18 is PX 995.  And the time is

19   the Plaintiff's; it is 5 minutes and 11 seconds.

20          THE COURT:  Please proceed with this witness by

21   deposition.

22                      DAVID JOHN BREWER

23                     BY VIDEO DEPOSITION

24   Q.   Okay.  Could you please state your full name for the

25   record?

1    A.   David John Brewer.

2    Q.   Okay.  What are your job duties and responsibilities?

3    A.   So I'm an account executive who sells hardware and

4    software to AT&T.  Responsibilities are present new products

5    to AT&T, develop and present pricing to AT&T, convince AT&T to

6    close on particular prices for particular products, and ensure

7    that that's documented appropriately in contract form so that

8    we can then begin accepting purchase orders based on an

9    executed contract.

10   Q.   So PIM cancellation was developed for the dual-band

11   units, but it also has advantages with the -- specifically

12   with band 5.  Is that your answer?

13   A.   No.  My answer is it was initially developed for -- well,

14   it was developed for dual band.  There are some specific cases

15   for single band where it may also be relevant, but those tend

16   to be very minor and small and don't always exist with every

17   operator, but they can exist.

18        So there can be passive intermod concerns with single

19   band under certain scenarios, but between Nokia and AT&T and

20   the Nokia footprint there are no such concerns with band 5

21   because AT&T doesn't have enough spectrum to have multiple

22   carriers of band 5.

23   Q.   So it is your understanding that AT&T turns PIM-C on for

24   every Nokia -- RRH in its network?

25   A.   Correct.  It's my understanding that's their intention,

1   and I think there may be data that was done via an audit, and

2   so if there are some that are off they've -- they've done it

3   by accident.

4   Q.   This is Bates No. NOK_FIN_00026987.

5        The title is B12B14B29 tri-band RRH commercial proposal.

6   A.   Yes.

7   Q.   All right.  Are you familiar with this document?

8   A.   I am 100 percent familiar with this document.  I prepared

9   this document.

10  Q.   Okay.  So in a broad sense, what is this document for?

11  A.   This document is the document we use to initiate the

12  formal discussion with AT&T supply chain on a new piece of

13  hardware.  So at this point in the process we've already had

14  discussions with CTO, which is the technical team at AT&T, and

15  we've got some guidance from them -- well, in most cases we've

16  got guidance from them that they're interested in a product,

17  and in some cases they are interested enough to give us

18  requirements or specifications that -- that they would like us

19  to meet.  In some cases they don't give us any specifications

20  or requirements; they say, you know, you guys go build it and,

21  you know, come back with a proposal that we think is

22  interesting.  So that happens sometimes.  And in some cases we

23  actually make proposals that CTO is not even on board with in

24  the sense of, you know, they haven't asked for something

25  specifically, and we're trying to proactively put something in

1    front of them.

2         But in any event, this document is at the stage where

3    we're taking a proposal to supply chain, we have -- went

4    through the internal review process, which I described, that

5    allow us to put a commercial price in front of AT&T and begin

6    the negotiations.  And so this is a document that is the

7    starting point for negotiating with supply chain on the price

8    they will agree to pay for a new product.

9    Q.   So -- so you don't know if there is additional

10   PIM-cancellation capabilities in this tri-band unit?

11   A.   I've been told by -- by our technical teams that I

12   believe it to be true that it can cancel PIM across the

13   various combinations of bands that are in this RRH.  Because

14   you have more bands, you have more combinations and,

15   therefore, does it do more PIM cancellation?  I believe the

16   answer is yes.  That's what I've been told--it does more PIM

17   cancellation.  But does it take more components and hardware

18   in order to do that?  I don't know.

19            THE COURT:  Does that complete this witness by

20   deposition?

21            MS. FAIR:  Yes, Your Honor.

22            THE COURT:  Call your next witness.

23            MS. FAIR:  Our last witness by deposition at this

24   time is Mr. Alex Casillas.  He is a Nokia senior hardware

25   engineer.  For the record Deposition Exhibit 10 is PX 834,

1    Deposition Exhibit 8 is PX 839, and Deposition Exhibit 5 is

2    PX 917.  The Plaintiff's time is 10 minutes and 43 seconds,

3    the Defendants' time is 1 minute and 30 seconds.

