```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
                  MARSHALL DIVISION

FINESSE WIRELESS, LLC,        (  CAUSE NO. 2:21-CV-316-JRG
                              )
          Plaintiff,          (
                              )
vs.                           (
                              )
AT&T MOBILITY, LLC, et al.,   (  MARSHALL, TEXAS
                              )  JANUARY 12, 2023
          Defendants.         )  8:30 A.M.
_____


                      VOLUME 4

_____


                 TRIAL ON THE MERITS

         BEFORE THE HONORABLE RODNEY GILSTRAP
          UNITED STATES CHIEF DISTRICT JUDGE

_____
```

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                    A P P E A R A N C E S

 2          FOR THE PLAINTIFF:    SUSMAN GODFREY, LLP - HOUSTON
                                  1000 LOUISIANA ST., SUITE 5100
 3                                HOUSTON, TEXAS  77002
                                  (713) 651-9366
 4                                BY: MS. MENG XI
                                      MR. JOSEPH GRINSTEIN
 5
                                  WARD, SMITH & HILL, PLLC
 6                                1507 BILL OWENS PARKWAY
                                  LONGVIEW, TEXAS  75604
 7                                903-757-6400
                                  BY:  MS. ANDREA FAIR
 8                                     MR. JOHNNY WARD

 9          FOR THE DEFENDANT:    BAKER BOTTS, LLP - DALLAS
            (AT&T)                2001 ROSS AVENUE, SUITE 900
10                                Dallas, TEXAS  75201-2980
                                  (214) 953-6747
11                                BY:  MR. DOUG KUBEHL

12                                THE DACUS FIRM, PC
                                  821 ESE LOOP 323, SUITE 430
13                                TYLER, TEXAS  75701
                                  (903) 705-1117
14                                BY:  MR. DERON DACUS

15
            FOR THE DEFENDANT:    QUINN EMANUEL URQUHART &
16          (NOKIA)              SULLIVAN, LLP - CHICAGO
                                  500 WEST MADISON, SUITE 2450
17                                CHICAGO, ILLINOIS  60661
                                  (312) 705-7400
18                                BY:  MS. BRIANNE STRAKA
                                      MS. DAVE NELSON
19
20          OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  100 E. HOUSTON STREET
21                                MARSHALL, TEXAS  75670
                                  (903) 923-8546
22

23

24

25
```

## INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| JAMES PROCTOR | |
| Cross By MR. GRINSTEIN | 5 |
| Redirect By MR. NELSON | 28 |
| Recross By MR. GRINSTEIN | 43 |
| STEPHEN BECKER, Ph.D. | |
| Direct By MR. DACUS | 45 |
| Cross By MS. FAIR | 85 |
| Recross By MS. FAIR | 136 |
| Redirect By MR. DACUS | 139 |

```
 1              THE COURT:  Be seated, please.

 2        Are the parties prepared to read into the record those

 3   items from the list of pre-admitted exhibits used during

 4   yesterday's portion of the trial?

 5              MS. STRAKA:  Yes, Your Honor.

 6              THE COURT:  Let's proceed to do that, please.

 7              MS. STRAKA:  Plaintiff's Exhibit 450, 464, 664, 708,

 8   827, 862, 867, and 911.  Defendant's Exhibits 9, 10, 19, 40,

 9   93, 95, 103, 274, 279, 281, 283, 287, 295, 305, 318.

10              THE COURT:  Does that complete your rendition?

11              MS. STRAKA:  Yes, it does, Your Honor.

12              THE COURT:  Is there any objection?

13              MS. FAIR:  No, Your Honor.

14              THE COURT:  All right.  Are you prepared to continue

15   with your cross-examination of the witness, Mr. Grinstein?

16              MR. GRINSTEIN:  I am, Your Honor.

17              THE COURT:  Mr. Proctor, I see you're on the witness

18   stand.  I'll remind you that you remain under oath.

19        And let me ask both of you gentlemen to make sure that

20   the other one's finished before you jump in with the next

21   answer or the next question.  It's important that we keep the

22   record clear and avoiding talking over each other is

23   important.

24        All right.  Let's bring in the jury, please, Mr. Turner.

25              (Whereupon, the jury entered the courtroom.)
```

1        THE COURT:  Good morning, ladies and gentlemen.

2   Welcome back.  Please have a seat.

3        We will pick up this morning with the continuing

4   cross-examination of Mr. James Proctor by counsel for the

5   Plaintiff.

6        Mr. Grinstein, you may continue.

7        MR. GRINSTEIN:  Thank you.

8            JAMES PROCTOR, PREVIOUSLY SWORN,

9   testified under oath further as follows:

10            CROSS EXAMINATION continued

11   By Mr. Grinstein:

12   Q.   Good morning, Mr. Proctor.

13   A.   Good morning.

14   Q.   Now, in addition to claiming that the Defendants don't

15   infringe Finesse's patents, you're also saying that the

16   asserted claims of Finesse's patents are invalid.  Right?

17   A.   Correct.

18   Q.   And there is a presumption that patents issued by the

19   United States Patent and Trademark Office are valid.  Right?

20   A.   Correct.

21   Q.   And that applies to all patents, including the Finesse

22   patents in this case.  Right?

23   A.   Yes.

24   Q.   And so to show that Finesse's patents are invalid, you

25   need to demonstrate clear and convincing evidence.  Correct?

```
1    A.   Correct.

2    Q.   Now, with respect to prior art, there are two different

3    kinds of invalidity arguments or invalidity

4    theories--anticipation and obviousness.  Right?

5    A.   Yes.

6    Q.   And anticipation is where one single prior art reference

7    discloses all the elements of a patent claim.  Right?

8    A.   Correct.

9    Q.   So if you were going to say one inventor out there had

10   invented all of Mr. Smith's inventions before he did, you

11   would assert an anticipation argument.  Right?

12   A.   Yes.

13   Q.   But the Defendants in this case are not asserting

14   anticipation as their validity defense.  Right?

15   A.   Well, on the '775, I put forth an opinion of anticipation

16   for McCalister and obviousness for the combination.

17   Q.   Do you think that the jury instructions in this case are

18   going to instruct the jury on the issue of anticipation?

19   A.   I would assume so.

20   Q.   You want to stake your credibility on that?

21   A.   I don't -- I have not seen the jury instructions, so I'm

22   not making any opinion about that.

23   Q.   You are asserting an obviousness case.  Correct?

24   A.   Yes.

25   Q.   And that involves combining two prior art references
```

1   together and saying those combined references contain all the

2   elements of the claim.  Right?

3   A.   Correct.

4   Q.   And in an obviousness case, it is the Defendant's burden

5   to show that there would have been a motivation to combine.

6   Correct?

7   A.   Yes.

8   Q.   So you can't just take two random pieces of prior art and

9   slap them together.  You actually have to show a skilled

10  artisan would have been motivated to combine them.  Right?

11  A.   Yes.  If those two random pieces had motivation to

12  combine, you could combine them.

13  Q.   Now, you've heard of the phrase hindsight is 20/20,

14  haven't you?

15  A.   Yes.

16  Q.   And in an obviousness analysis, you can't use hindsight

17  bias to show there would have been a motivation to combine two

18  pieces of prior art.  Right?

19  A.   Correct.

20  Q.   And Defendants have to prove this motivation by clear and

21  convincing evidence as well.  Right?

22  A.   Yes.

23  Q.   Strict standard of proof.  Right?

24  A.   Correct.

25  Q.   And yet every time you've opined in court on the issue of

1    patent validity, it just so turns out that you've found that

2    clear and convincing evidence that the U.S. Patent and

3    Trademark Office shouldn't have issued patent claims.  Right?

4    A.   Yes.

5    Q.   Now, one of the two pieces of prior art that you

6    discussed as to the '134 Patent is this reference called Kim.

7    Right?

8    A.   Yes.

9            MR. GRINSTEIN:  And I think that's DX 10.  Let's

10   look at that real quick.

11   Q.   (BY MR. GRINSTEIN)  Now, the claims of the '134 Patent,

12   not the Kim, but the claims of the '134 Patent relate to a

13   digital system.  Is that right?

14   A.   They do, yes.

15   Q.   Kim deals with analog systems.  Right?

16   A.   Well, no.  It's not specific to it.

17   Q.   Does it expressly call out digital?

18   A.   It doesn't expressly call out, either.

19   Q.   And so you put together Kim with digital Bazarjani for

20   your combination.  Right?

21   A.   Yes.

22   Q.   And I think, if I got your testimony right, you said that

23   the world was moving towards digital at this time so someone

24   would be motivated to make the Kim invention digital.  Is that

25   right?

1   A.   Yes, it is.

2   Q.   The Kim patent was filed in 1998.  Right?

3   A.   Yes.

4   Q.   Bazarjani was actually filed a year earlier in '97,

5   wasn't it?

6   A.   Yes.

7   Q.   So Bazarjani was out there promoting a digital approach

8   when Kim did this patent and didn't say digital.  Right?

9   A.   Correct.

10        MR. GRINSTEIN:  If I could look at column 3, lines

11   47 through 56, of Kim, please.

12   Q.   (BY MR. GRINSTEIN)  These are some lines of the patent

13   that I think you discussed in your direct testimony yesterday.

14   Is that right?  Or if you didn't, can you let me know?

15   A.   I don't recall if I cited that specific section or not.

16   Q.   There's a discussion up there about an IMD product

17   generator.  Do you see that?

18   A.   Yes.

19   Q.   That's intermodulation product?

20   A.   Yes.

21   Q.   And it says right there that suitable configurations are

22   known to those skilled in the art.  Right?

23   A.   Yes.

24   Q.   Kim doesn't purport to show all those configurations,

25   does it?

1    A.   No.

2    Q.   Kim teaches using a filtered copy of the intermodulation

3    to create the cancellation signal.  Right?

4    A.   I'm sorry.  Repeat that?

5    Q.   Kim teaches using a filtered copy of the intermodulation

6    to create the cancellation signal.  Right?

7    A.   No.

8    Q.   Does Kim show using source signals to create

9    intermodulation?

10   A.   Transmit signals.

11   Q.   Do you see line 51 up there?  It says, the main signal is

12   filtered out so as to leave only intermodulation products?  Do

13   you see that?

14   A.   Yes.

15   Q.   Were you here for Mr. Smith's testimony on Monday?

16   A.   I was.

17   Q.   And did you hear him testify that his invention was a

18   departure from the three historical ways of dealing with PIM?

19   A.   Yes.

20   Q.   And did you hear him testify that one of the three

21   historical ways of dealing with PIM that he specifically

22   rejected was filtering?  Did you hear that?

23   A.   I did.

24   Q.   The Bazarjani patent, that's DX 9, this is the other

25   reference that you cited in your '134 validity analysis.  Is

1    that right?

2    A.    Yes.

3    Q.    And, again, your contention is that if you put Kim and

4    Bazarjani together, they render the '134 obvious.  Correct?

5    A.    Yes, they do.

6    Q.    Now, Bazarjani does mention intermodulation products.

7    Right?

8    A.    No.

9    Q.    Okay.  So it doesn't mention intermodulation products.

10   A.    No.  It's an A to D converter with a decimating filter

11   for isolating.

12   Q.    It never mentions cancellation then of intermodulation

13   products if it doesn't mention intermodulation products.

14   Right?

15   A.    Well, correct, yes.

16   Q.    I think if you did a word search, the word cancel

17   wouldn't even appear in Bazarjani.  Right?

18   A.    I wouldn't expect it, no.

19   Q.    And you mentioned that Bazarjani was assigned to

20   Qualcomm.  Right?

21   A.    Yes.

22   Q.    You can see that right on the first page.  Right?

23   A.    Yes.

24   Q.    Did you hear from Mr. Smith on Monday that he disclosed

25   his technology to Qualcomm?

```
1    A.    Yes.

2    Q.    And did you hear his testimony on Monday that Qualcomm

3    was praiseworthy of his technology?

4    A.    I don't recall that.

5    Q.    Did you hear his testimony that Qualcomm never said his

6    technology was old?

7    A.    I suppose.  I don't recall that specifically.

8    Q.    Did you hear his testimony that Qualcomm never said his

9    invention was obvious?

10          THE COURT:  Just a minute, counsel.

11       What is that noise?  That's downstairs?

12       I apologize.  Apparently we're having some improvements

13   done downstairs that I didn't think were scheduled for today.

14       Okay.  Let's continue.

15   Q.    (BY MR. GRINSTEIN)  Did you hear Mr. Smith's testimony

16   that Qualcomm never said his invention was obvious?

17   A.    No, I didn't hear that.

18   Q.    I mean, it doesn't sound like in Mr. Smith's meetings

19   with Qualcomm, Qualcomm pulled out the Bazarjani patent and

20   said, your stuff isn't new.

21   A.    I wouldn't expect that.

22   Q.    By the way, we've heard in this trial all sorts of

23   testimony about how smart and accomplished AT&T's engineers

24   are.  Have you heard that testimony?

25   A.    Yes.
```

1    Q.   And we've heard all kinds of testimony about how smart

2    and accomplished Nokia's engineers are, too.  Have you heard

3    that testimony?

4    A.   Definitely.

5    Q.   But you haven't said anything on the stand about AT&T's

6    inventing Mr. Smith's inventions before Mr. Smith did, have

7    you?

8    A.   No.

9    Q.   And you haven't said anything on the stand about Nokia's

10   inventing Mr. Smith's inventions before Mr. Smith did, have

11   you?

12   A.   No.

13   Q.   Now, obviously the '775 is a different patent from the

14   '134.  Right?

15   A.   Yes.

16   Q.   And you haven't rendered an opinion that if the '134 is

17   invalid, therefore the '775 is invalid.  You didn't give that

18   opinion yesterday, did you?

19   A.   I did not.

20   Q.   You've gone and tried to show that the '775 is invalid

21   for independent reasons.  Right?

22   A.   Correct.

23   Q.   And in fact, for that matter, you didn't apply your '134

24   non-infringement arguments to the '775, did you?

25   A.   They're different patents.

1    Q.   I mean, you said the '775 did not infringe, but it was

2    for different reasons than the '134.  Right?

3    A.   They have different claims.

4    Q.   And the prior art combination that you have articulated

5    for the '775 Patent is a combination of McCalister and Lui.

6    Is that correct?

7    A.   Correct.

8    Q.   Is it Lui or Lui?  How do you say it?

9    A.   I would say Lui.

10   Q.   Lui.  Okay.

11        I think DX 19 is the McCalister patent.  Does that look

12   familiar to you, sir?

13   A.   Yes.

14   Q.   And McCalister mentions the word 'intermodulation'.

15   Right?

16   A.   Yes.

17   Q.   I think you cited that in your direct examination.

18   Correct?

19   A.   Yes.

20   Q.   It never calls out passive intermodulation, though, does

21   it?

22   A.   Yes, it does.

23   Q.   Does it use the word 'passive'?

24   A.   No, not in those words.

25   Q.   It doesn't use the word 'PIM', either, does it?

1    A.   It doesn't use the word 'passive', right, PIM.

2    Q.   And it doesn't, of course, then say passive

3    intermodulation cancellation.  Right?

4    A.   No.

5    Q.   And it doesn't say PIM-C.  Right?

6    A.   No, it doesn't mention canceling passive.  That's right.

7    Q.   Claim 1 of the '775 expressly mentions passive

8    intermodulation.  Right?

9    A.   Yes.

10   Q.   And expressly mentions canceling it.  Right?

11   A.   Yes.

12   Q.   And claim 1 of the '775 also mentions what's known as a

13   power series function.  Right?

14   A.   Yes.

15   Q.   It uses those words.  Correct?

16   A.   Yes.

17   Q.   And it also includes math of that function in the claim.

18   Right?

19   A.   Yes.

20        MR. GRINSTEIN:  Can we look at column 22, lines 48

21   to 67, of McCalister?

22   Q.   (BY MR. GRINSTEIN)  Do you see those lines on your

23   screen, sir?

24   A.   I do.

25   Q.   And there is a discussion in this paragraph about

1    something called a basis function.  Do you see that?

2    A.   I do.

3    Q.   McCalister doesn't use the term 'power series function',

4    does it?

5    A.   Well, it shows it right -- there's a power series right

6    there on line I, magnitude of I.

7    Q.   Does McCalister use the term 'power series function'?

8    A.   No, it doesn't say that.

9    Q.   And, in fact, if you look down a little bit in the middle

10   of the claim -- I'm sorry, in the middle of the paragraph,

11   there's a line that says the precise functional relationship

12   is not a critical parameter in the preferred embodiment.  Do

13   you see that?

14   A.   I do.

15   Q.   The '775 put the word 'power series function' right in

16   the claim language.  Right?

17   A.   Yes, it's right there.

18   Q.   No, the '775 --

19   A.   Oh, I'm sorry.  I thought you were pointing to the power

20   series that I cited to here.

21   Q.   Yes.  The '775 puts the word 'power series' right in the

22   claim language.

23   A.   Yeah, it uses the words, yes.

24   Q.   And it puts the math right in the claim language.  Right?

25   A.   It does --

```
 1   Q.    So to the '775 --

 2   A.    I'm sorry.  I was still finishing my answer.

 3   Q.    Please do, sir.

 4   A.    Yeah, it claimed one type of implementing a power series.

 5   Q.    As far as the '775 is concerned, the power series

 6   function is a critical parameter.  Right?

 7   A.    Yes.  They've claimed a very specific implementation of a

 8   power series.

 9         MR. GRINSTEIN:  I believe the Lui reference is DX 5.

10   Q.    (BY MR. GRINSTEIN)  And that's a paper entitled, Passive

11   Intermodulation Interference in Communication Systems.  Is

12   that right?

13   A.    Yes.

14   Q.    The Lui reference doesn't disclose some new technology

15   that Mr. Lui developed, does it?

16   A.    Well, no.  It's been known a long time.

17   Q.    I mean, you're not saying that Mr. Lui invented Mr.

18   Smith's PIM-C cancellation technique before Mr. Smith did, are

19   you?

20   A.    No.

21   Q.    In fact, the Lui reference is just a paper that gives an

22   overview of passive intermodulation interference in

23   communication systems.  Right?

24   A.    In addition to other things.

25   Q.    I mean, the middle sentence of the first paragraph says,
```

1    This paper gives an overview of passive intermodulation

2    interference in communication systems.  Right?

3    A.    Yes.

4    Q.    And it discusses that this problem is well known.  Right?

5    A.    Yes.

6    Q.    It says that right in the line right before.  Right?

7    A.    Yes.

8    Q.    And then what it does is summarize previous

9    investigations of PIM and discusses systems that measure PIM.

10   Right?

11   A.    Yes.

12   Q.    Lui never mentions PIM cancellation, does it?

13   A.    No.

14   Q.    The word 'cancellation' doesn't appear in the Lui

15   reference, does it?

16   A.    No, it doesn't.

17   Q.    I don't even think cancel appears, does it?

18   A.    No.  It addresses it through site hygiene.

19   Q.    Now --

20          MR. GRINSTEIN:  You can take that down, Mr. Boles.

21   Thank you.

22   Q.    (BY MR. GRINSTEIN)  Now, a patentholder can defend

23   against an obviousness challenge by pointing to some things

24   called secondary considerations of non-obviousness.  Is that

25   right?

1    A.   That's right.

2    Q.   And those are pieces of evidence that show it wouldn't

3    have been obvious to put two references together.  Right?

4    A.   Correct.

5    Q.   And you're aware that Finesse is making a variety of

6    secondary considerations arguments in this case.  Right?

7    A.   I addressed those.

8    Q.   Okay.  Did you address all of them?

9    A.   I believe so.

10   Q.   Well, one piece of evidence that Finesse has cited as

11   relevant to secondary considerations is forward citations.

12   Right?

13   A.   Yes.

14   Q.   I don't think you said anything about forward citations

15   in your direct testimony, did you?

16   A.   Oh, I'm glad to talk about them now if you like.

17   Q.   You didn't say anything in your direct testimony about

18   forward citations, did you?

19   A.   No.

20   Q.   So, you know, Finesse has testified that more than

21   50 -- I'm sorry.  Mr. Smith testified that more than 50

22   different later patents cited back to the Finesse patents.

23   Did you hear that testimony?

24   A.   I did.

25   Q.   But in your direct opinions you disclosed to the jury,

```
1    you did not analyze that issue.

2    A.   I'm glad to talk about it now if you'd like.

3    Q.   Well, I want to confine you to what you --

4            THE COURT:  Just a minute.  He didn't ask you if you

5    were happy to talk about it.  He asked you if you did or you

6    didn't.  Answer the question.

7            THE WITNESS:  I did not.

8            THE COURT:  Don't go beyond what the question calls

9    for.

10           THE WITNESS:  Sorry, Your Honor.

11           THE COURT:  Let's continue.

12   Q.   (BY MR. GRINSTEIN)  You are responsible for two of those

13   forward citations yourself, aren't you?

14   A.   I guess so.

15   Q.   Another secondary consideration is long-felt need.  Is

16   that correct?

17   A.   Yes.

18   Q.   And that's the idea that if people had felt that they

19   needed to solve a problem for a long time, then an invention

20   solving that problem is less likely to be obvious because

21   otherwise someone would have come up with it earlier.  Is that

22   basically the gist?

23   A.   Yes.

24   Q.   And I think we were just talking about the Lui reference,

25   DX 5.  Is that right?  Do you remember that we just talked
```

1    about this?

2    A.   Yes.

3            MR. GRINSTEIN:   And can we look at section 6 from

4    Lui, Mr. Boles?

5    Q.   (BY MR. GRINSTEIN)   In section 6, Mr. Lui discusses that

6    people have been investigating the issue of passive

7    intermodulation for the last 40 years.   That's the first line.

8    Right?

9    A.   Yes.

10   Q.   And Lui is from 1990.   Right?

11   A.   Yes.

12   Q.   So 40 years, that's going back to 1950.   Right?

13   A.   Yes.

14   Q.   Indeed, you know, the excerpt from Lui a little bit

15   further down talks about research conducted on intermodulation

16   between 1947 and 1990.   Do you see that?

17   A.   Yes.

18   Q.   I mean, 1947 is before when you were even born.   Right?

19   A.   Yes.

20   Q.   Another secondary consideration is unexpected results.

21   Is that correct?

22   A.   Yes.

23   Q.   And you did discuss that secondary consideration in your

24   direct testimony.   Is that correct?

25   A.   Correct.

1    Q.   And the idea here is that if experiments are run and

2    generate surprising results, then it's less likely that an

3    invention is obvious.  Correct?

4    A.   Yes.

5    Q.   And you heard Mr. Smith's testimony about the testing

6    that he did on his inventions.  Right?

7    A.   Yes.

8    Q.   You heard him say that his inventions caused testing

9    orders of magnitude more impact on PIM than he was expecting.

10   Right?

11   A.   I did not hear that.

12   Q.   Well, you did hear that he was -- he generated results

13   that surprised him.  You heard that?

14   A.   Yes, I did hear that.

15   Q.   And you didn't provide any testimony in your direct

16   examination disputing the results of his tests, did you?

17   A.   No.

18   Q.   You didn't say he ran his tests wrong, did you?

19   A.   No.

20   Q.   And you're not here disputing his genuinely-held belief

21   that those results were unexpected to him, are you?

22   A.   I'm not.

23   Q.   Another one of the secondary considerations is industry

24   praise.  Correct?

25   A.   Correct.

1   Q.   I think it's also called professional approval.  Is that

2   right?

3   A.   Sure.

4   Q.   And that is the idea that if others in industry are

5   praising an invention, it's less likely that the invention is

6   obvious.  Right?

7   A.   Yes.

8   Q.   And you did discuss that secondary consideration in your

9   direct as well.  Correct, sir?

10  A.   Yes.

11  Q.   And, in fact, I think you put up a slide --

12          MR. GRINSTEIN:  Can I see Mr. Proctor's slide 107.

13  Q.   (BY MR. GRINSTEIN)  You put up this slide for the

14  professional approval industry praise, that factor.  Correct?

15  A.   Yes.

16  Q.   And you said that Mr. Smith went to many different

17  companies to try to partner with them and they turned him

18  down.  I think that's what you mentioned in your direct.

19  Right?

20  A.   Yes.

21  Q.   Of course, there could have been business reasons why

22  these companies turned Mr. Smith down rather than technical

23  reasons.  Correct?

24  A.   Sure.

25  Q.   I mean, did you go and interview each of these companies

1   to find out why they didn't partner with him?

2   A.   No.

3   Q.   I mean, you don't have any idea exactly what their

4   internal reasoning for not partnering with them was, do you?

5   A.   I worked at several of them, and I'm from the industry.

6   Q.   Oh, so you were there during the pitches when Mr. Smith

7   went to these companies and pitched his technology to them.

8   You were there.

9   A.   No, sir.

10  Q.   Okay.  So you don't know why these companies turned him

11  down, do you?

12  A.   Well, as I mentioned, I was -- I worked at several of

13  those companies and I'm from the industry and so I have ideas

14  about why that might be, but I have no definitive facts

15  because I was not at the meeting.

16  Q.   I mean, you're not here rendering an opinion on Mr.

17  Smith's business skills, are you?

18  A.   No.

19  Q.   So, I mean, you don't know one way or the other whether

20  Mr. Smith is good at pitching his ideas to companies, do you?

21  A.   I would bet he is.

22  Q.   Now, you were here to hear Mr. Smith's testimony in this

23  case.  Right?

24  A.   I was.

25  Q.   On Monday?

```
1    A.   I was.

2    Q.   And did you hear his testimony on Monday that Professor

3    Gary Kelson from the University of California-berkeley and

4    Professor Tom Lee from Stanford University reviewed his

5    invention?

6    A.   I did.

7    Q.   And did you hear his testimony on Monday that they said

8    his invention was totally unique, something they hadn't seen

9    before, disruptive, and elegant?  Did you hear that?

10   A.   I did hear him say that.

11   Q.   Are you here testifying that none of that happened?

12   A.   I have no basis for saying that.

13   Q.   Did you hear Mr. Smith testify that Professor Lee thought

14   his technology was so good, that he offered Mr. Smith a

15   Stanford Ph.D.?

16   A.   Yes, I heard that.

17   Q.   And did you hear Mr. Smith's testimony that Nokia, AT&T,

18   and Qualcomm all reviewed his technology?

19   A.   Yes.

20   Q.   And did you hear his testimony that they all said

21   positive things about his technology?

22   A.   Yes.

23   Q.   Are you saying that didn't happen?

24   A.   Can I correct a previous answer?

25   Q.   Absolutely.
```

1    A.    Yeah.  He offered -- what I heard was that the offer was

2    to enter the Ph.D. program as opposed to handing him a Ph.D.

3    on the spot.

4    Q.    Sure.  Fair enough.  But if I can ask my question again

5    just to make it clear, did you hear Mr. Smith's testimony that

6    Nokia, AT&T, and Qualcomm all said positive things about his

7    technology?

8    A.    Yes.

9    Q.    And you're not saying that didn't happen, are you?

10   A.    I wasn't there.  I can't say.

11   Q.    I mean, you put Nokia, AT&T, and Qualcomm on your slide

12   of companies that did not partner with Mr. Smith.  Right?

13   A.    That's what I heard him say, yes.

14   Q.    But in your direct you didn't actually discuss what

15   Nokia, AT&T, and Qualcomm said to him during those partnering

16   meetings, did you?

17   A.    I did not, other than they didn't do it.

18   Q.    Did you hear Mr. Smith testify on Monday that back when

19   he talked to Nokia and AT&T, they never described his

20   technology as old?

21   A.    He didn't address that.

22   Q.    Oh.  So you didn't hear Mr. Smith testify on Monday that

23   when he went and talked to the Nokia and AT&T, they never said

24   that his -- that they had seen a PIM-C solution like his

25   before?

1   A.   I don't recall the exact testimony, but I don't doubt it

2   if you're telling me they said that.

3   Q.   I mean, do you recall Mr. Smith testifying on Monday that

4   when he went and talked to Nokia and AT&T, they never said his

5   technology was obvious?

6   A.   He did not say they communicated that to him.

7   Q.   You think he didn't say that on Monday?

8   A.   I'm not -- I'm not sure.  Could you state the question

9   more precisely, please?

10  Q.   Absolutely.  Absolutely, sir.  Did you hear Mr. Smith

11  testify on Monday that when he talked to Nokia and AT&T, they

12  never said his technology was obvious?

13  A.   Correct.

14  Q.   But now you're here testifying on behalf of Nokia and

15  AT&T that his invention is obvious.  Right?

16  A.   Yes.

17  Q.   So did you go and interview those Nokia and AT&T people

18  who spoke to Mr. Smith back before this lawsuit and asked

19  them, why do you guys disagree with me?

20  A.   Of course not.

21  Q.   That's all the questions I have for you.  Thank you for

22  your time.

23            MR. GRINSTEIN:  Pass the witness.

24            THE COURT:  All right.  Is there redirect, Mr.

25  Nelson?

