IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FINESSE WIRELESS, LLC,           (   CAUSE NO. 2:21-CV-316-JRG
                                 )
          Plaintiff,             (
                                 )
vs.                              (
                                 )
AT&T MOBILITY, LLC, et al.,      (   MARSHALL, TEXAS
                                 )   JANUARY 13, 2023
          Defendants.            )   8:30 A.M.
_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                    A P P E A R A N C E S

 2          FOR THE PLAINTIFF:   SUSMAN GODFREY, LLP - HOUSTON
                                 1000 LOUISIANA ST., SUITE 5100
 3                               HOUSTON, TEXAS  77002
                                 (713) 651-9366
 4                               BY: MS. MENG XI
                                     MR. JOSEPH GRINSTEIN
 5
                                 WARD, SMITH & HILL, PLLC
 6                               1507 BILL OWENS PARKWAY
                                 LONGVIEW, TEXAS  75604
 7                               903-757-6400
                                 BY:  MS. ANDREA FAIR
 8                                    MR. JOHNNY WARD

 9          FOR THE DEFENDANT:   BAKER BOTTS, LLP - DALLAS
            (AT&T)               2001 ROSS AVENUE, SUITE 900
10                               Dallas, TEXAS  75201-2980
                                 (214) 953-6747
11                               BY:  MR. DOUG KUBEHL

12                               THE DACUS FIRM, PC
                                 821 ESE LOOP 323, SUITE 430
13                               TYLER, TEXAS  75701
                                 (903) 705-1117
14                               BY:  MR. DERON DACUS

15
            FOR THE DEFENDANT:   QUINN EMANUEL URQUHART &
16          (NOKIA)             SULLIVAN, LLP - CHICAGO
                                 500 WEST MADISON, SUITE 2450
17                               CHICAGO, ILLINOIS  60661
                                 (312) 705-7400
18                               BY:  MS. BRIANNE STRAKA
                                     MS. DAVE NELSON
19

20          OFFICIAL REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                 100 E. HOUSTON STREET
21                               MARSHALL, TEXAS  75670
                                 (903) 923-8546

22

23

24

25
```

1          THE COURT:  Be seated, please.

2      Are the parties prepared at this time to read into the

3  recorded those items from the list of pre-admitted exhibits

4  that were used during yesterday's portion of the trial?

5          MS. STRAKA:  Yes, Your Honor.

6          THE COURT:  Please proceed to do so, counsel.

7          MS. STRAKA:  Yesterday we admitted DX 5 and DX 90.

8  Additionally, yesterday I read PX 464, but I should have

9  stated PX 646.  There is no Exhibit 464, so the record should

10 have said PX 646.

11         THE COURT:  All right.  Anything further?

12         MS. STRAKA:  No, Your Honor.

13         THE COURT:  Any objection to that rendition?

14         MS. FAIR:  No, Your Honor.

15         THE COURT:  All right.  Thank you.

16     Let me say this.  I'm about to bring in the jury and

17 present the Court's final instructions to them.  The Court

18 considers its charge to the jury and counsel's closing

19 arguments to be the most serious part of a very serious

20 process.  Therefore, I do not want any disruptions of any

21 kind.

22     If you are going to remain in the courtroom and you're in

23 the gallery, I expect you to sit still, I expect you to be

24 quiet, I expect you to make sure that there are no devices in

25 your possession that should inadvertently sound, ring, or

1    interrupt the proceedings.  I expect people to sit there with

2    their heads still and not nod in agreement when they hear

3    something they like or nod in disagreement when they hear

4    something they don't like.

5         In other words, I want complete, respectful attention and

6    stillness throughout the process of the Court giving its final

7    instructions to the jury and counsel presenting its closing

8    arguments.  If there's anything you need to do that's

9    inconsistent with that, do it now and do it before I bring the

10   jury in.

11        All right.  Then we'll proceed.

12        Mr. Turner, please bring in the jury.

13            (Whereupon, the jury entered the courtroom.)

14            THE COURT:  Good morning, ladies and gentlemen.

15   Please have a seat.  Welcome back.

16        Ladies and gentlemen of the jury, you've now heard all

17   the evidence in this case and I will now instruct you on the

18   law that you must apply.

19        I want you to understand that these instructions that I

20   am giving you will be given to you orally, but they are also

21   available in writing and I am going to see that each of you

22   have your own written copy of these instructions to refer to

23   when you deliberate in the jury room.  Therefore, you don't

24   need to feel compelled to make notes as I give them to you

25   orally.  My preference is that you listen carefully while I

1    give them to you orally, understanding you'll have your own

2    written copy to review when you get to the jury room.

3         It is your duty to follow the law as I give it to you.

4    On the other hand, and as I've said, you, the jury, are the

5    sole judges of the facts in this case.  You should not

6    consider any statement that I have made in the course of the

7    trial or that I make in the course of these instructions as an

8    indication to you that I have any opinion about the facts in

9    this case.

10        Now, you're about to hear closing arguments from the

11   attorneys for the competing parties.  Statements and arguments

12   of the attorneys, ladies and gentlemen, are not evidence, and

13   they are not instructions on the law.  They're intended only

14   to assist you, the jury, in understanding the evidence and the

15   parties' competing contentions.

16        A verdict form has been prepared for you, and you will

17   take this verdict form with you to the jury room.  And when

18   you have reached a unanimous agreement as to your verdict, you

19   will have your foreperson, which you will select, fill in the

20   blanks in that verdict form reflecting your unanimous

21   agreement, then your foreperson will sign it, date it, and

22   advise the Court security officer.

23        Answer the questions as directed in the verdict form from

24   the facts as you find them to be.  Do not decide who you think

25   should win this case and then answer the questions to reach

1    that result.  Your answers and your verdict, I remind you,

2    must be unanimous.

3         Now, in determining whether any facts have been proven in

4    this case, you may, unless otherwise instructed, consider the

5    testimony of all the witnesses regardless of who may have

6    called them, the stipulations of the parties, if any, and you

7    may consider all the exhibits received and admitted into

8    evidence, regardless of who may have introduced them.

9         As I've said, you, the jury, are the sole judges of the

10   credibility of all the witnesses and the weight and effect to

11   give to all of the evidence.  Now, in deciding the facts in

12   this case, you may have to decide which testimony to believe

13   and which testimony not to believe.  You alone are to

14   determine the questions of credibility or truthfulness of the

15   witnesses.

16        In weighing the testimony of the witnesses, you may

17   consider a witness' manner and demeanor on the witness stand,

18   any feelings or interest they may have in the case, any

19   prejudice or bias about the case that the witness may have,

20   and the consistency or inconsistency of their testimony

21   considered in the light of the circumstances.  Has the witness

22   been contradicted by other evidence?  Has he or she made

23   statements at other times and in other places contrary to what

24   they're now saying on the witness stand?  In other words,

25   ladies and gentlemen, you must give the testimony of each

1    witness the amount of credibility and weight that you think it

2    deserves.

3         You must also keep in mind that a simple mistake does not

4    mean that a witness is not telling the truth.  You must

5    consider whether any misstatement was an intentional falsehood

6    or a simple lapse in memory and what significance should be

7    attached to that testimony.

8         As I've told you, the attorneys in this case are

9    advocates or they're competing parties, they're competing

10   clients, and they have a duty to object when they believe

11   evidence is being offered that should not be admitted under

12   the rules of the Court.

13        Now, when the Court sustained an objection to a question

14   addressed to a witness, you must disregard that question

15   entirely, and you may draw no inference from its wording or

16   speculate about what the witness would have said if the Court

17   would have permitted them to answer the question.

18        However, if an objection was overruled by the Court, then

19   you must treat the answer to the question just as you would

20   treat any other question and answer as if no objection had

21   been made.  Now, by allowing the testimony or other evidence

22   to be introduced over the objection of an attorney, the Court

23   did not indicate any opinion about the weight or effect of

24   such evidence.  Again, that is your responsibility.

25        Now, at various times during the course of the trial, it

1    was necessary for the Court to talk to the lawyers outside of

2    your hearing either by calling them here to the bench or by

3    taking a recess and talking to them while you were outside of

4    the courtroom.  This happens, ladies and gentlemen, because

5    things occur during trials and come up that do not directly

6    involve the jury.  You should not speculate or guess about

7    what was said during such discussions that took place outside

8    of your presence.

9        There are two types of evidence that you may consider in

10   properly finding the truth as to the facts in this case.  One

11   is direct evidence, such as the testimony of an eyewitness.

12   The other is indirect evidence, also called circumstantial

13   evidence, that is, the proof of a chain of circumstances that

14   indicates the existence or non-existence of certain other

15   facts.  As a general rule, you should know that the law makes

16   no distinction between direct evidence or circumstantial

17   evidence, but simply requires that you find the facts based on

18   all the evidence presented, both direct and circumstantial.

19       Now, the parties may have stipulated or agreed to some

20   facts in this case, and when the lawyers on both sides

21   stipulate as to the existence of a fact, then unless otherwise

22   instructed, you must accept the stipulation as evidence and

23   regard the fact as proven.  These facts are not in dispute

24   between the parties.

25       Also, certain testimony in this case has been presented

1    to you through depositions.  As I've told you, a deposition is

2    the sworn, recorded answers to questions asked of a witness in

3    advance of the trial.  If a witness cannot be personally

4    present to testify in person from the witness stand during the

5    trial, then the witness' testimony may be presented under oath

6    in the form of a deposition.

7         Before the trial began, the attorneys representing all

8    the parties questioned these deposition witnesses under oath.

9    A court reporter was present at that time and recorded their

10   sworn testimony.  Deposition testimony, ladies and gentlemen,

11   is entitled to the same consideration by you as testimony

12   given by a witness in person in open court from the witness

13   stand.  Accordingly, you should judge the credibility and

14   importance of deposition testimony to the best of your

15   ability, just as if the witness had testified before you in

16   open court.

17        Now, while you should consider only the evidence in this

18   case, you are permitted to draw such reasonable inferences

19   from the testimony and exhibits as you feel are justified in

20   the light of common experience.  In other words, you may make

21   deductions and reach conclusions that reason and common sense

22   lead you to draw from the facts that have been established by

23   the testimony and evidence in this case.  However, you should

24   not base your decision on any evidence not presented by the

25   parties during this case, including your own personal

1    experiences with any of the products that might be at issue.

2       Now, unless I instruct you otherwise, you may properly

3    determine that the testimony of a single witness is sufficient

4    to prove any fact, even if a greater number of witnesses may

5    have testified to the contrary, if after considering all the

6    evidence you believe that single witness.

7       As I've told you, when knowledge of a technical subject

8    may be helpful to you, the jury, a person who has special

9    training and experience in that technical field--we call them

10   an expert witness--is permitted to state his or her opinions

11   on those technical matters.  However, ladies and gentlemen,

12   you are not required to accept any expert witness' opinions.

13   As with any other witness, it is solely up to you to decide

14   whether or not to accept an opinion given and whether to rely

15   on it or how much to rely upon it, or not at all.

16      Now, certain exhibits have been shown to you during the

17   trial that were illustrations.  We call these types of

18   exhibits demonstrative exhibits or simply demonstratives.

19   Demonstrative exhibits are a party's depiction, picture, or

20   model of something involved in the trial.  If your

21   recollection of the evidence differs from the demonstratives,

22   you should rely on your recollection.

23      Demonstrative exhibits are sometimes called jury aids,

24   and demonstrative exhibits themselves, ladies and gentlemen,

25   are not evidence, but a witness' testimony concerning a

1    demonstrative is evidence.  Please note, demonstrative

2    exhibits will not be available for you to review during your

3    deliberations in the jury room.

4         Now, in any legal action, facts must be proven by a

5    required amount of evidence known as the burden of proof.  The

6    burden of proof in this case is on the Plaintiff for some

7    issues and on the Defendant for other issues.  And there are

8    two burdens of proof that you will apply in this case:  The

9    preponderance of the evidence and clear and convincing

10   evidence.

11        The Plaintiff, Finesse Wireless, which you've heard

12   referred to throughout the trial simply as the Plaintiff or as

13   Finesse, has the burden of proving patent infringement by a

14   preponderance of the evidence.  Finesse also has the burden of

15   proving damages for any patent infringement by a preponderance

16   of the evidence.

17        A preponderance of the evidence means evidence that

18   persuades you that a claim is more probably true than not

19   true.  Sometimes this is talked about as being the greater

20   weight and degree of credible testimony.

21        Now, the Defendant in this case, AT&T Mobility, which

22   you've heard referred to throughout the trial as either the

23   Defendant or AT&T, has the burden of proving the invalidity of

24   Finesse's patent claims by clear and convincing evidence.  As

25   I've told you earlier, AT&T and Nokia now stand together in

1    this case.  However, Nokia asked the Court to intervene or

2    join the case on AT&T's side after the case had been brought

3    by Finesse against AT&T.  And so, procedurally, Nokia is

4    what's known as an Intervenor while AT&T is the named

5    defendant.

6         Now, clear and convincing evidence means evidence that

7    produces in your mind an abiding conviction that the truth of

8    the party's factual contentions are highly probable.  Although

9    proof to an absolute certainty is not required, the clear and

10   convincing evidence standard requires a greater degree of

11   persuasion than is necessary for the preponderance of the

12   evidence standard.  If proof establishes in your mind, ladies

13   and gentlemen, an abiding conviction in the truth of the

14   matter, then the clear and convincing evidence standard has

15   been met.

16        Now, as I've mentioned, these two burdens of proof are

17   not to be confused with a different and a third burden of

18   proof known as beyond a reasonable doubt, which is the burden

19   of proof applied in a criminal case and which has absolutely

20   no application in a civil case like this one.  Beyond a

21   reasonable doubt is a higher standard or burden of proof than

22   the preponderance of the evidence and clear and convincing

23   evidence.

24        Now, as I did at the beginning of the case, I'll first

25   give you a summary of each side's contentions.  I'll then

1    provide you with detailed instructions on what each side must

2    prove in order to win on each of its contentions.

3         As I've told you, this is an action for patent

4    infringement.  Finesse, the Plaintiff, contends that AT&T, the

5    Defendant, infringes certain claims of the patents-in-suit.

6    Remember, there are two United States patents at issue in this

7    case.  They are U.S. Patent No. 7,346,134, which you've heard

8    referred to during the trial as the '134 Patent.  You may have

9    heard it called the '134 Patent sometimes.  Additionally, the

10   second U.S. patent at issue in this case is United States

11   Patent No. 9,548,775, which you've heard referred to as the

12   '775 or the '775 Patent during the trial.

13        The Plaintiff Finesse contends that AT&T, the Defendant,

14   infringes the following claims of these patents-in-suit:

15   claims 1, 2, and 3 of the '134 Patent and claims 1, 4, 9, 16,

16   21, 29, and 36 of the '775 Patent.  These are the asserted

17   claims.

18        Finesse contends that AT&T has infringed these asserted

19   claims by making, using, selling, importing, or offering for

20   sale in the United States base station equipment and

21   components that incorporate Nokia technology found in remote

22   radio heads implementing GROOT code bearing model numbers

23   AHFIB, AHLBA, and AHLBBA.  And I'll refer to these as the

24   accused products.

25        Finesse contends that it's entitled to money damages in

1    the form of a reasonable royalty for AT&T's infringement.

2    Finesse has the burden to prove these issues by a

3    preponderance of the evidence.

4         AT&T denies that it infringes any of the asserted claims

5    from either of these two patents-in-suit.  AT&T denies that it

6    makes, uses, offers for sale, sells, or imports any accused

7    product that infringes any of the asserted claims.  AT&T also

8    denies that it owes Finesse any money damages.

