IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| FINESSE WIRELESS LLC,<br><br>   *Plaintiff*,<br><br>v.<br><br>AT&T MOBILITY LLC, | § <br> § <br> §  **CIVIL ACTION NO. 2:21-CV-00316-JRG** <br> §  **(LEAD CASE)** <br> § <br> § <br> § <br> § |
| CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS,<br><br>   *Defendants*. | §  **CIVIL ACTION NO. 2:21-CV-00317-JRG** <br> §  **(MEMBER CASE)** <br> § <br> § <br> § |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Before the Court is Defendants' Rule 50(b) Motion for Judgment as a Matter of Law regarding Damages (the "Motion"). (Dkt. No. 296.) In it, Defendant AT&T Mobility, LLC ("AT&T") and Intervenor-Defendant Nokia of America Corporation ("Nokia") (collectively, "Defendants") move for judgement as a matter of law ("JMOL") on damages. (*Id.* at 1.) Plaintiff Finesse Wireless LLC ("Finesse") opposes the Motion. (*See* Dkt. No. 310 at 1.) For the following reasons, the Court finds that the Motion should be **DENIED**.

### II. BACKGROUND

Finesse filed a complaint on August 23, 2021, alleging infringement by Defendants of U.S. Patent Number 7,346,134 and U.S. Patent Number 9,578,775 (collectively, the "Asserted Patents"). (*See generally*, Dkt. No. 1.) Specifically, Finesse accused Defendants of using certain infringing cellular base stations. (*See id.*)

A jury trial was held on the Asserted Patents in January of 2023. On January 13, 2023, the jury returned a verdict finding that the Defendants infringed all asserted claims. (Dkt. No. 273 at

4.) Further, the jury found that Defendants had failed to prove that any of the asserted claims were invalid. (*Id.* at 5.) The jury awarded damages in the form of a lump sum for the remaining life of the patents in the amount of $166,303,391.00. (*Id.* at 6.)

### A. Background of the Technology

Base stations include radios that send and receive signals. A signal that is sent by the radio station is called a downlink signal (*e.g.*, the signal that is sent to a cell phone), and a received signal (*e.g.*, a signal that is received by a cell phone) is called an uplink signal. Sometimes, signals interact with one another to create interference. The resulting interference is sometimes called passive intermodulation ("PIM"). The patents-in-suit describe methods and apparatuses for removing this type of interference. This is known as passive intermodulation cancellation or "PIMC", or "PIM-C".

### B. Background on the Damages Models Presented

At trial, Plaintiff and Defendants each presented a lump sum damages model. Defendants' model was largely based on the cost associated with manually fixing any PIM generated at a base station. Plaintiff's model, on the other hand, was based on the amount of spectrum salvaged by the technology at issue. Another word for spectrum is bandwidth, and cellular communication companies purchase spectrum wherein they can operate. Plaintiff's model is essentially based on the idea that the technology at issue allows AT&T to make better use of its own spectrum.

### III. LEGAL STANDARD

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Diag. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006).

Rule 50(a)(2) requires the moving party, when moving for JMOL before the case is submitted to the jury, to "specify the judgment sought and the law and the facts that entitle the movant to the judgment." Generally, a party who fails to present a Rule 50(a) motion on an issue prior to the close of evidence waives both its right to present a Rule 50(b) motion after judgment and its right to challenge the sufficiency of the evidence on appeal. Fed. R. Civ. P. 50(b); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007) (citing *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001)).

IV.     ANALYSIS

Defendants make multiple arguments as to why judgment as a matter of law should be granted in their favor on the issue of damages. The Court will address each in turn.