4              THE COURT:  All right.  Proceed with this witness by

5    deposition, please.

6                        ALEXANDER JAMES CASILLAS

7                        BY VIDEO DEPOSITION

8    Q.   Would you please state your full name for the record?

9    A.   It's Alexander James Casillas.

10   Q.   I'm providing this to you in case you need to refer to

11   these deposition topics, because I'm sure you're aware you've

12   been designated to testify as to certain topics today as a

13   corporative representative on behalf of a Nokia.  Do you

14   understand that?

15   A.   Yes.

16   Q.   And your current title at Nokia is senior hardware

17   engineer.  Correct?

18   A.   Actually I got a promotion recently, like last month, and

19   to be honest, I was a senior hardware engineer and I think I'm

20   now a staff engineer.  I don't know what the official

21   nomenclature is.  But for purposes of this deposition, yeah,

22   during the period that GROOT was being developed, I was a

23   senior hardware engineer.

24   Q.   What is GROOT, just generally, if you can give me an

25   abstract for it?

1    A.   Well, GROOT is an FPGA, and its primary goal is to

2    perform the PIM-C function for the Galaxy variants, the radios

3    that require PIM-C.

4    Q.   And so GROOT is the FPGA used for performing the PIM-C

5    function for Galaxy variants.  Is that right?

6    A.   Right.  I mean -- yes, for Galaxy variants when it's

7    enabled, and if the FPGA is, you know, populated, you know,

8    the FPGA is solely responsible for the PIM-C function.

9    Q.   This is Bates produced document NOK_FIN_000021612 [sic]

10   and will be Exhibit Casillas 05.

11        And have you seen this document before?

12   A.   Yes, at some point.  And this was over the last period of

13   six years, yes.

14   Q.   And on the front page of this document titled 'AirScale

15   Multiradio BTS Rel5.1 Galaxy PIM-C Functional Algorithm

16   Specification', there is a sub-heading that says 'Galaxy

17   program'.  What is the Galaxy program?

18   A.   Well, that's just a nomenclature that -- that was given

19   to the galaxy radio program.  I mean, I don't -- I'm not sure

20   how to -- how else to describe it.

21   Q.   And in the legend it mentions the RX as you noted, and

22   the Ul + actual PIM path.  Do you see that?

23   A.   Yes, uh-huh.

24   Q.   And what is the UL?

25   A.   Uplink.

1    Q.   And is that synonymous --

2    A.   Up --

3    Q.   Sorry.  Go ahead, sir.

4    A.   Yes.  Uplink is synonymous with the receive; downlink is

5    synonymous with the transmit.

6    Q.   And it also says '+ actual PIM path'.  What does that

7    mean?

8    A.   From our standpoint, that -- that RX would be considered

9    to be dirty.  So it's the RX and it has potential PIM included

10   on it.

11   Q.   And where is the PIM generated?

12   A.   Well, in this diagram -- well, it's labeled on the

13   diagram.  PIM sources:  Duplexer, cables, antenna.  It looks

14   like it's this dashed outline.  It could be any one of those

15   three things that they're outlining.

16   Q.   And can you tell me which components in Figure 1 are

17   located in the transmitter?

18   A.   Look -- what do you mean 'located in the transmitter'?

19   Q.   They're on the -- they're on the transmission side.

20   A.   Right.  I mean, I guess they would be the -- clearly the

21   digital-to-analog converter, then they have the -- it looks

22   like this low-power TX section, then the PA.  And it looks

23   like -- I'm not sure what that little circle with the arrow

24   circulating on it.  I guess that's the -- that's the

25   circulator.  I would say those components.

1          And then technically a duplexer is part of the transmit

2     session because the transmit goes through that and then it

3     makes it through the cable to the antenna.  So it's -- it's

4     effectively the entire top half.  And then the transmit also

5     gets fed back into the FPGA through the -- I guess that's a

6     red dash line.  Yeah, that's red.  Through the RF ADC that

7     goes into the PIM adaptive model (IM3 IM5 block) and the FPGA.