```
 1                    MR. NELSON:  Yes, Your Honor.

 2                    THE COURT:  Let's proceed with redirect.

 3                    MR. NELSON:  May I proceed, Your Honor?

 4                    THE COURT:  You may proceed.

 5                    MR. NELSON:  Thank you.

 6                         REDIRECT EXAMINATION

 7     BY MR. NELSON:

 8     Q.   Good morning, Mr. Proctor.

 9     A.   Good morning.

10     Q.   So do you recall some questions yesterday from counsel

11     about a patent of yours with another inventor named Kevin

12     Negus?

13     A.   Yes.

14     Q.   I think it's -- we called it the '540 Patent?

15     A.   Yes.

16                    MR. NELSON:  And may I have the document camera,

17     please?

18     Q.   (BY MR. NELSON)  Now, tell us what we're looking at here.

19     Is this the first page of that patent?

20     A.   Yes, it is.

21     Q.   So now I see there's a column that says, references

22     cited.

23     A.   Yes.

24     Q.   And then other publications.  Can you just tell us what

25     that is?
```

1   A.   Yes.  That's the listing of the patents that we disclosed

2   to the Patent Office as well as the patents that the Patent

3   Office found that they considered during examination and then

4   other publications as well.

5   Q.   So now I see that it says for both references, the U.S.

6   patent documents and other publications, it says continued.

7   Do you see that?

8   A.   Yes.

9   Q.   And what does that mean?

10  A.   That means this is another patent we got after our

11  initial filing of the first patent.

12  Q.   Well, specific to the list of references when it says

13  continued there, what does that mean?

14  A.   Yes.  Continued means it's -- there were too many

15  references that we disclosed to the Patent Office to include

16  on one page.

17  Q.   So now, if I go to the second page, the list continues?

18  A.   Yes, it does.

19  Q.   And I notice on here, if we look over and, for example,

20  three-quarters of the way down in the first column, there's a

21  number of your own patents there.  Is that right?

22  A.   Yes.

23  Q.   And over in the second column on this, we see another 10

24  or 20 of your own patents cited.  Is that right?

25  A.   Yes, that's correct.

1    Q.   So now if I go to the third page, does that list

2    continue?

3    A.   It does.

4    Q.   Okay.  And now we see other publications.  Can you tell

5    us what other publications are?

6    A.   Those are journal articles, papers that are published in

7    magazines or other publications.

8    Q.   And now if I go to the fourth page, and what do we see

9    here?

10   A.   Additional publications.

11   Q.   So there is four pages.  How many references there do you

12   think that we looked at?

13   A.   Oh, a page is 66 lines and two columns.  So call it a

14   hundred per page roughly times four.  Guessing 400 or so.

15   Q.   Okay.  So you mentioned yesterday about this idea of a

16   duty to disclose.  Can you explain to us what your

17   understanding was of that?

18   A.   Yes.  When you're getting a patent, you are honor-bound

19   to provide everything you know that's been published as prior

20   art to the Patent Office because you want to be fair.  You

21   want to put it all out there.

22        And as an inventor, if I know anything, it's easier to

23   just send it.  If it's remotely related, just send it.  And it

24   makes the patent stronger if you do that.

25             MR. NELSON:  So then if we pull up PX 4, Mr.

1    Horseman?

2    Q.   (BY MR. NELSON)   So PX 4 is the '775 Patent.  Is that

3    right?

4    A.   Yes.

5    Q.   Now, if we go down to the first page, you see references

6    cited.

7    A.   Yes.

8    Q.   Do you see that?  And there are two.  Right?

9    A.   Yes.

10   Q.   And if we go to the second page, we see another, say, 25.

11   Is that right?

12   A.   Yes.

13   Q.   Now, in here, just that we're clear, there's two

14   references that say McCalister?

15   A.   Yes.

16   Q.   Are those different from the patent that you've talked

17   about here for the jury?

18   A.   They are.  They're the same inventor as the McCalister

19   reference, but it's a different patent, a different

20   disclosure.

21   Q.   So would that be similar to, if we just looked at your

22   '540 Patent, you had cited your own patents maybe

23   20-something, 30 times?

24   A.   Yes.

25   Q.   Okay.  Now, you see this legend here for the -- it says,

1    asterisks cited by examiner.  Do you see that?

2    A.    Yes.

3    Q.    And can you tell us what that means?

4    A.    There are two ways that patents can -- that publications

5    and patents' prior art can get to the examiner.  One is you

6    send them in yourself, your duty to disclose.

7         The other one is the examiner finds them himself when

8    he's searching.  They have a big database, and they can search

9    on terms.  And if the examiner finds it, it puts an asterisk

10   by the -- the particular prior art.

11   Q.    And so if we go back to the -- well, first, while we're

12   on this page, are there any of the references here that don't

13   have an asterisk?

14   A.    No.

15   Q.    So does that tell you whether Mr. Smith, in terms of the

16   references cited here, submitted any of these references?

17   A.    None of these.

18   Q.    So now let's go back to the first page.  And there were

19   two, and do they also have an asterisk?

20   A.    They do.

21   Q.    So how many references then did Mr. Smith disclose to the

22   Patent Office when he applied for the '755 [sic] Patent?

23   A.    There were none.

24   Q.    And with respect to your '540 Patent and your duty to

25   disclose, about how many were disclosed between you and your

1    co-inventor?

2    A.    Many.  I don't know how many.  Most of them.

3    Q.    Hundreds.

4    A.    Yes.

5    Q.    Does that sound fair?

6          Now, the '134 Patent -- we looked at the '540 and you had

7    cited your own patents several times.  Right?

8    A.    Yes.

9    Q.    And why is it that you would cite your own patents when

10   you're trying to get a new patent?

11   A.    To make sure the examiner had all the information that

12   was available so he could make a good decision.

13   Q.    So is it your understanding that your own patents in some

14   cases can actually be prior art to subsequent patents?

15   A.    Yes.  It happens.

16   Q.    Now, in the list that we just looked at at the '755

17   Patent -- '775 Patent, excuse me, did you see the '134 Patent

18   cited?

19   A.    I did not.

20   Q.    And the '134 Patent, is that actually prior art to the

21   '775 Patent?

22   A.    It is.

23   Q.    And so Mr. Smith didn't even disclose that patent to the

24   examiner?

25   A.    No.

1          MR. GRINSTEIN:  Objection, Your Honor.  This

2   violates a MIL with respect to equitable issues.  May we

3   approach?

4          THE COURT:  Approach the bench.

5          (The following was had outside the hearing of the

6          jury.)

7          THE COURT:  This seems like it's getting awful close

8   to --

9          MR. GRINSTEIN:  Equitable conduct, Your Honor,

10  that's --

11         THE COURT:  -- equitable conduct.

12         MR. NELSON:  No, no, I'm not --

13         THE COURT:  One at a time.

14         MR. NELSON:  Yes, Your Honor.

15         THE COURT:  What's your position, Mr. Nelson?

16         MR. NELSON:  First of all, I'm done with this line

17  of questioning, but the reason is to respond directly to

18  counsel's cross-examination regarding the disclosure of the

19  patent and what the duties to disclose were.

20      He asked Doctor -- excuse me, Mr. Proctor about that

21  yesterday, and so it's only an explanation of why he disclosed

22  the prior art.  The inference was that he disclosed the '755

23  Patent -- '775, excuse me, or at least the application because

24  it was so relevant, and all I'm showing he disclosed every

25  potential thing out there where, in contrast, Mr. Smith didn't

```
 1   disclose anything.
 2            THE COURT:  You're through with this line of
 3   questioning?
 4            MR. NELSON:  Correct, Your Honor.
 5            THE COURT:  Let's move on.
 6            (The following was had in the presence and hearing
 7            of the jury.)
 8            THE COURT:  Let's proceed.
 9            MR. NELSON:  Thank you, Your Honor.
10   Q.   (BY MR. NELSON)  So now can we -- I want to talk about
11   the signal of interest.
12   A.   Yes.
13   Q.   Do you recall some questions about that yesterday?
14   A.   I do.
15   Q.   Okay.  So now here --
16            MR. NELSON:  Could you put up slide 35 from the
17   presentation yesterday?
18   Q.   (BY MR. NELSON)  So here is the Court's construction of a
19   signal of interest.  Can you read that for us?
20   A.   "With respect to the receiver, a signal that the receiver
21   is trying to receive and send, in digital form, to the
22   baseband processor."
23   Q.   And when you went through your analysis, both for
24   infringement and invalidity, is that the construction that you
25   applied?
```

```
1    A.   Yes, it was.

2    Q.   Okay.

3         MR. NELSON:  So now if we could go to your slide 34.

4    Q.   (BY MR. NELSON)  And what is it that Doctor Wells says is

5    the signal of interest in the accused Nokia radios?

6    A.   The transmit signal.

7    Q.   Okay.  So now let's --

8         MR. NELSON:  Mr. Horseman, if we could blow up a

9    little bit the UL(RX) box in the Nahka ASIC.  It's the bottom

10   left corner -- or, excuse me, bottom right corner.

11   Q.   (BY MR. NELSON)  So UL(RX), what is that?

12   A.   Uplink receive.

13   Q.   So remind us what the uplink is.

14   A.   The uplink is the transmission from the mobile phone to

15   the base station.

16   Q.   Is that the signal that the receiver is trying to

17   receive?

18   A.   It is.

19   Q.   Okay.  And can you explain to us why that's the case?

20   A.   Well, because in two-way communications, the base station

21   already knows what it's transmitting to the mobile and what

22   it's trying to receive is what's transmitted by the mobile to

23   communicate with whomever you're talking to.

24   Q.   Now, you were here for Doctor Wells' testimony.  Correct?

25   A.   Yes.
```

```
1    Q.   And did you hear Doctor Wells agree that the uplink RX

2    was the uplink receiver?

3    A.   Yes.

4    Q.   Okay.  And is RX a common abbreviation in your industry

5    for the term 'receiver'?

6    A.   It is.

7    Q.   Okay.  So with respect -- if we go back to the Court's

8    claim construction.  So with respect to your understanding,

9    what's the receiver in the accused Nokia radios?

10   A.   Yeah.  The receiver is the whole path up to the baseband,

11   which is the Nahka ASIC.  So it includes the GROOT all the way

12   up to the A/Ds --

13   Q.   And -- well, let's go back --

14   A.   -- and beyond.

15   Q.   Let's go back to the previous slide.  So here the receive

16   path is, at least in the Nahka ASIC, is where?  Into the

17   uplink RX?

18   A.   Yes.

19   Q.   Okay.  So if we trace that path and if we go out, and you

20   talked about this yesterday, but is the receive path comes in

21   the antenna, is that the case?

22   A.   Yes.

23   Q.   And then the front-end duplexer, remind us what that is.

24   A.   That's here.  The signal comes through here through the

25   LNA, through the A/D converter, through the uplink signal,
```

1    desired signal plus actual PIM that wants to be canceled,

2    through the subtractor where the PIM is removed, through the

3    desired uplink path, following the green path to the uplink

4    receive into the baseband chip.

5    Q.   Now, the downlink transmit signals or sometimes I think

6    it was referred to as the transmit reference signals --

7    A.   Yes.

8    Q.   -- are those provided to the uplink receiver in the Nahka

9    ASIC?

10   A.   No.

11   Q.   And can you explain to us why that's the case?

12   A.   Because it has a separate path.  This red path we

13   discussed goes through a directional coupler, follows this

14   path to a separate analog-to-digital converter into the

15   modeler to generate the estimated intermodulation where it's

16   subtracted from the desired signal there.

17   Q.   And so then does the downlink transmit signal or the

18   transmit reference signal, whoever you refer to that, does

19   that meet the Court's construction of a signal of interest?

20   A.   No, it doesn't.

21   Q.   Okay.  And if we go back to the construction, can you

22   explain to us why that's the case?

23   A.   Well, there's two reasons.  With respect to the receiver,

24   the whole middle part there, it's not a signal that the

25   receiver is trying to receive and pass to the baseband.  It

 1   doesn't go to the Nahka ASIC.  It never goes there.

 2   Q.   Now, if we could go back to the previous -- on the red

 3   path before you get to the home plate shaped RF ADC there.  Do

 4   you see that?

 5   A.   Yes.

 6   Q.   Okay.  So the red path before that, is there any signal

 7   on that path called the PIM model or the model PIM signal?

 8   A.   No.

 9   Q.   Okay.  And were you here for Mr. Davis' testimony

10   regarding that issue yesterday?

11   A.   I was.

12   Q.   And did he agree with you?

13   A.   Yes.

14   Q.   Okay.  Did you hear Finesse's counsel ever ask him a

15   single question about whether that was accurate or the case?

16   A.   No.

17   Q.   Now, let's -- I want to talk about closed loop.  So do

18   you recall some questions from counsel yesterday about the

19   definition of closed loop?

20   A.   Yes.

21   Q.   Okay.

22        MR. NELSON:  Now, Mr. Horseman, if you could put the

23   Court's claim constructions back up.

24   Q.   (BY MR. NELSON)  So if we look at the first page, we

25   don't see any definition, any construction of closed loop.  Is

1    that right?

2    A.   Correct.

3    Q.   And if we go to the second page, is there any

4    construction by the Court of the term 'closed loop'?

5    A.   No.

6    Q.   And if we go to the third page, is there any construction

7    by the Court of closed loop?

8    A.   No, there's not.

9    Q.   And, finally, if we go to the fourth and last page, is

10   there any construction by the Court of closed loop?

11   A.   No.

12   Q.   So without a construction of closed loop, what is your

13   understanding of what you're supposed to do in order to

14   determine whether the accused products actually do what's

15   required by the claim in a closed loop fashion?

16   A.   They use what's disclosed in the patent and the knowledge

17   of one of ordinary skill in the art.

18   Q.   So -- and why don't you from the perspective of one of

19   ordinary skill in the art tell us that understanding of what

20   closed loop is?

21   A.   Closed loop is when you have a process, for instance, in

22   this case a subtractor removing interference, and you look at

23   the result, and then you feed it back to the thing that's

24   controlling how well it performs.  Like a radio, AM radio, as

25   you turn the dial, you keep going like this until it's right.

1    You go, oh, it's staticky there, it's good, and that's the

2    feedback based on the results.  And that's -- that's closed

3    loop.

4    Q.   Now, in the accused Nokia radios, do they perform phase

5    and amplitude adjustments in a closed loop fashion?

6    A.   In the products, they do not.

7    Q.   Okay.  And explain to us why that's the case.

8    A.   Over the last number of years, there have been

9    significant advances in mathematics in how to do very high

10   performing techniques called open loop.  The specific

11   technique is called minimum needs square error.  And you take

12   check a copy of something that's bad in this case and you can

13   generate coefficients that make the other thing look exactly

14   like it.  In fact, that's higher performing than looking at

15   the result.  It's like cloning the signal mathematically.

16        And so you're taking the inputs and you kind of clone the

17   piece of it to make -- figure out how to make one thing look

18   at another.  And those are those weights we talk about.  And

19   so those weights are applied so that in the data they're

20   using, it matches.  But if you keep using those weights, new

21   data will look just like the new signal, too.  Okay?

22        So you're using the branches going into the subtractor as

23   opposed to looking at the result.  You don't need to look at

24   the result because this works better.  It's the same math,

25   this open loop is the same math that has WiFi in your home

 1    getting better year after year.  It's called MIMO.  It's the

 2    exact same stuff, and I've used it in -- in products as well.

 3    Q.    Now, were you -- you were here for Mr. Davis' testimony

 4    yesterday.  Is that right?

 5    A.    I was.

 6    Q.    Now, did you hear Mr. Davis testify at length about the

 7    open loop approach in the accused product?

 8    A.    I did.

 9    Q.    And did you agree with the way Mr. Davis described that?

10    A.    I did.

11    Q.    And remind us what portion of the code for the product

12    that Mr. Davis wrote?

13    A.    He wrote the GROOT ASIC, most of it -- or FPGA.  Sorry.

14    Q.    So did you hear Finesse's counsel ask Mr. Davis one

15    single question about the way he described the open loop

16    operation of the accused radios?

17    A.    No, I didn't.

18    Q.    So I'd just like to ask you a few questions about the

19    Qualcomm.

20         So two -- do you recall Mr. Smith's testimony regarding

21    Qualcomm?  You were asked some questions by counsel?

22    A.    Yes.

23    Q.    Okay.  So that was about the 2004 time frame.  Is that

24    right?

25    A.    It was, yes.

1   Q.   Now, the -- according to Mr. Smith, Qualcomm said, We

2   don't have a problem even though we like your technology.  Is

3   that basically his testimony?

4   A.   Yes.

5   Q.   Okay.  Now, did you hear Mr. Smith testify that in 2011,

6   he saw public articles that PIM was starting to be or PIM was

7   now a problem in the industry?

8   A.   Yes.

9   Q.   Okay.  And did you hear Mr. Smith's testimony that by

10  2016, pIM was a problem and even a greater problem in the

11  industry?

12  A.   Yes.

13  Q.   Did you ever hear Mr. Smith testify that he went back to

14  Qualcomm and said, Well, you liked my technology and now there

15  really is a problem?

16  A.   I didn't hear that.

17  Q.   I thank you, sir.  I have no further questions.

18          MR. NELSON:  I pass the witness, Your Honor.

19          THE COURT:  All right.  Is there additional cross

20  examination, Mr. Grinstein?

21          MR. GRINSTEIN:  Very briefly, Your Honor.

22          THE COURT:  All right.  Please proceed.

23                    RECROSS EXAMINATION

24  BY MR. GRINSTEIN:

25  Q.   Mr. Proctor, Mr. Smith's '134 Patent was in front of the

1    examiner during the '775 prosecution.  Correct?

2    A.    I don't recall.  I don't think it was.

3              MR. GRINSTEIN:  Can we see the '775 Patent, please,

4    Mr. Boles?  If we go to the second page.

5    Q.    (BY MR. GRINSTEIN)  You see the list of references cited,

6    U.S. patent documents, Mr. Proctor?

7    A.    I do.

8    Q.    And if you countdown maybe six or so, what do you see

9    right there?

10   A.    I see that the examiner found it, yes.

11             MR. GRINSTEIN:  No further questions.

12             THE COURT:  Any additional direct?

13             MR. NELSON:  No, sir, Your Honor.

14             THE COURT:  You may step down, Mr. Proctor.

15        Defendant and Intervenor, call your next witness.

16             MR. DACUS:  Thank you, Your Honor.  At this time we

17   call Dr. Stephen Becker.

18             THE COURT:  All right.  Doctor Becker, if you'll

19   come forward and be sworn, please.

20             (Whereupon, the oath was administered by the Clerk.)

21             THE COURT:  Please come around, have a seat on the

22   witness stand, Doctor Becker.

23             MR. DACUS:  Your Honor, may we approach with some

24   binders and notebooks?

25             THE COURT:  You may distribute binders.

```
1              MR. DACUS:  Thank you.

2              THE COURT:  All right, counsel.  You may proceed

3    with direct examination.

4              MR. DACUS:  Thank you, Your Honor.

5                   STEPHEN BECKER Ph.D., SWORN,

6    testified under oath as follows:

7                        DIRECT EXAMINATION

8    BY MR. DACUS:

9    Q.   Doctor Becker, would you introduce yourself to the jury,

10   please, sir?

11   A.   Yes.  My name is Stephen Becker, and I live in Austin.

12   Q.   And what's your role here in this trial, sir?

13   A.   So I am an economic and financial expert, and I'm here as

14   the AT&T and Nokia's damages expert.

15   Q.   Okay.  And for our discussion and question and answer

16   today, have you prepared some slides to both assist us and

17   help the jury in our discussion?

18   A.   I have.

19   Q.   Okay.  Would you give the jury a thumbnail sketch of your

20   educational background, please, sir?

21   A.   Sure.  I started out at the University of Pennsylvania

22   with a Bachelor of Science, a BSE, in computer science and

23   engineering, and my concentration was in computer science and

24   electrical engineering.  I got that in 1981.