9         AT&T further contends that the asserted claims of the

10   patents-in-suit are invalid as obvious in the light of prior

11   art.  Invalidity, ladies and gentlemen, is a defense to

12   infringement.  AT&T has the burden to prove invalidity by

13   clear and convincing evidence.

14        Invalidity and infringement are separate and distinct

15   issues.  Your job is to decide whether AT&T has infringed the

16   asserted claims and whether those claims are invalid.  If you

17   decide that any asserted claim has been infringed and is not

18   invalid, then you will need to decide the amount of money

19   damages, if any, to be awarded to Finesse to compensate it for

20   that infringement.

21        Now, before you can decide many of the issues in this

22   case, you need to understand the role of the patent claims.

23   The patent claims, as you've been told, are the numbered

24   sentences at the end of each patent.  The claims are

25   important, ladies and gentlemen, because it is the words of

1    the claims that define what a patent covers.  The figures and

2    the text in the rest of the patent provide a description or

3    examples of the invention and they provide a context for the

4    claims, but it is the claims themselves that define the

5    breadth of the patent's coverage.

6        Each claim is effectively treated as if it were a

7    separate patent, and each claim may cover more or cover less

8    than any other claim.  Therefore, what a patent covers

9    depends, in turn, on what each of its claims covers.

10       Now, you'll first need to understand what each claim

11   covers in order to decide whether or not there is infringement

12   of the claim and to decide whether or not the claim is

13   invalid.

14       Now, the law says that it is my role to define the terms

15   of the claims and it's your role to apply my definitions to

16   the issues that you are asked to decide in this case.

17   Accordingly, and as I've explained to you at the beginning of

18   the case, I have already determined the meaning of some of the

19   claim language and I have provided that -- those constructions

20   or those definitions to you in your juror notebooks.

21       These definitions must be accepted by you as being

22   correct regarding the words of the claims, and it's your job

23   to take these definitions or constructions that I have

24   provided and apply them to the issues that you are deciding,

25   including the issues of infringement and invalidity.

1          Now, you should disregard any evidence presented at the

2    trial that contradicts or is inconsistent with the

3    constructions and definitions that I have given you.

4          For claim limitations or language that I have not

5    construed--that is, limitations that I have not interpreted or

6    defined for you--you are to use and apply the plain and

7    ordinary meaning of the limitations as understood by one of

8    ordinary skill in the art, which is to say, in the field of

9    the technology of the patent at the time of the alleged

10   invention.

11         Now, the meaning of the words of the patent claims must

12   be the same, ladies and gentlemen, when deciding the issues of

13   both infringement and invalidity.  And you -- as I've noted,

14   you have been provided with copies of the patents-in-suit,

15   they're inside your juror notebooks, and you may use them and

16   refer to them throughout your deliberations.

17         Several times in these instructions I have referred to a

18   person of ordinary skill in the field of the invention, or a

19   person of ordinary skill in the art.  In deciding the level of

20   ordinary skill in the field, you should consider all the

21   evidence introduced at trial, including but not limited to:

22   (1) the levels of education and experience of the inventor and

23   other persons actively working in the field; (2) the types of

24   problems encountered in the field; (3) previous solutions to

25   those problems; (4) the rapidity with which innovations are

1    made; and (5) the sophistication of the technology.

2        The claims are intended to define in words the boundaries

3    of the inventor's rights.  Only the claims of the patent can

4    be infringed.  Neither the written description nor the

5    drawings or figures can be infringed.  Each of the claims must

6    be considered individually.

7        I will now explain to you how a claim defines what it

8    covers.

9        A claim sets forth in words a set of requirements.  Each

10   claim sets forth its requirements in a single sentence.  If a

11   product satisfies each of these requirements, then it is

12   covered by the claim.  And there can be several claims in a

13   patent and each claim may be narrower or broader than another

14   claim by setting forth more or fewer requirements.

15       The coverage of a patent is assessed on a claim-by-claim

16   basis.  And in patent law, the requirements of a claim are

17   often referred to as the claim elements or referred to as the

18   claim limitations.  When a product meets all the requirements

19   of a claim, the claim is said to cover that product, and that

20   product is said to fall within the scope of that claim.  In

21   other words, a claim covers a product where each of the claim

22   elements or limitations is present in that product.  If a

23   product is missing even one element or limitation of a claim,

24   then the product is not covered by the claim.  And if the

25   product is not covered by the claim, the product cannot

1    infringe the claim.

2         Now, the beginning portion or preamble of a claim often

3    uses the word 'comprising'.  The word 'comprising', ladies and

4    gentlemen, when used in a preamble, means including but not

5    limited to, or containing but not limited to.  When comprising

6    is used in the preamble, if you decide that an accused product

7    includes all the requirements of that claim, the claim is

8    infringed.  This is true even if the accused product contains

9    additional elements or features.

10        For example, a claim that covers a table top that would

11   say comprising a table top -- let me say that again.  A claim

12   that a claim to a table -- I'll get it right in a second.  A

13   claim to a table comprising a table top, legs, and glue, would

14   be infringed by a table that includes a table top, legs, and

15   glue even if the table also contains other structures or

16   features such as leaves to expand the size of the table top or

17   wheels to go on the ends of the legs.

18        Now claims 2 and 3 of the '134 Patent are claims that are

19   in a special form called means-plus-function format.  These

20   claims do not cover all the structures that could perform the

21   function set forth in the claims.  Instead, they cover a

22   structure or set of structures that perform that function and

23   that is either identical or equivalent to the structures

24   described in the patent for performing the function.  The

25   issue of whether two structures are identical or equivalent is

1    for you to decide.

2        For purposes of this case, I have identified these

3    structures described in the '134 Patent that perform the

4    claimed functions.  These are contained in the claim

5    constructions, which I have provided to you in your juror

6    notebooks.  You should apply my definition of the function and

7    the structures described in the '134 Patent for performing

8    that function in the same way that you would apply my

9    definition of any other claim term.

10        Now, this case involves two types of patent claims:

11    independent claims and dependent claims.  In this case, claims

12    1, 2, and 3 of the '134 Patent and claims 1, 4, 16, 21, and 36

13    of the '775 Patent are independent claims.  Claims 9 and 29 of

14    the '775 Patent are dependent claims.

15        An independent claim sets forth all the requirements that

16    must be met in order to be covered by the claim.  It's not

17    necessary to look at any other claim to determine what an

18    independent claim covers.

19        On the other hand, a dependent claim does not itself

20    recite all the requirements of the claim, but refers to

21    another claim for some of its requirements.  In this way, the

22    claim depends on another claim.  A dependent claim

23    incorporates all the requirements of the claim to which it

24    refers or from which it depends, and the dependent claim then

25    adds its own additional requirements.

1    So to determine what a dependent claim covers, it's

2   necessary to look at both the dependent claim and any other

3   claim to which it refers or from which it depends.  A product

4   that meets all the requirements of both the dependent claim

5   and the claim to which it refers or depends is covered by that

6   dependent claim.

7    Now, if a person or a corporation makes, uses, sells, or

8   offers for sale within the United States or imports into the

9   United States what is covered by a patent claim without the

10  patent owner's permission, that person or corporation is said

11  to infringe that patent.

12   In reaching your decision on infringement, keep in mind

13  that only the claims of a patent can be infringed.  You must

14  compare the asserted claims, as I have construed each of them

15  for you, to the accused products to determine whether or not

16  there is infringement.  This is the only correct comparison,

17  ladies and gentlemen.

18   You should not compare the accused product with any

19  specific examples set out in the patents, with the prior art,

20  or with the Plaintiff's own products, prototypes or marketing

21  plans in reaching your decision on infringement.  In deciding

22  infringement, the only correct comparison is between the

23  accused products and the limitations of the claims as the

24  Court has construed them.  You must reach your decision as to

25  each assertion of infringement based on my instructions about

1    the meaning and scope of the claims, the legal requirements

2    for infringement, and the evidence presented to you by both of

3    the parties.

4        I will now instruct you on the specific rules that you

5    must follow to determine whether Finesse has proven that AT&T

6    has directly infringed one or more of the patent claims

7    involved in this case.

8        A patent can be directly infringed even if the alleged

9    direct infringer did not have knowledge of the patent and

10   without the direct infringer knowing that what it did was

11   infringement of a claim.  A patent may also be directly

12   infringed even though the accused direct infringer believed in

13   good faith that what it did was not infringement of the

14   patent.  Infringement does not require proof that any party

15   copied its product from the asserted claims.

16       You must decide separately for each asserted claim

17   whether or not there is infringement.  However, if you find

18   that an independent claim on which other claims depend is not

19   infringed, there cannot be infringement of any dependent claim

20   that refers directly or indirectly to that independent claim.

21       On the other hand, if you find that an independent claim

22   has been infringed, you must still decide, separately, whether

23   the product meets the additional requirements of any claims

24   that depend from that independent claim; that is, whether

25   those independent [sic] claims have also been infringed.

1    Again, a dependent claim includes all the requirements of any

2    claim to which it refers or from which it depends, plus its

3    own additional requirements.

4        Now, in order to prove direct infringement of a patent

5    claim, Finesse, the Plaintiff, must show by a preponderance of

6    the evidence that the accused products include each and every

7    limitation or element of the claim.  In determining whether

8    the accused products directly infringe a patent claim in this

9    case, you must compare the accused products with each and

10   every one of the requirements or limitations of that claim to

11   determine whether the accused products contain those

12   requirements or limitations.  An accused product infringes a

13   claim if it is reasonably capable of satisfying the claim

14   elements, even though it may be capable of non-infringing

15   modes of operation.

16       A claim requirement is literally present if it exists in

17   an accused product just as described in the claim language,

18   either as I have explained that claim language to you or if I

19   did not explain or define it for you as would be understood by

20   a person -- as would be understood as to its plain and

21   ordinary meaning by a person of ordinary skill in the art.  If

22   an accused product, ladies and gentlemen, omits any element

23   recited in a claim, you must find that the product in question

24   does not literally infringe the claim.

25       So long as an accused product has each and every one of

1   the claim elements, infringement of that claim is shown, even

2   if the product contains additional features or elements not

3   required by the claims.

4       As I've previously explained, claims 2 and 3 of the '134

5   Patent include requirements that are in means-plus-function

6   form.

7       A means-plus-function -- excuse me.  A product that meets

8   a means-plus-function requirement of a -- I'll say that again.

9   A product that meets a means-plus-function requirement of

10   claim meets it if:  (1) it includes a structure or set of

11   structures that perform the identical function recited in the

12   claim and (2) that structure or set of structures is either

13   identical or equivalent to the described structures in the

14   '134 Patent that I have defined in your juror notebooks as

15   performing the functions set out in the asserted claims of the

16   '134 Patent.

17       If the accused products do not perform the specific

18   function recited in the claim, the means-plus-function

19   requirement is not met and the products do not literally

20   infringe the claim.  Alternatively, even if the accused

21   product has a structure that performs the function recited in

22   the claim but the structure is neither identical or equivalent

23   to the structure that I defined for you as being described in

24   the '134 Patent and performing this function, the product does

25   not literally infringe the claim.

1     A structure or a set of structures may be found to be

2  equivalent if one of the structures or set of structures I

3  have defined as being described in the '134 Patent, if a

4  person having ordinary skill in the field of the technology of

5  the '134 Patent would have considered the differences between

6  them to be insubstantial at the time the '134 Patent issued or

7  if that person would have found the structures performed the

8  function in substantially the same way to accomplish

9  substantially the same result.

10     In deciding whether the differences would be

11  insubstantial, you may consider whether a person having an

12  ordinary level of skill in the field of the technology of the

13  '134 Patent would have known of the interchangeability of the

14  two structures or sets of structures at the time the patent

15  issued.  The fact that a structure or set of structures is

16  known to be equivalent today is not enough.  The structure or

17  set of structures must have been available at the time the

18  '134 Patent issued.

19     Now, in order to prove direct infringement of a

20  means-plus-function limitation, Finesse must prove the above

21  requirements are met by a preponderance of the evidence.

22     In this regard, if you do not find that each element or

23  limitation of a claim is literally met, then you may still

24  find infringement if you find that each element is met under

25  the doctrine of equivalents.  If a person makes, uses, sells,

1    or offers for sale within the United States, or imports into

2    the United States a product that does not meet all the

3    requirements of a claim and does not, thus, literally infringe

4    the claim, there can still be direct infringement if that

5    product satisfies that claim under the doctrine of

6    equivalents.

7         In this case, only the means-plus-function claim elements

8    that I have just described are alleged to be infringing under

9    the doctrine of equivalents.  In order to prove infringement

10   by equivalence in the means-plus-function context, Finesse

11   must prove the equivalency of the structure in the accused

12   products regarding each and every element of the asserted

13   claims.

14        Under the doctrine of equivalents, an accused product

15   infringes a claim if it contains elements or limitations

16   corresponding to each and every element or limitation of the

17   claim that it is equivalent to, even though not literally met

18   by an accused product.

19        You may find that an accused product is equivalent to an

20   element or limitation of a claim that is not literally met if

21   a person having ordinary skill in the field of technology of

22   the patent would have considered the differences between them

23   to be insubstantial or would have found that an accused

24   product:  (1) performs the same function, (2) in substantially

25   the same way, (3) to obtain substantially the same result as

1    the element or limitation of the claim.

2         In order for the structure or action to be considered

3    interchangeable, the structure or action must have been known

4    at the time of the alleged infringement to a person having

5    ordinary skill in the field of the technology of the patent.

6    Interchangeability at the present time is not sufficient.

7         Now, in order to prove direct infringement under the

8    doctrine of equivalents, Finesse must prove by a preponderance

9    of the evidence that for each claim element or limitation not

10   literally present in the accused products, the equivalent of

11   that claim element or limitation is present.

12        I'll now instruct you about the rules you must follow in

13   deciding whether or not AT&T has proven that any of the

14   asserted claims of the patents-in-suit are invalid.  An issued

15   United States patent, ladies and gentlemen, is accorded a

16   presumption of validity based on the presumption that the

17   Patent and Trademark Office, which you've heard referred to

18   simply as the Patent Office or the PTO, has acted correctly in

19   issuing the patent.  This presumption of validity extends to

20   all issued United States patents.

21        Now, in order to overcome this presumption, AT&T must

22   establish by clear and convincing evidence that a claim is

23   invalid.  Like infringement, invalidity is determined on a

24   claim-by-claim basis, and you must determine separately for

25   each claim whether that claim is invalid.  If one claim of a

1  patent is invalid, this does not mean that any other claim is

2  necessarily invalid.

3      Claims are construed the same way for determining

4  infringement as for determining invalidity, and you must apply

5  the claim language consistently and in the same manner for

6  issues of infringement and for issues of invalidity.  In

7  making your determination as to invalidity, you should

8  consider each claim separately.

9      As I explained earlier, ladies and gentlemen, a previous

10  device, system, method, publication, or patent that predates

11  the claimed invention is generally called prior art, and may

12  include items that were publicly known or that have been used

13  or offered for sale, or references, such as publications or

14  patents, that disclose the claimed invention or elements of

15  the claimed invention.

16      Prior art may be authored or created by anyone.  In

17  evaluating prior art to determine whether an invalidity

18  defense has been proven by clear and convincing evidence, you

19  may consider whether that prior art was or was not before the

20  PTO.

21      In this case, AT&T contends that claims 1, 2, and 3 of

22  the '134 Patent are obvious in light of the knowledge of one

23  of ordinary skill in the art in combination with U.S. Patent

24  No.  6,393,011, which you have heard referred to as the Kim

25  patent, and U.S. Patent No. 6,005,506, which you've heard

1    referred to as the Bazarjani patent.