**A. Whether Dr. Bazelon's Opinions Were Disclosed and Reliable.**

Defendants argue that Dr. Bazelon never disclosed a lump-sum opinion is his summary of conclusions and instead opined that the parties would have agreed to a running royalty. (Dkt. No. 296 at 5.) Indeed, Defendants contend, Dr. Bazelon only made one reference to a "lump sum" in his report, and this is not sufficient. (*Id.* at 5–6.) Moreover, Dr. Bazelon never disclosed any lump

3

sum methodology. (*Id.* at 6 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009) (error for expert to fail to account for the "significant differences" that "exist between a running royalty license and a lump-sum license")).) Rather, Defendants contend that Dr. Bazelon made clear in his report and at trial that his purported damages were tied directly to how often the licensed invention is later used. (*Id.* at 7 (citing *Lucent Techs.*, 580 F.3d at 1326).)

Defendants also contend that Dr. Bazelon's opinions were unreliable. (*Id.* at 8–11.) A lump sum opinion must be based on some evidence of the parties' expectation of future use, and Dr. Bazelon did not provide sufficient basis for his future damages theory. (*Id.* at 8–9 (citing *Lucent Techs.*, 580 F.3d at 1327; *Allergan Sales, LLC v. UCB, Inc.*, No. 2:15-CV-01001-JRG-RSP, 2016 WL 8222619, at *2–3 (E.D. Tex. Nov. 7, 2016); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012)).) Defendants contend that Dr. Bazelon agreed that AT&T could turn the accused features off after trial and the he also overlooked evidence that AT&T would indeed do so instead of paying an ongoing royalty. (*Id.* at 9.) Instead, Defendants argue, Dr. Bazelon assumed that AT&T would continue to infringe. (*Id.* at 9–10.)

In response, Plaintiff argues that an expert's alleged failure to disclose an opinion is an improper basis for judgment as a matter of law. (Dkt. No. 310 at 9 (citing *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013)).) Further, Plaintiff contends, Dr. Bazelon did disclose the $166MM number, an expert's opinion is not limited to the summary of his report. (*Id.* (citing Dkt. No. 283 (hereinafter "1/10/2023 Trial Tr.") at 211:8–24; Dkt. 281-4 at 54 with Ex. 1, Bazelon Supp. Report at 8 Table 4.S).) Plaintiff points out that Dr. Bazelon explained in his report that the result of multiplying Finesse's negotiated share by the calculated salvaged spectrum "is the dollar amount that each Defendant would agree to pay as a lump-sum royalty for the right to practice the Asserted Patents over the license term." (*Id.* at 10 (quoting Dkt. No. 156-2 at 63, ¶

4

127).) Plaintiff further contends that Defendants' remaining arguments on this point are challenges to Dr. Bazelon's methodology, which are not proper bases for JMOL. (*Id.* at 10–11 (citing *KAIST IP US LLC v. Samsung Elecs. Co., Ltd.*, 439 F. Supp. 3d 860, 877 (E.D. Tex. 2020) (rejecting at JMOL what "is essentially a late-breaking, and thus waived, Daubert challenge.")).)

Plaintiff also argues that Dr. Bazelon's testimony concerning future infringement was not timely challenged by Defendants, is consistent with Defendants' own damages theory, and is consistent with the law. (Dkt. No. 310 at 12–16.) As a preliminary matter, Plaintiff argues, Defendants' arguments that Dr. Bazelon's opinions were unreliable should have been raised at *Daubert*. (*Id.* at 12.) The Defendants themselves presented a lump sum model, and both Defendants' and Plaintiff's model contemplated future infringement, as the law requires. (*Id.* at 12–13.) Moreover, Plaintiff argues, *Lucent* is distinguishable because there the jury awarded damages that were multiple times higher than what the expert opined to, and because there are no licenses at all. (*Id.* at 13–14 (citing *Lucent*, 580 F.3d at 1327–30).) Plaintiff further contends that Defendant's challenge that Dr. Bazelon's testimony is speculative is also a late breaking *Daubert*, which is not appropriate for JMOL. (*Id.* at 14 (citing *KAIST*, 439 F. Supp. 3d at 877).) Further still, Plaintiff contends, the Court should not consider any new facts not presented to the jury, as JMOL is an inappropriate time to present new facts. (*Id.* at 15 (citing *KAIST*, 439 F. Supp. 3d at 891 ("The Court will not sit in the place of the jury and entertain evidence and arguments on a Rule 50(b) motion that were not heard by the jury at trial.")).) Plaintiff also argues that *Allergan Sales* is distinguishable because it represents a timely filed *Daubert*, and reiterates that future infringement is not free. (*Id.* at 15–16 (citing *Allergan Sales*, 2016 U.S. Dist. LEXIS 191853).) Additionally, Plaintiff argues, *ActiveVideo Networks* is also distinguishable because it addressed a post-trial royalty rate, not a lump sum. (*Id.* at 16 (citing *ActiveVideo*, 694 F.3d at 1343).)