8     Q.   Do you consider it significant to Galaxy as a feature

9     that wideband PIM-C processing is accomplished in Galaxy?

10    A.   Based on what I can see on marketing slides, I would say

11    yes.

12    Q.   And why is that?

13    A.   Well, it's a feature.  It's a feature.  Just like any

14    product has features, it's a feature that the customer can

15    enable if they need to.

16    Q.   And what benefit does it provide to customers?

17    A.   Well, when it's enabled it improves the signal-to-noise

18    ratio on the receive side, and for our customers that's --

19    that translates to more cell -- more calls per -- per cell.

20    Q.   We're going to get right into our next exhibit here with

21    Casillas 08, and this is a Nokia-produced document with the

22    Bates number ending in 0710.

23          And so how is correlator -- what is correlator doing with

24    a dual-band input.

25    A.   Well, the correlator generates the model on its own also.

1  So just like the NL generates a model, the correlator

2  generates the exact same model.  And so the delay search would

3  be run on the selected term.  So if a product had -- let's say

4  an IM3 was the primary area of concern, then the correlator

5  would run delay search on an IM3, and then that delay,

6  whatever it finds, would be put in the respective NL engine,

7  and that's when cancellation happens.

8      So the term that the correlator generates could be from a

9  single band, it could be a cross term, it could be an IM3

10  special.  It's up to the software to decide which term to run

11  the delay search on.

12  Q.   Okay.  And So the delay blocks after the NL block, those

13  are adjusting the signal space.  Is that right?

14  A.   No.  It's -- in a time domain it's adding delay to align

15  the transmit model with the RX.

16  Q.   But that's not fixed delay.  Correct?

17  A.   It's variable.  There's a default delay -- delay at

18  power-up, which I believe is 10, and the PIM engine is

19  disabled by default.  And once delay search is run on the

20  respective term, the delay is programmed, and then, you know,

21  the cancellation can be enabled at that point.

22  Q.   And so is the delay affected by -- is the delay after the

23  NL block here affected by the correlator delay search

24  determination?

25  A.   Yes.  The delay search that's running the correlator is

1    what ultimately determines what delay is programmed into the

2    NL block.

3    Q.   So the key performance indicator for your team would be

4    to meet the system requirements for -- for individual products

5    in terms of your test cases performed as to PIM-C.  Is that

6    right?

7    A.   Right.  Yes and no.  It's an optional feature.  So in the

8    -- you know, the customers would want as much cancellation as

9    possible because it increases, you know, their signal-to-noise

10   ratio.  But their -- you know, there are scenarios, like this

11   band edge IM3, where even with the best -- you know, even with

12   the best situations, you can't pull up as much cancellation as

13   you need to.

14   Q.   So one of the notes mentions that the results improved

15   with further optimization here.  If your engineering tests

16   were unable to meet the spec requirements across the range

17   provided at the top of -- of this test case, for example,

18   would that product still be provided to a customer?

19   A.   Right.  Because the worst case is that there's no PIM

20   cancellation and when -- you know, the customers are no better

21   off than they were before.

22   Q.   So red numbers aren't necessarily a bad thing; they just

23   mean that you haven't achieved the level of results you were

24   looking to achieve.

25   A.   Correct.  Yes.

1    Q.    But the PIM cancellation is still improving customer

2    signal-to-noise ratio and the other things you mentioned.

3    A.    For the most part, yes.  I agree.

4    Q.    Is this still accurate in terms of the way the correlator

5    is implemented?

6    A.    This is the initial diagram from 2016 or '17.  So let me

7    take a look real quick.  Yes, it's effectively the same.  So

8    this has -- AHPMDD is the last entry in the FPGA hardware

9    configuration table on page 25.  I think I'm reading that

10   right.  Oh, it's page 26 of the PDF.  So this is -- this is

11   very recent.  There have been a few small changes.  But if you

12   look at the revision table, the only changes at this point are

13   adding -- adding hardware IDs to this table.

14   Q.    And -- but you're saying there have been modifications to

15   this document since then?

16   A.    Remember, I referred to the hardware variant that's being

17   developed in China?