25             I then worked in industry for a while.  And back then in
```

1    1984, I went to the University of Texas at Austin where I got

2    an MBA with a concentration in finance.

3         I then again went out and worked for a number of years.

4    And then in around 1991, I enrolled in the Ph.D. program at

5    the University of Texas and received a Ph.D. in public policy

6    with a concentration in an area called econometrics.

7    Q.   Would you also tell the jury a little bit about your

8    professional work background, please, sir?

9    A.   Sure.  The first two logos there on the top of the

10   screen, when I got out of my engineering program at the

11   University of Pennsylvania, I went to work for a company in

12   Houston called Schlumberger.  It's the -- I think at the time

13   was the largest oil field services company in the U.S., and

14   actually worldwide.  I was a systems engineer in their R&D

15   labs in Houston.

16        I left the Schlumberger to start a small computer systems

17   company called The Solutions Group, and I had that company

18   until I decided to go back to get my MBA at the University of

19   Texas.

20        After I finished the MBA program, I went to work for a

21   company called Booz Allen & Hamilton.  It's a very large

22   international management consulting company.  I was based in

23   Dallas and basically traveled all over North America doing

24   business and economic strategy consulting.

25        The logo there Becker & Associates is a firm that I had

1    while I was getting my Ph.D.  I had to find a way to pay for

2    the schooling, and so I hung out a shingle and did some

3    consulting work.

4         And then the last logo there is Applied Economics.

5    That's where I work now.  It's a firm that I formed in 1999,

6    and initially it was just myself and my partner.  And we've

7    grown that firm to about 25 people now in Austin and Houston

8    primarily.

9    Q.   And can you give the jury a little more flavor on what

10   you do at Applied Economics?

11   A.   So at Applied Economics, what the firm does and what I do

12   is kind of what's embedded in the name.  We do applied

13   economics.  Most of the work that we do and that I do is

14   focused on using economic tools to value things.  We do some

15   business valuation.

16        I do -- my primary area of work is in valuing

17   intellectual property and patents, and we also do a lot of

18   valuation of other types of assets.

19   Q.   During your 25 years or so of doing this, can you give

20   the jury some sense of how many times you've served as an

21   expert and analyzed patent infringement damages and royalties?

22   A.   Yes.  I've provided, at least by report, expert opinions

23   on patent damages and the value of patents in cases like this

24   over 150 times.

25   Q.   And these are situations, to be clear, where you're

1  analyzing, reviewing information, coming to conclusions about

2  negotiations between parties related to a patent license and

3  the appropriate royalty.  Is that right?

4  A.    Yes.  In every one of those, that's sort of a basic

5  framework and question that I've been asked to answer.

6  Q.    Now, as you know, this case relates to the

7  telecommunications industry and telecommunications patents.

8  Can you give the jury some sense of whether or not you have

9  any experience in that specific regard?

10  A.    Yes.  I -- the very first patent case where I ever served

11  as an expert on patent damages was not only in the

12  telecommunications area, it was on digital cellular

13  communication systems like the ones that are at issue in this

14  case.  That was almost 25 years ago, back when cell phones --

15  the very first digital cell phones were -- I don't know if

16  anybody remembers, but they were the size of a brick or they

17  called them bag phones.

18       And I worked as a damages expert on one of the very first

19  sort of big patent cases related to the first generation of

20  digital cellular.  And then over the ensuing 20-plus years, I

21  have worked on patent infringement questions in every single

22  generation.  We refer to sort of currently LTE that's on most

23  people's phones as 4G cellular.  Things are coming out with 5G

24  now, but there have been 1G, 2G, 3G, 3 and a half G, 4G.

25       I've had provided expert opinions on patent values in

1  every one of those sort of generations of cellular systems

2  since the very first.

3  Q.   In your experience, have you participated in, been an

4  expert in, these cases on behalf of both patentowners and

5  accused infringers?

6  A.   Yes.  So over the course of my career in that, say, 150

7  patent cases that I've worked on, I've been on -- working and

8  providing opinions for the patentholder about half the time

9  and for the accused infringer or defendant about half the

10  time.

11          MR. DACUS:  Your Honor, at this time we would tender

12  Doctor Becker as an expert on patent infringement damages.

13          THE COURT:  Is there objection?

14          MS. FAIR:  No objection.

15          THE COURT:  Without objection, the Court will

16  recognize this witness as an expert in that particular field.

17      Please continue.

18          MR. DACUS:  Thank you, Your Honor.

19  Q.   (BY MR. DACUS)  Doctor Becker, would you at a high level

20  tell the jury what your specific assignment was in this case?

21  A.   Sure.  I really had two assignments.  The first was to

22  look at the facts and circumstances of this case, review the

23  evidence, and develop an independent opinion about a

24  reasonable royalty, what a reasonable royalty would be for the

25  '134 and '775 Patents if there's a finding that AT&T and Nokia

1    have infringed and that those patents are not invalid.

2         The second category of my assignment was to respond to

3    Doctor Bazelon, Finesse's damages expert, look at what he did,

4    understand his models and develop opinions about whether I

5    think those are reliable or not.

6    Q.   Now, you understand AT&T and Nokia say we do not infringe

7    these patents.  Correct?

8    A.   I understand that.

9    Q.   And we say that these patents weren't new and therefore

10   they're not valid.

11   A.   I understand that, yes.

12   Q.   You also understand because you've done this, neither

13   AT&T nor Nokia nor I nor you nor anyone at that table gets to

14   make that decision.  Right?

15   A.   That's correct.

16   Q.   That's the jury's decision.

17   A.   That's correct.

18   Q.   So in the event that the jury were to decide there was

19   infringement here, is your role to provide them with evidence

20   to make a decision on damages if they get that far?

21   A.   It is.  That's why I have to assume kind of a world where

22   I just put the question of whether there's infringement or

23   validity aside and say, if this becomes a question that the

24   jury has to answer, what is the appropriate or reasonable

25   royalty.

1   Q.   Give the jury some indication of what information you

2   looked at and relied on in coming to your conclusions.

3   A.   So there are lots of documents produced in a case like

4   this.  Back in the day, a long time ago, it was literally

5   mountains of documents, boxes, and rooms full of boxes of

6   documents.  Thankfully today it's all digital.  But still it's

7   lots of documents from AT&T, Nokia, and Finesse, a lot of

8   court documents.

9        There's also expert reports and trial testimony and

10  depositions that my staff and I have read.  And then I've had

11  discussions with Mr. Proctor, the technical expert for AT&T

12  and Nokia, and also discussions with Mr. Taylor, the engineer

13  at AT&T who -- I think he was described as the PIM guy.  I had

14  several discussions with him.

15  Q.   We're going to dig into the details, but would you give

16  the jury a summary of your opinions and then we'll go into

17  exactly how you reached those?

18  A.   Sure.  It's my opinion that, looking at these patents and

19  the facts and circumstances of this case, that the reasonable

20  royalty would be what we call a non-exclusive U.S. license to

21  the patents starting in July of 2018, and if the '775 Patent

22  and really if it's the '775 or both the '775 and the '134

23  Patent are valid and infringed, it's my opinion that the

24  reasonable royalty is $1.35 million.  And if only the '134

25  Patent is valid and infringed, that one expires in 2024, next

1    year, so the time period is much shorter and the number there

2    would be $531,000.

3              THE COURT:  Ladies and gentlemen, I expect this

4    examination to go considerably longer.  I think this is

5    probably a good place to take a short break and at this point

6    I'm going to ask you simply to leave your notebooks in your

7    chairs, follow all my instructions, including not to discuss

8    the case among each other, and I'm going to excuse you for a

9    short recess at this time.

10        We'll be back shortly and continue with Doctor Becker's

11   direct examination.

12        The Court's excused for recess.  Excuse me.  The jury's

13   excused for recess, but the Court's going to take one, too.

14              (Whereupon, the jury left the courtroom.)

15              THE COURT:  We'll try to keep this short.  The Court

16   stands in recess.

17                        (Brief recess.)

18              THE COURT:  Be seated, please.

19        Mr. Dacus, are you prepared to continue?

20              MR. DACUS:  Yes, Your Honor.

21              THE COURT:  All right.  And are you intending on

22   using the chart like that?

23              MR. DACUS:  Yes, Your Honor.

24              THE COURT:  Okay.

25              MR. DACUS:  If that's okay with the Court.

1          THE COURT:  That's fine.

2      Let's bring in the jury, please.

3          (Whereupon, the jury entered the courtroom.)

4          THE COURT:  Please be seated.

5      We'll continue with the direct examination of Dr. Stephen

6  Becker.

7      Mr. Dacus, you may proceed.

8          MR. DACUS:  Thank you, Your Honor.

9  Q.    (BY MR. DACUS)  Doctor Becker, when we left off, you had

10  just given us your summary of opinions with respect to your

11  calculation of a reasonable royalty.

12      I want to just at a high level if you would -- you also

13  told the jury that your second assignment here was to look at

14  what Mr. -- Doctor Bazelon did in this case, and we're going

15  to discuss that in detail.

16      But just as a preview, can you give the jury what your

17  assessment is of what Doctor Bazelon has done in some of his

18  assumptions?

19  A.    Sure.  Obviously we're far apart on our opinions, and I

20  think the primary reasons why Doctor Bazelon gets to a place

21  that's, I think, incorrect and unreasonable, first is that he

22  dismisses important market evidence.  We'll talk about that.

23      The second is a fundamental assumption that he makes

24  where he says that AT&T's value comes from the sort of

25  spectrum value, the value of using the PIM-C.  I think the

1    evidence I've looked at and the testimony I've heard said that

2    the value comes from a voided site hygiene cost.  This is one

3    of the tools in the tool kit for dealing with internal PIM,

4    but the primary thing is site hygiene.  And so that's a big

5    difference of opinion.

6         Third is that he unreasonably assumes that every radio

7    out there that has the PIM-C turned on, that it must mean that

8    there is not just detectable amounts of PIM but enough PIM in

9    the radio, internal PIM, that if you didn't have it turned on,

10   the -- you know, it would be chewing up a bunch of spectrum,

11   and that's just not the case.

12        And, finally, he has some errors that are technical

13   errors in his model that I think lead to contribute to the

14   overstatement of the damages.

15   Q.   Let's begin by looking at the details of how you went

16   about calculating a reasonable royalty in this case.  So tell

17   the jury where you start from, please, sir.

18   A.   So in any patent case like this, this is a technique I've

19   used for all of those 150-plus cases that I've worked on.  I'm

20   asked to imagine that the parties on the patentholder, Finesse

21   Wireless in this case, and the potential licensee, or the

22   accused infringer, what if they had sat down at a table and

23   actually negotiated a license to these patents, what would a

24   reasonable outcome be and something that is reasonable and

25   acceptable to both sides.

1    Q.    Okay.  And I see here on the slide you have Finesse on

2    one side, AT&T on another, and also Nokia.  Correct?

3    A.    Yes.

4    Q.    So Nokia would be in your hypothetical a part of this

5    negotiation?

6    A.    Yes.  In my opinion they would be at the negotiation.  As

7    we've heard, they -- all of the radios that are accused in

8    this case are Nokia radios.  It's the only thing that's

9    accused.  And the only thing within those radios that's

10   accused is this PIM-C software that Nokia designed and

11   implemented.  And they have intervened in this case and are

12   effectively a defendant, so I put them at the table to be part

13   of the negotiation.

14   Q.    And when does this negotiation occur?

15   A.    So it occurs in July of 2018.  And that date is triggered

16   by the first use of the PIM-C by AT&T in one of the accused

17   radios that the evidence indicates that that's when the

18   software was released and pushed out into the field for the

19   radios that AT&T has.

20   Q.    Do you make some assumptions that are required by the

21   Court in this case?

22   A.    Yes.  So in this negotiation, some aspects of it are like

23   a real negotiation and other aspects are -- I have to sort of

24   impose some -- some assumptions.

25         First, I have to assume and I assume the parties at this

1    negotiation would understand the patents to be valid and

2    enforceable.  They would also understand that they need to

3    reach an agreement on a license.  They're not there saying, we

4    don't use it.  AT&T and Nokia are here and have the right to

5    say that in this courtroom, but at the hypothetical

6    negotiation they're all saying, look, we need reach an

7    agreement about this, what's going to be reasonable.

8         On the right there, the reasonable knowledge and

9    expectations and same information, this is a negotiation where

10   the -- essentially the cards are dealt face up instead of

11   people holding information close to the vest.  So things that

12   Finesse would know that maybe AT&T wouldn't know in the real

13   world, they're going to know in this negotiation.  And the

14   same information goes the other way.

15        Finally, both sides are going to act in good faith and

16   must reach an agreement.

17   Q.   So how is it that you go about determining what the

18   result of this negotiation would have been?

19   A.   Well, the good news is there's -- there is a case from

20   1970 called the *Georgia-Pacific* case that was a patent case.

21   And in the opinion that the Court wrote on that, they sort of

22   set out this concept of a hypothetical negotiation as a way to

23   figure out what would be reasonable.

24        And in that ruling or in that opinion, they didn't just

25   say, use this hypothetical negotiation sort of construct; it

1    laid out 15 factors, sort of a checklist of factors that might

2    be considered in the determination of the outcome of the

3    negotiation.

4    Q.   We don't need to go through them at this point, but is

5    this a listing of the 15 factors that you considered and

6    should consider?

7    A.   It is.  This is -- this is a list of the factors and this

8    is the sort of checklist that I start with in every patent

9    case that I work on.

10       One example would be, for example, that very first one on

11   the top left, licenses to the patents-in-suit.  Just like if

12   you were a real estate appraiser trying to figure out the

13   value of a house, one of the first things you may do is look

14   to see whether there's any market evidence of that house being

15   sold or similar houses being sold, sort of comparables.  And a

16   couple of the factors look at that market evidence.

17   Q.   Are there specific factors in this case that you consider

18   more important than others?

19   A.   Yes.  So I always go through the list and consider them

20   all, and in each case the evidence sort of leads you in one

21   direction or another.  And in this case, the nature of the

22   technology and the -- the ways in which it creates value sort

23   of lead me to the four factors that I have highlighted here

24   that really look at the question of the benefits provided to

25   AT&T by this patented technology.

1    And so we're looking at the advantages of the technology

2    over the prior art, you know, what's the nature of the

3    benefits.  That's an important thing, what is the nature of

4    the benefits, and we'll talk about that.  This is related to

5    site hygiene.

6    Q.   So describe for us, if you would, what you -- what you

7    found with respect to the benefits of the patented technology

8    in this case and that impacts your reasonable royalty?

9    A.   Yes.  So three primary conclusions that I reached about

10   that whole sort of technical benefits and the way AT&T derives

11   benefits, first is that AT&T primarily uses site hygiene to

12   resolve internal PIM issues, addressing the root cause.  If

13   there's a loose connector, they go fix it.

14       Second is a very small fraction of the radios in AT&T's

15   network at any given point in time are going to be

16   experiencing internal PIM at problematic levels.  We heard Mr.

17   Taylor talk about that quite a bit.

18       And, finally, that the economic benefit to AT&T from the

19   Nokia PIM-C software is avoided trips out to the tower --

20   either avoided or delayed trips out to the tower, to go fix

21   the cable or the connector or the antenna that's causing the

22   internal PIM.

23   Q.   You were here when Doctor Bazelon testified.  Correct?

24   A.   Yes.

25   Q.   And we're going to go through his assumptions in a

1   minute, but just so -- as we go through this, your first point

2   that AT&T primarily uses hygiene, you know that Doctor Wells

3   and Doctor Bazelon on behalf of Finesse, you heard them both

4   say that your assumption is site hygiene does not cure

5   internal PIM.  You heard them say that?

6   A.   Yes, I heard that, and obviously at the time I wrote my

7   report, I hadn't heard that.  But certainly in Doctor Wells'

8   report and in Doctor Bazelon's report, he makes it very clear

9   that he based his opinion on an assumption that site hygiene

10   was not an alternative to reducing PIM or curing PIM with

11   PIM-C.

12   Q.   Likewise, with respect to your second bullet point, that

13   a small fraction of radios have problematic PIM, you were here

14   when Doctor Bazelon said his assumption was that if PIM

15   cancellation was on, that PIM was present.  So that's another

16   disagreement between the two of you?

17   A.   It is.

18   Q.   Let's dig into this site hygiene issue.  Explain to the

19   jury the basis for your assumption and your conclusion that

20   AT&T utilizes site hygiene to cure this internal PIM issue.

21   A.   So my first basis here was talking to Mr. Taylor who, as

22   we heard, is the PIM guy at AT&T.  I had several conversations

23   with him.  And what he told me is also reflected in a number

24   of different documents, which is that internal PIM, the nature

25   of that, it's the loose connector, it's something in the cable

1    from the radio to the antenna or right there on the tower.

2    It's not the parking garage across the street, the

3    air-conditioning unit, you know, coming on and off.  It's just

4    right there in the feed line.

5        And he made it very clear to me that those are

6    identifiable problems when they do crop up and they just go

7    fix them.  They're not going to leave them to just be causing

8    problems.  Since they know how to fix it, it's easy.

9    Q.   As part of your work, do you agree that it's important to

10   make sure we are distinguishing between external and internal

11   PIM in this case?

12   A.   Yes.  That was one thing that became very clear to me

13   looking through the documents is that external PIM, things

14   caused by like the air-conditioning unit on the building

15   across the street that comes on and goes off and comes on and

16   maybe is causing problems when it's on but not when it's off,

17   that's all external PIM.  And both Mr. Taylor and the

18   documents reflect that that's a very challenging problem, very

19   challenging.  But that's not what the PIM-C in this case

20   addresses.

21       So I don't think there's any dispute that the Nokia

22   software only addresses that internal line PIM.  And so it's

23   really important to distinguish between the two because there

24   are documents that suggest that the external PIM is a really

25   big problem, but that's not what we're talking about.

1    Q.   You were here in the courtroom for both Mr. Loddeke's

2    testimony and Mr. Taylor's testimony.  Correct?

3    A.   Yes.

4    Q.   And based on that and the information that you have in

5    this case, what do you understand AT&T's strategy to be for

6    dealing with and curing internal PIM?

7    A.   So two main things.  If we click on the first click on

8    this slide, this is this sort of various steps.  We saw this

9    document, I think, with Mr. Loddeke.

10       And this first one, for me at least, is very important,

11   which is that AT&T does not accept a cell site or a new radio

12   installation from its vendors unless it has been demonstrated,

13   not just assumed to be free of internal PIM, it's demonstrated

14   through testing, sort of like when you go to a car dealership

15   to pick up your new car, you're going to walk around and at

16   least make sure it's in perfect condition because it's brand

17   new.  You're not going to drive it off the lot with squeaky

18   brakes or rattles or, you know, wobbly tire.  So the very

19   first thing they do is make sure they never put a cell site or

20   a radio into service if it's not absolutely PIM free.

21       And so given that, that's the sort of first three steps,

22   you're not going to have internal PIM on anything unless it

23   has sort of crept in over time.  And the last step there --

24   Q.   Let me ask you this.  What do they do if -- what's your

25   understanding of how AT&T addresses the internal PIM if you

1    issue -- if it does creep in over time, so to speak?

2    A.   So this fourth step in the -- in the sort of chain of

3    events is post installation, and we can see here that the PIM

4    problems are addressed primarily with in-depth PIM clean-up.

5    And this is consistent with what I learned from Mr. Taylor and

6    heard from Mr. Loddeke's testimony.

7    Q.   In the course of your work in this case, did you see

8    anything or did you hear anything from -- in the course of

9    this trial that said AT&T would cure this internal PIM issue

10   by going to buy spectrum?

11   A.   No.

12   Q.   Based on your expert analysis, would going buy spectrum

13   be a reasonable economic cure for this internal PIM issue?

14   A.   No, it wouldn't.  I mean, it's -- as we heard Mr. Taylor

15   say, they -- if internal PIM is present, it's not a mystery

16   how to fix it, they just need to send somebody out to fix it.

17   Q.   And so I want to make sure we have a clear answer on this

18   issue.  With respect to the PIM cancellation process that's in

19   these products, is it your position or AT&T's position that it

20   is completely worthless?

21   A.   No, not at all.  It -- it does provide value.  And we'll

22   talk a little more about the way it provides value with some

23   real actual numbers, but it provides value as a tool, one of

24   the tools in the toolkit.  And the real value is in delaying

25   or avoiding some quantity of site visits to fix the PIM.  But

```
 1    the PIM is going to be fixed eventually by a site visit.

 2    Q.   To be clear, we believe the PIM cancellation in the Nokia

 3    products works differently from the patent.  Correct?

 4    A.   Yes.

 5    Q.   But to the extent the jury's determining the value of it,

 6    we believe it has a value, just not a significant one.  Is

 7    that fair?

 8    A.   Well, I think, you know, the value that I've calculated,

 9    I frankly consider that it's in the millions of dollars of

10    overall value that I believe should be shared -- would be

11    shared in a hypothetical negotiation with Finesse.  That's

12    significant, but it's not the magnitude of numbers that Doctor

13    Bazelon's assumptions lead to.

14    Q.   Very good.

15         Tell us about your second benefit that you've looked at

16    with respect to the PIM cancellation technology.

17    A.   So the second critical question is, how prevalent is

18    internal PIM.  And my conclusion from the evidence is that a

19    very small fraction of the radios, the Nokia radios that have

20    this PIM-C capability, in only a small fraction of those would

21    there be internal PIM present if you didn't have the PIM-C.