2         At&t also claims that claims 1, 4, 9, 16, 21, 29, and 36

3    of the '775 Patent are obvious in light of the knowledge of

4    one of ordinary skill in the art in combination with U.S.

5    Patent No. 8,805,298, which you've heard referred to as the

6    McCalister patent, and an article entitled Passive

7    Intermodulation Interference in Communication Systems from the

8    Electronics & Communication Engineering Journal published in

9    June 1990, which you've heard referred to as the Lui

10   reference.  These obviousness theories pertain to the asserted

11   claims in this case as presented in the evidence you've heard.

12        I'm now going instruct you how to determine whether any

13   of the asserted claims are invalid as being obvious.

14        Even though an invention may not have been identically

15   disclosed or identically described in a single prior art

16   reference before it was made by an inventor, in order to be

17   patentable, the invention must also not have been obvious to a

18   person of ordinary skill in the field of the technology of the

19   patent at the time the invention was made.

20        AT&T, the Defendant, has the burden of establishing

21   obviousness by showing by clear and convincing evidence that

22   the claimed invention would have been obvious to persons

23   having ordinary skill in the art at the time the invention was

24   made in the field of the technology of the patent.

25        In determining whether a claimed invention is obvious,

1    you must consider the level of ordinary skill in the field

2    that someone would have had at the time the invention was

3    made, the scope and content of the prior art, and any

4    differences between the prior art and the claimed invention.

5    Keep in mind that the existence of each and every element of

6    the claimed invention in the prior art does not necessarily

7    prove obviousness.  Most, if not all, inventions, ladies and

8    gentlemen, rely on the building blocks of prior art.  The

9    skill of the actual inventor is not necessarily relevant

10   because inventors may possess something that distinguishes

11   them from persons having ordinary skill in the art.

12       In considering whether the claimed invention was obvious,

13   you must first determine the scope and content of the prior

14   art.  The scope and content of the prior art for deciding

15   whether the invention was obvious includes at least prior art

16   in the same field as the claimed invention.  It also includes

17   prior art from different fields that a person of ordinary

18   skill in the art would have considered when trying to solve

19   the problem that is addressed by the invention.

20       Further, teachings, suggestions, and motivations may also

21   be found within the knowledge of a person of ordinary skill in

22   the art, including inferences and creative steps that a person

23   of ordinary skill in the art would employ.  A person of

24   ordinary skill may be able to fit the teachings of multiple

25   pieces of prior art together like pieces of a puzzle.  A

1    person of ordinary skill in the art would have the capability

2    and understanding, the scientific and engineering principles

3    applicable to the pertinent art.

4         Now, in considering whether a claimed invention is

5    obvious, you may but are not required to find obviousness if

6    you find that at the time of the claimed invention there was a

7    reason that would have prompted a person having ordinary skill

8    in the field to combine the known elements in a way the

9    claimed invention does, taking into account such factors as:

10        1.   Whether the claimed invention was merely the

11   predictable result of using prior art elements according to

12   their known function;

13        2.   Whether the claimed invention provides an obvious

14   solution to a known problem in the relevant art;

15        3.   Whether the prior art teaches or suggests the

16   desirability of combining elements in the claimed invention;

17        4.   Whether the prior art teaches away from combining

18   elements in the claimed invention;

19        5.   Whether it would have been obvious to try the

20   combination of elements in the claimed invention, such as when

21   there is a design need or market pressure to solve a problem,

22   and there are a finite number of identified predictable

23   solutions; and

24        6.   Whether the change resulted more from

25   design incentives or other market forces.

1        To find the invention obvious, you must find that the

2    prior art provided a person having ordinary skill in the field

3    a reasonable expectation of success.  Obvious to try is not

4    sufficient in unpredictable technologies.

5        In determining whether the claimed invention was obvious,

6    consider each claim separately.  Do not use hindsight;

7    consider only what was known at the time of the invention.  In

8    other words, you should not consider what a person of ordinary

9    skill in the art would know now or what has been learned from

10   the teachings of the patents-in-suit.

11       In making these assessments, ladies and gentlemen, you

12   should take into account any objective evidence, sometimes

13   called secondary considerations, that may have existed at the

14   time of the invention and afterwards that may shed light on

15   the obviousness or not of the claimed invention.  The

16   following are possible secondary considerations, but it is up

17   to you to decide whether secondary considerations of

18   non-obviousness exist at all:

19       1.  Whether the invention was commercially successful as

20   a result of the merits of the claimed inventions, rather than

21   the result of design needs or market pressure, advertising, or

22   similar activities;

23       2.  Whether the invention satisfied a long-felt need;

24       3.  Whether the inventor proceeded contrary to accepted

25   wisdom in the field;

1        4.   Whether others tried, but failed, to solve the

2   problem solved by the claimed invention;

3        5.   Whether others invented the invention at roughly the

4   same time;

5        6.   Whether others copied the claimed invention;

6        7.   Whether others accepted licenses under the

7   patents-in-suit because of the merits of the claimed

8   invention;

9        8.   Whether the claimed invention achieved unexpected

10  results;

11       9.   Whether others in the field praised the claimed

12  invention;

13       10.   Whether there were changes or related technologies

14  or market needs contemporaneous with the claimed invention;

15  and whether persons having ordinary skill in the art at the

16  time of the invention expressed surprise or disbelief

17  regarding the invention.

18       These factors are relevant only if there is a connection

19  or a nexus between the factors and what differentiates the

20  claimed invention from the prior art.  Finesse has the burden

21  of establishing this connection or nexus.  Moreover, even if

22  you conclude that some of the above indicators of objective

23  evidence have been established, those factors should be

24  considered along with all the other evidence in the case in

25  determining whether AT&T has proven that the claimed invention

1    would have been obvious.

2         Now, in support of obviousness, you may also consider

3    whether others independently invented the claimed invention

4    before or at about the same time as the named inventor thought

5    of it.  In making these determinations, a person of ordinary

6    skill uses simple common sense and can rely upon the

7    inferences and creative steps of that -- the creative steps

8    that a person of ordinary skill in the art would employ.

9    Also, AT&T does not need to show that one of ordinary skill

10   would actually have combined the physical structures of two

11   references; one need only combine the teachings.

12        Remember, and as I've stated earlier, the prior art is

13   not limited to patents and published materials, but includes

14   the general knowledge that would have been available at the

15   time to one of ordinary skill in the field of the invention.

16   If you find that AT&T has proven the obviousness of a claim by

17   clear and convincing evidence, then you must find that the

18   claim is invalid.

19        If you find that AT&T has infringed any valid claim of

20   the patents-in-suit, you must then consider what amount of

21   damages, if any, to award to the Plaintiff Finesse.

22        I'll now instruct you about the measure of damages.  By

23   instructing you on damages, ladies and gentlemen, I am not

24   suggesting which party should win this case on any issue.  If

25   you find that AT&T has not infringed any valid claim of the

1    patents-in-suit, then Finesse is not entitled to any patent

2    damages.

3         Finesse, the Plaintiff, has the burden to establish the

4    amount of its damages by a preponderance of the evidence.  In

5    other words, you should award only those damages that Finesse

6    establishes that it more likely than not suffered as a result

7    of AT&T's infringement.  While Finesse is not required to

8    prove the amount of its damages with mathematical precision,

9    it must prove them with reasonable certainty.  Finesse is not

10   entitled to damages that are remote or that are only

11   speculative.

12        The damages that you award, if any, must be adequate to

13   compensate Finesse for any infringement that you may find.

14   You must not award Finesse more damages than are adequate to

15   compensate it for the infringement.  You must also not include

16   any additional amount in any damages award you make for

17   purposes of punishing AT&T or for purposes of setting an

18   example.

19        I'll now instruct you on how to calculate reasonable

20   royalty damages.

21        A royalty, ladies and gentlemen, is a payment made to a

22   patent holder in exchange for the right to make, use, or sell

23   the claimed invention.  A reasonable royalty is the amount of

24   royalty payment that a patent holder and the alleged infringer

25   would have agreed to in a hypothetical negotiation taking

1    place at a time prior to when the infringement first began.

2         In considering this hypothetical negotiation, you should

3    focus on what the expectations of the patentholder and the

4    alleged infringer would have been had they entered into an

5    agreement at that time, and had they acted reasonably in their

6    negotiations.  In determining this, you must assume that both

7    parties believed the patents were valid and infringed and that

8    both parties were willing to enter into an agreement.

9         The reasonable royalty you determine must be a royalty

10   that would have resulted from the hypothetical negotiation and

11   not simply a royalty that either party would have preferred.

12   Evidence of things that happened after the infringement first

13   began can be considered in evaluating the reasonable royalty

14   only to the extent that the evidence aids in assessing what

15   royalty would have resulted from a hypothetical negotiation.

16   Although evidence of the actual profits of an alleged

17   infringer may be used to determine the anticipated profits at

18   the time of the hypothetical negotiation, the royalty may not

19   be limited or increased based on the actual profits the

20   alleged infringer made.

21        A reasonable royalty is the amount of royalty payment

22   that a patentholder and the alleged infringer would have

23   agreed to in a hypothetical negotiation taking place at a time

24   immediately prior to when the infringement first began.

25   You've heard references throughout this trial for whether

1    infringement should be entitled to a running royalty or a lump

2    sum royalty.  If you find Finesse is entitled to damages, you

3    must decide whether the parties would have agreed to a running

4    royalty or a fully paid-up lump-sum royalty at the time of the

5    hypothetical negotiation.

6         A running royalty, ladies and gentlemen, is a fee paid

7    for the right to use the patent that is paid for each unit of

8    the infringing products that have been sold.  If there are

9    additional units sold in the future, any damages for these

10   sales will not be addressed by you.  If you decide that a

11   running royalty is appropriate, then the damages that you

12   award, if any, should reflect the total amount necessary to

13   compensate Finesse for AT&T's past infringement.

14        However, a lump-sum royalty is when the infringer pays a

15   single price for a license covering both past and future

16   infringement.  If you decide that a lump sum is appropriate,

17   then the damages you should award, if any, should reflect the

18   total amount necessary to compensate Finesse for AT&T's

19   infringement throughout the life of the patents.

20        Now, the law requires that any royalty awarded to Finesse

21   correspond to the value of the alleged inventions within the

22   accused products as distinct from the other unpatented

23   features of the accused products.  And this is particularly

24   true where the accused products have multiple features and

25   multiple components not covered by the patent or where the

1    accused products work in conjunction with other non-patented

2    items.  If unpatented features contribute to the accused

3    products, you must apportion that value to exclude any value

4    attributable to unpatented features.  You must determine an

5    appropriate royalty rate and an appropriate royalty base that

6    reflect the value attributable to the patented invention

7    alone.

8         In determining the reasonable royalty, you should

9    consider all the facts known and available to the parties at

10   the time the infringement began.

11        Some of the kinds of factors that you may consider in

12   making your determination are:

13        1.  The royalties received by the patentee for the

14   licensing of the patents-in-suit, proving or tending to prove

15   an established royalty;

16        2.  The rates paid by the licensee for the use of other

17   patents comparable to the patents-in-suit.  Comparable license

18   agreements include those covering the use of the claimed

19   invention or similar technology;

20        3.  The nature and scope of the license, as exclusive or

21   non-exclusive, or as restricted or non-restricted in terms of

22   territory or with respect to whom the manufactured product may

23   be sold;

24        4.  The licensor's established policy and marketing

25   program to maintain its patent exclusivity by not licensing

others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.   The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business;

6.   The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of their non-patented items, and the extent of which such -- excuse me -- and the extent of such derivative or convoyed sales.

7.   The duration of the patent and the term of the license;

8.   The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.   The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.   The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11.   The extent to which the infringer has made use of the invention and any evidence probative of the value of that

1  use;

2      12.  The portion of the profit or of the selling price

3  that may be customary in the particular business or in

4  comparable businesses to allow for the use of the invention or

5  analogous inventions;

6      13.  The portion of the realizable profits that should be

7  credited to the invention as distinguished from non-patented

8  elements, the manufacturing process, business risks, or

9  significant features or improvements added by the infringer;

10      14.  The opinion and testimony of qualified experts; and

11      15.  The amount that a licensor, such as the patentee,

12  and a licensee, such as the infringer, would have agreed upon

13  at the time the infringement began if both had been trying

14  reasonably and voluntarily to reach an agreement; that is, the

15  amount which a prudent licensee--who desired, as a business

16  proposition, to obtain a license to the patented

17  invention--would have been willing to pay as a royalty and yet

18  be able to make a reasonable profit and which amount would

19  have been acceptable to a prudent patentee who was willing to

20  grant a license.

21      You may have heard these factors that I've just read

22  referred to as the *Georgia-Pacific* factors.  No one of these

23  factors is dispositive, ladies and gentlemen, and you can and

24  you should consider the evidence that's been presented to you

25  in this case on each of these factors.  You may also consider

1    any other factors which, in your mind, would have increased or

2    decreased the royalty the alleged infringer would have been

3    willing to pay, and the patentholder would have been willing

4    to accept, acting as normally prudent business people.

5        In determining a reasonable royalty, you may also

6    consider whether AT&T had commercially acceptable

7    non-infringing alternatives to taking a license from Finesse

8    that were available at the time of the hypothetical

9    negotiation and whether that would have affected the

10   reasonable royalty the parties would have agreed upon.

11       A non-infringing alternative is a way of providing the

12   same or comparable functionality or achieving the same or a

13   comparable result that does not require using the asserted

14   claims.  You may compare the patented invention to

15   non-infringing alternatives to determine the value of the

16   patented invention, including the utility and advantages of

17   the patent over the old modes or devices, if any, that had

18   been used to achieve similar results.

19       Now, ladies and gentlemen, at this point we will proceed

20   to hear closing arguments for the attorneys for the competing

21   parties.

22       The Plaintiff may present its first closing argument to

23   the jury.

24       Would you like a warning on your time, Mr. Grinstein?

25           MR. GRINSTEIN:  Your Honor, I'm going to try to time

1    myself with my phone so I don't think that's necessary.

2         THE COURT:  All right.  You may proceed with your

3    closing argument.

4         MR. GRINSTEIN:  Hello again, ladies and gentlemen of

5    the jury.  Let me start out by thanking you for your time and

6    your jury service in this case.  I know it's been a burden on

7    you, but as you can probably tell, we wouldn't have resolved

8    this dispute between us without your help.  And that's really

9    what sets us apart from the rest of the world.  I mean, people

10   have fought and died to protect our fundamental rights, and

11   one of those rights is the right to resolve disputes with a

12   trial like this one.  We couldn't have done that without your

13   help, so thank you for your service.

14        Now, like I mentioned in opening, this is a case about

15   respect.  And I think we proved to you that Mr. Smith is a man

16   deserving of respect.  An Army veteran, 40 years in the

17   wireless industry, holds the tiptop security clearances in

18   this nation.  He's even a member of the Space Technology Hall

19   of Fame.

20        And we are here today in this case because he developed

21   this groundbreaking new technology for PIM-C; technology that

22   even the Defendants Nokia, Qualcomm, AT&T, they all praised

23   that technology when they first saw it.  But these Defendants

24   today aren't providing Mr. Smith with that respect.  They're

25   using his intellectual property without his permission and

1    without compensation and their response to this lawsuit has

2    been to try to tear up his patents.  That's not right, but

3    you, ladies and gentlemen of the jury, you can make it right.

4        Now, I know this is a complex case with lots of complex

5    testimony, facts, and figures, but I think there are a few

6    guiding principles that you-all can take back with you into

7    the jury room to help you work through those complexities.