In reply, Defendants argue that Plaintiff's reliance on Dr. Becker's opinions are misplaced because he did not calculate the damages from a salvaged spectrum model. (Dkt. No. 315 at 2.) Moreover, Defendants contend, Dr. Bazelon testified that AT&T would not have paid $166 MM at the date of the hypothetical negotiation. (*Id.* at 2–3 (citing 1/10/2023 Trial Tr. (Bazelon) at 174:1–3 (testifying that reasonable royalty damages "through the date of this trial today—actually last week" totaled $58M)).) Demonstrating this, Defendants argue, is the fact that Dr. Bazelon did not discount the $166 MM into 2018 dollars. (*Id.* at 3 (citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536–37 (1983)).) Defendants further argue that Dr. Bazelon's "Royalties to Expiration", *i.e.*, lump sum, were merely calculations of the expected running royalties into the future, not a lump sum opinion. (*Id.* at 4.) Indeed, Defendants point out, Finesse made clear that its damages through trial were no more than $58 MM. (*Id.* at 4–5 (citing Dkt. No. 286 (hereinafter "1/13/2023 Trial Tr.") (Finesse Closing) at 55:8–13).)

In its sur-reply, Plaintiff argues that Dr. Becker used the same methodology as Dr. Bazelon. (Dkt. No. 326 at 2.) Moreover, Plaintiff argues, the fact that Dr. Bazelon alternatively calculated a running royalty does not undermine his lump sum. (Dkt. No. 326 at 2–3).) Indeed, Plaintiff contends, a running royalty can be used to support a lump sum. (Dkt. No. 326 at 3–4 (citing *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299–1301 (Fed. Cir. 2015); *KAIST*, 439 F. Supp. 3d at 887; *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299, 1311–12 (Fed. Cir. 2018)).) Finally, Plaintiff again contends that there is no surprise; the lump sum opinion was in Dr. Bazelon's report. (Dkt. No. 326 at 4.)

The Court is not persuaded by Defendants' arguments. Dr. Bazelon *did* disclose the lump sum number of $166MM in his report. The fact that it was not in his summary of conclusions is irrelevant. Moreover, Defendants' arguments about Dr. Bazelon's use of spectrum cost as a basis

6

for damages is a methodology challenge that is not appropriate at this stage. *See KAIST*, 439 F. Supp. 3d at 877. Further, Dr. Bazelon did explain his methodology. (*See* Dkt. No. 156-2 at 63 ¶ 127.) Similarly, Defendants' arguments that Dr. Bazelon did not address the fact that AT&T could turn off the infringing features after trial are challenges to his methodology and are not appropriately addressed at the JMOL stage. *See id.*

Moreover, *Allergan Sales* is distinguishable because it involved a motion to strike an expert's opinion on future damages via a running royalty, not a lump sum which "includes compensation for projected future infringement." 2016 WL 8222619 at *1–2. *ActiveVideo* is also distinguishable because it addressed a post-trial royalty rate, not a lump sum. 694 F.3d at 1343. Finally, the fact that Dr. Bazelon opined that damages would be $58MM through trial is irrelevant to whether the lump sum award of $166MM is proper. This is because a lump sum award compensates the patent owner for the life of the patent. *Lucent*, 580 F.3d at 1326; 1/10/2023 Trial. Tr. at 264:19–265:1 ("Q. And so if the jury, who decides the damages in this case, wants to award a single lump sum for all of the license term that would go all the way into the future, is that what you're calculating here through expiration in your damages calculations? A. Yes. That's the idea this is getting at is if you wanted to figure out the value for the whole life of the patent and do it in one lump sum payment, that's the number.").