18   Q.    Right.

19   A.    That -- whenever a new variant comes up, we have to edit

20   this document and add the new hardware ID.  So you can see

21   that version 3.22 is add hardware ID; version 3.23, add

22   hardware ID; 3.24, add hardware ID.  So the difference between

23   this document and the one that's out there right now is just,

24   effectively, a hardware ID that's been added for a new Chinese

25   variant.

1            THE COURT:  Does that complete this witness by

2    deposition?

3            MS. FAIR:  Yes, Your Honor.

4            THE COURT:  All right.  Thank you, counsel.

5        Ladies and gentlemen of the jury, the information I've

6    been given indicates that the next witness is going to be on

7    the witness stand approximately two hours.  We are not going

8    to start that kind of a lengthy witness this late in the day.

9    It's 20 minutes until 6:00.

10        I'm going to ask you as you leave the courtroom in a few

11   minutes to take your juror notebooks with you.  Place them

12   closed on the table in the jury room so that they'll be there

13   awaiting you in the morning.

14        Let me remind you to please plan your travel such that

15   you can be assembled in the jury room around 8:15 in the

16   morning, and we will try to start back in court with the next

17   Plaintiff's witness as close to 8:30 as possible.  But please

18   plan your travel accordingly.

19        Please remember all my instructions and follow them,

20   including among them not to discuss the case with anyone.  And

21   I promise you, unless you live at home by yourself or you have

22   a Mynah Bird that can talk, when you walk through the door

23   you're going to be asked what happened in federal court today.

24   Just don't try to answer that question.

25        Please travel safely to your homes and with that, ladies

1    and gentlemen.  You are excused for the evening.  I'll see you

2    tomorrow morning.

3              (Whereupon, the jury left the courtroom.)

4              THE COURT:  Please be seated.

5         Counsel, let me remind you of your meet and confer

6    obligations overnight.  I'll be looking for an update around

7    10:00, and then tomorrow morning if there are disputes that

8    have not been able to be resolved through your ongoing and

9    continuing meet and confer efforts, then I'll expect a binder

10   delivered to chambers by 7:00 a.m. tomorrow promptly that

11   outlines where you still have disputes, including a

12   representative of any demonstrative or other matter that's the

13   subject of your dispute together with a single paragraph

14   explaining each party's position on each dispute, and then

15   I'll be prepared to meet with you and resolve those before we

16   bring the jury in and begin tomorrow's portion of the

17   evidence.

18        Also let me remind you that prior to me bringing in the

19   jury tomorrow morning, I'm going to expect a representative of

20   each side to be prepared to read into the record from the

21   podium the list of pre-admitted exhibits that may have been

22   used during today's portion of the trial, and I'll do that

23   each morning before the jury comes in on a rolling basis so

24   that we can accurately record in the minutes--excuse me--in

25   the transcript which items from the list of pre-admitted

1    exhibits have actually been used before the jury and are

2    admitted exhibits and a part of the record evidence in the

3    case.  So be prepared to do that before the jury comes in each

4    morning of each day.

5         For your information, according to the Court's records,

6    we've used 2 hours 33 minutes and 49 seconds of allocated

7    trial time today.  That is to be allocated 1 hour and 56

8    minutes and 55 seconds to the Plaintiff; to the Defendants and

9    Intervenor, 36 minutes and 54 seconds.

10        Are there other issues we need to take up before we

11   recess for the evening?

12             MR. GRINSTEIN:  Nothing from the Plaintiff, Your

13   Honor.

14             MR. DACUS:  Nothing from us, Your Honor.  Thank you.

15             THE COURT:  All right.  We had mentioned in chambers

16   this morning, counsel, the motion for leave to narrow the case

17   and the objections thereto.  I had asked for some follow-up

18   input from Plaintiffs on their time and resources allocated to

19   those matters that would be discarded through that narrowing.

20   I would hope you could have something for me tomorrow morning

21   when we meet in chambers.

22             MR. GRINSTEIN:  Yes, Your Honor.

23             THE COURT:  All right.  With that, counsel, we stand

24   in recess until tomorrow morning.

25             (The proceedings were concluded at 5:45 p.m.)

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          01/09/2023

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25