22    Q.   And what's the basis for you saying that?

23    A.   Well, one -- my initial basis is talking to Mr. Taylor

24    and understanding in particular that they won't accept a cell

25    site if it has internal PIM.  And so since the internal PIM
```

1    comes from -- if it's present, it's coming from some sort of

2    defect in the components or in the way they were installed, if

3    you have this strict policy of never accepting a cell site

4    until it's been proven to be internal PIM free, that by itself

5    says that it's not going to be very prevalent.

6        Also, then the process they go through to address the

7    internal PIM further reduces the likelihood that it would

8    occur.  And there's also data that suggests that kind of

9    allows me to calibrate how much there is.

10   Q.   Were you here when Mr. Taylor, Mr. Mike Taylor,

11   testified?

12   A.   Yes.

13   Q.   And you saw him present that data or information about

14   the measurement of how often internal PIM is present?

15   A.   Yes, I was here for that.

16   Q.   Okay.  And is that information you had before this trial

17   through your discussions with Mr. Taylor and in performing

18   your calculation?

19   A.   Yes.  I rely on -- on that same data that he presented

20   for some of my calculations.

21   Q.   What did that data or information say to you and how does

22   that fit into your analysis?

23   A.   So what -- what I can infer in sort of and sort of my

24   take-away from the test data that Mr. Taylor presented is that

25   if we sort of look at all the Nokia radios in the network, and

1    this number here, 84,733, that's -- that's the number of

2    accused Nokia radios in 2020, just pull that number as an

3    example, Mr. Taylor's test data suggests, and I think gives a

4    pretty strong indication, that less than two percent of those

5    radios have problems in the line, with the connector, or

6    something that would be causing any amount of detectable

7    internal PIM.

8    Q.   Now, with respect to this less than two percent number,

9    did you have information or did you rely on information that

10   Mr. Taylor presented to the jury just yesterday?

11   A.   Yes.  So this table is essentially sort of my version of

12   the table that he presented, and I think he talked about these

13   two numbers.  The top one that I've got is the detectable

14   levels of PIM.  This is where he ran the test, and it's 1.98

15   percent.  So less than 2 percent have even detectable levels.

16        But as he explained, the point at which it

17   becomes -- would even be impacting the performance of the cell

18   site is quite a bit -- you need quite a bit more internal PIM

19   than just detectable PIM, and that's that lower number the

20   1.19 percent, which is impacting what we call KPIs, the key

21   performance indicators, for the way the radio is performing.

22   Q.   Was there information in the study done by Mr. Taylor and

23   AT&T that also told you whether or not in that 1.19 percent of

24   times that internal PIM is above the threshold, whether or not

25   PIM cancellation actually works to cancel it?

1    A.   Yes.  So the -- the nature of the test that -- and

2    analysis that Mr. Taylor was able to do tells us two

3    interesting things.  One is how prevalent is it, but also

4    because he can look at where it's on versus where it's not on,

5    we see that the PIM cancellation technology actually only sort

6    of fixes the problem.  If you were having an impact on the

7    KPIs, turn it on, it doesn't make it all go away.  It's only

8    in about 30 percent of the sites would you expect that the PIM

9    cancellation software gets you back into sort of the -- where

10   it isn't impacting the KPIs.

11       So the take-away is that it's not happening very

12   frequently, and where it is happening the PIM cancellation

13   software is in the Nokia radios that's accused is only curing

14   the problem 30 percent of the time.

15   Q.   Let's compare this data and information from AT&T that

16   you relied on to Doctor Bazelon.  And how much of the time did

17   Doctor Bazelon assume that internal PIM was present?

18   A.   100 percent of the time.

19   Q.   So --

20   A.   Well, let me -- let me clarify.  He assumes that -- he

21   looks and he sees that the PIM cancellation software is on in

22   78 percent of the radios in the -- of the Nokia radios that

23   have it as a capability.  He assumes that if it's on, there

24   must be not just any PIM but enough internal PIM that it would

25   be causing problems in a hundred percent of those where it's

1    turned on.

2    Q.   So for those turned on, Doctor Bazelon assumes a hundred

3    percent.  Correct?

4    A.   Yes.

5    Q.   AT&T's study and the information you relied on says it's

6    present in 1.19 percent at a detectable level.  Is that a fair

7    summary?

8    A.   Well, at a level that's impacting performance.  Less than

9    2 percent, right about 2 percent at even detectable levels,

10   whereas he's assuming a hundred percent.

11   Q.   Now, with respect to the number of times in that 1.19

12   percent that PIM cancellation actually cancels the internal

13   PIM, what does Doctor Bazelon assume in this second one?

14   A.   A hundred percent.

15   Q.   A hundred percent.

16   A.   A hundred percent.

17   Q.   And the information you relied on from AT&T would say how

18   much percent?

19   A.   Roughly 30 percent.  A little less than a third.

20   Q.   What's the third piece of information or the third

21   benefit that you looked at in your analysis?

22   A.   So my third sort of key finding here is that the -- as an

23   economist, when I'm going to say, okay, now I've looked at

24   this technology, how it's used, what impact is it having, what

25   is the economic benefit.  And it's very clear to me that the

1    economic benefit that AT&T receives from this Nokia PIM-C is

2    cost savings in the form of a reduced number of site hygiene

3    visits.  They can go out there less frequently and sort of let

4    the fix happen later or maybe actually avoid some trips out to

5    the towers.

6    Q.   Were you able to put this economic benefit to AT&T in

7    dollars and cents?

8    A.   Yes.

9    Q.   Explain to the jury how you went about calculating the

10   saved costs or saved hygiene costs.

11   A.   Right.  So what I've got right here is the sort of path I

12   followed to get from the data to a cost savings attributable

13   PIM-C.  First is -- that first box is just what's the total

14   number of radios out there that have this PIM-C on it.

15   Obviously if it doesn't have PIM-C on the radio, you're not

16   going to get any benefit from it.

17        Second is the percent of sales that have -- that would

18   have internal PIM problems, any problem for the software to

19   cancel.

20        Third is that thing we just talked about, which is that

21   what percent of the time does PIM-C actually solve the

22   problem.

23        If I take those three factors, I get the number of

24   avoided site hygiene visits.  I can then take that avoided

25   site hygiene visit number and multiply it by the cost per site

1    hygiene visit, and that gives me the cost savings that are

2    attributable to having this Nokia PIM-C software.

3    Q.    How did you go about filling in the -- the numbers that

4    you needed to make that calculation?

5    A.    Right.  So the first number, the number of radios in the

6    network, AT&T produced a bunch of data that lets us count up,

7    and I think Nokia produced data, too, that Doctor Bazelon and

8    I have access to that tells us how many radios are out there

9    during any given point in time that have this PIM-C

10   capability.  So I've got that.

11        Second is those factors of the prevalence of internal PIM

12   and how frequently the PIM-C software will fix it, come from

13   that national test data that Mr. Taylor talked about.

14        The third key thing that I need is the cost-per-site

15   hygiene visit.

16   Q.    Let's talk about how you obtained that information.

17   A.    So this comes from a document that I believe Mr. Loddeke

18   talked about.  AT&T tracks its -- they use third-party vendors

19   to go out to the towers whenever there's a problem.  They will

20   generate what's called a trouble ticket or a repair ticket

21   when they have a problem, need to send somebody out.  And then

22   the vendor goes out and they send people up the tower and they

23   fix it, or they do what they can.  And they keep track of this

24   data.

25        And we can see they keep track of it by year, which is

1    good, and they keep track of it -- they sort of separately

2    track internal PIM trouble visits versus internal PIM visits.

3    That's good.  Allows me to get more precise.  And then,

4    finally, they even track it by the type of radio.  So we've

5    got a number by year for the tower visits to address internal

6    PIM specific to the Nokia/Alcatel-Lucent radios.

7              MR. DACUS:  Ms. Brunson, may I have the document

8    camera briefly, please?  Thank you.

9    Q.   (BY MR. DACUS)  I want to ask you about one issue

10   on -- do you remember Mr. Taylor presented the studies

11   yesterday about when PIM is present?  Do you remember that?

12   A.   Yes.

13   Q.   You were here when Mr. Ward questioned him about whether

14   or not that was a one-off?

15   A.   Yes.

16   Q.   And you remember Mr. Taylor saying, no, I think internal

17   PIM is consistent.  So it's not a one-off since it's

18   consistent; we can use that data and information.  You were

19   here for that testimony?

20   A.   Yes.

21   Q.   Now, what I have on the screen here, this is information

22   you've seen.  Correct?

23   A.   Yes.

24   Q.   This is the information that you were just showing us the

25   summary of related to the tower vendor repairs?

1    A.   Yes.  I rely on this exactly what you've got up on the

2    screen for my analysis.

3    Q.   How long of a period does this cover?

4    A.   Oh, about six years.  It's 2017 through 2022.

5    Q.   Okay.  And so on this issue of whether or not internal

6    PIM is consistent, is it true that if we want to know the

7    number of times that internal PIM was repaired, there was a

8    ticket generated, we can look at this line item PIM/RSSI?

9    A.   Yes, it's highlighted in yellow in every year of this

10   table.

11   Q.   And remind us, this is about out of a million radios in

12   the network.  Correct?

13   A.   Yes.  So this isn't limited just to radios that are at

14   issue in this case.  This is all the internal PIM issues

15   across the whole network, which is just shy of a million

16   radios.

17   Q.   So for this six years or so, if we wanted to look at

18   internal PIM and how many tickets were generated, that would

19   be the numbers that I'm putting a red dot beside.  Is that

20   accurate?

21   A.   It is.

22   Q.   And so, roughly speaking, each year it's about 3,000

23   tickets for internal PIM.  Is that fair?

24   A.   Give or take, yes.  But it's -- considering the magnitude

25   of the number, it's pretty consistent.

1          MR. DACUS:  If we can go back to the display Ms.

2    Brunson?  Thank you.

3    Q.   (BY MR. DACUS)  Let's finish up your discussion on the

4    calculation of the saved costs if we could, Doctor Becker.

5    A.   Yes.  So before I had the sort of graphic of the

6    ingredients here, I'm going to walk through how the actual

7    numbers work.  And I'm using 2020 as an example year.  So the

8    first step was the total accused radios.  In 2020, that's

9    84,733.

10   Q.   Can I pause you there?  Doctor Bazelon used 64,000; you

11   use 84,000.  Is there -- how do we -- why is there a

12   difference?

13   A.   Well, he's only looking at the radios where it's actually

14   turned on, and then he assumes in those that there's a big

15   problem in all of those.  To be conservative, I'm applying

16   this calculation to all the accused radios that have the PIM-C

17   capability, whether they at any given point in time have it

18   turned on or not.

19   Q.   Okay.  I apologize for interrupting.  Please continue.

20   A.   Okay.  Then we've got to 1.19 percent, how often is there

21   going to be a problem if you didn't have the PIM-C capability.

22   Q.   Let me pause you there.  One additional question with

23   respect to this total accused radios of 84,000.  How many

24   radios are there in the total AT&T network?

25   A.   Just under a million.

1   Q.   Okay.  And to the extent the jury has been left with the

2   impression that every Nokia radio in the network has PIM

3   cancellation, is that a correct assumption?

4   A.   No.  About 30 percent of the network is Nokia radios.

5   So, round numbers, between 250- and 300,000 Nokia radios in

6   the network and only 84,000 of those.  So very -- maybe it's 8

7   percent of all the radios in the network, and a pretty small

8   fraction of the Nokia radios are the ones that have this

9   capability.

10  Q.   So from what I heard you say, the bottom line is there

11  are several hundred thousand Nokia radios in the AT&T network

12  that do not have PIM cancellation.

13  A.   Yes.

14  Q.   Okay.  What's the next thing you did in your calculation?

15  A.   So taking that, what I call, the incidence rate, what's

16  the likelihood that you have a radio that has internal PIM, I

17  can get to an estimate that there would be 1,308, just over a

18  thousand radios, with internal PIM where you've got a loose

19  connector or something going on that's impacting KPIs.

20       I then apply --

21  Q.   What's the next step?

22  A.   I'm sorry.  I then apply -- we've got hard data that says

23  this PIM cancellation software doesn't fix all of those.  In

24  fact, it's only -- it's less than a third.  So I apply that

25  factor of 29.8 percent, and that tells me that the PIM

1    cancellation software, my estimate is that they would delay or

2    outright avoid a trip out of the tower in 300 towers, 301.

3    Q.   And so how do you take that number and turn it into a

4    saved dollar amount?

5    A.   So that's an easy step which is we have these costs that

6    are tracked very detailed by year.  I can take in 2020, it was

7    $2,619.  And that gives me an avoided cost for 2020, if we

8    click the next click, of $788,017.

9    Q.   And then how do you go about calculating the amount of

10   royalty based on these saved costs?

11   A.   So I've got a -- you know, it wouldn't be rational to

12   charge as a royalty all the benefit that you're going to get.

13   There has to be some savings of that because it's a

14   negotiation over the amount of the benefit that really it

15   should be -- is attributable to pay to Finesse as opposed to

16   AT&T needs to keep it.

17        So there I looked to Doctor Bazelon.  He has a model that

18   he uses to kind of figure out in a negotiation between Finesse

19   and AT&T what Finesse would -- what's a reasonable share for

20   them.  17.6 percent.  He's their expert, he says that's the

21   share they would ask for.  I don't see any reason to doubt

22   that.  So I'm willing to adopt that 17.6 percent sharing of

23   the benefits that Doctor Bazelon says.

24   Q.   So was that the last step or what is the last step in

25   this calculation?

1    A.    So that takes me down to a Finesse share of AT&T cost

2    savings of $138,921 for this one year.

3    Q.    And is that where you stop at one year?

4    A.    No.  So I then took -- I have a model that's in my report

5    that takes this same calculation every year from 2018 all the

6    way through to patent expiration in the sort of longest time

7    period of 2029, September of 2029, or the shorter time period

8    of just until next year, through late 2024.

9    Q.    And so what's the overall summary of this cost savings

10   that AT&T would -- would experience from the PIM cancellation

11   and the calculation of the royalty associated with it?

12   A.    Right.  So I've -- I've tried to summarize kind of the

13   different ways I looked at it.  First is I ran the model

14   twice, one saying how many site visits would there be avoided

15   if there's a site visit every time and only when these key

16   performance indicators are impacted by the internal PIM.

17   Those are the lower numbers here.

18        And for the longer time period, it's $964,000, and for

19   the shorter time period, it's $378,000 and some change.

20   Obviously if you -- if I assume very conservatively that

21   you've avoided a truck roll, even if there was detectable PIM,

22   the numbers are going to be higher.  So there we get 1.7

23   million in the longer time period and 683,000, 684,000, in the

24   shorter time period.

25        The average of those for the longer time period is

1    $1,352,819, and for the shorter period, $531,267.

2    Q.   Okay.  Let's look at some of the other factors that

3    you're required and the jury's required to look at in this

4    reasonable royalty determination.  Can you tell us what you

5    looked at?

6    A.   So there are three factors in these 15 factors that I

7    generally would say are looking at market data.  One of them

8    is what market data do we have from Finesse.  Another one

9    looks at, is there any market data from AT&T and Nokia about

10   licensing similar technology.  And the third one is, what

11   about just generally in the industry.

12        So these three factors together are really what we call

13   market data or the market approach.

14   Q.   And what information did you have in this case in that

15   regard?

16   A.   So there are no actual licenses that Mr. Smith or Finesse

17   were able to enter into.  But we heard testimony, when Mr.

18   Smith testified, that he approached a company called

19   Intellectual Ventures in 2011 and offered to sell the patents

20   to them.  And so I've looked at that data to sort of glean at

21   least what their asking price was.

22   Q.   You were here when Doctor Bazelon testified that this

23   potential sale in 2011 was for the portfolio of five patents?

24   A.   Yes.  The Intellectual Ventures' notes and the testimony

25   around this makes it clear that what he was offering was the

1    entire PIM-C portfolio that I think was five patents.

2    Q.   And you may have said and I didn't hear you and I

3    apologize:  Did you say what the asking price was by Mr.

4    Smith?

5    A.   So if -- if we look through here in -- in this

6    correspondence, he approached them in June of 2011 and asked

7    for their level of interest, and we saw that Intellectual

8    Ventures in their internal notes said, Yeah, we might be

9    interested, but you need to tell us what you're asking.  And

10   they actually indicated that a couple of times, you need to

11   tell us what your asking price is.

12        And then on August 23rd, the CEO of Finesse talked to

13   Sherri Richman, the Intellectual Ventures' person, and

14   communicated that the asking price was $3 million.  And then

15   they reiterated that asking price in November of 2011 of 3

16   million.

17   Q.   So as an economics and damages expert, why is that

18   important to your and the jury's analysis in damages here?

19   A.   Well, I think if we think back to that picture that I

20   have of the negotiating table with the parties sitting there

21   and also that the cards are dealt face up, so I think it's

22   important to know that one of the parties, the seller of the

23   license, at that negotiation had -- we have evidence that they

24   were willing to sell outright these two patents and three

25   others for $3 million.

1       And if they were willing to sell it for that, it gives me

2   as an economist some indication of what a reasonable royalty

3   would be, which is less than owning the patents; it's just

4   having the right to use them.

5   Q.   Were you here when Mr. Smith testified that he went back

6   to Intellectual Ventures in 2016 --

7   A.   Yes.

8   Q.   -- to sell?

9   A.   Yes.

10  Q.   And you heard him say that they declined his offer even

11  in 2016?

12  A.   Yes.  So they didn't reach a deal in 2011, and in 2016

13  they didn't reach a deal.

14  Q.   And just to -- you were here when Mr. Smith said that by

15  2011 he -- at least his understanding was that PIM, external

16  and/or internal, was an issue in the industry.  Correct?

17  A.   Yes.  He indicated that, and I think what he more

18  importantly indicated is that his understanding of that, I

19  think he had been aware of it for years, but that industry

20  literature was beginning to recognize PIM as a real problem by

21  2011.

22  Q.   Were there additional factors that you looked at and you

23  believe the jury should look at in determining a reasonable

24  royalty here?

25  A.   Yes.  So there are two more factors, and this is really

1    the last of the factors that had an impact on my opinion and

2    that I think are important.  These are the duration and term

3    of the license and the nature and scope of the license.  This

4    kind of looks at what sort of license would AT&T get in this

5    negotiation.

6    Q.   And how does that, in terms of dollars and cents, how

7    does that come into play into your calculation and analysis?

8    A.   So that's important because in considering this market

9    data, this $3 million offer to sell, their asking price for

10   all five patents, was to have Intellectual Ventures own the

11   patents outright.  But the nature of this license is that AT&T

12   would just be getting a non-exclusive license, sort of instead

13   of selling somebody, if you have an apartment building here in

14   Marshall, and the difference between offering to sell the

15   building for $3 million versus renting one apartment.  It's

16   a -- it's a part of the value of owning the patents would be

17   the value of a non-exclusive license.

18   Q.   And so how do you put that into dollars and cents for

19   purposes of a royalty calculation?

20   A.   So I think economically it's reasonable to look at the

21   whole pie as the value of this technology to sort of the

22   entire market and then look at AT&T's market share as of the

23   July 2018 negotiation, which was about 38.5 percent, that if

24   Finesse had licensed them, they'd essentially be carving off

25   about 38.5 percent of the licensing potential of this

1    portfolio of patents.

2        And so I've done that math.  You peel out 38 percent of

3    it, and you get $1.155 million.

4    Q.   Now, having looked at all of this information in its

5    totality, did you reach a conclusion as to what a reasonable

6    royalty would be in this case?

7    A.   Yes.

8    Q.   And what is that?

9    A.   So it's my opinion that if the patents are found to be

10   valid and infringed, that a reasonable royalty would be $1.35

11   million for a non-exclusive license to AT&T for the '775, and

12   I should say the '775 and/or both the '775 and '134 Patents.

13   Q.   Okay.  And what about if only the '134 Patent is

14   infringed and found not invalid?

15   A.   So if it's only the '134, that's the shorter time period,

16   it would be $531,000.

17   Q.   And just the jury a flavor of this 1.35 million.  All the

18   considerations, the fact -- did you take into consideration

19   all those factors that we've discussed?

20   A.   Yes.  I considered everything.  And the primary thing,

21   the real driver, you'll recognize that number is basically

22   that Finesse's share of the cost savings, because I think that

23   gets right to the heart of specifically what value was created

24   by AT&T's use of this Nokia software.

25       I used the market evidence, that sort of $3 million and

1   the resulting piece that would be attributable to a

2   non-exclusive license as a reasonableness check and sort of

3   told me that the cost savings numbers were also leading me to

4   a reasonable number.

5   Q.   Let's discuss for just a minute your response to Doctor

6   Bazelon's damages expert report.  Is that okay?

7   A.   Yes.

8   Q.   First of all, do you agree with Doctor Bazelon's numbers?

9   A.   No, not at all.

10  Q.   Okay.  Help us understand why you have a disagreement?

11  A.   So the first is that I think he dismisses this market

12  evidence.  He purports to have looked at a negotiation.  But I

13  think in a negotiation if the parties know that Doctor Smith

14  was trying to sell these patents and the asking price, not

15  even what other people were willing to pay, their outright

16  asking price was $3 million, Doctor Bazelon's numbers are

17  just -- just don't make sense in that world.  So I think his

18  dismissal of that market evidence is unreasonable.

19  Q.   Were you here when Doctor Bazelon also said that he did

20  not take into consideration the fact that the oldest of these

21  patents had been in existence for 15 years and that no one had

22  taken a license?

23  A.   Yes.

24  Q.   What's the second key issue you have with Doctor

25  Bazelon's opinion?

1  A.   Yes.  So this is where we're really kind of ships passing

2  in the night.  I think the evidence makes it clear that the

3  value of this technology to AT&T, the way they've deployed it

4  in their network, is avoided site hygiene costs.  It's not

5  avoided spectrum purchases, and this -- all this sort of talk

6  about you would need more spectrum if you didn't have this

7  technology.

8  Q.   This all goes back to Doctor Bazelon and Doctor Wells

9  saying that site hygiene will not cure internal PIM.  Correct?

10 A.   Yes.  I think it's even bigger than that because it

11 certainly depends on that assumption that you can't cure it,

12 but it also depends on the assumption that if you had to turn

13 it off, that the -- this internal PIM out there would be so

14 prevalent that it would chew up so much spectrum, that AT&T

15 would have to go buy more spectrum and there's just no

16 evidence of that.

17 Q.   What's the third key issue you have with Doctor Bazelon's

18 damage opinions?

19 A.   All right.  We talked about this, is that he assumes

20 just, it's right there in his model, that if PIM-C was

21 enabled, that there is a significant enough internal PIM

22 problem that, if you didn't have it on or couldn't use it,

23 that it would be causing a serious problem that would chew up

24 a bunch of spectrum in that radio site.

25 Q.   What's the fourth key issue you have with Doctor

1    Bazelon's opinions?

2    A.   So the fourth issue is really there is some technical

3    issues with his approach.  And I think this came out when he

4    testified and -- and with Mr. Taylor, and that's -- one of the

5    first steps in Doctor Bazelon's modeling, he put up a graph

6    that had a bunch of dots where he sort of interpolated a line.

7    He's trying to determine the relationship between PIM and the

8    impact on upload and download speeds, and his starting point

9    for that was this Los Angeles test that AT&T did.

10   Q.   Can I stop you there, Doctor Becker?

11        So up here we wrote when we questioned Doctor Bazelon,

12   whether or not he assumed that internal and external PIM have

13   the same effect on throughput, and you remember he said he

14   made that assumption.  Do you remember that?

15   A.   Yes.

16   Q.   So is that what you're addressing here, at least in part?

17   A.   Yes, that's precisely what I'm addressing.

18   Q.   So you were in the courtroom when Mr. Taylor showed the

19   difference through those graphics of internal PIM effect

20   versus external PIM effect.  Correct?

21   A.   Yes.

22   Q.   And so what's your understanding as to whether or not

23   this assumption is accurate that they have the same affect on

24   throughput?

25   A.    It's my understanding from Mr. Taylor's testimony that

1    they would -- that that's a flawed assumption, and he's making

2    an assumption about -- that he can use that Los Angeles test

3    data, but it's going to dramatically overstate the impact of

4    internal PIM.

5    Q.   Do you remember those graphics yesterday that Mr. Taylor

6    presented, that external affected all four receivers in the

7    antenna?

8    A.   Yes.

9    Q.   And how many receivers did the internal PIM affect?

10   A.   One.

11   Q.   As part of this, you remember I asked Doctor Bazelon

12   whether he assumed that equipment in that Los Angeles study

13   being the P614 Ericsson equipment cured internal PIM?

14   A.   Yes.

15   Q.   And that was his assumption.  Correct?

16   A.   Yes, it was.

17   Q.   What's your understanding as to whether or not the P614

18   related to internal or external PIM?

19   A.   It's my understanding that the equipment that was used in

20   that test is exclusively looking and addressing external PIM.

21   Q.   And is that based on information from Mr. Taylor --

22   A.   Yes.

23   Q.   -- and Mr. Loddeke?

24   A.   Yes.

25   Q.   So just so we can summarize, would you summarize what,

1    based on your work that you've done in this case, you believe

2    a reasonable royalty would be for a license starting in July

3    of 2018?

4    A.   Yes.  As I indicated at the beginning, it's my opinion if

5    the patents are found to be valid and infringed, that a

6    reasonable royalty would be $1.35 million.  If only the '134

7    Patent is valid, it would be the smaller of those two numbers,

8    $531,000.

9    Q.   That's all the questions I have for you, Doctor Becker.

10            MR. DACUS:  I pass the witness, Your Honor.

11            THE COURT:  All right.  Cross examination by the

12   Plaintiff.

13            MS. FAIR:  Yes, Your Honor.  May I have leave to

14   hand out the binders?

15            THE COURT:  You may.

16       All right, Ms. Fair.  You may proceed with cross

17   examination.

18            MS. FAIR:  Thank you.

19                       CROSS EXAMINATION

20   BY MS. FAIR:

21   Q.   Good morning, Doctor Becker.

22   A.   Good morning.

23   Q.   We know each other.  Right?

24   A.   We do.

25   Q.   Now, I notice that you weren't here for Doctor Wells'

1    testimony on Tuesday.

2    A.    Correct.

3    Q.    And that's, in part, unsurprising, because you have to

4    assume that there's infringement in this case.  Right?

5    A.    Correct.

6    Q.    You have to assume that the patents are valid.  Right?

7    A.    Correct.

8    Q.    And you have to assume that at the hypothetical

9    negotiation, the Defendants wouldn't be holding out.  Right?

10   A.    Correct.

11   Q.    They have to be willing to license.

12   A.    Absolutely.

13   Q.    You were here for Doctor Bazelon's testimony.

14   A.    Yes.

15   Q.    And you heard the Defendant's lawyer criticize Doctor

16   Bazelon for not having negotiated an actual patent license.

17   You heard that?

18   A.    Yes.

19   Q.    Now, to be fair, you don't have extensive experience in

20   actual patent license negotiations.  Right?  I believe it's

21   three licenses.

22   A.    Yes.  Yes.  I wouldn't call it extensive, but I do have

23   experience in actual negotiations in a -- in a couple of

24   instances.

25   Q.    What Doctor Bazelon has spent his entire career in is

1    telecommunications economics.  Right?

2    A.   Correct.

3    Q.   And you told this jury that your career has been in

4    lawsuits.  Right?

5    A.   It's been -- a substantial part of it has been providing

6    expert opinions in lawsuits.  You know, that's been about 23

7    years, but I've been working as an economist and an engineer

8    for almost 45.  So it's a substantial part of the more recent

9    20 years of my career.

10   Q.   Certainly the more recent five years.  Right, Doctor

11   Becker?

12   A.   Absolutely.

13   Q.   I mean, you're in a courtroom on average every other

14   month testifying in trial.

15   A.   Yes.

16   Q.   Does that sound about right?

17   A.   Yes.

18   Q.   And you talked a little bit about specific experience

19   amongst your 150 lawsuits, a few telecommunications cases

20   you've had.  Right?

21   A.   Yeah.  It's more than a few, but it's been -- a subset of

22   the 150 have been telecom related.

23   Q.   Now, you get paid, too.  Right?

24   A.   Yes.

25   Q.   You didn't tell the jury that on your direct examination,

1    did you?

2    A.    No.

3    Q.    How much are you getting paid?

4    A.    $750 an hour.

5    Q.    And of the 150 cases, I mean, I just looked at the last

6    four or five years of the ones you've been in, some of it is

7    telecommunications, but it ranges from semiconductors, video

8    games, oil and gas, digital movie transmission, security for

9    transmitting movies to theaters, alarm systems, fiber optics,

10   air mattresses, medical diagnostics.  I mean, you're not just

11   in the telecommunications space.  Right?

12   A.    That's right.  That's right.  I specialize in patent

13   valuation, and I've been in all those industries that you

14   talked about.

15   Q.    You specialize in patent litigation.

16   A.    Well, I would -- I would say because I do a good bit of

17   consulting on patent and intellectual property valuation

18   generally, that my specialty is in valuing patents and I apply

19   that specialty very frequently in cases like this.

20   Q.    Now, if we get out of the lawsuit world, you would agree

21   that Doctor Bazelon has more experience in the economics of

22   wireless networks.  Right?

23   A.    I would agree that the economics of telecom -- and I'm

24   only hesitating because I do a lot of work in -- in like WiFi

25   and Bluetooth wireless, and I didn't see anything in Doctor

1    Bazelon's background that was really in the economics of -- of

2    the sort of Bluetooth world or WiFi world.  It may be, but I

3    think he's more in the cellular spectrum world.

4    Q.   He is.  He is exactly in the world that this case is

5    about, isn't he?

6    A.   No, I disagree.  It's -- he -- it's only the world that

7    he thinks is relevant because he's looking at it from the

8    perspective of an assumption that the economic impact of this

9    software is in, you know, sort of chewing up spectrum versus

10   not chewing it up, as opposed to site hygiene costs that I

11   think are more relevant.

12   Q.   And we'll talk about site hygiene and the data that you

13   relied on, but one of the things that you were telling this

14   jury is relevant is this market evidence that you were

15   pointing to.  Right, Doctor Becker?

16   A.   Yes.

17   Q.   And these are some negotiations that Finesse had with

18   Intellectual Ventures around the 2011 time period.  Right?

19   A.   Yes.

20   Q.   Now, you were here for opening.  Right?

21   A.   Yes.

22   Q.   And you heard Mr. Dacus tell the jury that they know

23   better about PIM problems and needs because they're in the

24   cellular industry.  Right?  Better than Mr. Smith.

25   A.   Yes.

1    Q.    Do you remember that?

2         Intellectual Ventures is certainly not in the cellular

3    industry, are they?

4    A.    As a company, it has -- it's a company that's a

5    consortium of member companies that buy patents, and its

6    member companies include companies in the cellular industry.

7    But Intellectual Ventures itself is not a cellular provider

8    and they're not in that business.

9    Q.    And you're not suggesting, are you, that when

10   Intellectual Ventures goes out and decides, negotiates about

11   patents, that they go consult with AT&T, for example, or

12   companies that you're calling member companies of Intellectual

13   Ventures.  You're not suggesting that to the jury, are you?

14   A.    No, no.  They have internal experts in various -- in a

15   bunch of different industries who evaluate their -- the

16   proposals to buy patents.

17   Q.    Can you identify any of those internal experts that they

18   use for their proposals?

19   A.    No.  I don't know them by name.

20   Q.    And you don't have any examples for the jury of any that

21   are in this cellular industry, do you?

22   A.    No, I can't tell you that.

23   Q.    In fact, Intellectual Ventures has business people who

24   are negotiating for the purchase of patents.  Right?

25   A.    Oh, yes.  It's definitely the business people that are

1    out on the negotiating end of things.

2    Q.   And in 2011 when Intellectual Ventures was negotiating

3    with Finesse, they didn't have all the information that the

4    jury's seen over the past few days, did they?

5    A.   That's correct.

6    Q.   They didn't have the materials that Doctor Wells

7    considered, the materials that Doctor Bazelon considered, the

8    materials you considered, did they?

9    A.   That's correct.

10   Q.   Finesse didn't have it.  Right?

11   A.   They didn't have the internal materials.  I think we've

12   seen a bunch of information this week that was out in the

13   public domain, but I think it's fair that all of the internal

14   stuff that's been produced in this case, Finesse didn't have.

15   Q.   Most of what the jury has seen this week didn't even

16   exist in 2011.  Isn't that right?

17   A.   That's fair.

18   Q.   Now, we sat through several hours of testimony from

19   Doctor Wells and Doctor Bazelon.  Right?

20   A.   Yes.

21   Q.   Almost a full day.

22   A.   Yes.

23   Q.   How much work do you think they did to get to that point?

24   A.   I'm sure it was significant.  I forget how many hours

25   Doctor Bazelon said he and his team worked, but it was a lot.

1    Q.   Now, you're not aware of either Finesse or Intellectual

2    Ventures doing that before or during those negotiations in

3    2011, are you?

4    A.   No.

5              MS. FAIR:   Mr. Boles, can we please have DX 90?

6    Q.   (BY MS. FAIR)   These are the deal notes that you relied

7    on from Intellectual Ventures.   Right?

8    A.   Yes.

9    Q.   Who is Sheri Richman?

10   A.   Sherri Richman is an acquisitions specialist at

11   Intellectual Ventures, one of the people that fields these

12   proposals or inquiries that come into them.

13   Q.   Do you know her?

14   A.   No.

15   Q.   Do you know her background?

16   A.   No.

17   Q.   Would it surprise you to learn that she has an MBA, she

18   doesn't have any technical background at all?

19   A.   That wouldn't surprise me, no.

20   Q.   Do you know what she was relying on in her negotiations

21   with Finesse?

22   A.   Well, I do know that the primary thing she was relying on

23   that I find to be relevant from the negotiation is she was

24   relying on Mr. Chapman's asking price.

25             MS. FAIR:   Mr. Boles, can we go to page 5?

1    Q.    (BY MS. FAIR)  We see a section here that she wrote up,

2    licensing review notes.  Do you see that?

3    A.    Yes.

4    Q.    And there are seven questions.

5    A.    Yes.

6    Q.    She didn't even answer all of these seven questions, did

7    she?

8    A.    They didn't get to the point where they had -- in the

9    negotiations where they answered all of those questions,

10   that's correct.

11   Q.    You're suggesting that she didn't answer them because the

12   negotiations didn't get that far?  I mean, do you know that?

13   Did you talk to her?

14   A.    No, no.  I don't know how far they got.  I just -- what's

15   relevant to me is what was Finesse's asking price.

16   Q.    You're not suggesting that either party to these

17   negotiations had some detailed market analysis of the cellular

18   industry as it exists today or what AT&T's or other wireless

19   carriers needs and use of the invention might be in the

20   future, are you?

21   A.    No.

22   Q.    And you're not even aware of a product that was on the

23   market at the time of these negotiations that did PIM-C.

24   Right?

25   A.    Correct.

1    Q.   You don't think any exist.

2    A.   No.  At that time?  No.  Nobody had commercialized a

3    PIM-C product at that time.

4    Q.   And the products in this case weren't even out until

5    2018, seven years later.  Right?

6    A.   That's correct.

7    Q.   Now, by the way --

8         MS. FAIR:  Mr. Boles, can we have slide 27?

9    Q.   (BY MS. FAIR)  This is the slide you showed the jury

10   about the Intellectual Ventures' negotiation?

11   A.   Yes.

12   Q.   And if we go to the slide before it, this is how you

13   introduced what you call the market evidence.  Right?

14   A.   Yes.

15   Q.   Now, this first factor listed here, you put licenses to

16   the patents-in-suit.  Right?

17   A.   Yes.

18   Q.   That's not actually what the factor is from

19   *Georgia-Pacific*, is it?

20   A.   That's a paraphrasing of the way that it's become used in

21   the industry.  I think in the actual case, there's a long

22   sentence that talks about tending to establish evidence and

23   establish royalty or something to that effect.

24   Q.   It's not just tending to prove an established royalty, is

25   it, Doctor Becker?

1    A.    No.  The case opinion has a lot of discussion of each of

2    these factors.

3    Q.    Well, and you wouldn't say that negotiations for one

4    potential sale of a portfolio would tend to establish

5    anything, would you?

6    A.    No, no.  I'm not suggesting that it's establishing a

7    royalty.  It's just providing relevant economic evidence to a

8    negotiation.

9    Q.    Well, the factor actually is the royalties received for

10   the licensing of the patent-in-suit, isn't it?

11   A.    Yes.

12   Q.    And there are no royalties received in negotiations, are

13   there?

14   A.    No.

15   Q.    And there are no royalties received when you sell

16   something, are there?

17   A.    No.  You get -- you get a purchase price when you sell

18   something.

19   Q.    And so if you were to go out and buy a piece of land, the

20   purchase price, you might pay, let's say, a hundred thousand

21   dollars for it.  Are you with me?

22   A.    Yes.

23   Q.    And Exxon comes and drills on the land, gets some oil

24   out.

25   A.    Correct.

1    Q.    Right?  Seven years after you buy it, let's say.

2    A.    Okay.

3    Q.    You're not going to be limited in the royalties they owe

4    you to a hundred thousand dollars, are you?

5    A.    Oh, no.  No.  I'm not suggesting that it provides some

6    limit.  It's just relevant economic evidence to inform a

7    negotiation.

8          MS. FAIR:  Mr. Boles, can we please have slide 16?

9    Q.    (BY MS. FAIR)  One of the things -- well, this slide of

10   yours, Doctor Becker, is citing DX 93.  We see that at the

11   bottom left?

12   A.    Yes.

13   Q.    And you were explaining to the jury that this document is

14   part of why you used site hygiene savings costs for your

15   model.  Right?

16   A.    Yes.

17   Q.    And you also explained to the jury, we're hearing more