8        And the first and most important of those guiding

9    principles is common sense.  I mean, for example, why hasn't

10   AT&T turned off this supposedly useless PIM-C feature from all

11   those thousands of Nokia radios?  I mean, wouldn't the best

12   proof to this whole world be that PIM-C isn't worth anything

13   to turn off that PIM-C?  And yet it hasn't done that.

14       The best explanation I think we've heard out of AT&T for

15   why it hasn't has been, we don't really need to.  I mean,

16   think about your common sense there, or think about this.  You

17   know, we've heard throughout this trial that more than half of

18   AT&T's radios, those are Ericsson radios and Ericsson doesn't

19   have PIM-C, except it comes out that, in fact, next year

20   Ericsson is launching PIM-C on its radios and that was at

21   AT&T's request.  Why is Ericsson putting into its new radios

22   this useless feature that AT&T doesn't need, unless that

23   feature really is useful and AT&T really does need it?  I

24   mean, use your common sense.

25       You know, the second I think guiding principle you-all

1    can think about is how the Defendants are asking you not to

2    believe your lying eyes.  I mean, essentially what the

3    Defendants are saying is, believe us, believe what we're

4    saying in court, but don't look over there at those documents

5    and don't believe your eyes and what you see in them.

6        You know, for example, AT&T keeps saying, oh, PIM-C is

7    useless, we don't like it.  But that's not what AT&T's

8    documents say.  Instead, you get documents like this one, this

9    email from 2020.  You've got AT&T engineers talking to each

10   other about these PIM-C radios.  They are practically giddy

11   about how well it works.

12       You know, Mr. Dacus made the comment that in this case,

13   it's kind of like there are two ships passing in the night.

14   And he's probably right, except the Finesse ship is loaded

15   down with a cargo of AT&T and Nokia documents.  Their ship has

16   got a cargo of attorney argument and inconsistent witness

17   testimony.

18       I think a third guiding principle that you-all could use

19   back in the jury room is to be very wary of people who change

20   their tune after a lawsuit's been filed.  You heard a lot in

21   this trial about this one-day study from Mr. Taylor.  Mr.

22   Taylor's study, which we don't know who put it together, he

23   didn't put it together, it's one day's worth of data on half

24   the radios in the system, and which he applies secret math to

25   it.  And yet before this lawsuit was filed, Mr. Taylor was

1    telling people, oh, don't rely on one-day studies of PIM

2    because PIM changes too much, you can't do that.  I guess a

3    lawsuit will get you to change your view on things as well.

4        So with those guiding principles in mind, let's talk

5    about the issues in this case.  And the first issue in this

6    case is infringement.  Are the Defendants using Finesse's

7    property?  And on that particular issue, Finesse bears the

8    burden of proof by a preponderance of the evidence.  And what

9    does that mean?  Basically means the greater weight of the

10   evidence.

11       Now, I know that there was a lot of technical discussion

12   from some very technical experts.  One of those experts said,

13   hey, that animal over there is a dog and one of those experts

14   over there said, hey, that animal over there is a cat.  And

15   how are you supposed to reconcile those two things?

16       Well, I would suggest you think about witness credibility

17   because credibility really shone through on that witness

18   stand, didn't it?

19       We presented you Doctor Wells, and Doctor Wells went

20   carefully through each claim and each element of the claim and

21   showed you one by one how the Defendants infringe.  And did

22   they really touch his credibility on cross-examination?  I

23   didn't see it.  I mean, the only issue they've been harping on

24   about cross-examination with Doctor Wells is this whole is the

25   modeled PIM path on the red line or not.  I'll tell you,

1    that's a non-issue because that whole thing doesn't even

2    matter for Finesse's infringement theory.

3          On top of that, it's making a mountain out of a mole hill

4    because everyone agrees that the modeled PIM path is on that

5    red line, it's at the bottom of the red line, that arrow

6    pointing down, that red arrow pointing down.

7          So that's Doctor Wells.

8          What about Defendants' expert, Mr. Proctor?  You know, he

9    didn't want to say it at first, but it eventually came out in

10   cross-examination what his real job is.  His real job is

11   testifying dozens and dozens of times to invalidate other

12   people's patents, even though he apparently doesn't have a

13   problem suing on his own patents and saying those are valid.

14         You know, Mr. Proctor knows what his job is.  His job is

15   to testify for defendants, and so he will do whatever

16   defendants ask him to do and ignore any other requests.

17         So, for example, if Defendants asked him a question, he

18   will answer it one way, but if Finesse or -- if Finesse asks

19   him the exact same question, he'll answer it the opposite way.

20   He does that because that's what his employers want him to do.

21         Now, you heard this long oration from Mr. Proctor about

22   how Defendants don't satisfy the signals of interest

23   definition in the patents, and you heard him talk about what

24   signal of interest means.  But then it comes out that the

25   Court has defined signal of interest completely differently

1     than the way Mr. Proctor was trying to tell you what it means.

2          You know, it's pretty easy to win the game if you get to

3     make up your own rules like Mr. Proctor wants to.

4          And on top of all that, Mr. Proctor doesn't even get some

5     of the basic facts right.  He testifies to Defendants' counsel

6     that the '134 Patent wasn't cited during the prosecution of

7     the '775 Patent, and then 10 minutes later in

8     cross-examination he admits he's wrong, it was cited.

9          So what are the Defendants' big non-infringement

10    arguments with respect to the '134 Patent?  I mean, they made

11    a lot of little arguments.  I don't have time to respond to

12    all of those today.  Doctor Wells handled each and every one

13    of them.  But I will talk about some of the arguments that

14    they spent more of their time on in trial.  And the first of

15    the arguments was this signal of interest argument.

16         But, as Doctor Wells showed, that red dashed line right

17    there carries the signal of interest and the interference

18    generating signal, and it carries it into the receiver.  So

19    that red dashed line carries the signal of interest because it

20    is a signal that the receiver is trying to receive and then to

21    send to the GROOT baseband processor.

22         How do the Defendants get around that?  Well, they get

23    around it by trying to redefine what signal of interest is, by

24    saying, oh, it's this uplink signal or it's something coming

25    from a cell phone, so on and so forth.  But, as you saw, none

1    of those words are in the Court's claim construction.  They're

2    trying to change the rules so they can win the game.

3         All that matters from the perspective of the Court's

4    claim construction is, is the signal of interest a signal

5    that's trying to be received by the receiver and then sent to

6    the baseband processor.  You can see it right there, that red

7    dashed line is going into the RF ADC, the receiver, and then

8    it goes to the baseband processor.  That's all it takes,

9    ladies and gentlemen of the jury.

10        Now, the second argument you heard out of the Defendants

11   was, is GROOT a baseband processor at all.  And we agree that

12   that Nahka box over on the left side of that figure you see

13   there, we agree that's a base brand processor.  The question

14   is whether GROOT is as well.  And, you know, to answer that

15   question, you got to think about the fact that Nokia's a

16   really sophisticated company, and it's probably got a really

17   sophisticated filing system.  It puts its documents where they

18   belong, and it probably does that with respect to its computer

19   files, too.  It probably knows where to put its properly

20   placed computer files.

21        So where does Nokia store its GROOT documents?  Well, you

22   can see in Plaintiff's Exhibit 839 at page 286, it stores its

23   GROOT documents in the computer directory baseband.  So isn't

24   it a little strange that Nokia is storing its GROOT documents

25   in the baseband computer directory, and yet it comes to court

1    and tries to argue to you that GROOT isn't baseband?  Don't

2    believe your lying eyes, ladies and gentlemen of the jury.

3        Now, the next non-infringement argument you heard was

4    about the closed loop manner claim limitation.  And Doctor

5    Wells went through that claim limitation and explained to you

6    clearly how the Defendants infringe by using a closed loop

7    manner.

8        So what do the Defendants do?  Well, they come up with

9    this new word 'feedback', and they say, oh, well, you haven't

10   shown feedback; therefore, there's no closed loop, except

11   feedback doesn't appear anywhere in the claims.  It doesn't

12   appear anywhere in the Court's definitions.  The Defendants

13   just inserted it in there so they could have a straw man to

14   shoot against.  Again, making up your own rules for the game

15   to make it easier to win the game.

16       What about '775 infringement?  Well, on the '775 Patent,

17   I mean, the Defendants spent about six slides talking about

18   '775 non-infringement.  The best that I could tell, they only

19   made two arguments.  The first of their arguments is, well,

20   the Court's claim construction requires three signals.  We

21   only have two signals; therefore, we don't infringe.

22       But look closely at what the Court said about the three

23   signal construction.  The Court said you have -- you don't

24   have to have three unique signals.  Think about it this way.

25   Basically what this claim is saying is that there is a system

1    and it performs math using three variables, but the Court's

2    claim construction doesn't say you have to map those three

3    variables to three signals.  No.  You can use two signals for

4    those three variables and even -- as long as you use one of

5    those signals over again.  That's what the Court says when it

6    means it's not limited to three unique input signals as long

7    as you can separately identify the three variables we're

8    talking about.

9         What was the Defendants' next '775 -- and I would just

10   say, by the way, Doctor Wells went through this two

11   signal/three signal analysis and showed quite clearly how the

12   Defendants infringed.

13        What was the other '775 non-infringement argument we

14   heard from Defendants?  Well, that was when Mr. Proctor

15   declared from the stand that Doctor Wells hadn't proven up the

16   seven multiplications.  Now, Mr. Proctor didn't cite to

17   anything or show you anything to prove that; he just declared

18   it from on high.  And it's simply not true.  I mean, Doctor

19   Wells went through all of those multiplications, he went

20   through the Defendants' documents, and he explained quite

21   clearly how those multiplications are in the Defendants'

22   products.  So that's infringement.

23        Let's go on to the next issue--validity.  So what

24   Defendants are going to argue to you, you know what?  Even if

25   we don't infringe these patents, that's okay because they're

1    invalid anyway.  That, of course, is Defendants' defense so

2    they bear the burden of proof on that defense and that burden

3    of proof is by clear and convincing evidence, a strict

4    standard of proof.

5        And so what's their argument here?  Well, they take these

6    two references, they take one reference here and one reference

7    there, and they slap it together and say the '134 is invalid,

8    and they do the same thing for the '775.  But isn't it telling

9    that the Defendants couldn't find one single inventor out

10   there anywhere who'd actually come up with Mr. Smith's

11   invention before he did?

12       Instead, they had to do this obvious analysis mixing and

13   matching from various places.  And even the places they mixed

14   and matched from had their problems.  I mean, the prior art

15   they cited wasn't digital when it needed to be, it didn't

16   mention cancellation or canceling when it needed to, it didn't

17   even talk about intermodulation or passive intermodulation or

18   PIM problems.  There were all sorts of holes in the prior art

19   that Mr. Proctor tried to explain to you.

20       And mind you, this was half of Defendants' defense in

21   this case.  And what did Mr. Proctor do?  Spend maybe 45

22   minutes, maybe an hour on that half of Defendants' defense in

23   this case.  And that's all the testimony you got on invalidity

24   from the Defendants in this case.

25       On top of that, the Court's instructed you to consider

1    these things called secondary considerations of

2    non-obviousness.  That's evidence that you should look at to

3    consider, hey, are these inventions really obvious or not.

4    And one of the things you're asked to consider about is the

5    issue of long-felt need.  In other words, if there's been this

6    problem in the industry for a super long time and no one has

7    yet come up with a solution to it, then the solution's

8    probably not obvious.  And Defendants' own Lui reference right

9    there tells you that this has been a problem all the way back

10    to 1947.  So plainly what Mr. Smith did to solve it wasn't

11    obvious.

12        Another of the secondary considerations is unexpected

13    results.  You heard Mr. Smith's testimony.  You saw the

14    documents in this case about the surprising and unexpected

15    testing results that he generated.  That proves this invention

16    is not obvious.

17        And then there's the factor of industry praise.  What are

18    people in the industry saying about Mr. Smith's invention?

19    Well, you heard his testimony on Monday about how those

20    professors from Stanford and Berkeley were bowled over when

21    they first saw his invention.  In fact, he showed his

22    technology to AT&T and Nokia, the Defendants in this case, way

23    back in the early 2000s.  They didn't say his technology was

24    old.  They didn't say he hadn't come up with something new.

25    They didn't say that his technology was obvious.  Doesn't that

1      tell you all you need to hear about that particular issue?

2          Back before this lawsuit was filed, the Defendants didn't

3      act like Mr. Smith's technology was obvious.  After this

4      lawsuit is filed, then they claim his patents are obvious.

5      That's invalidity.

6          The next issue is damages.  And, ladies and gentlemen of

7      the jury, once you find Finesse's patents are infringed and

8      once you find Finesse's patents are valid, then the Court asks

9      you to assess damages in this case.  And you heard two

10     competing damages presentations.  Our damages expert, Doctor

11     Bazelon, said damages were $166 million.  Their expert, Doctor

12     Becker, said they're only a million dollars.  How do you

13     reconcile those two things?

14         Well, Mr. Dacus helps us again here.  He said in his

15     opening argument, you really need to look at the experts'

16     methodologies, and when you look at those methodologies, that

17     is going to give you the best sense of who to believe.

18         And on that point we agree, because what was Doctor

19     Becker's methodologies?  He said the damages should be

20     premised on site hygiene costs, except do you remember Mr.

21     Loddeke's testimony?  He said site hygiene doesn't fix all of

22     PIM.  Site hygiene's not a complete solution to PIM.  There is

23     PIM-C you still need.  And the Defendants' actions prove that

24     point.

25         Now, what did Doctor Bazelon do?  Doctor Bazelon went and

1    constructed a model using his vast experience in the telecom

2    industry, and he considered that the highway that is being

3    used by the Defendants is blocked by this debris of

4    intermodulation, and what Finesse's inventions do is help to

5    clear the debris from that highway.

6        And so how do you measure the value of that cleared

7    debris?  Well, what Doctor Bazelon did was conduct the

8    specific radio-by-radio analysis using Nokia's own testing

9    data and AT&T's spectrum holdings to put a value on that

10   blocked lane that is cleared up by Finesse's inventions, and

11   that value is $1.05 billion.  He then conducts a hypothetical

12   negotiation exercise to split the value of that lane between

13   AT&T and Finesse, and he comes up with an answer to that.  And

14   I will say Doctor Becker largely doesn't disagree with Doctor

15   Bazelon's hypothetical negotiation construction.

16       But what's Doctor Becker's math?  Doctor Becker considers

17   300 of the 80,000 Nokia radios in AT&T's system.  He's

18   required to assume that everything infringes.  That's what

19   damages experts have to do.  But he's talking 300 radios?

20       And how does he get to those 300 radios?  Well, first he

21   deducts 98.8 percent of the radios based upon Defendants'

22   PIM-isn't-the-problem argument.  Then from that he deducts

23   another 70 percent of the radios based on Defendant's

24   PIM-C-doesn't-help-argument, and that gets him down to 300

25   radios.  And where does he get those numbers to do those

1    deductions?  Well, he gets them from AT&T's PIM guy.

2         But you saw the problems with that data:  One day's worth

3    of data, don't know where it came from, secret math applied to

4    it, only half of the radios even accounted for.  I mean, he

5    admitted that AT&T has data going back a year on these radios,

6    but we don't know what the data looks like the next day, the

7    previous day, a year earlier.  And, in fact, it comes out that

8    he defends this one day's worth of data by saying, don't

9    worry, PIM doesn't really change much day-to-day.  That's what

10   he says in court, except it comes out that before court he was

11   saying the exact opposite thing.

12        Now, we redid the math, as you saw, applied proper math

13   to Doctor Becker's analysis, and when we did that, it actually

14   comes out to $39 million in damages a year or $190 million

15   over the life of the patents, even more than what Finesse is

16   asking for.