**B. Whether Dr. Bazelon's Reliance on $41 Billion in Spectrum Bids Was Proper**

Defendants argue that there was no evidence that the value of spectrum had anything to do with the value of the accused functionality. (Dkt. No. 296 at 11.) Defendants point out that Dr. Bazelon himself admitted that he has "no evidence that" AT&T has "gone out and purchased spectrum in response to PIMs." (*Id.* (citing 1/10/2023 Trial Tr. (Bazelon) at 221:4–11).) Rather, Defendants contend, Finesse repeatedly invoked the $41 billion number to make its "damages amount appear modest by comparison," and skew the damages horizon for the jury. (*Id.* at 4, 11–

7

12 (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310 (Fed. Cir. 2011); *LaserDynamics*, 694 F.3d at 68).)

In response, Plaintiff argues that any criticism of the spectrum savings model should have been raised in a *Daubert* motion, not at the JMOL stage. (Dkt. No. 310 at 16 (citing *Versata*, 717 F.3d at 1264).) Indeed, Plaintiff points out, Defendants did not challenge Dr. Bazelon's reliance upon the $41 billion at *Daubert* or at trial. (*Id.* (citing *KAIST*, 439 F. Supp. 3d at 877). Finally, Plaintiff argues that there was substantial evidence tying the value of PIM-C to the value of spectrum. (*Id.* at 17.)

In reply, Defendants argue that there was insufficient evidence connecting the value of the PIM-C to the tens of billions of dollars in spectrum purchase because no document or testimony connect PIM-C with the value of AT&T's spectrum holdings. (*Id.* at 5–6.)

In its sur-reply, Plaintiff notes that the $41B number was in an exhibit that was preadmitted without objection exhibit—PX-518. (Dkt. No. 326 at 5.) In any event, Plaintiff contends, Defendants' arguments constitute challenges to admissibility, which are not appropriately addressed at the JMOL stage. (Dkt. No. 326 at 5 (citing *Versata*, 717 F.3d at 1264).) Finally, Plaintiff argues, there was no comparison between the $41B and the damages number, as there was in *Uniloc*. (Dkt. No. 326 at 5.)

The Court is not persuaded that the $41B number skewed the damages horizon for the jury. As a preliminary matter, the Defendants did not object to the admission of PX-518, which contained the $41B number. Finally, *Uniloc* and *LaserDynamics* are distinguishable. In *Uniloc*, the plaintiff used a large number as a "check" on its offered damages. 632 F.3d at 1319. Here, Plaintiff made no such comparison between the damages number ($166MM) to the spectrum cost ($41B). Moreover, in *LaserDynamics*, the large number "had no demonstrated correlation to the

value of the patented feature." 694 F.3d at 68. Here, by contrast, there was a plethora of evidence that the damages number ($166MM) was based on the amount of spectrum salvaged so the cost of spectrum ($41B) is relevant. (*See, e.g.*, PX-611; PX-995; PX-690; Dkt. No. 282 (hereinafter "1/9/2023 Trial Tr.") at 302:8–19.)

### C. Whether Dr. Bazelon Made Unreliable Assumptions

Defendants argue that Dr. Bazelon's damages model is rooted in the notion that PIM cancellation affects the spectral efficiency of a cellular network, but he had no technical basis for that assumption, and there was no evidence that any cellular carrier had purchased more spectrum to mitigate PIM. (Dkt. No. 296 at 12–13.) Instead, Defendants argue, AT&T put forth evidence showing that PIM was typically managed by a technician fixing the loose connection causing the PIM—"site hygiene." (*Id.* at 13–14.) Dr. Bazelon incorrectly assumed, according to Defendants that site hygiene was insufficient to remedy or mitigate internal PIM. (*Id.* at 14.) Defendants assert that this was baseless and unsupported speculation. (*Id.*) Defendants further argue that Dr. Bazelon incorrectly assumed that PIM was present where PIM cancellation was turned on and that evidence at trial showed this was false. (*Id.* at 14–15.)