18   again about this big difference between internal PIM and

19   external PIM.

20   A.    Yes.

21   Q.    Right?

22         Now, we saw this document yesterday when Mr. Ward was

23   questioning Mr. Loddeke.  Do you remember that?

24   A.    Yes.

25   Q.    And Mr. Ward asked him about this document.  Do you

1    remember that?

2    A.   Yes.

3    Q.   They were talking about developing teams, tiger teams, to

4    tackle PIM.

5    A.   Yes.

6    Q.   Right?

7         Do you remember what Mr. Loddeke's response was?

8    A.   I'm not sure what part of the tiger teams.  I know there

9    were several questions about tiger teams.  If you can be more

10   specific.

11   Q.   Yeah.  So knowing that this was one of the main documents

12   that you relied on to use a site hygiene cost savings model,

13   did it surprise you when you heard Mr. Loddeke say, oh, well,

14   this is about external PIM specifically?

15   A.   Well, I'd need to see his testimony.  I think the

16   question -- my understanding is that the tiger teams are

17   -- were formed to address external PIM, and certainly any

18   testimony about the tiger teams I think would be specific to

19   external PIM.

20   Q.   Does it sound to you like every time there's a document

21   the Defendants don't like, they just say, oh, that's external

22   PIM?

23   A.   No.  It sounds to me like most of the problems in the

24   network are external PIM and that's why most of the documents

25   talk about external PIM.

1    Q.   Including this one, as Mr. Loddeke told us yesterday.

2    A.   Oh, sure.   This -- we saw that the document itself is

3    about PIM mitigation strategies generally, both internal and

4    external.

5    Q.   One of the parts of your model is that you assume that

6    reduced maintenance is one of the benefits provided by the

7    invention.   Right?

8    A.   Yes.

9    Q.   And you told the jury that Nokia would have been at the

10   negotiating table at the hypothetical negotiation?

11   A.   Yes.

12   Q.   Do you remember seeing PX 995 with Mr. Davis yesterday?

13   A.   Tri-band -- yes.

14   Q.   And on page 2 of this document, this is Nokia --

15        MS. FAIR:   I'm sorry, Mr. Boles.   Can we go back to

16   the title slide?

17   Q.   (BY MS. FAIR)   This is Nokia's commercial proposal for

18   one of the radios at issue in this case.   Right?

19   A.   Yes.

20   Q.   And on page 2 of this document, Nokia talks about some of

21   the benefits of this radio.   Right?

22   A.   Yes.

23   Q.   And they're not talking about that PIM cancellation can

24   reduce your maintenance, are they?

25   A.   From Nokia's perspective, they're -- you know, Nokia

1   doesn't have maintenance costs, so they're not talking about

2   the benefits of reduced site visits here.  I don't see

3   anything mentioning that.

4   Q.   You don't think Nokia in selling a product, a commercial

5   proposal to its customer, one of its biggest customers, would

6   include benefits to the customer?

7   A.   Well, I mean, they are mentioning that they talk about

8   the fact that this product has built-in PIM cancellation, but

9   they're not -- again, the site hygiene is -- is not something

10  that I see them -- that Nokia calling out as a benefit.

11  Q.   We haven't seen any Nokia documents calling that out as a

12  benefit, have we?

13  A.   No.  I wouldn't expect to.

14  Q.   By the way, you criticized Doctor Bazelon for assuming

15  the Defendants would have gone out and bought more spectrum if

16  they didn't have this technology.  Right?

17  A.   Yes.

18  Q.   That's not actually what he said, is it?

19  A.   It's not -- I'm sorry.  It's not what I said or what he

20  said?

21  Q.   That's not what Doctor Bazelon said, is it?

22  A.   Well, it's -- I know he's described his approach in a

23  number of different ways, but it is what his model assumes.

24  And I can tell you economically his model specifically assumes

25  that, without the PIM-C, AT&T would require additional

1       spectrum and he has gone out and priced that spectrum.

2       Q.   He testified -- I mean, he did his model.  Right?  He's

3       the one who did the model.

4       A.   Yes.

5       Q.   He knows what his assumptions are.  Right?

6       A.   Yes, I think that's fair.

7       Q.   He knows why he did his model the way that he did it.

8       Right?

9       A.   Yes.

10      Q.   And he testified the exact opposite.  When Mr. Dacus

11      asked him about this very issue that they would have gone out,

12      run out and bought more spectrum, he said, no, that's not my

13      assumption.

14      A.   I heard him say that.

15      Q.   And he had explained that it's like having debris on a

16      lane of highway.  Right?

17      A.   Yes.

18      Q.   And you've got that lane of highway, and if we can clear

19      the debris and value what that lane's worth now that you can

20      use it, that's what a spectrum salvage model will do for you.

21           That's what Doctor Bazelon testified to.  Right?

22      A.   Yes, I -- I think his -- his explanation of it, you got

23      to go a little further as to what he assumed the consequence

24      of not clearing the debris would be, but I agree that he

25      talked about the -- the debris on the highway.

1    Q.   Now I want to talk to you about I think one of the other

2    big disconnects between you and Doctor Bazelon, and that's

3    this, I think you called it, national test data?

4    A.   Well, it's the -- the big disconnect is the difference of

5    opinion about how prevalent PIM is.  I -- one piece of

6    evidence that I'm relying on for that is the national test.

7              MS. FAIR:  Mr. Boles, can we have Doctor Becker's

8    slide 19?

9    Q.   (BY MS. FAIR)  The two percentages that you have

10   highlighted here are directly from what you're calling the

11   national test data.  Right?

12   A.   Correct.

13   Q.   The 1.98 percent and the 1.19 percent.  Right?

14   A.   Yes.

15   Q.   As well as this 29.8 percent here.  Right?  We're going

16   to see that in your analysis.  Right?

17   A.   Yeah, you do -- I use that factor.

18   Q.   All of these percentages come from the same source, what

19   you're calling the national test data.

20   A.   Correct.

21   Q.   You're not suggesting to the jury that AT&T went out and

22   did a test on the radios for this national test data.  Right?

23   A.   Well, I'm not sure what you mean by went out.  There's

24   data -- the AT&T systems can collect data from the radios, and

25   the test was Mr. Taylor taking the data that is collected or

1    was collected from these radios and running an analysis of,

2    you know, whatever he needs to do as the technology person who

3    understands how to test for PIM is --

4            THE COURT:  Let me suggest this, Doctor Becker.  If

5    you don't understand the question, don't speculate about what

6    it might mean.  Just ask counsel to explain it or ask it

7    again.

8            THE WITNESS:  Okay.  I'm sorry, sir.

9    Q.    (BY MS. FAIR)  He didn't go out and turn off radios and

10   then turn them back on all across the country to see what was

11   happening here.

12   A.    That's true.

13   Q.    It's a snapshot of one day of data.  Right?

14   A.    Correct.

15   Q.    And the reason that we have this data is because you

16   asked AT&T for measurements to show whether there was internal

17   PIM and whether or not this PIM cancellation technology was

18   having an effect.  Right?

19   A.    Correct.

20   Q.    So AT&T's hired damages expert comes to them and says,

21   hey, I'm putting together the number I'm going to present to

22   the jury, I need some data on whether PIM is a problem and

23   whether PIM cancellation works.  Right?

24   A.    Right.

25   Q.    And you made that request after this lawsuit was filed.

1    Right?

2    A.    Yes.

3    Q.    After they'd already learned that they were facing a

4    substantial damages claim.  Right?

5    A.    Correct.

6    Q.    And in a year and a half of this lawsuit they have all

7    this data day after day, in response to this request you were

8    provided one day.  Right?

9    A.    Yes.

10   Q.    One day of data.

11   A.    That's correct.

12   Q.    AT&T picked the date that this data would come from.

13   Right?

14   A.    Oh, I'm sure they did.  I didn't give the date to them.

15   Q.    And you got this from Mr. Taylor, we heard.  Right?

16   A.    Yes.

17   Q.    And you were here when he testified yesterday?

18   A.    Yes.

19   Q.    And he told us that this type of data, it's available day

20   after day.  Right?

21   A.    Yes.

22   Q.    He didn't give it to you, did he?

23   A.    Any other day?  No.

24   Q.    He didn't even know that someone had done this, had

25   pulled this data.  Right?  You heard him say that yesterday?

1    A.   The -- yes, that -- he obviously knew that the analysis

2    was done because he did it, but he didn't know that the data

3    had been pulled until I asked that he go do that analysis.

4    Q.   He didn't even know it existed is what he told the jury.

5    A.   I think I heard him say he didn't know that the report

6    had been run; he knew that the capability to monitor these

7    conditions in the radios existed.

8    Q.   He didn't know who pulled it?

9    A.   Correct.

10   Q.   He didn't know how to even figure out who pulled the

11   data.

12   A.   Correct.

13   Q.   He didn't know who generated the information.  Right?

14   A.   Correct.

15            MS. FAIR:  Mr. Boles, can we have Demonstrative PX

16   1384, please.

17   Q.   (BY MS. FAIR)  You were here.  You saw this email

18   yesterday.  Right?  This is the one where --

19   A.   Yes.  Yes.

20   Q.   This is what Mr. Taylor said before the lawsuit started.

21   Right?

22   A.   Yes.

23   Q.   This is July of 2019.

24   A.   Yes.

25   Q.   He said, It's almost impossible to draw definitive

1    conclusions from a one-off test as PIM changes so much from

2    minute to minute, hour to hour, day to day, month to month, et

3    cetera.  Right?

4    A.   He said that in this email in the context of what they

5    were talking about, yes.

6    Q.   Well, you didn't have this document.  Right?

7    A.   That's correct, I didn't.

8    Q.   When you did your analysis?

9    A.   Correct.

10   Q.   I didn't see it on your list of materials considered.

11   A.   That's correct.

12   Q.   AT&T didn't give you this email, did they?

13   A.   I don't think it was in the set of things -- I know it

14   wasn't in anything I saw.  It might have been in the materials

15   that I was provided.

16   Q.   Now, we heard yesterday the Defendants say, oh, no, no,

17   no, this is external PIM, this is external PIM.  We heard

18   that.  Right?

19   A.   Yes.

20        MS. FAIR:  Mr. Boles, can we go to page 5 of this

21   document?  And if we look at the -- see that box kind of right

22   there in the middle?  Yes.  Thank you.

23   Q.   (BY MS. FAIR)  We see markets have ongoing carrier adds.

24   And you understand in this context carrier is talking about

25   what frequencies are carrying the data?

1   A.   Yes.  I think when they talk about carrier adds, it's --

2   they are either talking about, you know, adding new

3   frequencies or just adding new radios that relate to different

4   frequencies.

5   Q.   And they're talking about the PIM pressure test app?

6   A.   Yes.

7   Q.   And then in the box, they talk about they're going to

8   conduct PIM testing and they explain how, by measuring KPIs --

9   and, by the way, KPIs are the performance measurements that

10  Doctor Bazelon talked about.  Right?

11  A.   Correct.

12  Q.   And at the end of that same line where they talk about

13  measuring KPIs, they talk about B17 and B14.  You recognize

14  that.  Right?

15  A.   Yes.

16  Q.   That's bands 14 and 17?

17  A.   Yes.

18  Q.   And those are the bands -- the same bands that are on the

19  radios that are at issue in this case.  Right?

20  A.   Yes.

21       MS. FAIR:  Mr. Boles, can we please have PX 274?

22  I'm sorry.  I said PX.  I believe it's DX 274.

23  Q.   (BY MS. FAIR)  This is that snapshot of data.  Right?

24  A.   Yes.

25       MS. FAIR:  Mr. Boles, do you happen to have the

1    native in Excel?

2    Q.   (BY MS. FAIR)  So this is the first tab of the snapshot

3    that AT&T gave you when you were coming up with your damages

4    numbers.  Right?

5    A.   Yes.

6    Q.   And if we go to the second tab, RRH with PIM-C on, this

7    is the list row by row of radio heads where they have PIM-C

8    turned on.  Right?

9    A.   Yes.

10            MS. FAIR:  And if we go all the way to the right,

11   Mr. Boles.

12   Q.   (BY MS. FAIR)  There's three columns that are kind of

13   separated from the first traunch of data.  Right?  Doctor

14   Becker?

15   A.   Oh.  Oh, yes.

16   Q.   These over here?

17   A.   Yeah, I saw that.

18   Q.   And those are the columns that you used for your

19   analysis.  Right?

20   A.   I used two of those three.

21   Q.   Fair enough.  Two of those three, the first two, AP and

22   AQ?

23   A.   Correct.

24   Q.   Okay.  So if we click in -- and you're familiar with

25   Excel.  Right?

1    A.    Yes.

2    Q.    You use Excel a lot.

3    A.    Yes.

4    Q.    It can help in pulling together a lot of data and

5    calculating more complicated things than might be simple math?

6    A.    Yes.

7    Q.    So if we click on -- and if you click on a cell in an

8    Excel document, you can see what the formula was that was used

9    to get to that number.  Right?

10   A.    Sometimes if it's -- if there's a formula in there.

11   Q.    If there is.  Right?

12          MS. FAIR:  So if we go to AP 2, Mr. Boles.  Can you

13   click on that cell?

14   Q.    (BY MS. FAIR)  Okay.  Doctor Becker, if there were a

15   formula that told us about that, it would be right here.

16   Right?

17   A.    Yes.

18   Q.    So what's happened is somebody has put a 0 or a 1 in each

19   of those cells.  Right?

20   A.    Yes.  From my understanding from talking to Mr. Taylor,

21   that he did.  This is his work.

22   Q.    Yeah.  He made that determination.  Right?

23   A.    Yes.

24   Q.    AT&T's employee who's providing the damages expert in a

25   lawsuit made that determination.  Right?

1   A.   Yes.

2   Q.   And you can't tell us what he did, can you?

3   A.   Oh, right.  I certainly can't.  That's way beyond my

4   technical skills.

5   Q.   And, by the way, just -- what do you understand the

6   difference between the 0 and the 1 to mean in these columns

7   that you used in your analysis?

8   A.   So the 0s and 1s in column AP, if it's a 1, it's that the

9   KPIs -- that the internal PIM was -- or whatever was going on

10  in the radio was causing the KPIs to be exceeded, like, in a

11  bad direction.

12  Q.   So it's a yes or no.  The 0 or 1 means yes or no.

13  A.   Yes or no, is there something, a problem that is causing

14  an impact on the KPIs.  And if it's a 1, the answer to that

15  question is yes.

16  Q.   And so you can't tell us what was done to figure out

17  whether the cell should say 0 or 1.

18  A.   Correct.

19  Q.   And Mr. Taylor didn't tell us that, did he?

20  A.   I did not hear him asked any questions about this

21  specific formula.

22  Q.   Well, he testified that the algorithms, the math that he

23  used to determine what should go in each of these blanks and

24  these columns over here, was proprietary.  Do you remember

25  hearing that?

1  A.   I did hear that, yes.

2  Q.   It's a secret.  Right?

3  A.   I think that's another way to talk about what proprietary

4  means.

5  Q.   So for all of this snapshot of data, we have to rely on

6  AT&T for all of the decision-making.  Right?

7  A.   Yes.

8  Q.   What day it came from?

9  A.   Correct.

10  Q.   What radios they listed here?

11  A.   Correct.

12  Q.   How they got to decide whether to put a 0 or 1 in the

13  columns that you used in your analysis.  Right?

14  A.   That's correct.

15  Q.   And we don't even know who pulled the data, do we?

16  A.   The original data, yeah, we don't.

17  Q.   Did you know before yesterday that this snapshot, this

18  one-off test, doesn't even test all of the accused radio

19  models?

20  A.   Yes.  Yeah.  I could see that from the -- from the radio

21  counts in the -- I know that there's more radios that are

22  accused than are in this test.

23  Q.   A lot more, aren't there?

24  A.   I -- I haven't tried to calculate the difference.  I know

25  this is a subset of the radios that were tested or that the

1    test is a subset of the radios out on the network.

2              MS. FAIR:  Mr. Boles, can we go back to the data

3    summary, please?

4    Q.   (BY MS. FAIR)  Mr. Taylor told us yesterday that that

5    second row there, number of radio channels where it says

6    67,159 with PIM-C on, and 3,026 with PIM-C off, that's not the

7    number of radios.  Right?

8    A.   I think I heard him say that's channels, that you can

9    have multiple channels per radio.

10   Q.   And these -- this one-off test was only testing dual band

11   radios.  You know that?

12   A.   I think I recall seeing that in -- when we were digging

13   through the data, but I -- if you have evidence of that,

14   I'll -- I'll accept your representation.

15   Q.   I think Mr. Taylor told us we could essentially cut the

16   number in half to know how many radios were being tested, not

17   exactly but roughly cut it in half.

18   A.   I heard him say that, yes.

19   Q.   So if we were to cut 70,000 in half, we're talking

20   about -- about 35,000 radios.  Right?

21   A.   That would be the number, yes.

22             MS. FAIR:  And, Mr. Boles, can we go to RRH with

23   PIM-C on again and scroll all the way to the left?

24   Q.   (BY MS. FAIR)  And, by the way, 35,000 is less than half

25   of the accused radios in this case.  Right?

1   A.   It -- yes, of the ones that have the capability, it's

2   about half of the ones of the count of total that would have

3   it on.

4   Q.   Right.

5         MS. FAIR:  Mr. Boles, can you highlight column F?

6   Q.   (BY MS. FAIR)  You recognize that, Doctor Becker, the

7   band?

8   A.   Yes.

9   Q.   And so all we see there --

10        MS. FAIR:  Well, Mr. Boles, can you click the down

11  arrow?

12  Q.   (BY MS. FAIR)  That's a filter in Excel.  Right, Doctor

13  Becker?

14  A.   It is.  It is.

15  Q.   I'm sorry for talking over you.  So if we click the down

16  arrow, what we see in this box here are all of the -- any

17  option of text that could be in that column.  Right?

18  A.   Right.

19  Q.   And so what we know from this is that the only bands that

20  were tested as part of this -- or tested as part of this

21  snapshot are bands 14 and band 17.  Right?

22  A.   Correct.

23  Q.   Now, band 17 is a subset of which band?

24  A.   I -- I don't know.

25  Q.   Band 12?

1  A.   I -- I don't have the band allocation numbers committed

2  to memory.

3  Q.   So you don't know which bands this partial snapshot of

4  data looked at compared to which bands are at issue in this

5  case?

6  A.   I -- I did not dig into the -- the -- at the level of

7  bands and sectors and what he was testing.  I looked at the

8  overall results and talked to him about what that indicated to

9  him.

10  Q.   You have heard testimony yesterday about how AT&T was

11  having particular problems with band 29, they had this

12  spectrum, they needed to figure out a way to deploy it.

13  Right?

14  A.   I've heard testimony about that, yes.

15  Q.   There's no band 29 listed here, is there?

16  A.   No.

17  Q.   And there's no band 25.  That's one of the others that

18  the accused radios operate on.  Right?

19  A.   It is, yes.

20  Q.   There's no band 66.  We don't see that there?

21  A.   That's correct.

22  Q.   So when you did your calculations, you were looking at a

23  one-day snapshot from who knows who pulled it using secret

24  math on something like less than half of the accused radios in

25  this case.

1    A.   That's correct.

2    Q.  You can't tell us what the data was the day before, can

3    you?

4    A.   No.

5    Q.  You can't tell us what the data looked like the day

6    after.  Right?

7    A.   No.

8    Q.  We don't know what the data looked like even on the same

9    day for the rest of the infringing radios, do we?

10    A.   Correct.

11    Q.   If it's a different two percent of radios every day and

12    we roll that out for a month, that's 60 percent of the radios,

13    isn't it?

14    A.   Well, I mean, your premise of a different two percent

15    every day, I mean, if you want me to accept that, sure, but

16    that can't happen because of the nature of internal PIM.  It

17    wouldn't be a different set of radios every day that have a

18    kink in the connector.  One day, it's there; one day, it's

19    not; the next day, it's there again--that's not the nature of

20    internal PIM.

21    Q.   Well, we just can't know that because we don't have any

22    of that data, do we?

23    A.   We don't have the data on this.  We know -- there is

24    plenty of other data and Mr. Taylor's testimony about the

25    consistency of internal PIM.  But this data, I agree it's one

1    day.

2    Q.   Of less than half the radios.

3    A.   Yes.

4         MS. FAIR:  Mr. Boles, you can take that down.  Thank

5    you.

6    Q.   (BY MS. FAIR)  Now, you're familiar with the damages

7    statute.  Right, Doctor Becker?

8    A.   Yes.

9    Q.   I didn't see in your slide presentation the language from

10   the damages statute in it.

11   A.   I -- I didn't put that in.  I think throughout my

12   presentation, I'm talking about the use made of the invention

13   and the benefits that AT&T gets from that.  But I didn't have

14   that damages statute in -- on a slide.

15        MS. FAIR:  Mr. Boles, can you pull up Doctor

16   Bazelon's slide 6?

17   Q.   (BY MS. FAIR)  Now, you just told the jury part of this

18   language, but you added to it, didn't you?  You told them

19   about you were testifying about the use made of the invention

20   by the infringer and the benefits of it and went on to explain

21   more.  Right?

22   A.   Yes.  The -- okay.

23   Q.   Right?

24   A.   Yes.

25   Q.   Now, your opinion is that AT&T owes $1.35 million in a

1    fully paid-up lump sum --

2    A.   Correct.

3    Q.   -- for the life of the patent --

4    A.   Correct.

5    Q.   -- for all of the infringement.  Right?

6    A.   Correct.

7    Q.   And if it's just the '134 that's infringed, it's only

8    $531,000.  That's your testimony?

9    A.   Yes.

10   Q.   You say that's a fair measure of AT&T's use of the

11   invention.  Right?

12   A.   Yes.

13   Q.   I think your words on direct examination were, they're

14   not there sitting at the table saying they don't use it.

15   Right?

16   A.   Correct.

17   Q.   So they're admitting use.

18   A.   Well, they're admitting use of the Nokia radios.  I have

19   to assume that -- that -- that it's an admission of

20   infringement, but that's really for the jury to determine.

21   Q.   Right.  And they have to also admit the patents are

22   valid.  Right?

23   A.   Yes.

24   Q.   And they have to be willing to actually license the

25   technology from Finesse.  Right?

1    A.    Yes.

2    Q.    And your opinion is that, in this hypothetical world,

3    that Finesse would have agreed with AT&T for a million

4    dollars, $1.35 million.

5    A.    Yes.

6    Q.    That's a huge disconnect from Doctor Bazelon, isn't it?

7    A.    I agree.  It is.

8    Q.    Now, you understand what use of the invention means.

9    Right?  We're talking about infringement.

10   A.    Yes.

11   Q.    And you understand the difference, having testified in

12   patent infringement cases, trials every other month, the

13   difference between a method claim and an apparatus claim.

14   Right?

15   A.    Yes.

16   Q.    You know that it's important to determining how much

17   infringement there is what type of claim we're talking about.

18   Right?

19   A.    It can be important in some cases to distinguish between

20   apparatus claims and method claims.

21   Q.    It can be very important for damages.  Right?

22   A.    It can be.

23   Q.    You know that there are apparatus claims asserted in this

24   case?

25   A.    Yes.

1    Q.   And you know for an apparatus claim, we're talking about

2    not actually performing a method, but using an apparatus,

3    using a thing, using a product.  Right?

4    A.   Yes.

5    Q.   And all that's required for infringement of an apparatus

6    claim is that the product have the functionality.  Right?

7    A.   Correct.

8    Q.   And you understand Doctor Bazelon did his calculations

9    based on the number of units that were turned on.  Right?

10   A.   Yes.

11   Q.   You don't quibble with how many radios were turned on.

12   Right?

13   A.   No.

14   Q.   You're just saying there wasn't really a problem and

15   those radios don't really do that much.  Right?

16   A.   I wouldn't say there's not a problem.  I've looked at

17   what the extent of the potential internal PIM that would be

18   canceled and how much of it the evidence indicates it does

19   cancel, but, I mean, we don't quibble over the number of

20   radios that were on.

21   Q.   And your reduction for how much of a problem there is and

22   how often you're saying that PIM-C works is from that snapshot

23   that AT&T fed you from one day of half the radios.  Right?

24   A.   The specific factor is the overall assessment of the

25   prevalences from a much larger set of data.

1    Q.   The jury hasn't seen this much larger set of data, have

2    they?

3    A.   Well, when I say data, I meant data and evidence.

4    They've heard Mr. Taylor's testimony.  We've seen Mr.

5    Loddeke's sheet that tells us when you have the million

6    radios, you're getting about 3,000 site visits a year.  That

7    tells us the extent of internal PIM is a problem.  That's what

8    I meant by data.  Data and evidence.

9    Q.   Let's talk about what you did with that one-day snapshot.

10   I mean, that's where the real numbers come from.  Right?

11   A.   Several of the factors come specifically from the one

12   day.

13             MS. FAIR:  Mr. Boles, can we have slide 24, please?

14   Q.   (BY MS. FAIR)  This is a slide you showed the jury during

15   your testimony?  Right?

16   A.   It is.

17   Q.   And the first step you do is you cut out 98.8, give or

18   take, radios that are infringing.  Right?

19   A.   Well, I'm not cutting out the radios.  I'm trying to get

20   to an estimate of how many trips out to the tower there would

21   be.  So it's -- it's not eliminating the radio; it's taking a

22   radio and saying how many of them have internal PIM problems.

23   Q.   You go from 84,000 radios to 1,008, you cut out 98.8

24   percent of them.  Right?

25   A.   In terms of the ones that would have an internal problem,

1    yes.

2    Q.   And then you cut out another 70 percent --

3    A.   Yes.

4    Q.   -- of the thousand that remain.

5    A.   Yes.

6    Q.   And those two numbers come directly from the columns that

7    we saw in the snapshot one-off set of data where there were

8    all those 0s and 1s.  Right?

9    A.   Yes.

10   Q.   With the mystery math, who knows who pulled it, the day

11   that AT&T picked.  Right?

12   A.   Correct.

13   Q.   And you get to 301 radios.

14   A.   Yes.

15   Q.   And you use that 301 radios out of 84,000 and multiply it

16   times $2,619 to get to just under $800,000 in avoided costs.

17   Right?

18   A.   True.

19   Q.   Have you done the math to see what that would be if you

20   used all 84,000 radios?

21   A.   No.

22         MS. FAIR:  Mr. Boles, can we have a calculator,

23   please?

24       I'm sorry, Ms. Brunson.  Can Mr. Boles have it?

25   Q.   (BY MS. FAIR)  Okay.  So to do that, we would do 84,733

1    times 2,619.  Right?

2    A.    Yes.

3    Q.    And instead of just under $800,000, what do we get?

4    A.    $222 million.

5    Q.    And if we reduce that by the 17.6 percent of cost savings

6    to Finesse --

7              MS. FAIR:  Mr. Boles, it would be times .176.

8    Q.    (BY MS. FAIR)  Right, Doctor Becker?

9    A.    It is.

10   Q.    And what do we get?

11   A.    $39 million.

12   Q.    So it would be $39 million would be Finesse's share of

13   the cost savings if you had used all the radios.  Right?

14   A.    Right.

15   Q.    That's just for one year.

16   A.    Correct.

17   Q.    Did you -- the next step in your analysis that you did to

18   get to the $1.35 million, it's more complicated math than just

19   multiplying out.  Right?

20   A.    Yeah.  You -- because of the time value of money, you

21   can't just take the number and multiply it by the number of

22   years.  But it's -- it is more than just the 39 million.

23   Q.    Did you do the math to see what the damages would be if

24   you used Doctor Bazelon's 64,702 radios that were turned on?

25   A.    And an assumption that literally you have PIM exceeding

1    KPIs in a hundred percent of them and a hundred percent of

2    them would be fixed?  No.

3    Q.   Would it surprise you to learn it's $193 million through

4    2029?

5    A.   No.

6    Q.   And $58 million through 2024?

7    A.   It wouldn't surprise me, no.

8           MS. FAIR:  Mr. Boles, you can take that down.

9    Q.   (BY MS. FAIR)  Doctor Becker, you're familiar with

10   monitored home alarm systems, are you?

11   A.   Yes.

12   Q.   You've had one before?

13   A.   Yes.

14   Q.   And you pay a monthly subscription to whoever your

15   provider is.  Right?

16   A.   Yes.

17   Q.   And you do that so that when someone breaks into your

18   house, either the company is alerted or maybe it calls the

19   police automatically for you, it does something automatically

20   for you when there's a break-in.

21   A.   Correct.

22   Q.   When you get to the end of the month and you haven't had

23   a break-in, you don't call the alarm company and say, well, we

24   didn't have the problem this month that this was designed to

25   fix, so I don't think we should have to pay for it this month.

1   A.   No, you don't get to do that.

2   Q.   You don't get to the end of the year and say, well, we

3   only had two percent of break-ins and your alarm only worked a

4   little bit of the time, so we think you should cut our bill by

5   99.4 percent.

6   A.   No, you don't get to do that.

7   Q.   Here you took the snapshot fed to you by AT&T that's half

8   the radios to cut out all but 300 from the analysis that you

9   did.  Right?

10  A.   The sample for the test was half.  I don't want to leave

11  the impression that I took it down to half the radios.  The

12  factor came from the test that was about half the radios.

13  Q.   That's right.  AT&T took it down to half the radios,

14  didn't they?

15  A.   Well, the -- the test sample was -- was on less than all

16  of the radios.  That's true.

17  Q.   And AT&T picked which radios.

18  A.   Yes.

19  Q.   AT&T decided what day.

20  A.   Yes.

21  Q.   AT&T decided how to do the math to feed their damages

22  expert in a case where you're going to tell the jury how much

23  they should have to pay.  Right?

24  A.   That's true.

25  Q.   So you cut it down to 300 radios.

1    A.   Correct.

2    Q.   You're not suggesting to this jury that AT&T can turn it

3    on for free, infringe for free, until there's a problem.

4    A.   No, not a bit.  I'm suggesting that a license, just much

5    like a home monitoring license, you pay a fee to have the

6    ability to have it on, and that the license to have this in

7    their network is -- would be $1.35 million to be able to have

8    the ability to have this on.

9    Q.   For the entire life of the patent, to turn it on in

10   64,000 radios a year, you think they would have agreed to a

11   million dollars.

12   A.   A little more than a million, yes.

13           MS. FAIR:  I'll pass the witness.

14           THE COURT:  Redirect, Mr. Dacus?

15           MR. DACUS:  Yes, Your Honor.

16           THE COURT:  All right.  Proceed with redirect.

17           MR. DACUS:  Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19   By Mr. Dacus:

20   Q.   So what you and the jury are attempting to do in

21   determining a royalty is to determine how much use, what

22   value, what benefit, AT&T gets from this feature.  Correct?

23   A.   Correct.

24   Q.   Okay.  And if I understood, with respect to the amount of

25   PIM that's actually canceled, that's part of what you wanted

1    to determine in the work that you did here.  Is that fair?

2    A.    Yes.  That's an important thing to know as to whether

3    this Nokia software magically gets rid of everything that's

4    out there when it's present or not.

5    Q.    You cannot cancel PIM unless PIM is present.

6    A.    That's a fundamental reality.

7    Q.    And we know that Doctor Bazelon assumed what with respect

8    to how much PIM was present?

9    A.    He assumed that there is not just detectable PIM, but

10   I'll call it problematic -- significant problematic PIM

11   present at every single radio in the network where this

12   capability was on from the day the radio was installed.

13   Q.    Okay.  And so did you go ask AT&T -- when you got this

14   report and you saw that he made that assumption, did you ask

15   AT&T, hey, is that accurate or not?

16   A.    Yes.

17   Q.    And was that the purpose of trying to determine how much

18   internal PIM actually existed?

19   A.    Yes.

20   Q.    Okay.  So I want to walk through what evidence you have

21   and the jury has available to you on that point.  Is that

22   okay?

23   A.    Yes.

24   Q.    We know you have the one-day study.  Correct?

25   A.    Yes.

1   Q.   You also have Mr. Taylor and Mr. Loddeke's testimony.

2   Correct?

3   A.   Yes.

4   Q.   And you have your discussions with them.  Correct?

5            MS. FAIR:  Objection, leading, Your Honor.

6            THE COURT:  Sustained.

7            MR. DACUS:  I'll rephrase, Your Honor.  Thank you.

8   Q.   (BY MR. DACUS)  Did you talk with Mr. Loddeke and Mr.

9   Taylor in the course of your work in this case?

10  A.   Yes.

11  Q.   What did they tell you about how much PIM is internal PIM

12  that's present?

13  A.   They both told me that internal PIM, once a radio has

14  been installed, because of the installation guidelines, that

15  it's not at all prevalent, that it's very rare, that it would

16  actually crop up, and because of the regular maintenance of

17  the towers, it wouldn't be present for very long, and if it

18  was -- if it did crop up.

19  Q.   Were you here when they raised their right hand, swore to

20  tell the truth, and said exactly that in this courtroom?

21  A.   Yes.

22  Q.   Okay.

23            MR. DACUS:  May I have the document camera, Ms.

24  Brunson?

25  Q.   (BY MR. DACUS)  Now, you also had available to you other

1    AT&T information on this issue.  Correct?

2    A.   Yes.

3    Q.   This is the information that you and I just looked at a

4    minute ago on the number of times that they have to send a

5    repairman to cure internal PIM.  Correct?

6    A.   Yes.

7    Q.   To be clear, because of the criticism saying this study

8    was created after the lawsuit, was this -- did this

9    information, this AT&T information, was it kept in the

10   ordinary course of business long before this lawsuit?

11   A.   Yes.

12   Q.   As far back as 2017?

13   A.   Yes.

14   Q.   So on this issue of is there really a lot of internal PIM

15   or not, what does this information tell us?

16   A.   This information which they've been keeping since -- at

17   least since 2017 would say that the level or the incidence

18   rate of problematic internal PIM is actually far lower than

19   Mr. Taylor's sort of one-day study indicated.

20   Q.   That's what I want to ask you about.  Based on the study,

21   you used an assumption that PIM is present in 1.19 percent of

22   the time as a problem.

23   A.   Yes.

24   Q.   Correct?

25   A.   Yes.

1   Q.   If we go look at the actual data for how many repairs

2   there are made on the million radios per year, that's the

3   information you told us to look at beside my red dot, what

4   does the actual data kept before this lawsuit show the

5   incident rate to be?

6   A.   Less than .4 percent.

7   Q.   Okay.  So let's just say, rough numbers, 4,000.  It's

8   really closer to 3-, but let's just 4,000 per million.  I want

9   to be very clear.  What percentage is that?

10  A.   .4 percent.

11  Q.   .4 percent.

12  A.   Yes.

13  Q.   That's .004 if we're doing it in decimal.  Correct?

14  A.   Yes.

15  Q.   And you used for your assumption what percentage number?

16  A.   1.19.  So basically 1.2.

17  Q.   So the actual data shows that's the incidence of internal

18  PIM in the radios is more or less than what you actually used

19  in your assumption?

20  A.   It's about a third less than -- if you look over the

21  five-year period at all the million radios, it's about a third

22  less than I assumed.

23  Q.   So on the question of is internal PIM really present and

24  is it a problem, what's the conclusion?

25  A.   It's -- this data is consistent with Mr. Taylor's

1    national test which is consistent with their testimony which I

2    think is consistent with common sense about the way they

3    accept the radios at installation by the vendors, is that it's

4    just not a prevalent problem.  It does creep into the network,

5    but it's not prevalent.

6    Q.   So when we go through those questions of you only relied

7    on one day of testing for something that nobody knows who they

8    did it for an algorithm that we don't know about, is that

9    accurate at all?

10   A.   No, no.  As I said, the specific number -- I need a

11   specific number to put in the spreadsheet, and I used the 1.19

12   percent, but it's not accurate to say that that's the only

13   thing I'm considering in reaching my conclusion.

14   Q.   If you had used the actual data, .4 percent, your number

15   actually would have been lower.  Correct?

16   A.   Yes.

17   Q.   With respect to that algorithm, did you read Mr. Taylor's

18   deposition in this case?

19   A.   Yes.

20   Q.   You remember the Judge instructing the jury that those

21   depositions often last seven hours?

22   A.   Yes.

23   Q.   Did you read where they questioned Mr. Taylor extensively

24   about that algorithm?

25   A.   Yes.

1    Q.   So they know all about it.  Is that true?

2    A.   Well, they had an opportunity to question him for seven

3    hours.  So I don't recall, you know, how much detail they got

4    into, but I know they had an opportunity to ask him about the

5    algorithm.

6    Q.   With respect to the -- Mr. Smith's offer to license these

7    patents to Intellectual Ventures, is -- do you remember those

8    questions from Ms. Fair about what did Intellectual Ventures

9    think?

10   A.   Correct.  I do recall those.

11   Q.   Is what's more important to your analysis what

12   Intellectual Ventures thought or what Mr. Smith thought with

13   respect to the value of his patents?

14   A.   It is what Mr. Smith and what Finesse as a company

15   thought.  It's -- I'm not considering or really relying on

16   whether Intellectual Ventures -- what they thought.

17   Q.   In other words, if we were buying a house and the seller

18   of the house offered the house for a hundred thousand dollars,

19   is that what we expect the seller believes it's worth?

20   A.   I think that's fair if that was their asking price

21   straight out of the box.

22   Q.   If we did focus on Finesse -- I mean, on Intellectual

23   Ventures, I think Ms. Fair asked you, did Intellectual

24   Ventures have all the information then that you have now.  Do

25   you remember that question?

1    A.    Correct.

2    Q.    So if we gave Intellectual Ventures all the information

3    we have now--that is, that PIM cancellation is only present in

4    eight percent of the radios in the network, 99 percent of them

5    have no internal PIM, in the one percent where internal PIM is

6    present, it only cures it 30 percent of the time--do you think

7    that Intellectual Ventures would value these patents at the

8    tens of millions of dollars that Finesse does?

9    A.    No.

10   Q.    You were also asked some questions about Mr. Bazelon's

11   theory and whether or not he's proposing that AT&T would buy

12   spectrum.  Do you remember that?

13   A.    Yes.

14   Q.    And Ms. Fair, like Finesse's lawyers yesterday, said

15   that's not their position.  Do you remember that?

16   A.    Yes.

17   Q.    And they tried to get you to admit that that's not Doctor

18   Bazelon's position.  Do you remember that?

19   A.    Yes.

20   Q.    And if I understood you, you said, no, that is Doctor

21   Bazelon's position.

22   A.    It is -- it is Doctor Bazelon's position, at least as

23   expressed by all the math that leads to his numbers.

24   Q.    Okay.  So your impression was that Doctor Bazelon's

25   calculation was, this is how much spectrum AT&T would need to

1  buy.  Correct?

2          MS. FAIR:  Objection, leading, Your Honor.  He's

3  been leading this witness most of his redirect.

4          THE COURT:  Well, when you objected, I sustained it

5  and I'll sustain this.

6          MR. DACUS:  Understood.

7          THE COURT:  Avoid leading, counsel.

8          MR. DACUS:  Thank you, Your Honor.

9  Q.   (BY MR. DACUS)  Do you have an understanding as to what

10 Doctor Bazelon was proposing, at least in substance?

11 A.   In substance in his report and in his calculations, I

12 have an understanding that -- of what he is proposing.

13 Q.   And do you have an understanding as to at least what

14 Finesse is now telling the jury whether or not Doctor Bazelon

15 is proposing that this is what AT&T would buy as spectrum?

16 A.   I have an understanding from sitting through this trial

17 that they are -- appear to now be saying, oh, no, no, no, he's

18 not trying to say that he's valuing the damages through the

19 implied amount of spectrum -- additional spectrum that AT&T

20 would -- would need to acquire.  They're trying to say that's

21 not what he's saying, but that's not what he did.

22 Q.   Were you here when the Judge told the jury they're going

23 to have to judge credibility in this case?

24 A.   Yes.

25 Q.   Were you here when he specifically said, you need to

1  compare what folks said before this lawsuit with what they say

2  in this courtroom?  Were you here for that?

3  A.   Yes.

4  Q.   And so now Finesse is saying, no, Doctor Bazelon is not

5  proposing that you buy spectrum.  That's their position.

6  Correct?

7  A.   That appears to be, yes.