17        So let me pull it all together by talking about the

18   verdict form in this case.  The verdict form is first going to

19   ask you whether Finesse's patents are infringed.  We've proven

20   that by a preponderance of the evidence, so please answer yes

21   to all those questions.

22        It's next going to ask you, are Finesse's patents

23   invalid.  Defendants haven't proven that by clear and

24   convincing evidence, so please put no to all those questions.

25        And then you're going to be asked, how much in damages

1    should you compensate Finesse for.  And on this particular

2    issue, the discretion is yours.  You can choose a lump sum

3    royalty or you can choose a running royalty.  If you want to

4    end this case now, end it for good, and compensate Finesse for

5    the lifetime of its patents, then write in the number that

6    Doctor Bazelon -- first of all, write down lump sum and write

7    in the number Doctor Bazelon suggests--$166 million.

8        If, on the other hand, you want to just compensate

9    Finesse up to today's date and give the AT&T the option to

10   turn this PIM-C off in the future, even though it's never

11   indicated it has any intention to do so, write down running

12   royalty, check that, and put in Doctor Bazelon's figure of $58

13   million.

14       So, ladies and gentlemen of the jury, thank you for your

15   time.  I'm going to sit down right now.  The Defendants are

16   going to get up and speak next, and then the final

17   presentation of the day will be from my colleague, Mr. Ward.

18       Thank you very much.

19           THE COURT:  Defendants may now present their closing

20   argument.  Mr. Nelson, would you like a warning on your time?

21           MR. NELSON:  Yes, please, Your Honor.  If I could

22   have a warning when I've used 20 minutes.

23           THE COURT:  I'll warn you when you have used 20

24   minutes.

25           MR. NELSON:  I appreciate it.  Thank you, Your

1    Honor.  May I proceed?

2              THE COURT:  You may proceed.

3              MR. NELSON:  Good morning, everybody.

4       So let me start where counsel did and thank all of you.

5    I know that all of you have had -- you have other things that

6    you need and want to be doing this week.  But it is a very

7    important part of our process, and I sincerely thank you, my

8    clients sincerely thank you.

9          Now, this is a patent case, and so what I want to do, His

10   Honor has said your job is to decide the facts.  It's not my

11   job to tell you how to decide the facts.  It's not my job to

12   tell you how to check out the verdict form.  That's for you.

13   My job through this case has been to try to bring you the

14   facts and try to do that to the best of my ability.  Now what

15   I'd like to do is walk through some of those things to put it

16   in a framework that I hope will help you to make the decisions

17   you need to make.

18        So let me first say, what I'm going to do is I'm going to

19   go through some of the arguments that were made for

20   non-infringement for each of the patents, and the first thing

21   I want to say is what I'm going to go through here, you heard

22   his honor say that there's this thing called the doctrine of

23   equivalents.  But the doctrine of equivalents here only

24   applies to one little thing in this case and that's just

25   whether those structures for the means-plus-function, you

1    remember we talked about some of those Sigma Deltas, that's

2    it.  So with everything I'm going to talk about here, the only

3    thing you're considering is literal infringement.  You don't

4    even need to look at doctrine of equivalents.  If it's not

5    literally there, there is no infringement.

6         And where I want to start is with no closed loop, and

7    this -- if you agree that Finesse has failed to prove that the

8    products perform the phase and amplitude adjustment, I've

9    highlighted that part of the claim, in a closed loop manner,

10   then there's no infringement of any of the claims of the '134

11   Patent.  So let me talk about that.

12        Counsel said, well, there's nothing about feedback or

13   anything in the Court's definitions.  Of course not.  As I

14   went through yesterday with Mr. Proctor, the Court didn't

15   provide a definition of closed loop.

16        So what does that mean for you?  What you're supposed to

17   provide or, excuse me, what you're supposed to apply is the

18   understanding of one of ordinary skill in the art.  And Mr.

19   Davis, the gentleman who designed the products that we're

20   talking about here and who wrote the computer program, the

21   vast majority of the computer program for how it works, he

22   came and swore to tell the truth and sat on the stand and he

23   told you, closed loop -- and let me explain it because the

24   name should indicate it to you.  You see the little arrow back

25   to the control from the output?  It loops back.  That's why

1    it's called closed loop.

2        And what does that mean?  You can see here you take that

3    output -- so you do a calculation, you do an output, it's not

4    quite what you want, you loop that output back to a control

5    and then you try to modify the calculation you're making until

6    you get to the result that you want.  That's what closed loop

7    is.

8        Open loop means you won't see a loop.  That's why they

9    call it open loop.  And what that means is you do a

10   calculation and your answer is your answer.

11       Now, Mr. Davis explained why they do it -- the product

12   does it in an open loop fashion--for speed.  Remember, they're

13   trying to do these things millions of times every second, and

14   so it needs to be done quickly.  There is not time to go

15   through the process and say, did I get the answer right, let

16   me modify it, did I get the answer right.

17       So for that reason, as Mr. Davis explained and he showed

18   here, this is from DX -- I need to put my glasses on.  I'm

19   sorry.  From DX 281, this is at page 56, you'll see, see this

20   is what they're accusing -- I mean, this is the product.  This

21   is where these phase and amplitude adjustments are made.  And

22   look at this.  You see no loops back.  You won't see a single

23   thing.  Doctor Wells never pointed to a single thing.  And

24   it's because it's not there.

25       Mr. Davis got up on the stand, remember he wrote the

1    computer program that says how this works.  He got up on the

2    stand and he said, it is completely open loop.

3        Now, they had the opportunity -- remember, they have that

4    computer code.  They have all the documents.  They never asked

5    him a single question.  They never said, Mr. Davis, you're

6    wrong.  Mr. Davis, look at this document.  It really is, it

7    does loop back, it is closed loop.  Never once challenged it.

8        Instead, what did they do?  Well, here on the right, I

9    have the one and only demonstrative that Doctor Wells provided

10   when he told you that it was closed loop.  Now, counsel said

11   that Doctor Wells explained this at length.  Well, actually

12   I'll tell you what he put on the slide was all Doctor Wells

13   said about it.  It was about a half a page.  And what he

14   pointed to is this wide delay search and the narrow delay

15   search.

16       Now, it's interesting that that's what -- that's the only

17   thing he referred to.  Mr. Davis was asked, does the GROOT

18   FPGA implement a narrow delay search and a wide delay search?

19   No, it does not.

20       So what does that mean?  Doctor Wells, knowing that in

21   the actual product there's nothing that loops back, he

22   couldn't show anything that loops back so that he could call

23   it a closed loop system because it's not, it's an open loop

24   system, he chose to show you, ladies and gentlemen, something

25   that's not in the product.

1          Did they ask Mr. Davis a single thing?  Remember, they

2   have the computer program.  They said that, of exactly how

3   this product operates.  Did they go and say, well, it's

4   actually in there, you actually do that?  No, they never once

5   did that because they know and Doctor Wells knew that what he

6   was presenting to you is something that's not even in the

7   product.

8          Now, this also would be open loop, but that's beside the

9   point.  It's not there; it's not something to consider.  So

10  you have to ask yourself why would somebody get up on the

11  stand and try to present to you -- see, our job as lawyers is

12  to present to you the actual facts, not to try to obscure the

13  facts or have you look over here or distract.  So why would an

14  expert get up on the stand and show you for his one and only

15  example of why the product meets this important claim, and Mr.

16  Dacus said that this was a real issue in this case and has

17  been all along, why would he do that?  That's not for me to

18  decide; that's for you to judge.

19         Now, let me -- if you agree that Finesse has failed to

20  prove that the phase and amplitude adjustment are done in a

21  closed loop manner, there's no infringement of any of the

22  claims--claims 1, claims 2, claims 3.  That requirement is in

23  all those claims.

24         So now I want to talk about another one.  This is the

25  first, and it's oversampling at a desired frequency, this

1    passband of received signals to create a bit stream.  Okay?

2    So we're going to -- we sample something, we sample some

3    signals to create a bit stream that represents those signals.

4    And what does the claim tell us?  There has to be two types of

5    signals in there.  It has to be, one, signals of interest;

6    and, two, it has to include interference generating signals.

7    There has to be two types of signals in that bit stream that's

8    sampled in order to meet this claim.

9         Now, Court's construction.  Let's talk about the Court's

10   construction of signal of interest.  I have it right here:

11   "With respect to the receiver, a signal that the receiver is

12   trying to receive and send, in digital form, to the baseband

13   processor."

14        Now, Mr. Proctor explained, Mr. Davis explained, exactly

15   what that is.  Right?  Remember, the baseband processor, when

16   you're trying to communicate from your phone, you send a

17   message up and the baseband processor is what decodes that

18   message.  In fact, when Mr. Smith describes his invention, he

19   described it all in the context of that.  Right?  He told you

20   the whole point of this was to try to cancel that PIM

21   interference from the signal that the base station in this

22   case, the receiver is trying to receive.

23        So let's look at the products.  Because, remember, Doctor

24   Wells didn't identify the receive signal.  Right?  The uplink

25   signal as a signal of interest.  And I'm going to show you

1    here why that's the case.

2        So, first, I'm showing a message being sent up.  This

3    would be from your phone when you're trying to communicate

4    back really to get something from the internet or to upload a

5    picture or something like that.  And so there will be a

6    message sent, and that comes in through this blue link down to

7    the blue -- it's a home-plate shape, that's a sampler.  That's

8    what it does.  So what it does is it takes a signal and it

9    takes samples of that to create a bit stream, a digital

10   representation of that signal.  So that's what we're talking

11   about in that first element.

12       So now let's look at the other path.  See, now here is

13   the downlink.  That's the message that you're trying to send

14   down to the phone.  So that's the -- you make a request to get

15   something from the internet, and the base station's going to

16   send that back so you can get that on your phone.

17       Well, what did we hear?  So the transmit signal, that

18   copy or the transmit reference signal, it was called, but

19   anyway it is the signals that you're transmitting will come

20   down what I have here on the red path and go into the red

21   home-plate shaped sampler.  Right?  Two different samplers.

22       Why is it done that way?  Remember, in the accused

23   products the only interference that they're trying to correct

24   for is interference that would be caused by the signal that

25   the base station is actually transmitting.  They're not trying

1    to correct for any other types of interference.  That would be

2    this external PIM stuff that everyone agrees these products

3    don't do anything with respect to that external PIM.

4         So now what happens?  What's on that line?  Well, it's

5    undisputed, and in fact counsel said during his portion of

6    the -- of his closing argument, that that's the transmit

7    signals.  Right?  So the transmit signals that you're trying

8    to transmit, it goes into that red sampler and now a bit

9    stream comes out.

10        So what do I have in this instance?  We know the signals

11   that we're trying to correct for that cause the interference

12   and, in the parlance of patent, that would be the interference

13   generating signal, that's the transmission signal.  We know

14   the signal we're trying to receive.  That would be the uplink

15   signal, would be a signal of interest.  Right?  But they're

16   two different bit streams.  See?  And I've blown this up here

17   of exactly what's coming in.  So it's the signal in and the

18   bit stream out when it gets sampled.

19        Well, so what does that mean?  Well, if I look at the

20   claim language, I know that I need to sample the created bit

21   stream that has two different types of signals in it, a signal

22   of interesting and an interference generating signal.  So

23   Doctor Wells didn't try to map it to that because he knew that

24   he couldn't.  There is no bit stream that has both of those

25   things because they're in two different streams because we're

```
 1    only trying to fix the interference that is caused by the
 2    signal that we're transmitting.
 3         Now, what does that mean with respect to these other
 4    elements, isolating signals of interest and isolating source
 5    signals?  Well, that's to isolate the signal to take it from
 6    this bit stream when you have both types of signals in there
 7    so you can process each of those things independently.  Well,
 8    obviously if they're not in the same bit stream, you don't
 9    ever do the isolating.  Right?  So that's not done in the
10    accused products, either.
11         So now I want to talk a little bit about what Doctor
12    Wells tried to do.  So you'll recall that Doctor Wells said,
13    well, the signal of interest is the signal that the base
14    station is trying to transmit.  Now, first, you got to ask
15    yourself, does that make any sense?  Because we know that the
16    base station is not trying to receive the signal that it's
17    trying to send.  Right?  It already knows that.  That doesn't
18    make any sense.  What it's trying to receive is a signal from
19    the phone.  And that's all very consistent, that description,
20    with the way Mr. Smith described his invention.
21         So here -- but Doctor Wells then tried to confuse the
22    issue.  He tried to say, well, I know it's just the
23    transmission signal, but it also says modeled PIM path so
24    there must be modeled PIM on that line as well.  But what you
25    just heard from counsel was very important.  What he -- the
```

1    PIM -- the model of the PIM is not created until you see in

2    the GROOT, you have this PIM adaptive model.  Right?  That's

3    where it's created.  And he said, well, the PIM model only

4    comes out on that bottom red line coming out of the box.

5         So what does that mean?  Well, we know that there are no

6    other signals coming into that home-plate shaped sampler from

7    the red line, and what does that mean?  That means that if

8    there's only one type of signal, even if Doctor Wells calls

9    that the signal of interest, which is, look, the transmission

10   signals do not meet the Court's definition of a signal of

11   interest, it's not the signal that the receiver is trying to

12   receive and send to the baseband in digital form, in other

13   words, to decode the information.  There's only one type of

14   signal there.  There is no PIM model -- modeled PIM path

15   signal.

16        So if I only have one signal coming into that home-plate

17   shaped sampler, I can -- the bit stream that's going to come

18   out is only going to have information about that one signal.

19   But -- and Doctor Wells confirmed this and I don't need to

20   belabor this because counsel said that.  We had to go around a

21   little bit, but he -- he acknowledged that into this

22   home-plate shaped sampler, there is only the transmit signals.

23        So what does that mean with respect to the claim?  And

24   let's look at this first element.  We know we need a bit

25   stream that has two types of signals.  Right?  The signals of

1    interest and the interference generating signals.  If I

2    only -- even if I call the transmission signals the signals of

3    interest, that sampler is only going to create a bit stream

4    that has that signal in it.  There will be no interference

5    generating signal in that bit stream.  Therefore, the claim's

6    not met.

7        And, remember, we're not talking about equivalence here.

8    This is, is it literally present.  If I only have one type of

9    signal going in, regardless of what you call it, when I sample

10   it, I can only have a bit stream that has that one type of

11   signal coming out and therefore it can't meet the claim.

12       It also can't meet the isolating elements because, just

13   like I talked about with respect to the actual operation of

14   the products, if there's only one signal in that bit stream,

15   one type of signal in that bit stream, I can't isolate it

16   because there's nothing to isolate it from.  I already have

17   that signal.  I can just go ahead and process it.

18       So here what does that mean?  And I've put this in.  That

19   means there's four reasons that I've given you.  There's no

20   bit stream that has both of those signals in there, there's no

21   isolation, and the phase and amplitude adjustment is not done

22   in a closed loop manner.  If you agree with any one of those,

23   I don't -- we don't -- you don't need to agree with all four.

24   Right?  If you agree that Finesse has failed to prove to you

25   that those -- any one of those four things that I just went

1    through are in the accused products, none of the asserted

2    claims, none of the asserted claims, are infringed with the

3    '134 Patent.

4        So now I'd like to talk about the '775 Patent and talk

5    about the evidence and put this into context.

6        So here I want to focus on that last part of the claim

7    that I have highlighted where it starts with, generating the

8    ICSs.  The intermodulation product cancellation signals is

9    what that stands for.  So I want to start there.