In response, Plaintiff argues that Defendants' arguments are methodology challenges that were argued and rejected at the *Daubert* stage, and thus are not appropriately raised at the JMOL stage. (Dkt. No. 310 at 18 (citing *Rembrandt Wireless Techs. LP v. Samsung Elecs. Co., Ltd.*, No. 2:13-cv-213-JRG, 2016 WL 362540 at *34 (E.D. Tex. Jan. 29, 2016)).) Besides, Plaintiff argues, the "assumptions" were either not made or were supported by substantial evidence. (*Id.*) Plaintiff contends that Dr. Bazelon measured the value of spectrum made available that would otherwise face potential interference. (*Id.* (citing 1/10/2023 Trial Tr. at 178:4–180:2).) Further, Plaintiff argues, Dr. Bazelon specifically testified that he was not saying that AT&T would have to buy more spectrum. (*Id.* (citing 1/10/2023 Trial Tr. at 226:22–227:8).) Plaintiff also argues that

9

Defendants' insistence that Dr. Bazelon should have considered site hygiene is another methodology challenge, which is inappropriate for JMOL. (*Id.* (citing *Versata*, 717 F.3d at 1264).)

Plaintiff further argues that the jury also had reason not to credit Dr. Becker's reliance on site hygiene, as there was evidence that AT&T struggled with PIM management even though site hygiene had been available for years. (*Id.* at 19 (citing PX-911; PX-646; PX-995; PX-999).) Plaintiff asserts that Dr. Becker's site hygiene model would lead to higher damages if applied to all accused radios instead of just the 0.35% he applied the per-unit rate to. (*Id.*) In any event, Plaintiff argues, whether site hygiene was sufficient does not impact Dr. Bazelon's model, and there was substantial evidence to support a conclusion that site hygiene is not sufficient; AT&T's corporate representative admitted as much. (*Id.* at 19–20 (citing 1/10/2023 Trial Tr. at 275:5–8; Dkt. No. 284 (hereinafter "1/11/2023 Trial Tr.") at 43:3–22).) Plaintiff also contends that Dr. Bazelon did not assume PIM was present everywhere it was turned on, he merely calculated the value of the spectrum salvaged by using PIM-C. (*Id.* at 20.) Finally, Plaintiff argues that the evidence Defendants highlight to suggest that PIM is not an issue could have easily been discounted by the jury as AT&T brought an interested witness. (*Id.* at 20–21.)

Again, the Court is not persuaded by Defendants' arguments. Any unreliable assumptions that Dr. Bazelon made are properly challenged at the *Daubert* stage, not JMOL. *See KAIST*, 439 F. Supp. 3d at 877. Further, even if Dr. Bazelon's assumptions were thwarted by evidence produced at trial, the jury rejected that evidence (as it was entitled to). *Rembrandt*, 2016 WL 362540, at *5. In any event, the Court finds that Dr. Bazelon's assumptions were supported by substantial evidence. (*See* 1/10/2023 Trial Tr. at 178:4–180:2, 226:22–227:8.)

### D. Whether Dr. Bazelon Improperly Made Assumptions Beyond His Qualifications

Defendants argue that Dr. Bazelon has no qualifications to opine that PIM is always present in AT&T's radios, how often PIM occurs, or how effective or expensive effective site hygiene is. (Dkt. No. 296 at 16.) Dr. Bazelon is an economist, not an engineer, Defendants point out. (*Id.*) Defendants contend that AT&T put forth evidence showing that site hygiene is effective. (*Id.* at 16–17.) Defendants further argue that Dr. Bazelon used an irrelevant study about unaccused Ericsson base stations in the Los Angeles market, and thereby went beyond his expertise. (*Id.* at 17.)