8  Q.   Now, Doctor Bazelon did a written report in this case.

9  Correct?

10  A.   Yes.

11  Q.   Did you read that?

12  A.   Yes.

13       MR. DACUS:  May I have the document camera?

14       MS. FAIR:  Objection, Your Honor.  This is hearsay.

15  He's publishing to the jury the report of an expert.

16       THE COURT:  I'll sustain that.

17  Q.   (BY MR. DACUS)  Do you remember in Doctor Bazelon's

18  report that he specifically said --

19       MS. FAIR:  Objection.  He is telling the jury what

20  is hearsay.  The report is outside statements.  He had Doctor

21  Bazelon on the stand to cross-examine him.  He should not be

22  allowed to read from the report.  It's the same as putting it

23  up in front of the jury.

24       THE COURT:  While an expert like Doctor Becker

25  cannot be a mere conduit for outside hearsay testimony, he is

1    entitled to rely on it and he is entitled to testify about

2    what he has relied on.

3        So I'll allow you to examine this witness about the

4    hearsay from Doctor Bazelon's report that he has relied on in

5    his report, but you're not to publish it per se and you're not

6    to quote or read from it.  You're to ask this witness and let

7    him explain what he relied upon.  Understood?

8            MR. DACUS:  With one question, Your Honor.  May we

9    approach?

10            THE COURT:  Approach the bench.

11            (The following was had outside the hearing of the

12            jury.)

13            MR. DACUS:  I understand that I'm to use it as a

14    demonstrative, but I'd like to publish it as a demonstrative,

15    not as an exhibit but as a demonstrative.

16            THE COURT:  You want to use Bazelon's report as a

17    demonstrative with Becker?

18            MR. DACUS:  Because they have said clearly to this

19    jury --

20            THE COURT:  That's just an end-around about using

21    the expert's report, using this expert as a conduit to get

22    into hearsay of Bazelon's report.

23            MR. DACUS:  Well, as Your Honor just -- well, it's

24    directly to contradict what they told the jury.

25            THE COURT:  I'm telling you, you can't go there.

1    I'm telling you about how you can go there versus how you

2    can't.  And you can question Doctor Becker about what he

3    relied on and specifically about those portions of Bazelon's

4    report he relied on, but you can't publish the report and you

5    can't read from it per se.  That's the same thing as Becker

6    being a conduit for hearsay.

7              MR. DACUS:  So I'm just trying to be clear with the

8    Court.  My question is going to be exactly what he said in the

9    report.  I'm not going to read from it, but it's going to be

10   the same.  So I just don't want them to say --

11             MS. FAIR:  Your Honor, he can't feed the witness

12   what he wants Doctor Becker to say.  If he wants to ask Doctor

13   Becker what his understanding was of the report after he read

14   it, a fair open-ended question, that's one thing.  But if he

15   wants to try and feed hearsay to him under Rule 703 --

16             THE COURT:  I agree.  You're going to have to ask

17   Doctor Becker what he understood Doctor Bazelon's report to

18   mean.

19             MR. DACUS:  I will do that.

20             THE COURT:  Okay.

21             MR. DACUS:  Thank you.

22        (The following was had in the presence and hearing

23        of the jury.)

24             THE COURT:  All right.  Let's proceed.

25             MR. DACUS:  Thank you, Your Honor.

1    Q.   (BY MR. DACUS)   From Doctor Bazelon's report and the

2    substance of his testimony, did you understand that the

3    royalty he's proposing allows AT&T to buy spectrum?

4    A.   Yes.   The fundamental economic premise of his model, and

5    he's explicit about this in his report, is he's looking

6    at -- he assumes that without the PIM-C, the Nokia PIM-C, AT&T

7    would need to acquire additional spectrum to be able to run

8    their network at the same performance level.

9         And he very specifically then says how much is

10   that -- would it cost to get that spectrum.   That is the

11   fundamental math in his -- in his model, and it's what he

12   expressed as the methodology in his report.

13   Q.   Do you think that is appropriate or inappropriate in this

14   case?

15   A.   I think it completely -- it's inappropriate, it doesn't

16   measure what this technology does.

17             MR. DACUS:   I have no further questions, Your Honor.

18   I pass the witness.

19             THE COURT:   All right.   Additional cross

20   examination?

21             MS. FAIR:   Yes, Your Honor.

22             THE COURT:   Proceed with additional cross.

23                       RECROSS EXAMINATION

24   By Ms. Fair:

25   Q.   Doctor Becker, Mr. Dacus suggested that if we had just

1    asked the right question, maybe Mr. Taylor would have told us

2    about how he came up with whether or not to put a 0 or a 1 in

3    those columns you used to cut down to 300 radios.

4    A.   Yeah, something to that effect.  I think he was

5    indicating that you had an opportunity to question him about

6    that.

7    Q.   And Mr. Taylor testified live in this trial.  Right?

8    A.   Yes.

9    Q.   And when Mr. Ward asked him that for the one-day snapshot

10   of data the algorithm is proprietary, it's secret.  Correct?

11   A.   Yes.

12   Q.   Mr. Taylor said it is proprietary, yes.  Right?

13   A.   Yes.

14   Q.   And the Defendant's lawyers also had the opportunity to

15   ask Mr. Taylor to explain to the jury how he did his analysis.

16   Right?

17   A.   Yes.

18   Q.   And we never heard any testimony about what columns he

19   looked at in that snapshot of some of the radios from one day

20   to add or subtract or what math was done or what algorithm.

21   They never asked him, either, did they?

22   A.   Correct.

23   Q.   Because he told us, testified, it's proprietary, it's

24   secret.

25   A.   Well, he definitely testified to that.  I don't know that

1    that's why they -- you said because -- I don't know if that's

2    why neither side asked him any questions about that.  I'm sure

3    if he was asked, he probably would have answered.

4    Q.    And that data doesn't look at how much PIM is caused by

5    band 25, band 66, band 29; all it looks at is bands 14 and 17.

6    Right?

7    A.    Correct.

8    Q.    And the site visits that you put up also don't show how

9    much PIM is caused by combining, for example, bands 12, 14,

10   and 29 in a single tri-band radio.  Right?

11   A.    Well, those site visits would be -- to the extent that

12   there are any site visits caused by radios where that is

13   happening, that would be in there.  It's not granular enough

14   to peel out and say, Let me look at the site visits associated

15   with tri-band radios.

16   Q.    So we don't know amongst those which ones are band 12,

17   band 14, band 29 problems.  We don't know what's cured by

18   PIM-C.  That's not really a test or data that measures that,

19   is it?

20   A.    No.  It's looking at it from the other end.  It's looking

21   at it from, Okay, what's at the end of the day, what does it

22   tell us the prevalence was; not down at the granular level of

23   what's really causing it.

24   Q.    The problem of combining the bands that are combined in

25   the radios in this case is not something you looked at, is it?

1    A.    Correct.

2              MS. FAIR:  I'll pass the witness.

3              THE COURT:  Additional direct?

4              MR. DACUS:  Yes, Your Honor.

5              THE COURT:  Proceed.

6              MR. DACUS:  Thank you.

7                    REDIRECT EXAMINATION

8    By Mr. Dacus:

9    Q.    Given the totality of all the evidence you've seen in

10   this case with respect to this issue of how much internal PIM

11   is present, do you still stand by the fact -- your 1.19

12   percent number?

13   A.    Oh, absolutely.  I think the totality of the evidence

14   would indicate that that's very conservative.

15   Q.    Conservative meaning it's actually high?

16   A.    It's high, and I think Mr. Taylor indicated that in his

17   opinion, in his testimony, he said he thought it was a little

18   high.  And that's consistent with the truck roll data and

19   everything else I've heard.

20   Q.    And this information related to site visits, that's

21   across all of the radios.  Correct?  In the AT&T network.

22   A.    Yeah, 990-something-thousand radios.

23             MR. DACUS:  That's all I have, Your Honor.  I pass

24   the witness.

25             THE COURT:  Additional cross examination?

1           MS. FAIR:  No, Your Honor.

2           THE COURT:  All right.  You may step down, Doctor

3    Becker.

4        AT&T and Nokia, called your next witness.

5           MR. DACUS:  And this time, Your Honor, AT&T and

6    Nokia rest their case.

7           THE COURT:  All right.  The Defendant and Intervenor

8    have rested their case in chief.

9        Does the Plaintiff have rebuttal witnesses to call?

10          MR. GRINSTEIN:  Your Honor, may I confer with

11   Mr. Ward real quickly?

12          THE COURT:  You may.

13                   (Pause in proceedings.)

14          MR. GRINSTEIN:  Your Honor, Plaintiff has no

15   rebuttal.

16          THE COURT:  All right.  So both sides in this case

17   at this juncture rest and close, subject to final instructions

18   from the Court to the jury and closing arguments.  Correct?

19          MR. GRINSTEIN:  Yes from the Plaintiff, Your Honor.

20          MR. DACUS:  And yes from AT&T and Nokia, Your Honor.

21          THE COURT:  All right.  Ladies and gentlemen of the

22   jury, that means you have now heard all the evidence in this

23   case.

24        There are certain things I need to take up with counsel

25   outside of your presence before I will be in a position to

1    give you my final instructions on the law and to allow counsel

2    for the competing sides to present their closing arguments to

3    you.

4        Let me say it another way.  You get the rest of the day

5    off, but I need you back here in the morning at 8:30 ready to

6    go.  There is lunch in the jury room ready for you.  It's five

7    minutes until 12:00 now.  I'm sure it's there.  You're welcome

8    to eat; you're welcome to leave and leave the food behind.

9    It's whatever you want to do, ladies and gentlemen.

10       My instructions, though, follow you wherever you go.  You

11   are not to discuss the case with yourselves or with anyone

12   else or communicate about anything that's happened during this

13   trial in any way.  And at this late stage after all this work

14   and effort, it would be a travesty to jeopardize that if that

15   particular instruction were violated in any way.  So please be

16   vigilant about making sure you comply with that and every

17   other instruction I've given you.

18       I'd ask you to be here by 8:15 in the morning, assembled

19   and ready to start at or near 8:30.  Travel safely to your

20   homes when you leave.  And with that, you're excused until

21   tomorrow morning.

22           (Whereupon, the jury left the courtroom.)

23           THE COURT:  Be seated, please.

24       Counsel, for your information, Plaintiff had 37 minutes

25   remaining of trial time, Defendant had 1 hour and 31 minutes

1    of remaining trial time.

2        We're going to break for lunch.  When we come back from

3    lunch, I will take up motions presented by either party under

4    Rule 50(a) of the Federal Rules of Civil Procedure.  If you

5    are going to present any part of the closing arguments

6    tomorrow, you're not required to be here.  There are more than

7    enough lawyers on both sides of this case to cover the

8    practice under Rule 50(a) and the informal and formal charge

9    conference that will need to take place this afternoon.

10       When I reconvene after lunch, as I say, I will take up

11   motions under Rule 50(a).

12       Let me just say this.  On the one hand, it's very common

13   for the younger members of the trial team to be asked to argue

14   the motions under Rule 50(a), and I certainly applaud our more

15   junior members of the Bar getting an opportunity to get some

16   live courtroom experience.

17       On the other hand, sometimes those less experienced

18   lawyers forget that I have heard all the evidence, and it's

19   happened more than once that I take up motions under Rule

20   50(a) and some lawyer stands at the podium and looks at me and

21   says, Your Honor, this is a patent case.  I've been here the

22   whole trial.  I've heard all the evidence.  Please ask

23   whoever's going to present your motions to be targeted and

24   succinct and get to the point.

25       After I've completed hearing the motions from either

1    side under Rule 50(a) and ruling on those motions, then I'll

2    conduct an informal charge conference in chambers.  I've

3    received your latest iteration of the proposed final jury

4    instructions and verdict form as requested yesterday

5    afternoon.  I've had time to look at it.  I think we can make

6    good prompt progress when we get to the informal charge

7    conference.

8         I would hope we could complete the formal charge

9    conference today so that we won't need to do that in the

10   morning, but I have to maintain my entire staff at the time we

11   do the formal charge conference.  If the process takes longer

12   than expected, I may send them home and I may bring you back

13   for the formal charge conference earlier than 8:30 in the

14   morning.  I hope we don't have to do that.  I think there's a

15   good chance we won't.  We'll see how the rest of today goes.

16        We're going to recess for approximately 45 or 50 minutes.

17   About 10 minutes until 1:00, I'll be back in here to hear

18   motions under Rule 50(a).  Again, if you are not involved in

19   that process or in the charge conference process, you're not

20   required to be here.

21        Do we know at this point and can the parties tell me who

22   will be presenting closing arguments for the respective sides?

23        MR. GRINSTEIN:  Your Honor, for the Plaintiff, I

24   will open the closing and Mr. Ward will provide the rebuttal.

25        THE COURT:  All right.

1          MR. DACUS:  The expectation on our side, Mr. Nelson

2     and I will split it, Your Honor.

3          THE COURT:  All right.  That will be perfectly fine.

4       Is there anything else that either side needs to raise

5     with me before we recess for lunch?

6          MR. GRINSTEIN:  Nothing from the Plaintiffs.  Thank

7     you, Your Honor.

8          MR. DACUS:  Nothing from us.

9          THE COURT:  I'll see you after lunch.

10      Court stands in recess.

11                      (Lunch Recess.)

12          THE COURT:  Be seated, please.

13       Having completed the presentation of the evidence, having

14    released the jury for the day, we'll proceed to take up

15    motions either party may care to offer before the Court

16    pursuant to Rule 50(a) of the Federal Rules of Civil

17    Procedure.

18       Let me do this.  My typical practice, counsel, is to

19    first identify topically any area or substantive relief that

20    either party's requesting under the rule, and then I'll go

21    back and structure and hear arguments.  It's often the case

22    that I get directly diametrically opposing motions and it

23    makes sense to hear argument, both on the positive and the

24    negative, the affirmative and the negative version at the same

25    time.

1        So let me first find out what both sides want to move on,

2   and then we'll talk about how to present the argument related

3   to those matters.

4        Let me turn to Plaintiff first.  What matters does

5   Plaintiff wish to move on for relief under Rule 50(a), if any?

6             MS. GRIFFITH:  Thank you, Your Honor.  Meg Griffith

7   for Plaintiff Finesse.

8        Finesse intends to move under Rule 50(a) for judgment as

9   a matter of law on whether the Defendants infringe the

10  asserted claims of the '775 Patent.

11            THE COURT:  Infringement of the '775 Patent.

12  Anything further?

13            MS. GRIFFITH:  No, Your Honor.

14            THE COURT:  All right.  What matters, if any, do the

15  Defendant and Intervenor care to seek relief under Rule 50(a)

16  in regard to?

17            MS. STRAKA:  Your Honor, Brianne Straka for the

18  Defendants.

19            THE COURT:  Yes.

20            MS. STRAKA:  Defendants intend to move for JMOL or

21  judgment as a matter of law under Rule 50(a) with respect to

22  non-infringement on the '134 Patent, each of the asserted

23  claims; non-infringement on the '775 Patent, all of the

24  asserted claims; invalidity of the '134 Patent and invalidity

25  of the '775 Patent; the '775 asserted claims are obvious.

1          And we also have a number of motions that we intend to

2    make with respect to damages.

3               THE COURT:  Can you identify the particular matters

4    related to damages that you seek to move on?

5               MS. STRAKA:  Yes, Your Honor.  I picked up the wrong

6    sheet of paper, though.  May I --

7               THE COURT:  You may retrieve the proper sheet of

8    paper.

9               MS. STRAKA:  Thank you, Your Honor.

10         With respect to damages, we intend to move that there is

11   insufficient evidence to support an award of damages.  In

12   particular, there's insufficient evidence to support a reward

13   of a running royalty -- of a running royalty.

14         Furthermore, the Defendant -- or the Plaintiff did not

15   present sufficient evidence to support a verdict of a lump sum

16   royalty.  And there is no or insufficient evidence in the case

17   to support an amount of a lump sum royalty over $1.35 million.

18         I have some more notes here about some of the more

19   particulars, but I think everything falls, generally speaking,

20   into those categories.

21              THE COURT:  It's your view that that fully apprises

22   the Court of the relief that you and your clients are seeking?

23              MS. STRAKA:  Yes, Your Honor.

24              THE COURT:  Okay.  All right.  Well, it's clear that

25   we have diametrically opposed motions with regard to the issue

1    of infringement or non-infringement of the '775 Patent.  So I

2    will take that up, and then we'll turn to the remaining

3    matters raised by Defendant and Intervenor.

4        Let me hear argument first from the Plaintiff regarding

5    the issue of infringement in the '775 Patent.  Then I'll hear

6    from Defendant and Intervenor.

7        It's good to see you, Mr. Capshaw.  I see they let you

8    come inside the Bar and sit at the counsel table.

9            MR. CAPSHAW:  They did.  They uncaged me, Your

10   Honor.

11           THE COURT:  Good.

12       Go ahead, counsel.

13           MS. GRIFFITH:  Thanks, Your Honor.  Meg Griffith

14   again for Finesse.

15       Finesse is entitled to judgment as a matter of law on the

16   asserted claims of the '775 Patent because there is

17   substantial evidence, and none of it has been controverted,

18   that Defendants AT&T and Nokia's accused products infringe

19   those asserted claims.

20       Finesse is satisfied its prima facie case of infringement

21   has substantial evidence.  Among other evidence, Mr. Smith,

22   the inventor and current CEO of Finesse, testified to the

23   issuance of the '775 Patent and its assignment to Finesse

24   Wireless, LLC.

25       Finesse asserted seven claims in that patent--claims 1,

1  4, 9, 16, 21, 29, and 36.  And Finesse's infringement expert,

2  Dr. Jonathan Wells, painstakingly explained to the jury how

3  every single of those infringed claims have been satisfied.

4      Defendants have not controverted that substantial

5  evidence and Finesse's entitled to judgment as a matter of law

6  because the jury has no evidence of non-infringement to

7  consider.  Specifically, in a non-infringement argument on the

8  '775 patent, Defendants' non-infringement expert, Mr. Proctor,

9  put forward a single --

10      THE COURT:  Could you slow down, Ms. Griffith?

11      MS. GRIFFITH:  Yes, Your Honor.

12      Mr. Proctor put forward only a single argument as to why

13  the '775 Patent was not infringed.  And that was the

14  limitation common to each of the asserted claims, including

15  the three signals, S1, S2, and S3.

16      But the problem with Mr. Proctor's argument is that he

17  had prepared an infringement opinion based solely on

18  Defendants' preferred claim construction which Defendants had

19  not raised with the Court during the *Markman* process and

20  instead raised through a motion for summary judgment.

21      As this Court is aware, the Court has construed the three

22  signals term under the *02 Micro* case and construed that term

23  as separately identifiable signals but not limited to three

24  unique signals.

25      Now, Defendants are aware that under the federal rules

1   Mr. Proctor's limited to testifying within the scope of his

2   report.  But even after the Court construed the S1, S2, S3

3   term, Defendants did not seek to supplement Mr. Proctor's

4   report and he went to the stand to testify on those opinions

5   that were foreclosed by the Court's construction because he

6   argued and based his analysis on the construction that the

7   three signals do have to be unique.  Because he was limited to

8   his report, Mr. Proctor conflated the phrases separately

9   identifiable and unique.

10      Mr. Proctor's opinion would nullify the Court's claim

11   construction of the term, so his opinions under that

12   construction are not acceptable for a reasonable jury to

13   consider for infringement.  In particular, Mr. Proctor pointed

14   to the limitation citing the three signals in each of the

15   asserted independent claims and imported into each of the

16   asserted dependent claims.  His analysis did not apply the

17   Court's construction.  Instead, he asserted that because the

18   accused products use two transmit signals to compute

19   intermodulation products, there were not three separately

20   identifiable signals.

21      The evidence is undisputed that calculating third order

22   intermodulation products requires combining three signals

23   together regardless of whether those signals are unique.  But

24   Mr. Proctor, by conflating the terms separately identifiable

25   and unique, argued that even though there were two input

1    signals X1 and X2 that were both used to create third order

2    intermodulation products, those input signals were not

3    separately identifiable.

4        Mr. Proctor then argued that because Doctor Wells had

5    mapped those two transmit signals to the three terms S1, S2,

6    and S3, those are not separately identifiable.  Mr. Proctor

7    continued this impermissible argument by saying that Doctor

8    Wells had not pointed to seven multiplications which Mr.

9    Proctor interpreted to require seven unique results.

10        By definition, if the S1, S2, and S3 signals must be

11    separately identifiable but not limited to three unique input

12    signals, then it is possible that some of those seven

13    multiplications will not be unique results.  This does not

14    mean they do not exist in the product, but that in mapping

15    those multiplications, Doctor Wells was still pointing to the

16    seven multiplications in the three results that were in the

17    accused products.

18        Among other evidence, Doctor Wells pointed to Plaintiff's

19    Exhibit 858 at pages 2164 and -65.  These pages show the

20    signals X1, X2 going into the non-linear block of GROOT to

21    estimate intermodulation products.  And as Doctor Wells

22    highlighted on those pages, if X1 is S1 and S2, and X2 is S3,

23    then all of the possible combinations of these signals X1 and

24    X2 as third order intermodulation products are present.

25        Based on the mapping of these by Doctor Wells, the seven

1    multiplications result in three unique combinations which are

2    all to be found on page 2164 and 2165 of Exhibit 858.

3        Mr. Proctor's argument, as explained, was impermissible

4    and does not undermine or come close to controverting Doctor

5    Wells' analysis and for the same reasons, Defendants' cross

6    examination of Doctor Wells did nothing to controvert his

7    analysis of S1, S2, S3 limitation and the asserted claims of

8    the '775 Patent because the questions to Doctor Wells for that

9    limitation rested solely on the question of the number of

10   unique input signals or the number of unique results for the

11   seven multiplications, neither of which are permissible under

12   this Court's claim construction.

13       The reason Defendants' expert has made this argument as

14   explained is because this is why Mr. Proctor is limited to his

15   expert report.  Mr. Proctor has made no acceptable arguments

16   for non-infringement of this limitation, and he gave no

17   testimony regarding non-infringement of any other limitation

18   in the asserted claims of the '775 Patent.  As a result,

19   Defendants can point to no evidence of non-infringement of

20   these elements of the '775 Patent.

21       Because the jury has no evidence that these elements were

22   not met, and Defendants have not presented sufficient evidence

23   for a reasonable jury to conclude on the a preponderance of

24   the evidence that the accused products do not infringe the

25   asserted claims of the '775 Patent, there is no reasonable

1    dispute for the jury.  Finesse has presented substantial

2    evidence for the jury to consider, and therefore Finesse

3    respectfully asks this Court to enter judgment as a matter of

4    law that the asserted claims of the '775 Patent are infringed.

5              THE COURT:  All right.  Let me hear competing

6    argument from AT&T and Nokia on this matter.

7              MS. STRAKA:  Thank you, Your Honor.

8        Defendants Nokia and AT&T move for judgment as a matter

9    of law with respect to claims -- all asserted claims of the

10   '775 Patent.

11             THE COURT:  Let me stop you.

12             MS. STRAKA:  Yep.

13             THE COURT:  Both of you ladies are reading the text

14   of your argument, and you're reading very fast.  And it's been

15   a long week, and I want to follow your arguments.  And I want

16   the court reporter to have an opportunity to get them down

17   accurately.  So I'm going to ask, please slow down.

18             MS. STRAKA:  I will, Your Honor.  Thank you.

19             THE COURT:  And that goes for everybody in the room,

20   not just you, Ms. Straka.

21             All right.  Please continue.

22             MS. STRAKA:  Thank you, Your Honor.

23        The key limitation to -- in the '775 Patent asserted

24   claims is the limitation that reads, given three signals, S1,

25   S2, and S3, digitally multiplying and filtering another seven

1    equations that are listed and this is for the calculation of

2    the ICSs, an nth order ICS where n is an integer.

3         Each asserted claim requires that limitation, and as Your

4    Honor knows, Magistrate Judge Payne construed that claim

5    limitation in the context of summary judgment briefing as,

6    signals which must with separately identifiable but are not

7    limited to three unique input signals.  That is the

8    construction that Your Honor adopted in this case and that is

9    the construction that was applied by Mr. Proctor in his

10   analysis in this case.

11        Doctor Wells' presentation of evidence with respect to

12   the '775 Patent, particularly in relation to this limitation,

13   was insufficient.  Doctor Wells repeatedly testified that he

14   identified only two input signals, X1 and X2.  The claim

15   limitation is not limited to three unique input signals, but

16   the claim limitation does require there be three signals, S1,

17   S2, and S3, and each one of those three signals must be

18   separately identifiable.

19        In his analysis, Doctor Wells only identified X1 and X2,

20   and then he presented the jury with a chart that purported to

21   map the three claim signals, S1, S2, and S3, to the two

22   signals in the Nokia implementation X1 and X2.  Therefore, he

23   never identified a third signal for the jury to consider.

24        When he did his mapping, he used the very same signal,

25   X2, and he mapped it both to S2 and S3.  That is not

1    permissible under the Court's construction here which does

2    require that the three signals must be separately

3    identifiable.

4         Doctor Wells then -- his analysis was also insufficient

5    because he never then tried to show that the claimed

6    equations, the multiplications that are in the patent, were

7    actually in the product.  So Doctor Wells' analysis where he

8    showed how X1 and X2 could map to S1, S2, and S3 was a purely

9    hypothetical mapping.  He never showed that even the three

10   equations that that would boil down to were in the product.

11   And, in fact, he didn't show that any single one of the

12   multiplications that are required by the claim are in the

13   product.

14        Taken to a logical extreme, the evidence in this case

15   would be that Doctor Wells could have pointed to a single

16   signal and said that single signal cubed met the limitations,

17   that's what the Plaintiffs are arguing here and the Court's

18   construction does not permit that.  And that's -- the evidence

19   in this case did not show that there was a third signal that

20   is used in the calculation of the intermodulation product

21   cancellation signals as they had identified them with respect

22   to the '775 Patent.

23             THE COURT:  Anything further?

24             MS. STRAKA:  That's all, Your Honor.

25             THE COURT:  All right.  Let me move forward and hear

1    argument regarding Defendants' motion under Rule 50(a) for a

2    finding of no infringement as to the '134 Patent.

3         Go ahead, Ms. Straka.

4            MS. STRAKA:  Thank you, Your Honor.

5         With respect to the '134 Patent, we have several reasons

6    why this claim was not met as a matter of law.  With respect

7    to each of the '134 Patent asserted claims, they require

8    oversampling at a desired frequency, a passband of receive

9    signals to create a bit stream wherein the received signals

10   include signals of interest and interference generating

11   signals.

12        I think I note that one of the claims of the three only

13   says sampling and not oversampling, but each of the three

14   asserted claims have a substantially similar limitation that

15   requires either sampling or oversampling with those

16   requirements.

17        Doctor Wells presented no evidence that there is a set of

18   receive signals that include both the signal of interest and

19   the interference generating signals under the Court's claim

20   constructions in this case.

21        Signal of interest was construed to be a signal that from

22   the perspective of the receiver is both received and sent to a

23   baseband processor.  Doctor Wells pointed to the downlink

24   transmit signals as the signal of interest in his analysis.

25   The downlink reference transmit signal does not meet the

1     Court's construction of signal of interest.

2          Furthermore, he pointed to something that he called the

3     interference generating signal.  He pointed to the modeled PIM

4     path and he said that was a signal, but Mr. Davis testified

5     and Mr. Proctor testified that the -- both of them testified

6     that there is no such signal as the modeled PIM path signal.

7     So it identified a phantom signal as meeting the interference

8     generating signal in his analysis.

9          The way that the products actually work was also

10    presented in this case by Mr. Davis.  Mr. Davis explained that

11    the receive signals come through one path.  That path band of

12    receive signals is sampled and sent to the GROOT FPGA for

13    processing.  Through a separate -- completely separate path,

14    the downlink transmit signals are sent to the GROOT FPGA for

15    PIM modeling.

16         And, therefore, there is no signal passband within the

17    products that includes both what the actual receive signal is,

18    which is the definition of the signal of interest, and what

19    they have identified as the interference generating signal.

20    Even if there is a modeled PIM path signal that's on that

21    other path, they're not within the same passband.  And,

22    therefore, for this reason claims 1, claims 2, and claims 3

23    are not -- do not meet -- the claim limitations are not met.

24         Secondly, claims 2 and claims 3 have both been construed

25    as means-plus-function claims.  Each of those claims requires

1    means for oversampling or a sampling unit to sample.  Both of

2    those were construed by the Court, and the structure that is

3    required is either a Sigma Delta modulator or a flash A/D

4    converter.

5        Doctor Wells' analysis -- in Doctor Wells' analysis, he

6    pointed to a TI technical specification that -- and said that

7    that TI ADC met the claims construction, but he did not show

8    that it's a Sigma Delta modulator or a flash A/D converter.

9    He's proceeding under the assumption that it's an equivalent

10   thereto.  But when he did his analysis, he didn't provide any

11   evidence that the pipelined converter's structure of the TI

12   component is an equivalent to a Sigma Delta modulator or a

13   flash A/D converter.  Instead, he assumed it was equivalent

14   because it had the function of analog-to-digital conversion.

15       This is insufficient analysis as an equivalent for a

16   means-plus-function claim.  It is necessary for Doctor Wells

17   to have identified why the particular structure of the TI

18   component is equivalent to the architecture of a Sigma Delta

19   modulator or a flash A/D converter.  And by boiling the

20   analysis down to the function of analog-to-digital conversion,

21   he's essentially read that limitation out of the claims.  He's

22   read it so that it's no longer limited to the structures that

23   were disclosed in the specification.

24       To be clear, there may be analog-to-digital converters

25   that could fall within the scope, that could be equivalent to

1    a flash ADC or a Sigma Delta modulator, but he presented no

2    such analysis.

3         The third reason why the Defendants are entitled to a

4    judgment as a matter of law of non-infringement with respect

5    to the '134 Patent is that each of the asserted claims require

6    performing phase and amplitude adjustments on estimations of

7    intermodulation product interfering signal in a closed loop

8    manner.

9         Doctor Wells presented insufficient evidence that the

10   products work in a closed loop manner.  In fact, he didn't

11   describe what completed the loop, what made it be a closed

12   loop product.  When Mr. Davis got on the stand, Mr. Davis

13   testified clearly that it's an open loop design, and Mr.

14   Proctor testified the same.

15        Doctor Wells' presentation did not show any feedback, it

16   does not meet the plain and ordinary meaning of how a person

17   of ordinary skill in the art would understand a closed loop

18   manner to be, and, therefore, Finesse's -- the Defendants are

19   entitled of a judgment as a matter of law of non-infringement.

20        There's one more reason that the Defendants are entitled

21   to judgment as a matter of law with respect to the '134 Patent

22   on non-infringement, and that's each of the asserted claims

23   require sub sample phase shifts to make a phase adjustment on

24   the estimations of the intermodulation product and interfering

25   signals.

1          Doctor Wells did not present sufficient evidence that

2     there was a sub sample phase shift.  Again, when Mr. Davis

3     took the stand, Mr. Davis explained that the figure that he

4     actually pointed to in the products is a path on the RX, it

5     was the RX delay, had nothing to do with the delay search

6     component that Finesse identified as performing sub sample

7     phase shifting.

8          Mr. Davis also testified that that particular component

9     sampled at the rate of the receive signal.  And, therefore,

10    there was insufficient evidence that -- therefore, it could

11    not -- it was not sampling on the sub sample level, and,

12    therefore, there is insufficient evidence in the record to

13    show that there was any sub sample phase shifting.

14         Your Honor, I think that concludes my argument with

15    respect to the '134 Patent.

16         It did occur to me during my argument that I think, with

17    respect to the '775 Patent, I may have -- I just wanted to

18    make it clear for the record that Mr. Proctor also did put on

19    evidence that the three signals were not there and that the

20    seven claimed multiplications were not met due to the

21    particular type of math that is done in the products.  He

22    explained that it was complex math and that complex math does

23    not allow the seven multiplications to be met.

24              THE COURT:  All right.  Thank you.

25         Let me hear responding -- a responsive argument on the

1    motion for non-infringement as to the '134 Patent from

2    Plaintiff.

3              MS. GRIFFITH:  Thank you, Your Honor.  Meg Griffith

4    again for Plaintiff Finesse.

5              THE COURT:  Go ahead.

6              MS. GRIFFITH:  Defendants are not entitled to

7    judgment as a matter of law for non-infringement of the '134

8    Patent because Finesse has put forward substantial evidence

9    that each of the limitations in each of the asserted claims of

10   the 14 patent have been met.

11        With respect to Defendants' first argument on the set of

12   received signals containing signals of interest and

13   interference generating signals, Doctor Wells demonstrated a

14   signal of interest existed under the Court's construction.

15   Mr. Proctor, on the other hand, continually referred in his

16   direct examination to the signal of interest as an uplink or

17   as the signal of interest that one wants to receive that is

18   supposed to be received from the phone as opposed to be in a

19   two-way communication.

20        This is not to be found anywhere in the Court's

21   construction.  The Court's construction requires a signal to

22   be received and sent by a receiver to the baseband processor.

23        Doctor Wells showed that this was present through the red

24   path that was in figure 1 of PX 855.  Both sides agree that

25   the legend in that figure 1 describes the red path as the

1    downlink transmit reference signal and the legend also refers

2    to the modeled PIM path.

3        The downlink transmitter reference signals, according to

4    Doctor Wells' testimony, are the two transmit bands that are

5    sampled, x1 and x2.  These are the two signals that are viewed

6    by Doctor Wells, as explained in his testimony, as a signal of

7    interest in interference generating signal that the ADC

8    converter is trying to receive and to GROOT the baseband

9    processor.

10        Dr. Wells opined that GROOT was the baseband processor

11    and as competing testimony to what Defendants have pointed to

12    from their witnesses.  Doctor Wells also provided testimony

13    that the analog-to-digital converter found in GROOT is a

14    receiver that sends the signal in digital form to GROOT.  On

15    cross-examination, Mr. Proctor was forced to admit that the TI

16    specification stated that that analog-to-digital converter

17    manufactured by Texas Instruments is, in fact, a receiver.

18        The signal of interest is, therefore, met because the

19    transmit signals along the red path qualify as the signal of

20    interest in the interference generating signals that are

21    received by the ADC and sent to GROOT.  Those are in a single

22    bit stream sampled at that ADC converter on the red path,

23    satisfying the first limitation of each of the claims of the

24    '134 Patent.

25        Defendants' second argument pertains to the Sigma Delta

1    modulator structure limitation in claims 2 and 3 of the '134

2    Patent.  Doctor Wells testified that, based on his review of

3    the Texas Instruments technical specification, he considered

4    the Sigma -- the ADC converter from Texas Instruments to be

5    the equivalent of the Sigma Delta modulator in the flash or a

6    flash A/D converter because of the oversampling that it

7    performed and the fact that it was -- it collected a bit

8    stream with both of those signals that was then passed on to

9    the baseband processor.

10       Defendants' experts may have a -- I apologize.

11   Defendants' expert and fact witness may have a different view

12   as to what that is, but this is a matter for the jury to

13   decide as there's substantial evidence from Plaintiff.

14       The next issue raised by Defendants pertains to the

15   closed loop manner limitation in each of the three asserted

16   claims in the '134 Patent.  Doctor Wells on direct examination

17   testified as to what his understanding was that a person of

18   ordinary skill in the art would understand closed loop manner

19   to mean.

20       Closed loop manner is not defined in the specification of

21   the '134 Patent and has not been construed by this Court.  And

22   in providing an explanation of how he interpreted that term,

23   Doctor Wells set the standard by which he then identified the

24   closed loop.  In particular, Doctor Wells noted that the

25   closed loop manner includes the term manner and stated that,

1   because of that construction, in his view, it meant trying to

2   hold a signal at a certain value.  That was in the day 2

3   transcript, pages 66 to 68.

4        Doctor Wells explained why the amplitude coefficients and

5   the phase delay and delay searches in his view satisfied the

6   closed loop manner because they led to continuous alignment of

7   the signals.

8        Finally, Defendants argue that the sub sample phase shift

9   with limitation or element in the last limitation of each of

10  the asserted claims in the '134 Patent was not satisfied by

11  Finesse.

12       Again, Doctor Wells put forward substantial evidence that

13  this was met.  Doctor Wells explained his view that the

14  decimating filters applied to the signal from the adaptive PIM

15  model provided the sub samples that are relevant here.  And

16  Doctor Wells further testified that the delay search that he