10        And there's two things that are important.  There's the

11    three signals.  Right?  Three signals, S1, S2, and S3, and

12    then there's the required multiplications, and you recall

13    there are seven of those that combine all these things

14    together.  So we have the Court's construction that three

15    signals, S1 and s2, are signals which must be separately

16    identifiable, in other words, I have to be able to identify

17    one separately from another, but are not limited to three

18    unique input signals.  So that's the Court's construction.

19        Well, I would still need three separately identifiable

20    inputs.  You may be able under the Court's construction to

21    say, well, I have, let's say, X1, I have X2, and then I have

22    X2 again, another input.  Right?  But in order to have three

23    separately identifiable inputs, you need to have three inputs.

24        What is the undisputed evidence here?  There are only

25    two.  There is the X1 and X2.  Doctor Wells, he does not

 1    dispute this.  He never once said, oh, there are 3.  He

 2    identified X1 and X2.  And then he just said, I can count X2

 3    twice.  You can't count X2 twice because you need to have

 4    three separately identifiable signals, in other words, three

 5    separately identifiable inputs.  If they had X2 again, perhaps

 6    that would meet the Court's claim construction because they

 7    don't need to be unique, but they need to be separately

 8    identifiable.

 9         And, remember, the claim -- the part of the claim that

10    we're looking at here that we're talking about now, this was

11    added to get the patent.  Right?  This was something that the

12    Patent Office said, if you put this into the independent

13    claim, I'll give you the patent, but if it's not in there, you

14    can't have the patent.  So remember that.  And, remember,

15    we're not talking about whether something's equivalent; we're

16    talking about only whether something is literally met here.

17         So now what did we hear?  From Mr. Davis, he confirmed

18    and he showed here, this is page 76 of DX 281, that they only

19    need two inputs.  Right?  And that's all they use.  So the

20    facts are undisputed.  There are only two inputs; therefore,

21    there are only two separately identifiable signals.  The

22    Court's construction -- sorry, that hand doesn't work too

23    well -- requires three.

24              THE COURT:  20 minutes have been used.

25              MR. NELSON:  Three separately identifiable signals.

1    Okay?

2        So the next thing here is the mapping.  So Doctor Wells,

3    you'll see he went through the mapping.  Right?  And he said,

4    well, I could map the signals this way.  Now, he doesn't have

5    three signals.  He says that X2 is equal to S2and S3, but

6    remember we just looked at it, there is no third input.  But

7    even with that, he comes up with the mapping.  He never tried

8    to explain to you, which was his burden, of why those were in

9    the accused products.  You recall that?  Never was there

10   testimony to say, well, this first equation, X1 times X1 times

11   X2, here's where it is in the accused product.  Never did

12   that, or for any of the others.  It's their burden; they never

13   showed it.

14       And Doctor -- excuse me, Mr. Proctor explained why

15   why--because things have evolved and there's a completely

16   different map than what was claimed, in other words, added to

17   the patent in order to have the Patent Office give the patent.

18   And that hasn't been shown.

19       So if you agree with, meaning the multiplications that

20   Doctor Wells lays out, he never showed where they were on the

21   accused product -- remember what the Court said?  You compare

22   the claims to the accused product, not to some hypothetical

23   mapping.  So if you agree with either of those two things,

24   there's no infringement.

25       Now, and that's what I'm showing here.  It would apply --

1    either of those two arguments would apply to all the claims,

2    and there would be no infringement of the claims of the '775.

3        So now I just want to briefly talk about invalidity here.

4    We know from Kim that it was doing exactly the same thing.  It

5    was taking the interference signals, creating the

6    intermodulation products, and making a canceling signal.

7    Right?  In order to subtract that from the signal.

8        Now, the only, only, thing that the Plaintiffs said was,

9    well, there is -- it's not digital.  But we know at this time

10   there was a whole digital evolution.  And Bazarjani teaches

11   doing signal isolation, in other words, coming in, sampling

12   your signal and using the digital system in order to isolate

13   signals.  So we explain why there's a motivation to combine

14   those things.

15       And I know counsel says, well, you didn't show one person

16   did it.  But the Judge went through the whole obvious

17   analysis.  Right?  Went through everything and said, well, it

18   is the law.  So what they're asking you to do is to say, well,

19   don't follow the Judge's instruction, don't look at the facts

20   that were brought for you, just assume because one person

21   didn't before, that it can't be invalid.  And that simply is

22   not the law.

23       Now, with time, I'm going to turn things over to Mr.

24   Dacus here.  The one thing I will say is, with respect to the

25   '775 Patent, the only thing that counsel did is to say that

1    certain words weren't there.  But that's not the test.  That

2    isn't the test.  It's are the concepts there, and that was

3    explained.  And never did they put somebody else up to offer

4    contrary opinions and say, well, here are the things that are

5    missing.  Right?  Think about that.  Never do they offer that

6    testimony.

7         And with that, I'm going to turn it over to Mr. Dacus to

8    finish, and I thank you for your time.

9              THE COURT:  Would you like a warning on your time,

10   Mr. Dacus?

11             MR. DACUS:  Would you let me know when I have three

12   minutes, please, Your Honor?

13             THE COURT:  I will do so.

14             MR. DACUS:  How much time do I have left, Your

15   Honor.

16             THE COURT:  16 minutes and 22 seconds.

17             MR. DACUS:  Thank you, Your Honor.  That's the

18   downfall of following an electrical engineer turned lawyer who

19   knows a lot about this and can talk all day.

20        So good morning.  I do want to spend just a few minutes

21   talking to you about really the amount of money that Finesse

22   is seeking in this lawsuit.  You know, and I told you from the

23   beginning, that we do not believe that we owe them anything

24   because we don't believe that these Nokia products infringe

25   these patents.  And, candidly, when you look at all the

1    information and have it, these patents should not have been

2    issued, they're not valid.

3        I told you in opening statement that you can tell a lot

4    about what a lawsuit is really about if you look at not

5    necessarily just the amount but the method and the assumptions

6    that go into a Plaintiff's calculation of damages.  I don't

7    know if you remember that, but I said it on Monday.  It seems

8    like a lifetime ago to me.  Maybe to you also.

9        And we know that's true here.  You know now from the

10   evidence that we believe Finesse has used the wrong method and

11   measure of damages, and not only did they use the wrong method

12   and measure by measuring the spectrum, at literally every

13   single step the assumptions they made inflated the amount of

14   money that they are asking for.

15       The Court just read you the instructions on how to

16   calculate damages.  You can look, I wrote it down, it's on the

17   bottom of page 21, so for those of you taking notes, you can

18   go into the jury room, look at the bottom of page 21, and it

19   will say what you are attempting to do here is to look at the

20   actual value of the alleged invention, that's PIM

21   cancellation, that AT&T gets from that.

22       So what evidence do you have in that regard?  The first

23   thing you have is common sense, and the Judge has told you to

24   use your common sense.  What does common sense tell you about

25   these patents and their value?  The '134 Patent has been in

1    existence for 15 years, the '775 has been in existence for six

2    years.  They have attempted to license these patents, to

3    partner with folks for well over 20 years now, and there have

4    been no takers.

5         And why do I say that's common sense?  It's common sense

6    because of what we said during the trial.  If you were going

7    to buy a home or a piece of land, you'd look and see what

8    someone sold that for in the past or whether or not there was

9    any interest in buying that in the past.  And here we know.

10   This is not AT&T and Nokia saying anything about the value.

11   These are people in the industry, people who have knowledge of

12   how these things work in the telecommunications business,

13   saying, we see what you have, but it's just theoretical and

14   academic and not practical.

15        And, in fact, Mr. Grinstein emphasized this when he was

16   up here because did he say to you?  Well, the professors at

17   Stanford and Berkeley liked it.  Well, they probably did.  In

18   a theoretical, academic, ivory-tower setting, those professors

19   may have said, hey, this looks good.  But in a real-world,

20   practical-engineering setting, it just doesn't have practical

21   applicability.

22        We also have one piece of common sense information, and

23   that is, Finesse went to Intellectual Ventures, and you know

24   they attempted to sell these patents, actually five of their

25   patents, including these two, for $3 million.  Roughly

1    $600,000 a patent.  Intellectual Ventures said thanks, but no

2    thanks, not once but also twice, when they went back in 2016.

3    Long after Finesse claims everyone knew about PIM and PIM

4    cancellation and how important it was, no one in the

5    marketplace said, yes.

6        Now, let's focus on what the Judge told you to do, and

7    that is, to calculate the actual value or benefit.  The only

8    benefit in these patents, if there's any, is to cure internal

9    PIM.  Right?  This is not a home-monitoring alarm situation.

10   We've heard about that a couple of times.  That's not what

11   these patents are about.  The only value is to cure internal

12   PIM.  And so it begs the question --

13       May I have the document camera, please, Ms. Brunson?

14       So it begs the question, if the value is to measure

15   internal PIM, in order for the Plaintiff Finesse to convince

16   you that spectrum is the appropriate measure, they have to

17   assume that site hygiene is not also a solution for internal

18   PIM.  Right?  Mr. Bazelon knows, when he did his calculation,

19   that's the first critical assumption.  He has to assume that

20   site hygiene does not solve internal PIM.  Otherwise, there's

21   no reason to do this spectrum calculation.

22       So what I did is I made a list of the evidence that

23   you've heard on this particular question.  So who came to

24   court and said, okay, site hygiene is not a solution for

25   internal PIM?  The two paid experts for Finesse.  Right?  What

1    evidence do you have that it actually is?

2         Well, Mr. Loddeke and Mr. Taylor both took the stand,

3    told you, this is what we do day in and day out, we operate

4    the AT&T network.  In fact, Mr. Taylor is the PIM guy.  That's

5    his sole job.  Doctor Wells and Doctor Bazelon on the

6    Plaintiff's side, by the way, they've never worked a day at a

7    telecom company.

8         What else do you have in addition to their word?  We know

9    that -- you've seen this flowchart before.  Long before this

10   lawsuit was filed, long before, AT&T had a strategy, they had

11   a policy for how to deal with internal PIM, and it included

12   site hygiene.  This is not a document that was created for

13   this lawsuit.  It existed long before the lawsuit.

14        What other documentary evidence do you have?  This is DX

15   318, and I'm going to refer to it a couple of times so for

16   those of you taking notes, you can write it down.  DX 318.

17   This is the internal AT&T documentation of the amount of money

18   that they spend on hygiene and maintenance, sending repairmen

19   out to cure internal PIM, a document created long before this

20   lawsuit.  So even though the Plaintiff says, you can't cure it

21   with internal PIM, we know AT&T, that's exactly what they do.

22        Now, who else in this lawsuit said you can cure internal

23   PIM through site hygiene?  I'll tell you Finesse themselves

24   said it.  So this is, again, DX 160.  You can look at it back

25   in the jury room if you want to and ask for it.  So before

1    this lawsuit was filed, this is a presentation that Finesse

2    and Mr. Smith made to others about PIM and how to reduce it.

3    You can turn to the second page and see that they're

4    specifically talking about what they call feed system.  That's

5    their word for internal PIM.  You can look at every bit of

6    this as long as you want.

7         And then you turn to the fourth page and they say,

8    opportunities to mitigate, in other words, how do you cure

9    internal PIM.  And Mr. Smith and Finesse themselves say, most

10   impairment is from installation and can be improved with

11   diligent installation and ongoing maintenance.

12        We agree a hundred percent.  You heard from AT&T most of

13   the internal PIM comes from installation.  But we don't have

14   any because we don't even accept the cell tower until it is

15   internally PIM-free.

16        In addition, although their expert in this lawsuit says

17   maintenance doesn't cure internal PIM, before this lawsuit Mr.

18   Smith and Finesse said just the opposite--ongoing maintenance

19   is the cure.

20        So the entire premise of Doctor Bazelon's calculation

21   that site hygiene cannot cure internal PIM is really your

22   decision.  And I would say to you, once you decide that site

23   hygiene can cure, you can disregard his calculation.  But if

24   you're inclined to take a closer look at his calculation and

25   think that's the proper methodology, we need to look at

1   whether or not the assumptions that he used led to an

2   appropriate damages number.

3          So the first assumption that he made was that internal

4   PIM is present 100 percent of the time in the AT&T network

5   radios, the accused radios here.  That's his assumption--a

6   hundred percent of the time.  He starts his meter running for

7   damages as soon as we turn on the PIM-C feature.

8          Is that accurate?  Is that true?  Is that what the facts

9   show?  Again, I just made a list of what the facts in the case

10  show.  Mr. Loddeke and Mr. Taylor took the stand, raised their

11  right hand, told you that internal PIM is rarely present in

12  their experience.

13         What else did you see?  National testing.  That national

14  testing is the testing that they said, oh, well, that's only

15  one day.  But Mr. Taylor told you internal PIM doesn't change.

16  By the way, they keep showing you this document where they

17  claim Mr. Taylor said, no, internal PIM does change.  You

18  remember that was that whole episode here where we had the

19  folded paper with Mr. Ward showing that to Mr. Taylor when we

20  eventually find out that's relating to external PIM.

21         Remember, I told you at the beginning that could happen.

22  That whole unfolded paper issue and whether or not it relates

23  to internal or external, it relates to external.

24         What you also have is that same cost data that I showed

25  you.  It's Defendants' Exhibit 318.  When you go back there,

1    look at that cost data.  Remember, we looked at it yesterday.

2    For the 1 million radios in the AT&T system, they have to fix

3    about 3,000 a year on average.

4        There's one other piece of information that I'm sorrowful

5    that we didn't emphasize, but I want you to look at when you

6    do that.  Remember that information extends from 2017 through

7    2022.  And remember we didn't buy the first accused Nokia

8    radio until the middle of 2018.  So what you would expect to

9    see, just through common sense is, oh, once PIM-C shows up,

10   the number of radios we're having to repair that have internal

11   PIM would go drastically down.  You don't see that at all.

12   Look at it for yourself.  It remains basically the same.  We

13   saw it yesterday.  It's basically about 3,000 a year that we

14   have to repair.

15       That's actual evidence, information created long before

16   this lawsuit that says internal PIM, is it there?  It's there.

17   Is it a huge problem?  Not at all.  It's present in probably

18   less than one percent.  To be conservative, we'll say less

19   than two percent.

20       We also know that 70 percent of the radios in the network

21   are Ericsson.  Those don't have any PIM cancellation feature.

22   Network operates just fine.  We also know that Verizon buys

23   these same -- very same radios.  As Doctor Bazelon had to

24   admit Verizon doesn't even turn the feature on.  Verizon's

25   network operates with no problems at all without the PIM

1    cancellation feature.

2        At the end of the day, the most appropriate measure of

3    damages here are the amount of site hygiene costs that AT&T

4    saves.  To the extent there's any value in the PIM

5    cancellation feature, and -- and you've seen, you know from

6    the data, PIM cancellation shows up, let's just be generous

7    and say, one percent of the time.  In that one percent of the

8    time, PIM cancellation actually cancels it about a third of

9    the time.  So for that small percent of time, it can help us

10   and defer some hygiene and maintenance costs.  That's the

11   benefit we get.  We're not saying that we get absolutely no

12   benefit.  That's the benefit that we get, and that's exactly

13   what Doctor Becker measured in his calculation.

14       I do want to say one thing about the verdict form that

15   counsel showed you where you're going make a decision about

16   the lump sum versus the running royalty.

17            THE COURT:  You have three minutes remaining,

18   counsel.

19            MR. DACUS:  Thank you, Your Honor.

20       With respect to Doctor Bazelon's calculation, it was a

21   running royalty.  That's what he said, a certain amount per

22   radio.  If you agree that Doctor Bazelon's methodology is

23   appropriate, you should check the running royalty.