In response, Plaintiff argues that Defendants arguments constitute a *Daubert* challenge that is improper at the JMOL stage. (Dkt. No. 310 at 21 (citing *Rembrandt*, 2016 WL 362540, at *3–4).) Moreover, Defendants argue that Dr. Bazelon did not opine that PIM is always present, nor did he opine on how often PIM occurs, or how effective or expensive site hygiene is. (*Id.*) Finally, Plaintiff argues that Dr. Bazelon did not use the Ericsson base station data in his analysis. (*Id.* at 21–22.)

In reply, Defendants argue that Dr. Bazelon admitted that he based his damages on PIM being prevented when it's turned on. (Dkt. No. 315 at 6 (citing 1/10/2023 Trial Tr. at 240:13–241:12 (Bazelon)).) Defendants contend that this dooms his analysis because it is the basis for assuming AT&T would pay significant royalties for each and every radio. (*Id.*) Defendants further contend that Dr. Bazelon would have to demonstrate that internal PIM would be unfixable without PIM-C. (*Id.* at 7.) Moreover, Defendants argue, Dr. Bazelon said that site hygiene was insufficient, but he is not an engineer and must be to make that opinion. (*Id.* (citing 1/10/2023 Trial Tr. at 29:19–31:4).) Defendants also argue that the alleged admission from AT&T, that site hygiene is insufficient to remedy, PIM does not exist. (*Id.* (citing 1/10/2023 Trial Tr. at 275:5–8; 1/11/2023

11

Trial Tr. at 43:3–22).) Finally, Defendants argue that Dr. Bazelon *did* use the Ericsson tests to support his damages theory. (*Id.* (citing 1/10/2023 Trial Tr. at 247:24–250:22).)

In its sur-reply, Plaintiff points out that Defendants do not address that this is a rehash of their *Daubert* motion. (Dkt. No. 326 at 5.) Plaintiff further argues that Dr. Bazelon's statement that "everywhere PIMC was on, PIM was being canceled" was an assumption he made about what the parties would assume at a hypothetical negotiation, as he testified. (Dkt. No. 326 at 5–6 (citing 1/10/2023 Trial Tr. at 240:13–20).) Indeed, Plaintiff contends, there was substantial evidence for the jury to respect the notion that PIM was a small problem solved by site hygiene. (Dkt. No. 326 at 6 (citing 1/9/2023 Trial Tr. at 294:1–25, 285:18–287:5; PX-674; 1/10/2023 Trial Tr. at 295:9–296:7, 281:9–282:16, 289:13–290:14, 293:3–294:21; 1/11/2023 Trial Tr. at 101:11–13; PX-582; PX-690; PX-669; PX-672R; PX-678).) Moreover, Plaintiff argues there was testimony that site hygiene is insufficient, including from AT&T's own corporate representative. (Dkt. No. 326 at 6–7 (citing 1/9/2023 Trial Tr. at 285:18–287:5, 290:13–291:9; 1/10/2023 Trial Tr. at 275:5–8; 1/11/2023 Trial Tr. at 43:3–22, 49:15–25; PX-911; PX-646; PX-690; PX-886; PX-674).) Plaintiff also allege that Defendants again conflate Dr. Bazelon's use of the two separate parts of the tests AT&T ran. (Dkt. No. 326 at 7.)

The Court is not persuaded by Defendants' arguments. Any challenge that Dr. Bazelon testified beyond the scope of his qualifications is not appropriately raised at this stage. Again, Defendants' challenges are to methodology, which are not appropriate for JMOL. *See KAIST*, 439 F. Supp. 3d at 877. In any event, it appears that most of these challenges were rejected at the *Daubert* stage. The jury credited Dr. Bazelon, and the Court can find no reason to overturn the jury's determination.