17  looked to as the phase shift provided the sub sample phase

18  shift relevant to this element.

19       Therefore, as to each of the required limitations in the

20  '134 Patent's asserted claims, Finesse through Doctor Wells

21  has presented substantial evidence, and Defendants are not

22  entitled to judgment as a matter of law.

23            THE COURT:  All right.  Having heard argument with

24  regard to the issue of non-infringement concerning the '134

25  Patent, let's turn to the issue raised by Defendant and

1    Intervenor concerning invalidity as to both the '775 and the

2    '134 Patent.  I'd like to hear combined argument in invalidity

3    as to both patents.

4        We'll begin with the moving Defendant and Intervenor.

5           MS. STRAKA:  Thank you, Your Honor.

6        With respect to the '134 Patent, the Defendants presented

7    evidence through Mr. Proctor that all of the asserted claims

8    are obvious based on the combination of Kim in view of

9    Bazarjani.

10       Kim is a reference that teaches PIM cancellation.  He

11   showed that each and every limitation of the claims was met

12   except that Kim did not explicitly disclose certain structures

13   that were required for analog-to-digital conversion.  He used

14   the teachings of Bazarjani which included detailed analysis

15   with respect to Sigma Delta modulators and explained how a

16   person of ordinary skill in the art would convert analog

17   signals to digital signals and used those structures in there,

18   including decimating filters and other components, to meet

19   each and every claim of the '134 Patent.  Mr. Proctor also

20   presented evidence that it would be -- there would have been a

21   motivation to combine Kim with Bazarjani.

22       As of the time of late in the late '90s, much was

23   happening to convert systems from analog to digital.  Mr.

24   Proctor put forth that evidence.  And he explained that a

25   person of ordinary skill in the art reading Kim would look to

1    Bazarjani in order to figure out how to do that

2    analog-to-digital conversion.  He then used Kim to show how

3    the PIM cancellation features were met and presented evidence

4    that is done in a way that meets each and every claim

5    limitation of the '134 Patent.

6         He also presented evidence at the end of his argument, at

7    the end of his presentation, I should say, about the lack of

8    secondary considerations in this case.  He presented evidence

9    about the lack of a long-felt need.  He presented evidence

10   about how the results were not unexpected, and that was even

11   under the cross-examination that was presented by Mr.

12   Grinstein.  There is insufficient evidence of secondary

13   considerations here to create -- to rebut Defendants' prima

14   facie case here of obviousness in light of Kim and Bazarjani.

15        During his analysis Mr. Proctor also did note that the

16   level of ordinary skill in the art is not a relevant

17   consideration here and that the parties didn't really dispute

18   the level of ordinary skill in the art in the case.

19        Plaintiff chose not to present a rebuttal presentation on

20   that, and Mr. Grinstein's cross-examination of Mr. Proctor did

21   not demonstrate that any of the limitations were missing in

22   the combination of Kim and Bazarjani.  He asked Mr. Proctor

23   questions that asked whether or not Bazarjani taught

24   cancellation, and he asked a couple of questions about whether

25   or not Kim explicitly said anything about digital.  But again,

1    that comes from the combination, and Mr. Proctor presented a

2    prima facie case that it is all present there in the

3    combination, and the Defendants presented no rebuttal to that.

4         Turning to the '775 Patent, Mr. Proctor put forth a prima

5    facie case that all of the asserted claims are obviousness

6    over a combination of McCalister in view of Lui.  The Lui

7    reference was discussed repeatedly in this case, and it was

8    shown to be math that has been known certainly since the '90s

9    when the paper was published, but witnesses, including Mr.

10   Smith and including Mr. Proctor and including Doctor Wells,

11   testified that this math has been well-known for a very long

12   time.  The math for calculating intermodulation products has

13   been known for many years, and that's the primary reason that

14   Lui was used in the combination.

15        Mr. Proctor put forth substantial evidence that each and

16   every limitation of all of the asserted claims of the '775

17   Patent were met by the McCalister reference, given what a

18   person of ordinary skill in the art would have known and found

19   obvious at the time.

20        The only thing that McCalister did not explicitly say was

21   a power series description for the math that is claimed in the

22   '775 asserted claims, and therefore Mr. Proctor explained that

23   a person of ordinary skill in the art would know that math but

24   also look to Lui to confirm that math.  And so that math was

25   presented using the Lui reference.

1      Again, at the end of his presentation, Mr. Proctor

2    presented evidence that there is lack of secondary

3    considerations here.  There was certainly no substantial

4    evidence that would rebut the Defendants' prima facie case of

5    obviousness with respect to the '775 Patent here.  Plaintiff,

6    again, chose not to provide a rebuttal to the arguments that

7    Mr. Proctor presented.  And, therefore, the Defendants move

8    for judgment as a matter of law to invalidity with respect to

9    all of the asserted claims of the '775 Patent.

10         THE COURT:  All right.  Let me hear responsive

11    argument from Plaintiff in regard to invalidity concerning the

12    two asserted patents.

13         MS. GRIFFITH:  Thank you, Your Honor.  Meg Griffith

14    again for Plaintiff Finesse.

15      Defendants' position that Finesse is required to call a

16    validity expert to rebut Defendants' invalidity defenses on

17    the '134 and '775 Patents has already been rejected by the

18    Federal Circuit in a decision affirming a judgment of this

19    Court in Core Wireless Licensing, S.A.R.L. versus LG

20    Electronics, Incorporated, 880 F.3d 1356, in 2018.

21      At page 1364 of the Federal Circuit's opinion in Core

22    Wireless, the Federal Circuit stated, A patent is presumed

23    valid and the burden of establishing invalidity rests on the

24    party asserting it with clear and convincing evidence.  Here

25    it is Defendants who have that burden.

1    The Federal Circuit continued to explain that, although

2    the burden may shift to the patentholder if that burden is

3    met, the outcome of an alleged infringer's invalidity defense

4    at trial depends on whether the alleged infringer has carried

5    its burden of persuasion to prove by clear and convincing

6    evidence that the patent is invalid.

7    In the Core Wireless case tried before this Court, LG as

8    Defendant presented testimony of its invalidity expert and

9    Core Wireless cross-examined that expert to demonstrate why

10   those opinions were incorrect.  Core Wireless did not call its

11   own validity expert in rebuttal, and LG, as Nokia and AT&T

12   have here, moved for judgment as a matter of law on that

13   basis.

14   This Court denied that motion and noted that the jury was

15   not required to give full credit and acceptance to the

16   testimony of the invalidity expert in that case.  LG appealed.

17   The Federal Circuit upheld this Court's ruling and held that

18   Core Wireless had the right to choose to use its limited trial

19   clock for other purposes where it believed that LG's evidence

20   had been adequately impeached.

21   The jury is entitled to evaluate Mr. Proctor's testimony

22   and to determine whether the Defendants have clearly and

23   convincingly established that the prior art made the claims

24   here obvious.

25   Based on this and other rulings from Your Honor, the

1    Federal Circuit affirmed the judgment in Core Wireless.

2         Here Defendants have put up Mr. Proctor as their

3    invalidity expert, and Defendants' invalidity case is based on

4    obviousness of different combinations of two pieces of prior

5    art.

6         Mr. Grinstein, counsel for Finesse, cross-examined Mr.

7    Proctor on his assertions of obviousness.  Among other

8    evidence, Mr. Grinstein questioned Mr. Proctor about the fact

9    that Bazarjani, which Mr. Proctor quoted as prior art showing

10   digital rather than analog signals, came before Kim.  This,

11   among other evidence, undermines the motivation to combine.

12        And among other evidence, Mr. Grinstein questioned Mr.

13   Proctor about the fact that the Lui journal article used in

14   the combination for the '775 Patent had been printed long

15   before and simply stated what the problem in the industry was

16   without providing the solutions that, in combination, would

17   render the inventions in the asserted '775 claims obvious.

18        And among other evidence, Mr. Grinstein noted that the

19   math in Lui did not involve power series, just basis function.

20        Mr. Grinstein further elicited through Mr. Proctor

21   evidence of secondary considerations of non-obviousness that

22   had been presented to the jury through prior fact witnesses.

23   Among other evidence, that included industry praise and

24   recognition, unexpected results, and long-felt need.

25        Therefore, under the Federal Circuit precedent in Core

1    Wireless, Plaintiff has demonstrated substantial evidence of

2    validity and Defendants are not entitled to Rule 50 judgment

3    as a matter of law.

4         THE COURT:  All right.  Let's move to the general

5    topic of damages.  Defendant and Intervenor have moved for

6    relief under Rule 50(a) with regard to various issues

7    connected with the damages topic, arguing that there should be

8    no damages as a matter of law; that, alternatively, there

9    should be no running royalty damages as a matter of law; and,

10   alternatively, that there should be no damages awarded as a

11   lump sum as a matter of law.

12        Let me hear from the moving parties on this.  If there

13   are any other related issues that I haven't mentioned that you

14   are raising in this category under Rule 50(a), please make

15   that clear.

16        MS. STRAKA:  Your Honor, Defendants move for

17   judgment of a matter of law with respect to the damages issues

18   in this case.  Plaintiff Finesse did not provide sufficient

19   evidence to support an award of damages.  Furthermore, Finesse

20   did not provide sufficient support to support a running

21   royalty.

22        Should the jury find the asserted claims of the '775

23   Patent valid and infringed, the jury should award no more than

24   $1.35 million.  Should the jury find that the asserted claims

25   of the '134 Patent are valid and infringed, the jury should

1    award no more than $531,000.  There is not evidence to support

2    a higher award in this case.

3        Finesse has not introduced substantial evidence that it

4    is entitled to request $166 million in royalties because

5    Doctor Bazelon opined that if the '775 Patent is found valid

6    and infringed, the royalties to Finesse are $58 million, and

7    if only the '134 Patent is found value it and infringed, the

8    royalties to Finesse are $63 million.

9        He admitted that if AT&T stopped using PIM cancellation

10   technology tomorrow, that it wouldn't owe any more in damages,

11   nor has Finesse introduced substantial evidence that the

12   royalties to Finesse are $58 million to $63 million.  Doctor

13   Bazelon's methodology is speculative and unreliable, and he

14   was not qualified to make the technical assumptions that he

15   made in this case and he -- on which his determinations rely

16   on.

17       His salvage of Doctor Bazelon's salvaged spectrum

18   analysis relies on the calculation -- let me start that again.

19       Doctor Bazelon's analysis relies on the calculation of

20   salvaged spectrum despite clear and unrebutted testimony that

21   AT&T does not measure the value of PIM-C by purchasing

22   spectrum.  He conflates internal PIM with external PIM, and he

23   relies on performance assessments for non-Nokia and unaccused

24   products.  He also ignores the evidence showing that AT&T

25   mitigates PIM through site hygiene.

1          Spectrum -- sorry.

2          He also assumes that spectrum is salvaged everywhere that

3     AT&T has PIM-C on, ignoring the evidence that shows limited

4     prevalence of internal PIM issues in the AT&T network,

5     including that PIM-C is not a feature in roughly two-thirds of

6     the AT&T network and uses Ericsson radios in two-thirds -- and

7     does not use the PIM-C feature in two-thirds of Nokia's radios

8     within AT&T's network.

9          AT&T's limited number of internal PIM repair tickets per

10    year, the performance data showing that even with PIM-C off,

11    less than two percent of the accused radios experience

12    internal PIM.

13         Doctor Bazelon ignores the market evidence of patent

14    purchases and license offers for comparable technology,

15    including an offer that Finesse made to IV to sell a portfolio

16    including patents in the suit for $3 million.

17         There's also -- so, in total, this is insufficient

18    evidence to support a verdict in the form of a lump sum

19    royalty because Doctor Bazelon's analysis was based on a

20    running royalty through trial.  And, again, those numbers were

21    $58 million to $63 million.  And as I've already stated, his

22    analysis with respect to that was also insufficient, given the

23    evidence that was presented in the case.

24         And, therefore, there is no evidence in this case to

25    support an amount of a lump sum royalty over $1.35 million as

1   was presented by Defendants' expert, Doctor Becker.

2            THE COURT:  Anything further?

3            MS. STRAKA:  May I have one moment to confer, Your

4   Honor?

5            THE COURT:  You may.

6                  (Pause in proceedings.)

7            MS. STRAKA:  Your Honor, I just want to clarify for

8   the record, for all of the points that I went through, there

9   is both no evidence on these points and there's also no

10  substantial evidence to support Doctor Bazelon's analysis

11  here.

12           THE COURT:  All right.  Let me hear responsive

13  argument from Plaintiff, please.

14           MS. FAIR:  Good afternoon, Your Honor.

15           THE COURT:  Good afternoon.

16           MS. FAIR:  There is sufficient evidence for a

17  reasonable jury to conclude that the damages that the

18  Plaintiff presented in this case should be awarded.

19       The Defendants first moved on there being no damages at

20  all.  Doctor Bazelon was on the stand for several hours

21  walking through a detailed analysis of his methodology for

22  salvaged spectrum provided by each of these radios.

23       And taking in turn the Defendants' argument that there's

24  insufficient evidence for a running royalty, Doctor Bazelon

25  walked through how he calculated what each radio would save in

1  spectrum by using this technology, what the value of that

2  spectrum would be by radio by market based on the specific

3  operation of that radio, and how he did an economic analysis

4  rolling all of that together to get to a running royalty of

5  $272 per radio per year if only the '134 Patent is infringed,

6  and $251 per radio per year if the '775 Patent is infringed.

7       The Defendants criticize Doctor Bazelon for using

8  performance assessments for unaccused products.  Doctor

9  Bazelon explained that that's not what he did.  He relied on

10  portions of a test where AT&T applied PIM and then used actual

11  tests from Nokia to determine what the particular radio models

12  in this case would do in terms of providing performance

13  benefits.

14       The Defendants argued that AT&T does not measure the

15  performance of PIM-C by looking at salvage spectrum.  But as

16  the Court knows, a damages expert is not limited to how a

17  defendant views the benefits of a patent.

18       The Defendants also ignore the wealth of other evidence

19  presented in this case, particularly with respect to arguing

20  that there's insufficient evidence for the jury to award a

21  lump sum or a lump sum of more than $1.35 million.  The

22  Defendants have argued to this jury, and we expect that they

23  will continue to argue tomorrow, that they should -- that the

24  jury should award a lump sum fully paid-up license amount.

25       Doctor Bazelon did calculations as to what that amount

1    would be should the jury determine that that's the appropriate

2    way to award damages in this case.  And so Doctor Becker's

3    testimony that a lump sum is the appropriate answer and Doctor

4    Bazelon's testimony for how that should be calculated could

5    lead a reasonable jury to conclude that it should award a lump

6    sum of $166,303,391.

7         There is more than sufficient evidence for a reasonable

8    jury to award a lump sum, should they choose, or a running

9    royalty, should they choose, and there is certainly more than

10   sufficient evidence for a reasonable jury to award more than

11   $1.35 million in damages as a lump sum if the '775 Patent is

12   infringed and more than enough evidence for a reasonable jury

13   to award more than $531,000 if only the '134 Patent is

14   infringed.

15        And for those reasons, the Defendants' motion with

16   respect to damages should be denied.

17             THE COURT:  All right.  Thank you, counsel.

18        Before the Court announces its rulings on these various

19   motions raised by the parties under Rule 50(a), are there any

20   other matters we have not covered or have been left

21   incomplete?

22        Anything further from Plaintiff?

23             MS. GRIFFITH:  Nothing further, Your Honor.

24             THE COURT:  Anything further from AT&T or Nokia?

25             MS. STRAKA:  Nothing further, Your Honor.

1          THE COURT:  Okay.  With regard to Plaintiff's motion

2   for judgment as a matter of law that there is no -- that there

3   is infringement, rather, of the '775 Patent and the

4   corresponding motion from Defendant and Intervenor that there

5   should be judgment as a matter of law entered that there is no

6   infringement as to the '775 Patent, those two competing

7   motions are denied.

8          With regard to the Defendants' motion of non-infringement

9   under Rule 50(a) concerning the '134 Patent, that motion is

10  denied.

11         With regard to the Defendant and Intervenor's motion that

12  both the '134 Patent and the '775 Patent as to the claims

13  asserted in this case are invalid as being obvious, those are

14  denied.

15         And with regard to the Defendant and Intervenor's motion

16  for judgment as a matter of law related to damages, including

17  no damages, no running royalty damages, and no lump sum

18  royalty damages, those motions are denied.

19         All matters presented by the parties pursuant to Rule

20  50(a), to avoid any lack of clarity, are denied by the Court.

21         All right, counsel.  Thank you for your arguments.

22         It is 2:00, more or less.  I'd like to take about a

23  30-minute break, and then those of you that are going to be

24  participating and involved in the informal charge conference,

25  I'd ask you to meet me at 2:30 in chambers and we will review

1    the most current offering regarding the proposed final jury

2    instructions and verdict.

3         I welcome your participation and input.  The informal

4    charge conference is intended by the Court to be informal and

5    free-flowing.  I want to know what you think.  I want to

6    discuss where you disagree.  I may have areas that you're in

7    agreement that I want to discuss.  But we will cover anything

8    and everything related to the charge and the verdict form in

9    chambers during the informal charge conference.

10        Once I've had the benefit of a fulsome discussion with

11   counsel for the parties as a part of that process, then I will

12   take that input into account and I will generate what I

13   believe to be the appropriate and proper final jury

14   instruction and verdict form for use in this case.

15        I'll then deliver copies of those documents to counsel

16   for the competing parties with an opportunity to review and

17   consider the same.  And after you've had an opportunity to

18   review them and consider them, then I'll conduct a formal

19   charge conference in the courtroom on the record where either

20   party may raise such objections on the record as they believe

21   are both proper and in the interest of their clients.

22        Any questions?  If not, we stand in recess.  I'll see

23   those of you participating in the informal charge conference

24   in chambers in 30 minutes.

25                    (Recess taken.)

1           THE COURT:  Be seated, please.

2      After hearing from the parties with regard to motions

3  they cared to offer under Rule 50(a), the Court met with

4  counsel for the competing parties in chambers and conducted a

5  fulsome informal charge conference, reviewing the most current

6  submitted iteration of the final jury instructions and verdict

7  form.  The Court had an opportunity to discuss with counsel

8  for the parties those areas where they were not in agreement.

9  The Court also was able to discuss with the parties various

10  other areas about the submissions that perhaps they weren't in

11  agreement or were not in disagreement about but the Court felt

12  further input would be helpful.

13      After, as I say, a fulsome and free-flowing informal

14  charge conference, the Court considered and took into account

15  the input from the parties through their counsel and has now

16  generated what it believes to be the proper final jury

17  instructions and verdict form for submission in this case.

18  I'm now prepared to conduct a formal charge conference on the

19  record reviewing both the final jury instructions and verdict

20  form.

21      Counsel, some of you may be aware, and in case some of

22  you are not, my typical practice in this regard is to ask that

23  there be a single spokesman for each of the competing sides at

24  the podium together.  My practice is to walk through on a

25  page-by-page basis these documents beginning with the first

1    page and at each page ask if there are any objections to be

2    raised either as to something that has been included or

3    something that has been omitted, and by doing this on a

4    page-by-page basis, the Court believes that the likelihood of

5    overlooking anything unintentionally is greatly reduced.

6         So whoever will speak for Plaintiff and whoever will

7    speak for Defendant and Intervenor, if you would go to the

8    podium, we will begin with the final jury instructions and

9    we'll begin with page 1 of that document.

10        And I don't want you to feel like you're artificially

11   limited to only one person.  Your co-counsel are free to pass

12   you notes if you think that's necessary or to consult with you

13   quietly as we go through this, but it saves a lot of time if

14   we do this with each representative at the podium together

15   instead of waiting for the other one to get up and walk across

16   the courtroom and respond.

17        So we'll begin the formal charge conference.  Turning to

18   the final jury instructions, we will begin with the cover page

19   or page 1 of that document.  Are there any objections here

20   from either party?

21             MS. XI:  No objections from Plaintiff.

22             MS. KENNEDY:  Your Honor, just a minor thing while

23   we're here.  Nokia -- I think it's Nokia of America, comma,

24   Corporation in the caption.

25             THE COURT:  Nokia of America, not American?

1           MS. KENNEDY:  Is that right, Ms. Straka?

2      Yes, Your Honor.

3           MS. STRAKA:  Yes, Your Honor.

4           THE COURT:  So the style on the first page will be

5  Nokia of America, comma, Corporation.  Is that correct?  Your

6  head's moving up and down, counsel.

7           MS. KENNEDY:  Oh, yes.  Thank you, Your Honor.

8           THE COURT:  We still have a record.

9      Okay.  I'll make that change on the first page.

10          MS. STRAKA:  Your Honor, I think it's Nokia of

11  America Corporation without a comma between America and

12  Corporation.

13          THE COURT:  Well, I'm happy to do it either way, as

14  long as you-all can agree on what's the right way to do it.

15          MS. STRAKA:  No comma, Your Honor.

16          THE COURT:  All right.  So the style of the case,

17  the heading on the top of page 1 will be Nokia of America

18  Corporation.

19      All right.  Hearing nothing further on page 1, we'll turn

20  to page 2 of the final jury instructions.  Is there any

21  objection here from either party?

22          MS. XI:  No, Your Honor, for Plaintiff.

23          MS. KENNEDY:  No, Your Honor.

24          THE COURT:  Turning then to page 3, are there

25  objections here from either party?

1           MS. XI:  None from Plaintiff.

2           MS. KENNEDY:  No, Your Honor.

3           THE COURT:  All right.  Turning next to page 4, are

4    there objections here?

5           MS. XI:  None from Plaintiff.

6           MS. KENNEDY:  I'm sorry.  Page 4?

7           THE COURT:  Yes.

8           MS. KENNEDY:  No, Your Honor.

9           THE COURT:  Turning, then, to page 5 of the final

10   jury instructions, is there objection here from either party?

11          MS. XI:  None from Plaintiff.

12          MS. KENNEDY:  No, Your Honor.

13          THE COURT:  Turning to page 6, are there any

14   objections here?

15          MS. XI:  So from Plaintiff, I noticed that both AT&T

16   and Nokia bear the burden of proving invalidity of Finesse's

17   patents.  I think that's inconsistent with the verdict form,

18   and elsewhere throughout these instructions where only AT&T

19   has been mentioned as bearing that burden.

20          MS. KENNEDY:  And we do agree with that based on the

21   verdict form that has been proposed that the reference to

22   Nokia bearing a burden of proof would not --

23          THE COURT:  All right.  Then at the bottom of page

24   5, the final two lines, will read, "The Defendant AT&T

25   Mobility, LLC, which you've heard referred to throughout the

1    trial as AT&T, has the burden", the top of page 6, "of proving

2    invalidity of Finesse's patent claims by clear and convincing

3    evidence."

4         Any other objections on page 6?

5         And if you'll call that same occurrence to my attention

6    as we go forward, we'll adjust accordingly.

7              MS. XI:  Yes, Your Honor.

8         No other objections from Plaintiff.

9              THE COURT:  Anything further from Defendant and/or

10   Intervenor on page 6 of the final jury instructions?

11             MS. KENNEDY:  No, Your Honor, not on page 6.

12             THE COURT:  Turning, then, to page 7, any objections

13   here from either party?

14             MS. XI:  None from Plaintiff.

15             MS. KENNEDY:  For AT&T and Nokia, we object to "the

16   Nokia technology such as that found in remote radio heads."

17             THE COURT:  Can you specify where on the page you're

18   talking about?

19             MS. KENNEDY:  It is in the first paragraph, the

20   third line down, and I think 'such as that' -- our objection

21   is to 'such as that' because it suggests that it is an example

22   of or that it is technology that's like that but could be

23   broader.  So 'Nokia technology found in remote radio heads

24   implementing GROOT code' would be fine with us.  Our objection

25   is to the 'such as that' language.

1          THE COURT:  All right.  That objection is overruled.

2    Anything further on page 7?

3          MS. KENNEDY:  No, Your Honor.

4          THE COURT:  All right.  We'll turn to page 8 of the

5    final jury instructions.  Is there objection here from either

6    party?

7          MS. XI:  No, Your Honor.

8          MS. KENNEDY:  No, Your Honor.

9          THE COURT:  All right.  Then we'll turn to page 9 of

10   the final jury instructions.  Is there any objection here from

11   either party?

12         MS. XI:  None from Plaintiff.

13         MS. KENNEDY:  No, Your Honor.

14         THE COURT:  Turning to page 10 of the final jury

15   instructions, is there any objection here from either party?

16         MS. XI:  None from Plaintiff.

17         MS. KENNEDY:  May I have just a moment to confer

18   with Ms. Straka?

19         THE COURT:  Take a moment.

20              (Pause in proceedings.)

21         MS. KENNEDY:  Thank you.  No, Your Honor, no

22   objection

23         THE COURT:  Turning, then, to page 11 of the final

24   jury instructions, are there any objections here from either

25   party?

1        MS. XI:  None, Your Honor.

2        MS. KENNEDY:  No, Your Honor.

3        THE COURT:  All right.  Turning, then, to page 12,

4   are there any objections here?

5        MS. KENNEDY:  Your Honor, we do object to including

6   'or under the doctrine of equivalents' here --

7        THE COURT:  Can you specify where on the page you're

8   focusing?

9        MS. KENNEDY:  Yes.  Thank you, Your Honor.  So it is

10  the second paragraph, third line, "claim, either literally or

11  under the doctrine of equivalents."  There is not a broad DOE

12  assertion by the Plaintiff here, and any equivalence arguments

13  would be covered by the means-plus-function instructions.

14  That's the only area in which the Plaintiff is arguing any

15  sort of equivalent theory and there's no doctrine of

16  equivalents infringement question on the verdict form.

17        THE COURT:  All right.  That objection's overruled.

18     Anything else on page 12?

19        MS. XI:  None from plaintiff.

20        MS. KENNEDY:  No, Your Honor.

21        THE COURT:  Turning, then, to page 13, are there

22  objections here from either party?

23        MS. XI:  None from Plaintiff.

24        MS. KENNEDY:  No, Your Honor.

25        THE COURT:  All right.  If you'll return to page 12,

1    I have reconsidered Defendant and Intervenor's objection

2    there.  Turning to the second full paragraph on page 12, I'm

3    going to modify the first sentence to read as follows:  "In

4    order to prove direct infringement of a patent claim, Finesse

5    must show by a preponderance of the evidence that the accused

6    products include each and every limitation of the claim."  I

7    think that addresses the objection raised by Defendant and

8    Intervenor.

9            MS. KENNEDY:  Thank you, Your Honor.  It does.

10            THE COURT:  All right.  Let's return to page 13.

11    Am I correct there are no objections here?

12            MS. XI:  Yes, Your Honor.

13            THE COURT:  Is that correct for AT&T and Nokia?

14            MS. KENNEDY:  Yes, Your Honor.

15            THE COURT:  All right.  Then that brings us to page

16    14 of the final jury instructions.  Are there any objections

17    here?

18            MS. XI:  No objection.  There is a typo I think at

19    line 10 or 11; line 9 actually.  The D from the word 'does'

20    carries over.

21            THE COURT:  Oh, and 'thus does', the word 'does' is

22    split.  All right.  Thank you.  We'll put the four letters of

23    that word back together.

24            MS. KENNEDY:  And Your Honor, on the second full

25    paragraph on page 14 that begins, "If you do not find that

1   each element" --

2           THE COURT:  Yes.

3           MS. KENNEDY:  We would ask -- we ask that if you

4   find the means -- instead of the word 'each' on the second

5   line of that, 'if you find each element is met' to insert

6   between 'each' and 'element' "each means-plus-function claim

7   element."  And in that event -- yes.

8           THE COURT:  Well, it's clear that this section of

9   the final jury instructions is addressing the

10  means-plus-function limitations.  I'm not sure that it's

11  unclear that this sentence you've raised relates to anything

12  other than means-plus-function.  I am willing to preface the

13  first sentence in the second full paragraph by saying "In this

14  regard, if you do not find", And I think that ties it clearly

15  back to the means-plus-function discussion that precedes it.

16      To the extent that satisfies your objection, fine; if it

17  doesn't, then your objection is overruled, but that's the

18  change I'm going to make.

19          MS. KENNEDY:  Thank you, Your Honor.

20          THE COURT:  Is there anything else from either party

21  on page 14?

22          MS. XI:  No, Your Honor.

23          MS. KENNEDY:  Yes.  I'm sorry, Your Honor.  Thank

24  you.

25          THE COURT:  Yes there's no objection, or yes there's

 1    not?

 2              MS. KENNEDY:  There is no objection to page 14

 3    additional.

 4              THE COURT:  Other than what we've covered.

 5              MS. KENNEDY:  Yes.

 6              THE COURT:  Then we'll turn to page 15.  Are there

 7    objections here from either party?

 8              MS. XI:  None from Plaintiff.

 9              MS. KENNEDY:  No, Your Honor.

10              THE COURT:  Turning, then, to page 16, are there

11    objections here?

12              MS. XI:  From the Plaintiff, I think the only

13    objection we have would be to the last sentence of the first

14    full paragraph that states, "These obviousness theories

15    pertain to all asserted claims in this case."  I think that's

16    not clear that there is only one obviousness theory pertaining

17    to each patent or all of the patent claims in one of the

18    patents.  So the two theory is applied to both patents and all

19    of their claims, but not each of the theories applying to each

20    of the patents.

21              THE COURT:  All right.  Then with that objection in

22    mind, I'm going to alter the last sentence of the first full

23    paragraph on page 16 of the final jury instructions to read as

24    follows:  "These obviousness theories pertain to the asserted

25    claims in this case as presented in the evidence you have

1    heard."

2              MS. XI:  Thank you, Your Honor.

3              THE COURT:  Does that satisfy Plaintiff's objection?

4              MS. XI:  Yes, Your Honor.

5              THE COURT:  Any objection from Defendant or

6    Intervenor on page 16?

7              MS. KENNEDY:  No, Your Honor.

8              MS. XI:  Your Honor, sorry.  One more thing about

9    the second paragraph from the bottom.  Is there any way that

10   we could add the undisputed priority date of each patent?

11             THE COURT:  Are you talking about in the paragraph

12   that begins "Even though an invention"?

13             MS. XI:  Yes.  So it ends with "The invention must

14   also not have been obvious to a person of ordinary skill in

15   the filed of technology of the patent at the time the

16   invention was made."  It occurred to me that since we are

17   spelling out the particular prior art references in the two

18   obviousness combinations and theories that perhaps one of them

19   has a date -- the Lui reference has a June 1990 date.  If it

20   would be okay with the Court if we also added a 2001 and 2008.

21             THE COURT:  What does Defendant and Intervenor say

22   to that?

23             MS. KENNEDY:  Your Honor, we object to that

24   instruction.  I don't think --

25             THE COURT:  All right.  I'm not going to alter that

1    paragraph.  Certainly counsel, if it's not in dispute, it

2    certainly can be incorporated into the parties' closing

3    arguments they present to the jury, but I'm not going to go

4    into it in the instruction.

5         Anything else on page 16, counsel, before we go forward?

6              MS. XI:  No, Your Honor.

7              THE COURT:  Anything further, Ms. Kennedy?

8              MS. KENNEDY:  I'm sorry.  No, Your Honor.

9              THE COURT:  Turning to page 17 of the final jury

10   instructions, are there objections here from either party?

11             MS. XI:  None from Plaintiff, Your Honor.

12             THE COURT:  Anything from Defendant or Intervenor?

13             MS. KENNEDY:  Your Honor, we would object at the

14   last paragraph on page 17 that begins with "Considering

15   whether a claimed invention is obvious" to the words "but are

16   not required to."

17             THE COURT:  All right.  That objection is overruled.

18        Anything else on page 17?

19             MS. KENNEDY:  No, Your Honor.

20             THE COURT:  Turning, then, to page 18, is there any

21   objection here from either party?

22             MS. XI:  From the Plaintiff, looking towards the

23   bottom of the page at the last -- the second phrase in the

24   last sentence before the bulleted list, we object to "but it

25   is up to you to decide whether secondary considerations of

1    non-obviousness exist at all."

2            THE COURT:  All right.  That objection is overruled.

3        Anything from Defendant or Intervenor by way of objection

4    on page 18?

5            MS. KENNEDY:  No, Your Honor.

6            THE COURT:  Turning, then, to page 19, are there any

7    objections here from either party?

8            MS. XI:  None from Plaintiff.

9            MS. KENNEDY:  Your Honor, in the numbered list at

10   the top of page 19, item 6 is whether others copied the

11   claimed invention.  There has been no evidence at all that

12   there's been copying, and so we would ask that that not --

13   we object to that language being included here.

14           THE COURT:  That's overruled.

15       Anything further?

16           MS. KENNEDY:  No, Your Honor.

17           THE COURT:  Turning to page 20, are there objections

18   here from either party?

19           MS. XI:  None from Plaintiff.

20           MS. KENNEDY:  No, Your Honor.

21           THE COURT:  All right.  Turning, then, to page 21,

22   are there any objections here?

23           MS. KENNEDY:  Yes, Your Honor.

24           THE COURT:  State your objection.

25           MS. KENNEDY:  The objection is concerning the

1    language at the bottom of page 21, the second to last line

2    beginning with "However, a lump sum royalty is when the

3    infringer pays a single price for a license covering both past

4    and future infringing sales."  We contend that that language

5    actually -- I'm sorry.  That language is okay.  It is really

6    the next sentence that starts at the bottom of page 21.

7                THE COURT:  Since you raised that sentence,

8    Ms. Kennedy, I'm going to change 'infringing sales' to simply

9    'infringement', "covering both past and future infringement."

10   I think that's clearer.

11       Now, the next sentence you want to raise an objection in

12   regard to?

13               MS. KENNEDY:  Yes.  Although the language that is --

14   I am objecting to is on page 22, would you like me to just go

15   ahead and proceed?

16               THE COURT:  Yes.  The sentence begins at the bottom

17   of 21 and carries on to 22, so tell me what your objection is

18   on both pages.

19               MS. KENNEDY:  The objection, Your Honor, is that we

20   object that this language does not adequately comport with

21   what is required to prove a lump sum royalty.  We believe this

22   language suggests that the Plaintiff -- that the jury sitting

23   here today in the courtroom could consider what AT&T's going

24   to do in the future and what it has done in the past and based

25   on today's knowledge just award damages for past and future

1        infringement and call it a lump sum.

2            A lump sum royalty is what the parties would have agreed

3        to back in 2018 to pay a one-time lump sum, and so the Federal

4        Circuit pattern instructions we believe would be more

5        appropriate and -- which say, "A lump sum payment is equal to

6        an amount that the alleged infringer would have paid at the

7        time of a hypothetical negotiation for a license covering all

8        sales of the licensed product, both past and future.  When a

9        lump sum a paid, the infringer pays a single price for a

10       license covering both past and future infringing sales."

11           And we believe that language better reflects what the

12       lump sum reality is supposed to be is that the parties back in

13       2018 may not have known what the actual infringement would be

14       going forward, but that what one single lump sum price would

15       they have agreed to; not you need to sit here today and

16       compensate Finesse for any past and future infringement that

17       may happen.

18           The jury award should always be to compensate for past

19       infringement, and if the jury thinks that the amount for past

20       infringement would have been a one-time lump sum, they are

21       free to award that, but it should not be that the jury can

22       award damages for things that AT&T has not done yet.  And

23       that's consistent also with --

24               THE COURT:  I understand your objection.

25               MS. KENNEDY:  Okay.

1          THE COURT:  In response to your objection, here's

2    what I'm going to do, Ms. Kennedy.  I'm going to alter the

3    last sentence on the bottom of page 21 that carries over to

4    the top of page 22 so that it will hereafter read as follows:

5    "If you decide that a lump sum is appropriate, then the

6    damages you award, if any, should reflect the total amount

7    necessary to compensate Finesse for AT&T's infringement

8    through the life of the patents."  I think that addresses your

9    objection; you may not; but I'm satisfied that that's the

10   appropriate change.

11         MS. KENNEDY:  Understood, Your Honor.  We do still

12   maintain the objection to the new language as well and would

13   prefer the Federal Circuit pattern jury instruction that I

14   read in.

15         THE COURT:  To the extent you remain unsatisfied,

16   your objection is overruled.

17         MS. KENNEDY:  Thank you.

18         THE COURT:  Anything further, counsel, on page 22?

19         MS. XI:  No, Your Honor.

20         THE COURT:  And then page 23 covers the remainder of

21   the *Georgia-Pacific* factors that start on 22 and end at the

22   top of 24.  Does either party object to the Court charging the

23   jury on all 15 of the *Georgia-Pacific* factors?

24         MS. XI:  Not from Plaintiff.

25         MS. KENNEDY:  No, Your Honor.