24       But what you shouldn't do is give damages of any kind

25   beyond 2022 and the date of this trial, because the Judge just

1    gave you an instruction that said you should not give damages

2    based on speculation.  Doctor Bazelon admitted what is the

3    truth:  AT&T has the right to turn this off after this trial

4    if they choose to do so, and his number going beyond this

5    trial would assume speculatively that it stays on.

6         The Judge has told me I only have a couple of minutes so

7    here's where I want to wrap up.  When I sit down, Mr. Ward's

8    going to get to stand up and we're not going to get to respond

9    to what he says.  What I ask you to do is, whatever he says,

10   think to yourself, what would AT&T and what would Nokia say in

11   response.

12        Oftentimes lawyers stand up and they are critical of

13   defendants for having put forward defenses.  This is what I

14   want you to think about that, though.  From the very first

15   moment you came here, the Court played a video for you and

16   then he gave you instructions, and what those said in summary

17   is that not only is the Constitution in play with respect to

18   people who seek a patent, but the Constitution allows those

19   who are accused of infringement to come to court and defend

20   themselves under the Seventh Amendment in a jury trial and

21   specifically to assert the invalidity of the patent.

22        You make the final determination.  To the extent anyone

23   implies that you don't get to make that ultimate

24   determination, they're seeking to essentially say you don't

25   get to enforce your constitutional rights.

1          When Mr. Smith and Finesse went to the Patent Office,

2    they made a promise.  If you, the Patent Office, give us a

3    patent based on this secret process between us, then if I sue,

4    if we Finesse sue somebody, that party has a constitutional

5    right to come and assert invalidity and show whether or not

6    the Patent Office had all the information before it.

7          You now know that everything we showed you here, Kim,

8    McCalister, Bazarjani, that the Patent Office didn't consider

9    any of that.  They didn't have it in front of them.  You're

10   the first people to have that piece of evidence, make a

11   determination on the validity of the patent.

12         We thank you very much for your time and consideration.

13   I want to say this on behalf of the men and women who work at

14   Nokia and AT&T, the thanks here is not conditional, it's

15   unconditional.  Regardless of what your verdict is in this

16   case, all they ever wanted to do was present the facts and

17   evidence to a jury and you've given them that opportunity.

18   Thank you very much.

19         Thank you, Your Honor.

20              THE COURT:  Plaintiff may now present its final

21   closing argument.  Would you like a warning on your time Mr.

22   Ward?

23              MR. WARD:  I would, Your Honor.  If I could have a

24   two-minute warning and if you could tell me how much time I

25   have as well.

1          THE COURT:  You have 14 minutes and 52 seconds.

2    I'll warn you when you have two minutes remaining.

3          MR. WARD:  Thank you, Your Honor.

4          THE COURT:  You may proceed.

5          MR. WARD:  And like the other attorneys, I want to

6    thank you as well.  You-all have been paying attention and

7    that's all that we can ask.

8          Like Mr. Grinstein, I want to point out some things that

9    I think will help you to decide who is it that you can believe

10   because I think credibility is key.  And I'm not critical at

11   all of these Defendants asserting whatever defense they want

12   to.  But what I want to step back and look at is the defenses

13   they have asserted and how they've presented them to you

14   because in 15 minutes I can't go through all the infringement

15   analysis.  The Plaintiff and Defendant presentations were,

16   what, five or six hours?

17         But what I can tell you is that I think you can recall

18   how these witnesses behaved on the stand, because I recall

19   Doctor Wells going through every claim.  We spent the time; he

20   did the hard work.  There were no moments where Defense

21   counsel was cross-examining him and they got him to admit, no,

22   I didn't apply the Court's construction.  If I'd applied the

23   Court's construction, maybe you'd get a different result.

24         No, ladies and gentlemen.  That only happened with Mr.

25   Proctor during his cross-examination.

1        And Mr. Davis is here as a fact witness.  He was offering

2   facts.  He didn't offer opinion testimony about whether there

3   was infringement or non-infringement.  They relied upon Mr.

4   Proctor.

5        But then they switch horses because the fact that they

6   say we're not on the property and then you can see how quickly

7   they switch and they go, well, even if we're on the property,

8   it's our right to say the patents are no good, they're

9   invalid.

10       That's their right, but they have to do it with clear and

11  convincing evidence.  And they tell you, oh, well, there's

12  going to be 30 or 40 claims left over so, you know, we're just

13  tearing up three, four, five, six of his claims.

14       Do you think that what you've learned about the expense

15  in this case, do you think the expense and the time of all

16  these people in here, that we brought you the claims that are

17  weak and so if you tear up the claims that we've asserted and

18  declared them invalid, that does no harm to Mr. Smith?  Of

19  course it does.  And these Defendants want to send a message

20  to inventors that bring them to court--not only will we deny

21  infringement, we'll tear up your property.  And if we're not

22  right there, then we'll say that we only owe you a fraction of

23  what the actual damages are.

24       So think about that when you're assessing credibility of

25  these witnesses.  You-all have got to decide who to believe,

1   because one set of witnesses told you the sun rises in the

2   east, the other said they rise in the west.  You decide who to

3   believe.

4       We left off here yesterday because -- and they didn't hit

5   on it today because I think they might have gone back and read

6   the transcript.  You know, they said Doctor Bazelon assumed

7   that folks would go out and buy spectrum if think didn't have

8   PIM-C.  And this is Mr. Dacus' question to him, he says, you

9   would agree, sir, at the end of the day if the jury determines

10  that AT&T in fact attempts to or prevents or cures internal

11  PIM through site hygiene, as opposed to buying spectrum, and

12  the answer's down there at the bottom, he says, I can't agree

13  with that.  And why can't he?  Because you had in there the

14  premise they were buying spectrum as an alternative, and

15  that's not my assumption.  That's why you didn't hear that

16  argument today, because that's not what Doctor Bazelon said.

17      What else did they tell you because we've heard it here

18  in closing?  Mr. Dacus told us, AT&T needs a cost effective

19  and practical means to reduce and prevent that internal PIM.

20  They simply repair it.  They do this thing called hygiene.  In

21  fact, in opening they said that's all they do.  That's how

22  they -- they repair internal PIM with site hygiene.

23      Then we find out, well, we've got it activated on 60,000

24  radios.  And to his credit, Mr. Loddeke reluctantly admitted,

25  okay, well, maybe there is a little internal PIM even though

1    these radios are supposed to be in good repair.

2         And you'll see me -- I'm going to cite documents.  This

3    isn't going to be attorney argument.  This is not me trying to

4    tell you what I wish a witness had said, what I wish the

5    evidence had been.  You can look at the documents because we

6    know why is they have internal PIM.

7         This is in 2018 when they start acquiring spectrum and

8    the increase in noise due to PIM is inevitable based upon the

9    frequency plan in AT&T.  AT&T is buying spectrum and the

10   frequencies are on top of each other, bands 12, 14, 29, 25,

11   66.  You-all have heard those numbers.  You're about to see

12   it.  We've shown it during the case.  I think this will remind

13   you.  This is from PX 708:  AT&T's fragmented spectrum causes

14   cost and complexity.

15        They tell you, oh, well, Verizon doesn't have a problem.

16   Verizon doesn't have a problem in its network.  That's right

17   because Verizon isn't buying spectrum in these little

18   frequency bands like AT&T has.

19        And they say, well, Ericsson doesn't have PIM-C.  I mean,

20   did they forget that we looked at the documents that Mr.

21   Grinstein just showed you again where Ericsson is coming out

22   with it in 2023?  Don't believe your lying eyes.  Believe what

23   they tell you.

24        And what did Nokia tell them that the tri-band radio with

25   PIM-C was going to do?  One of the benefits, the best, return

1    on investment of AT&T'S purchase of B29 spectrum.  And how are

2    you going to maximize that purchase?  With built-in PIM-C

3    cancellation, will cancel wired PIM between three bands in the

4    remote radio head.

5         I mean, it's their documents that are telling them you're

6    going to get to use more of your spectrum, you're going to get

7    to solve this problem that is caused by putting these multiple

8    bands on these tri-band and dual-band radios.

9         And if that's not enough, PX 674, this is Mr. Edwards.

10   You remember he's the deponent who appeared by video

11   deposition.  This is in March of 2021.  Prior to the meeting

12   we want to pull together as much history as possible regarding

13   the decision to develop Nokia tri-band radio with PIM

14   cancellation.

15        What is the reason?

16        They have PIM-C.  He tells us, I realize that markets do

17   not do enough engineering as to isolation between antenna.

18   The spectrum group does not evaluate the mixing of existing

19   frequencies with new opportunities.  Therefore, the need for a

20   remote radio head that does as much as possible as to

21   eliminate or control PIM.  The reason we need PIM-C

22   cancellation is because of the mixing frequencies that are

23   resulting from the spectrum purchases.

24        If that's not enough, we ask Mr. Edwards this question,

25   and here's the testimony he gave:  If you didn't have PIM

1    mitigation, the radio would not be capable of carrying the

2    capacity that it was designed for.

3        He didn't say, if you didn't have PIM cancellation, you

4    wouldn't be able to figure out which radios were broken.  You

5    know, we had that one-day study that Mr. Taylor pulled out.

6    They've got this data all year long, they pull one day, feed

7    it to Doctor Becker, don't tell him anything about what the

8    inputs are.

9        But Ms. Fair showed you during her cross-examination of

10   Doctor Becker that the radio bands on the radios that appear

11   in that study are not 12, 14, and 29, or 25 and 66.  Isn't

12   that coincidental that the radios they checked and then they

13   put their mystery math over here to say whether or not PIM-C

14   is working, don't cover the bands that they've been talking

15   about why they need PIM-C cancellation.

16       Then they talk about there's a distinction between

17   internal and external.  Internal PIM's just not a problem.

18   Despite all the documents I just showed you, internal PIM's

19   not a problem, we don't have a problem, we cure that with site

20   hygiene.

21       Yet again, Mr. Edwards tells us, dual-band/tri-band

22   radios operating on these frequencies need PIM-C.

23       And he says, the math does not change.  Is that correct?

24       Yes, that's correct.  The math that doesn't change are

25   these third order conflicts.

1        You-all saw the documents where when you put these bands

2   right on top of each other, you get these conflicts and that's

3   why they developed PIM-C to address it.

4        Is it just, you know, one or two percent of the radios,

5   Mr. Edwards?

6        No, they're everywhere.  These PIM problems are

7   everywhere.

8        We just heard this again during closing as well.  This is

9   the way AT&T treats Mr. Smith in open court.  In open court

10  they're on their best behavior.  Right?  They got to be in

11  front of their best behavior; they are in front of eight

12  people on the jury.

13       They say, well, he's not worked at telecom service

14  providers; he just has a paper solution.  All he's got are

15  these patents.  It's just theoretical.  It's not practical.

16  And Finesse hasn't ever made a product.  They're not like

17  AT&T.

18       Think about Mr. Smith outside of the courtroom, dragging

19  his patents up to the door, knocking and saying, hey, I've got

20  something here; you-all are going to have a problem in the

21  future.

22       Who's that?  Mr. Smith?  You got any products?  You been

23  working for telecom?  No?  Go away.  We'll deal with this

24  problem when we want to deal with it.

25       Well, you know what?  In 2018, the problem that he

1    predicted arose and they started scrambling and they got their

2    solution and they got it from Nokia.  They told them exactly

3    what they wanted.

4        Let me talk to you about damages because what they

5    presented to you with Doctor Becker was a lump sum of a little

6    over a million dollars.  And that takes you out to the end of

7    the expiration of the '775.  And that's where Doctor Bazelon

8    said, if you don't think they're going to stop infringing,

9    damages for the entire period are $166 million.

10       Now, ladies and gentlemen, this is over 12 years because

11   we got five years of past infringement, we've got a billion

12   dollars of salvaged spectrum.  That works out to about $80

13   million a year of salvaged spectrum in their 40 to $45 billion

14   of spectrum that they own.  Doctor Bazelon focused in on the

15   spectrum that they're able to use, not going to buy new

16   spectrum, salvage spectrum, actually what Nokia said the

17   radios would do, get the best return on your investment in

18   this spectrum.  Exactly what he said.  That's what he valued.

19   80 million a year of savings, divide that between Finesse and

20   AT&T, it works out to about $12 to $13 million a year for the

21   past.

22       What was interesting is that AT&T didn't get up here and

23   commit to you to turning this off, did they?  They won't do

24   that because they want it.  That's why Ericsson's coming out

25   with these radios.  They need it because of the problem

1    they've created by the way they bought spectrum.

2         But there's a solution.  It's PIM-C.  They just don't

3    want to pay for it.  They want to tell you, site hygiene, that

4    cures all our PIM problems.  Don't worry about the evidence.

5    Trust us.

6         But if you trust them and you think they're going to turn

7    it off and you want to give them a chance to turn it off, 12

8    to $13 million a year in the past is this $58 million number,

9    check running royalty.

10        If you don't think they're going to turn it off, if you

11   think they're going to keep using it, they're going to keep

12   going forward just like they have been, it's interesting they

13   won't commit to turning it off if you-all return a verdict of

14   infringement, validity, and damages, but let's say they will,

15   let's say they're not going to turn it off, then it's $166

16   million, lump sum.  Up to present, $58 million running

17   royalty.  If you think they're going to keep using it, it's

18   the bigger number.  We're going to leave that up to you.

19             THE COURT:  Two minutes remaining.

20             MR. WARD:  When you-all come back in with your

21   verdict -- I take that back.  Right before you go out, you're

22   going to hear that all corporations stand equal in this

23   courtroom.  And we do.  This is the one place we get to stand

24   equal, the one place that Finesse stands toe-to-toe with AT&T.

25        When you-all come back in with your verdict and you read

1    your verdict out, I think Mr. Taylor--yeah, Mr. Taylor is

2    sitting out in the gallery--the PIM guy, I bet you he's going

3    to jump on his phone and he's going to make one of two phone

4    calls.  It's either going to be, we got them, they believed

5    everything we said, they disregarded all our documents, keep

6    on doing what we're doing; or it's going to be, we can't just

7    explain everything away, these people are sharp, we might talk

8    a little slower, we don't think slower, we're going to have to

9    change the way we do business, AT&T.  We're going to have to

10   respect people's property even if it's just patents.

11        You-all get to make the decision on which one of those

12   two phone calls gets made.

13        Thank you for your time.

14            THE COURT:  All right, ladies and gentlemen.  Let me

15   provide you with a few final instructions before you begin

16   your deliberations.

17        You must perform your duty as jurors without bias or

18   prejudice as to any party.  The law does not permit you to be

19   controlled by sympathy, prejudice, or public opinion.  All

20   parties expect that you will carefully and impartially

21   consider all the evidence, follow the law as I have given it

22   to you, and reach a just verdict regardless of the

23   consequences.

24        Answer each question in the verdict form based on the

25   facts as you find them to be, following the instructions that

1    the Court has given you on the law.  Again, do not decide who

2    you think should win and then answer the questions to reach

3    that result.  Also, let me remind you, your answers to the

4    questions in the verdict form and your verdict as a whole must

5    be unanimous.

6        You should consider and decide this case as a dispute

7    between persons of equal standing in the community, of equal

8    worth, holding the same or similar stations in life.  This is

9    true in patent cases between corporations, partnerships, or

10   individuals.  A patent owner is entitled to protect his rights

11   under the laws of the United States, and this includes

12   bringing a suit in a United States District Court for money

13   damages for infringement.  The law recognizes no distinction

14   among types of parties.  All corporations, partnerships, other

15   organizations, and individuals stand equal before the law

16   regardless of their size, regardless of who owns them, and

17   they are to be treated as equals.