### E. Whether Dr. Bazelon Improperly Ignored that PIM-C Provides Little Benefit to AT&T

Defendants argue that Dr. Bazelon dramatically overstated the value AT&T receives from the use of PIM-C. (Dkt. No. 296 at 17.) Undisputed evidence at trial showed that approximately 70% of AT&T's network uses Ericsson radios, which do not offer any PIM-C. (*Id.*) Indeed, Defendants argue, Dr. Bazelon admitted that he did not think it was relevant to damages whether any of the accused radios were actually cancelling PIM. (*Id.* at 17–18 (citing 1/10/2023 Trial Tr. at 266:14–22 ("Q. So it does matter in what percentage of these AT&T radios PIM is actually present so that you can measure the actual benefit. Correct? A. No."). Rather, Defendants argue that evidence showed that AT&T only uses the PIM-C in 2% of its radios. (*Id.* at 18.) Even Verizon, who purchased more than 100,000 of the radios accused of infringement in this case, only uses PIM-C in 5% of them. (*Id.* (citing 1/10/2023 Trial Tr. at 238:25–239:11).) As such, Defendants argue, no reasonable jury could credit Dr. Bazelon's testimony when he ignored the data showing the minimal benefit of PIM-C to AT&T. (*Id.* at 18–19.)

In response, Plaintiff argues that there was substantial evidence at trial confirming that PIM results from interaction between specific frequencies, and the value of PIMC depends on the specific equipment (i.e., whether single- or multi-band radios) involved, so the fact that one market or carrier is not experiencing PIM in one place says nothing about the prevalence of PIM elsewhere. (Dkt. No. 310 at 22 (citing PX-886; 1/9/2023 Trial Tr. at 285:18–287:5, 290:13–291:9; PX-674; 1/11/2023 Trial. Tr. 49:15–25; PX-611; PX-646).) As Dr. Bazelon testified, Plaintiff argues, because what spectrum is held by which carrier varies market-to-market, Verizon's need for PIMC or AT&T's need in the markets where it selects Ericsson's equipment have no bearing on the prevalence of PIM in areas where AT&T has turned on PIMC functionality. (*Id.* at 21.) Plaintiff then argues that, because of this, a reasonable jury could easily credit Defendants' own documents and the testimony of an expert (Dr. Bazelon) who was on the ground licensing spectrum

13

when it first began. (*Id.* at 21–22 (citing 1/10/2023 Trial Tr. at 167:6–168:5).) Finally, Plaintiff argues that the jury was entitled not to credit AT&T's claim that they only experience PIM 1–2% of the time and the PIM cancellation is only effective 25–35% of the time because the data came from one-and-a-half days, and was calculated using undisclosed algorithms. (*Id.* at 23 (citing Dkt. No. 285 (hereinafter "1/12/2023 Trial Tr.") at 102:15–103:21, 107:2–113:21, 119:23–120:12, 123:7–124:1; 1/11/2023 Trial Tr. at 80:2–4, 99:7–101:10, 103:10–104:25).)

Based on wholesome review of the record, the Court finds that there was substantial evidence for the jury to find that PIM-C provided value to AT&T. (*See* 1/9/2023 Trial Tr. at 285:18–287:5, 290:13–291:9; 1/10/2023 Trial Tr. at 167:6–168:5, 102:15–103:21, 107:2–113:21, 119:23–120:12, 123:7–124:1 1/11/2023 Trial. Tr. 49:15–25, 80:2–4, 99:7–101:10, 103:10–104:25; PX-611; PX-646; PX-674; PX-886.) The record is not so devoid of evidence as to justify overturning the jury's determination.