```
 1              THE COURT:  Okay.  Do I gather there are no other
 2    objections on page 22?  Correct?
 3              MS. XI:  Correct.
 4              MS. KENNEDY:  Correct.
 5              THE COURT:  Any objections on page 23 which continue
 6    with the Georgia-Pacific factors?
 7              MS. XI:  None from Plaintiff.
 8              MS. KENNEDY:  No, Your Honor.
 9              THE COURT:  Turning, then, to page 24 where the last
10    Georgia-Pacific factor runs to approximately the middle of the
11    page, are there any objections here regarding anything on page
12    24 from either party?
13              MS. XI:  None from Plaintiff.
14              MS. KENNEDY:  No, Your Honor.
15              THE COURT:  Turning to page 25, any objection here?
16              MS. XI:  None from Plaintiff.
17              MS. KENNEDY:  No, Your Honor.
18              THE COURT:  Turning, then, to page 26, is there any
19    objection here?
20              MS. XI:  None from Plaintiff.
21              MS. KENNEDY:  No, Your Honor.
22              THE COURT:  And page 27, the final page of the final
23    jury instructions, are there any objections here from either
24    party?
25              MS. XI:  None from Plaintiff.
```

1        MS. KENNEDY:  No, Your Honor.

2        THE COURT:  All right, counsel.  Then let's turn our

3   attention to the verdict form.  It's provided to you in the

4   same manner as the final jury instructions and we'll address

5   it in the same way.

6        Any objections to the cover page or page 1 of the verdict

7   form from either party?

8        MS. KENNEDY:  Your Honor, I'm sorry.  I want to make

9   sure I have the right thing open.

10       THE COURT:  Take a moment.

11       MS. XI:  None from Plaintiff.

12       MS. KENNEDY:  No, Your Honor.

13       THE COURT:  All right.  Turning, then, to page 2 of

14   the verdict form where there's a definition section, are there

15   any objections here from either party?

16       MS. XI:  None from Plaintiff.

17       MS. KENNEDY:  No, Your Honor.

18       THE COURT:  Turning, then, to page 3 of the verdict

19   form where there are instructions to the verdict from the

20   Court, any objections here from either party?

21       MS. XI:  None from Plaintiff.

22       MS. KENNEDY:  No, Your Honor.

23       THE COURT:  Turning, then, to page 4 where

24   question 1 is found.  Are there objections from either

25   party?

1              MS. XI:  None from Plaintiff.

2              MS. KENNEDY:  No, Your Honor.

3              THE COURT:  Turning to page 5 where question 2

4      is found, are there objections from either party?

5              MS. XI:  None from Plaintiff.

6              MS. KENNEDY:  No, Your Honor.

7              THE COURT:  Turning to page 6 where question 3

8      is found, are there objections here from either party?

9              MS. KENNEDY:  I would like a short break, Your

10     Honor, just very briefly, to go confer on question 3.

11             THE COURT:  If you'd like to consult with

12     co-counsel, take a moment to do that.

13             MS. KENNEDY:  Thank you.

14                      (Pause in proceedings.)

15             THE COURT:  Are you prepared to continue,

16     Ms. Kennedy?

17             MS. KENNEDY:  Thank you, Your Honor.  Yes.

18             THE COURT:  Let's return to page 6 of the verdict

19     form where question 3 is found.  I'll ask again, is there

20     objection here from either party?

21             MS. KENNEDY:  Your Honor, we incorporate our

22     previous objections that we believe that the Plaintiff has not

23     proven a lump sum royalty in this case and our objections to

24     the instructions on that, so that carries forward to this

25     instruction, as well as for the reasons objected to in our

1    Rule 50(a) motion we object to any of these verdict questions

2    going to the jury.

3              THE COURT:  Your position is noted.  Your objections

4    are overruled.

5              MS. KENNEDY:  Thank you.

6              THE COURT:  Anything further from Defendant or

7    Intervenor on page 6?

8         Ms. Kennedy?

9              MS. KENNEDY:  No.  Thank you, Your Honor.

10             THE COURT:  Anything from Plaintiff on page 6?

11             MS. XI:  No, Your Honor.

12             THE COURT:  Let's turn to page 7, which is the final

13   page of the verdict form.  Does either party have an objection

14   here?

15             MS. XI:  None from Plaintiff.

16             MS. KENNEDY:  No, Your Honor.

17             THE COURT:  All right, counsel.  That completes the

18   formal charge conference.  I'll make the changes as indicated

19   and I'll generate final versions of these documents.  Copies

20   will be provided to the parties by email this evening.

21        As I indicated to you in the informal charge conference,

22   it's my long-standing practice to prepare eight printed copies

23   of the final jury instructions to give to the jury and to tell

24   them before I give the instructions to them orally that they

25   will each have their own written copy to review during their

1    deliberations in the jury room.

2         Is there anything else from either party before we recess

3    for the evening?

4              MS. XI:  No, Your Honor.

5              MS. KENNEDY:  No, Your Honor.

6              THE COURT:  We stand in recess.  Thank you.

7              (The proceedings were concluded at 5:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts              01/12/2023

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25