18       When you retire to the jury room to deliberate on your

19   verdict, as I've told you, you're each going to have your own

20   printed copy of the final jury instructions that I've given

21   you today.  If during your deliberations you desire to review

22   any of the exhibits that the Court has admitted into evidence

23   and shown to you over the course of the trial, you should

24   advise me by a written note delivered by your foreperson to

25   the Court Security Officer.  And when I get that note, I will

1    send those exhibits that you asked for to you.

2         Once you retire, you should first select your foreperson

3    and then conduct your deliberations.  If you recess during

4    your deliberations, follow all the instructions the Court has

5    given you about your conduct during the trial.

6         After you have reached a verdict, your foreperson should

7    fill in your unanimous answers to the questions in the verdict

8    form, sign it, date it, and advise the Court Security Officer.

9    You should not reveal your answers to any question in the

10   verdict form until you've been discharged by me or unless

11   you're otherwise directed by me.  And you must never disclose

12   to anyone, not even to me, your numerical division on any

13   unanswered question.

14        Any notes that you've taken over the course of this

15   trial, remember they are aids to your memory only.  If your

16   memory should differ from your notes, you must rely on your

17   memory and not your notes.  The notes are not evidence.  And

18   the juror who has not taken notes should rely on his or her

19   own independent recollection of the evidence and not be unduly

20   influenced by the notes of other jurors.  Notes are not

21   entitled to any greater weight than the recollection or

22   impression of each juror about the testimony.

23        If during your deliberations you want to communicate with

24   me at any time, you should give a message or a question

25   written by your foreperson to the Court Security Officer who

1    will bring it to me, and I will then promptly respond, either

2    in writing or by having you brought back into the courtroom

3    where I can address you orally.  And I will always disclose to

4    the attorneys in the case any question you may have before I

5    respond to any question.

6        After you've reached a verdict in this case and the Court

7    has accepted your verdict and discharged you as jurors in this

8    case, please understand you are not required to talk with

9    anyone about your service as a juror in this case.  But by the

10   same token, at that time you will be perfectly free to talk

11   with anyone about your service as a juror in this case.  That

12   decision at that time will be up to you individually 100

13   percent.

14       I'm now going to hand eight copies of these final jury

15   instructions and one clean copy of the verdict form to the

16   Court Security Officer to deliver to you in the jury room.

17       Ladies and gentlemen of the jury, you may now retire to

18   the jury room.  We await your verdict.

19           (Whereupon, the jury left the courtroom.)

20           THE COURT:  Counsel, you are welcome to wait here in

21   the courtroom.  If you choose to wait off the premises, be

22   prepared to come quickly if we call you with either a question

23   or a message from the jury.  Otherwise, pending a note from

24   the jury or their return of a unanimous verdict, we stand in

25   recess.

1                    (Jury deliberates.)

2          THE COURT:  Be seated, please.

3      Counsel, the Court has received a note from the jury.

4  I'm going to mark it in the upper right-hand corner with a '1'

5  for identification.  I'm going to read it into the record.

6  I'll then hand the original to the Courtroom Deputy.  I also

7  have some Xeroxed copies of it for counsel.

8      The note is as follows.  It's dated today's date.  It's

9  signed by Mr. Miles as foreperson.  He is Juror No. 6.  And it

10  reads as follows:  "Request documentation of Proctor's

11  testimony about validity of patents."  That's all it says.  It

12  doesn't give exhibit numbers.  It doesn't say anything else.

13      I'll hand the original to the Courtroom Deputy, and

14  counsel, here are -- here's a copy for each side, if you want

15  to approach and take a copy with you.

16      My thoughts are this.  If you can meet and confer in the

17  next few minutes and agree on specific exhibits that might

18  have been used during Mr. Proctor's testimony regarding

19  validity, then I'm happy if you can agree to send them back.

20  If you don't agree, the only thing I know to do is tell the

21  jury that this is not specific enough and they're going to

22  have to make a request of specific exhibits for me to send

23  them back to them.

24      Why don't we go off the record and why don't you-all talk

25  just a minute.

1          (Discussion off the record.)

2               THE COURT:  All right.  Let's go back on the record.

3          Counsel, is there a lack of agreement here?

4               MR. WARD:  I believe so, Your Honor.

5               MR. GRINSTEIN:  There is.

6               THE COURT:  Okay.  Then let me prepare a written

7     response.  I'll read it to you and then if it's not objected

8     to with any meritorious objection, I'll send it back.

9          Why don't you have a seat.  Let's go off the record while

10    I prepare a written response.

11               (Discussion off the record.)

12               THE COURT:  All right.  Let's go back on the record.

13          Counsel, I would propose, in light of the note received

14    from the jury to respond with the following written response:

15    "Members of the jury, in response to jury note No. 1, I am not

16    able to determine which specific exhibits you might want from

17    the note you have sent me.  Please either specify exhibit

18    numbers that you are wanting or, at a minimum, describe the

19    documents in detail."

20          Any objection from either side for me to send that back

21    to the jury?

22               MR. WARD:  None from the Plaintiff.

23               MR. DACUS:  None from us, Your Honor.

24               THE COURT:  All right.  I'll hand one signed copy to

25    the Courtroom Deputy.  I'll direct the Court Security Officer

1    to take that note to the jury.

2         Counsel, I'm going to recess, but I suggest you don't go

3    too far because I suspect we're going to get something back

4    pretty quick.

5         The Court stands in recess.

6                   (Deliberations continue.)

7              THE COURT:  Be seated, please.

8         Counsel, I've received a second note from the jury.  I'll

9    mark it in the upper right-hand corner with a '2' for

10   identification purposes, and I'll hand it to the Courtroom

11   Deputy for inclusion of the papers of this case.

12        I'll read it to you.  I think it's very straight forward

13   this time.  It simply says "Request DX 318, DX 160."  Signed

14   by Mr. Miles as foreperson.

15        So it seems very straight forward the jury wants me to

16   send them those two Defense documents, and my intent is to do

17   so.

18        Any questions or problems from anybody?

19             MR. WARD:  None from Plaintiff.

20             MR. DACUS:  No, Your Honor.

21             THE COURT:  Like I did in the earlier note, I have a

22   copy for each side, if you want to get it from the Courtroom

23   Deputy.  And then I'll ask Ms. Brunson to pull those documents

24   out so that we can send them back to the jury.  And I'll

25   prepare a very short response just telling them I'm sending

1    them these two documents as they asked.

2                      (Pause in proceedings.)

3             THE COURT:  All right, counsel.  I have the

4    following written response accompanying these two exhibits.

5    The responds reads:  "Members of the jury, in response to your

6    note No. 2, I am sending you DX 318 and DX 160."

7          Any objections to me delivering these to the Court

8    Security Officer with instructions to take them to the jury?

9             MR. GRINSTEIN:  No, Your Honor.

10            MR. DACUS:  No, Your Honor.

11            THE COURT:  All right.  Mr. Mitchell, if you'll take

12   these to the jury, please.

13         And three hours in, awaiting either another note or a

14   return of a verdict, we stand in recess.

15                      (Deliberations continue.)

16            THE COURT:  Be seated, please.

17         Counsel, I've received the following note from the jury.

18   It simply says "We have a verdict."  It's signed by Mr. Miles

19   as foreperson and it's dated with today's date.  I'll hand

20   this note to the Courtroom Deputy.

21         Is anyone aware of any reason why I shouldn't bring in

22   the jury and receive the verdict?

23            MR. GRINSTEIN:  Not from the Plaintiff, Your Honor.

24            MR. DACUS:  No, Your Honor.

25            THE COURT:  Let's bring in the jury, please.

1            (Whereupon, the jury entered the courtroom.)

2            THE COURT:  Please be seated.

3       Members of the jury, I understand that you have reached a

4  verdict.

5       Mr. Miles, are you the foreperson of the jury?

6            THE PRESIDING OFFICER:  Yes, Your Honor.

7            THE COURT:  Has the jury reached a verdict?

8            THE PRESIDING OFFICER:  Yes, Your Honor.

9            THE COURT:  Would you hand the completed verdict

10  form to the Court Security Officer who will bring it to me?

11       Ladies and gentlemen, I'm going to announce the verdict

12  into the record at this time.  I'm going to ask each member of

13  the jury to listen very carefully as I do this because once I

14  have announced the verdict into the record I'm going to ask

15  each of you if this is your verdict so that we can poll the

16  jury and confirm on the record that it is, in fact, the

17  unanimous decision of all eight members of the jury.

18       Turning to the verdict form and beginning on page 4 where

19  Question 1 submitted to the jury is found, "Did the Plaintiff

20  prove by a preponderance of the evidence that the Defendant

21  infringed any of the following asserted claims?" as to the

22  '134 claim--excuse me--the '134 Patent claim 1, the answer is

23  'Yes', claim 2 the answer is 'Yes', and claim 3 the answer is

24  'Yes'.

25       As to the '775 Patent, claim 1 the answer is 'Yes', claim

1   4 the answer is 'Yes', claim 9 the answer is 'Yes', claim 16,

2   the answer is 'Yes', claim 21 the answer is 'Yes', claim 29

3   the answer is 'Yes', and claim 36 the answer is 'Yes'.

4        Turning, then, to page 5 of the verdict form where

5   Question 2 is found, "Did the Defendant prove by clear and

6   convincing evidence that any of the following asserted claims

7   are invalid?" as to the '134 Patent, claims 1, 2, and 3, the

8   jury's answer is 'No'.  As to the '775 Patent, claims 1, 4, 9,

9   16, 21, 29, and 36, the jury's answer is 'No'.

10        Turning to page 6 of the verdict form where Question 3 is

11  found, "What sum of money if paid now in cash has the

12  Plaintiff proven by a preponderance of the evidence would

13  compensate Plaintiff for Defendant's infringement of the

14  patents-in-suit?" the jury's answer is '$166,303,391'.  I'll

15  say that again--$166,303,391.

16        Continuing with Question 3, "The above sum of money you

17  have awarded is:"  The jury has chosen 'lump sum royalty for

18  the life of the patents'.

19        Turning to page 7, which is the final page of the verdict

20  form, I find that the verdict form is dated with today's date

21  and it is signed by Mr. Miles as foreperson of the jury.

22        Ladies and gentlemen of the jury, let me poll you and

23  make sure that this is the unanimous verdict of all eight

24  members of the jury.  If this is your verdict as I have read

25  it, would you please stand up?  Thank you.  Please be seated.

1          Let the record reflect that all eight members of the jury

2     immediately rose and stood in response to the Court's question

3     to poll the jury.  This confirms that this is the unanimous

4     verdict of all eight members of the jury.

5          Having considered and concluded that it is a unanimous

6     verdict, the Court accepts the jury's verdict.  I'll deliver

7     the original verdict form to the Courtroom Deputy to be filed

8     in this case.

9          Ladies and gentlemen, that now completes the trial in

10    this case.  From the very beginning I have instructed you over

11    and over and over about not discussing anything about the case

12    with each other or anyone else.  I am releasing you from those

13    instructions.  I'm releasing you from all the instructions

14    I've given you and I am discharging you as jurors in this

15    case.  That means that you're free to talk about your service

16    in this case with anyone that you'd like to.  That person that

17    met you on the first day at home at night and asked you what

18    was going on in Marshall, you can now tell them all that you

19    want to tell them.  By the same token, you are not required to

20    tell anybody anything about your service here, and whether you

21    talk to anyone about your service in this case, that decision

22    is yours 100 percent; nobody else's.

23         Now, I need to tell you that the custom and practice in

24    this court has been for as long as I can remember, and I

25    practiced law here 30 years before I got this job, but the

1    custom and practice in this court has always been that the

2    lawyers cannot contact you and they cannot inquire of you

3    about your service in this case.  Now, I can promise you all

4    of them are interested in what you thought on both sides.

5    Whether they're happy now or whether they're disappointed now,

6    they're all interested in what you thought and what they can

7    do better and what they should not do in the future going

8    forward.  However, they can't initiate a conversation with

9    you.

10        That being said, what has happened in the real world in

11   this courthouse for as long as anybody can remember is that

12   when you leave the building and walk down those front steps,

13   you might find all the lawyers standing at the bottom of the

14   steps hoping that you will decide to stop and initiate a

15   conversation with them, because if you stop and if you

16   initiate a conversation with them, I promise you they will be

17   interested in talking to you as long as you want to talk.  If

18   you don't want to initiate a conversation with any of them,

19   simply walk right by.  It is your call 100 percent.  None of

20   them are going to interfere with anything you do, none of them

21   are going to try to initiate any conversation with you;

22   they're just going to make themselves available in case you

23   want to initiate a conversation with them.

24        Now, over the last few years to avoid or at least to

25   modify some of that, I've developed the following practice:

1    I've asked each side to give me a name and a phone number for

2    somebody representing both sides of the case, and I have the

3    names and phone numbers here.  And before you leave, I'm going

4    to make those available to you, and if you want one take it

5    with you.  That way if you're not sure whether you want to

6    have a conversation on the front steps of the courthouse or

7    the sidewalk outside, you can always make a phone call later.

8    And I promise you if it's tomorrow or next week or next month,

9    they will be interested in talking to you.  And if you decide

10   you never want to make a phone call, then you're not under any

11   obligation to do that.  But just to give you more options, I'm

12   going to make those phone numbers available to you before you

13   leave.

14       But if you want to stay and talk today, I promise you

15   there will be people there who will want to talk to you.  But

16   that's the way it works, and I don't want you to not

17   understand the process.

18       Also, ladies and gentlemen, I want to ask a favor of you.

19   Now that the case is complete, the trial is over, and you have

20   been discharged as jurors, you're free to leave.  But I'm

21   going to ask a personal favor that before you leave that you

22   allow me an opportunity to come into the jury room, to look

23   each one of you in the eye, to shake your hands, and to tell

24   you face-to-face, person-to-person, thank you for your service

25   in this case.  I think what you've done and the sacrifice

1    you've made warrants that and I would consider it an honor if

2    you would give me just a few minutes before you leave the

3    building to let me come in and thank you in person for your

4    service.

5         Jury service is no small thing, and it is an absolutely

6    essential part of this court doing what we are supposed to do

7    under the Constitution, and we are dependent on you,

8    completely dependent on ordinary citizens who will sacrifice

9    their time and their energies to come and listen to lengthy

10   testimony and make hard decisions and resolve disputes.  And

11   that's what we do in this country.  We don't fight in the

12   street, we don't shoot at each other, we don't have people

13   show up in the middle of the night and take you out of your

14   home; we resolve our disputes in the civil system with a trial

15   by jury.

16        And it only works because people like you have made the

17   sacrifice that you've made in this case to come, to listen, to

18   concentrate.  And I've watched you throughout the trial.

19   There have been no disengaged jurors in that box.  Nobody has

20   been staring into space, nobody has gone to sleep, nobody has

21   tuned out; everybody has tuned in and stayed tuned in, and

22   that's not easy to do.  And a lot of the material you've been

23   confronted with for the first time in this case is complicated

24   and it's a challenge to grasp it, and you have all worked very

25   hard to do that.  And I can see it in your faces as you've

1    gone through this trial this week, and I believe that that

2    warrants a personal thank you.

3        So if in a moment when you stand up out of those chairs

4    and you leave this room, if you'd go back into the jury room

5    and wait for just a second, I'll be in there and I'd like to

6    thank you each in person.  I promise I won't keep you.  It's

7    Friday and we all have other places to be and things to do,

8    but I would like a moment of your time before you leave, if

9    you'll do me that honor.

10       All right.  The Court accepts the verdict of the jury.

11   This completes the trial of the case.

12       Counsel, you are excused.

13       Ladies and gentlemen I'll meet you in the jury room.

14            (The proceedings were concluded at 3:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts              01/13/2023

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25