### F. Whether Dr. Bazelon Improperly Ignored Transactions and Comparable Licenses

Defendants argue that royalties from comparable licenses are the best measure of a reasonable royalty and that Dr. Bazelon (and the jury) ignored such evidence—an offer Finesse made to sell its whole portfolio for $3MM. (Dkt. No. 296 at 19 (citing *Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (Fed. Cir. 2007); *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, ("*CSIRO*") 809 F.3d 1295, 1303–04 (Fed. Cir. 2015) ("[C]omparable license valuations []—at least in some cases—may be the most effective method of estimating the asserted patent's value.")).)

In response, Plaintiff argues that this is a *Daubert* challenge that is not appropriate at the JMOL stage. (Dkt. No. 310 at 23 (citing *KAIST*, 439 F. Supp. 3d at 888).) Plaintiff also argues that *CSIRO* is distinguishable because there the Federal Circuit held that it was incorrect for the

defendant to urge application of the entire market value rule and smallest salable patent-practicing unit concept in the context of an analysis that "did not apportion from a royalty base at all," but instead looked to royalty rate discussions between the parties themselves and an established rate card. (*Id.* at 24 (citing *CSIRO*, 809 F.3d at 1303–04).) That has nothing to do with the damages models here, Plaintiff contends. (*Id.*) Moreover, Plaintiff argues, even Dr. Becker admitted that he was "not suggesting that [the IV offer is] establishing a royalty" or that it constitutes "royalties received in negotiations" or "when you sell something." (*Id.* (citing 1/12/2023 Trial Tr. at 95:3–18).)

Defendants' arguments are again unpersuasive. Any challenge to evidence that Dr. Bazelon should have included is a challenge to reliability or his methodology, both of which are appropriately addressed at the *Daubert* stage, not JMOL. *See KAIST*, 439 F. Supp. 3d at 877. Moreover, *CSIRO* is distinguishable because it involved the application of the entire market value rule and smallest salable patent-practicing unit concept in the context of an analysis that "did not apportion from a royalty base at all," which is different from the spectrum-based model presented here. 809 F.3d at 1303–04.

### G. Whether Dr. Bazelon Improperly Relied on Unaccused and Irrelevant Products

Defendants point out that Dr. Bazelon admitted he used, in part, data related to unaccused Ericsson base stations in the Los Angeles market to calculate the value of the accused products. (*Id.* at 20 (citing 1/10/2023 Tr. 248:16–249:4).) However, Defendants argue, the Los Angeles data related to external PIM, not internal PIM, and the Nokia radios only cancel internal PIM. (*Id.* at 20.) Defendants further argue that evidence showed that external PIM has a larger effect than internal PIM. (*Id.* at 20–21.)

15

In response, Plaintiff argues that Defendants' arguments are a rehash of one of their *Daubert* challenges and are not properly considered at the JMOL stage. (Dkt. No. 310 at 24 (citing *Versata*, 717 F.3d at 1264).) Further, Plaintiff argues that Dr. Bazelon did not include the portions of the test on Ericsson equipment in his analysis. (*Id.* at 24–25 (citing 1/10/2023 Trial Tr. at 247:24–250:22).)

Plaintiff also argues that there is no meaningful distinction between internal and external PIM. (*Id.* at 25.) Plaintiff argues that the jury was entitled to reject Mr. Taylor, an interested witness, who testified that there was a distinction between internal and external PIM. (*Id.* (citing 1/13/2023 Trial Tr. at 6:9–7:2).) The tests Mr. Taylor relied on measured the impact of PIM on network performance for the same bands on which the accused radios operate. (*Id.* (citing PX-558 at 3–4).) However, Plaintiff argues, another document did not differentiate between internal and external PIM. (*Id.* (citing PX-690 at 3–4).)

The Court is not persuaded by these arguments, yet again. Any challenge to evidence that Dr. Bazelon should have included is a challenge to reliability or methodology, both of which are appropriately addressed at the *Daubert* stage, not JMOL. *See KAIST*, 439 F. Supp. 3d at 877.

## V. CONCLUSION

For the foregoing reasons, the Motion (Dkt. No. 296) should be, and hereby, is **DENIED**.

**So ORDERED and SIGNED this 29th day of August, 2023.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE